

# MIAMI-DADE COUNTY CLERK OF THE COURTS
## HARVEY RUVIN

**Contact Us**   **My Account**   

---

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

---

◀◀ BACK

**Not all search results will be displayed on-line. For example, the following case types (Sealed, Juvenile, Adoption and Mental Health Cases) may or may not be in existence and may or may not be viewable by the public pursuant to Florida Supreme Court Mandate and the corresponding** Access Security Matrix.

### ELIAS SANCHEZ SIFONTE ET AL VS JOSUE FONSECA ET AL

| | | | |
|---|---|---|---|
| **Local Case Number:** | 2020-027995-CA-01 | **Filing Date:** | 12/31/2020 |
| **State Case Number:** | 132020CA027995000001 | **Judicial Section:** | CA09 |
| **Consolidated Case No.:** | N/A | **Case Type:** | Libel / Slander |
| **Case Status:** | OPEN | | |

👥 **Parties**      Total Of Parties: 10  ➕

🔧 **Hearing Details**      Total Of Hearings: 0  ➕

🔊 **Dockets**      Total Of Dockets: 29  ➖

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 21 | 01/29/2021 | | Notice of Appearance | Event | Parties: Deanna K Shullman; Fonseca Josue; Telemundo International Studios LLC; Jaqual Media LLC; NBCUniversal Media LLC; Telemundo Network Group LLC; TM Television Inc.; TM Entertainment Inc. |
| | | 01/11/2021 | | 20 Day Summons Issued | Service | |
| 📄 | 20 | 01/11/2021 | | ESummons 20 Day Issued | Event | Parties: TM Television Inc. |
| | | 01/11/2021 | | 20 Day Summons Issued | Service | |
| 📄 | 19 | 01/11/2021 | | ESummons 20 Day Issued | Event | Parties: Telemundo International Studios LLC |
| | | 01/11/2021 | | 20 Day Summons Issued | Service | |
| 📄 | 18 | 01/11/2021 | | ESummons 20 Day Issued | Event | Parties: Telemundo Network Group LLC |
| | | 01/11/2021 | | 20 Day Summons Issued | Service | |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | | | | | | |
| 📄 | 17 | 01/11/2021 | | ESummons 20 Day Issued | Event | Parties: NBCUniversal Media LLC |
| | | 01/11/2021 | | 20 Day Summons Issued | Service | |
| 📄 | 16 | 01/11/2021 | | ESummons 20 Day Issued | Event | Parties: Telemundo Internacional LLC |
| | | 01/11/2021 | | 20 Day Summons Issued | Service | |
| 📄 | 15 | 01/11/2021 | | ESummons 20 Day Issued | Event | Parties: Fonseca Josue |
| | | 01/11/2021 | | 20 Day Summons Issued | Service | |
| 📄 | 14 | 01/11/2021 | | ESummons 20 Day Issued | Event | Parties: TM Entertainment Inc. |
| | | 01/11/2021 | | 20 Day Summons Issued | Service | |
| 📄 | 13 | 01/11/2021 | | ESummons 20 Day Issued | Event | Parties: Jagual Media LLC |
| | 12 | 01/09/2021 | | Receipt: | Event | **RECEIPT#:2520160 AMT PAID:$80.00 NAME:NAVARRO, LUIS F. NAVARRO/ MCKOWN 66 W. FLAGLER ST. 6TH FLOOR MIAMI FL 33130-1807 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 3139-SUMMONS ISSUE FEE 1 $10** |
| 📄 | 11 | 01/08/2021 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 10 | 01/08/2021 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 9 | 01/08/2021 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 8 | 01/08/2021 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 7 | 01/08/2021 | | (M) 20 Day (P) Summons (Sub) Received | Event | |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | 6 | 01/08/2021 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| | 5 | 01/08/2021 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| | 4 | 01/08/2021 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| | 3 | 01/05/2021 | | Receipt: | Event | **RECEIPT#:2530025 AMT PAID:$411.00 NAME:NAVARRO, LUIS F. NAVARRO/ MCKOWN 66 W. FLAGLER ST. 6TH FLOOR MIAMI FL 33130-1807 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 3102-MULTIPLE DEFENDANT 1** |
| | 2 | 12/31/2020 | | Complaint | Event | |
| | 1 | 12/31/2020 | | Civil Cover Sheet - Claim Amount | Event | |

◀◀ BACK

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer.

## General

Online Case Home

Civil / Family Courts Information

Logout

## Help and Support

Clerk's Home

Privacy Statement

ADA Notice

Disclaimer

Contact Us

About Us







# HARVEY RUVIN

Miami-Dade County
Clerk of the Courts

73 W. Flagler Street
Miami, Florida 33130

305-275-1155

©2021 Clerk of the Courts. All rights reserved.





**FORM 1.997.   CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I.   CASE STYLE

IN THE CIRCUIT COURT OF THE <u>ELEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>   COUNTY, FLORIDA

<u>Elias Sanchez Sifonte, Valerie Rodriguez Erazo</u>
Plaintiff

Case # _____
Judge _____

vs.

<u>Josue Fonseca, Telemundo International Studios, LLC, Telemundo Internacional, LLC, Jaguai Media, LLC, NBCUniversal Media, LLC, Telemundo Network Group, LLC, TM Television, Inc., TM Entertainment, Inc.</u>
 Defendant

### II.   AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

### III.   TYPE OF CASE      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
      ☐ Business governance
      ☐ Business torts
      ☐ Environmental/Toxic tort
      ☐ Third party indemnification
      ☐ Construction defect
      ☐ Mass tort
      ☐ Negligent security
      ☐ Nursing home negligence
      ☐ Premises liability—commercial
      ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
      ☐ Commercial foreclosure
      ☐ Homestead residential foreclosure
      ☐ Non-homestead residential foreclosure
      ☐ Other real property actions

☐ Professional malpractice
      ☐ Malpractice—business
      ☐ Malpractice—medical
      ☐ Malpractice—other professional
☒ Other
      ☐ Antitrust/Trade regulation
      ☐ Business transactions
      ☐ Constitutional challenge—statute or ordinance
      ☐ Constitutional challenge—proposed amendment
      ☐ Corporate trusts
      ☐ Discrimination—employment or other
      ☐ Insurance claims
      ☐ Intellectual property
      ☒ Libel/Slander
      ☐ Shareholder derivative action
      ☐ Securities litigation
      ☐ Trade secrets
      ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

- 2 -

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.      REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.      NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

   7

**VI.      IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.      HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.      IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Luis Frank Navarro          Fla. Bar # 629359
      Attorney or party                              (Bar # if attorney)

Luis Frank Navarro                    12/31/2020
 (type or print name)                    Date

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

      Plaintiffs,

                                 CASE NO.:

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

      Defendants.

_____

## **COMPLAINT FOR DAMAGES**

COME NOW Plaintiffs ELIAS SANCHEZ SIFONTE ("Sanchez") and VALERIE RODRIGUEZ ERAZO ("Rodriguez") (collectively, "Plaintiffs"), and sues Defendants JOSUE FONSECA a/k/a JAY FONSECA ("Fonseca"), TELEMUNDO INTERNATIONAL STUDIOS, LLC, ("Telemundo"), TELEMUNDO INTENACIONAL, LLC a/k/a TELEMUNDO DE PUERTO RICO, LLC ("Telemundo Puerto Rico"), JAGUAL MEDIA, LLC ("Jagual"), TM TELEVISION, INC. ("TM Television"), and TM ENTERTAINMENT, INC. ("TM Entertainment") and allege the following:

NAVARRO
66 W. Flagler Street, 6th Floor, Miami, Florida 33130

## PARTIES

1.      Plaintiff, ELIAS SANCHEZ SIFONTE, is an individual who resides in Miami-Dade County, Florida and is otherwise *sui juris.*

2.      Plaintiff, VALERIE RODRIGUEZ ERAZO, is an individual who resides in Miami-Dade County, Florida and is otherwise *sui juris.*

3.      Defendant, TELEMUNDO INTERNATIONAL STUDIOS, LLC, is a Florida limited liability company, whose principal place of business is located in Miami-Dade County, Florida.

4.      Defendant, TELEMUNDO INTERNACIONAL, LLC, is a Florida limited liability company, whose principal place of business is located in Miami-Dade County, Florida.

5.      Defendant, JOSUE "JAY" FONSECA is a lawyer, journalist, commentator and influencer whose principal place of business is in Puerto Rico, but also does business in the State of Florida.

6.      Defendant, JAGUAL MEDIA, LLC, is a Puerto Rico limited liability company, whose principal place of business is located in Puerto Rico.

7.      Defendant, NBCUNIVERSAL MEDIA, LLC, is a Delaware corporation, whose place of business is New York city, New York, but also does business in the state of Florida.

8.      Defendant, TELEMUNDO NETWORK GROUP, LLC, is a Delaware corporation doing business is Miami-Dade County Florida.

9.      Defendant, TM TELEVISION, INC., is a Puerto Rico corporation, whose place of business is located in Puerto Rico.

10.     Defendant, TM ENTERTAINMENT, INC., is a Puerto Rico corporation, whose place of business is located in Puerto Rico.

11.     The true names and capacities of DOES 1 through 10, inclusive, and each of them, whether individual, corporate, associate, or otherwise, as unknown to Plaintiffs, who therefore sues Defendants by such fictitious names. Plaintiffs will amend this Complaint when the true names and capacities of such Defendants have been ascertained. Plaintiffs are informed and believed and thereon alleges that each of the factiously named Defendants is responsible in some manner for the occurrences herein alleged, that the damages herein alleged were proximately cause by the conduct of each and all of such Defendants, and/or that such Defendants are otherwise liable for the relief requested herein.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this matter under Chapter 26 of the Florida Statutes as the amount in controversy exceeds $30,000.00, exclusive of interest, attorneys' fees and costs.

13.     This court has personal jurisdiction over each of the Defendants pursuant to Florida Statute 48.193 in that, as alleged above and below, each of the Defendants (i) organizes, conducts, engages in, or carries on a business or business venture in Florida, or has an office or agency in Florida, (ii) has committed one or more tortious acts within this state, and/or (iii) caused injury to Plaintiffs within Florida by means that arose out of the Defendants' acts or omissions outside of Florida.

14.     Venue is proper in this Court pursuant to Florida Statutes §§770.05 and 770.07 because the causes of action alleged herein first came into existence in Miami-Dade County, Florida, where the statements alleged herein were published to the Spanish-speaking public, and where Plaintiffs reside and, thus, where their damages (including but not limited to the harm to

their personal and professional reputations resulting from Defendants defamatory publications alleged herein) initially arose and first took effect.

15.     This Court has personal jurisdiction over Defendants under §48.193, Florida Statutes, because they each personally, in concert with one another and/or through an agency relationship, engaged in one or more of the following: (i) committed tortious acts within Florida; (ii) committed intentional torts expressly aimed at Plaintiffs in Florida, the effects of which were suffered in Florida; (iii) operated, conducted, engaged in or carried on business or business ventures in Florida, or had an office in this State; and/or (iv) engaged in substantial and not isolated activity within Florida.

16.     All conditions precedent to the filing of this action have been performed, have been waived or excused, or have been prevented by Defendant from being performed.

17.     Plaintiff has retained the undersigned attorney and is obligated to pay said attorney, a reasonable fee for his services.

## **INTRODUCTION**

18.     This Complaint seeks remedies against Defendants for a series of constant slanderous and libelous broadcasts of knowing, malicious, false and defamatory statements published and posted by Defendants on the dates and locations identified herein (collectively, the "Broadcasts"), constituting a continuing tort under Florida law. Most of the Broadcasts have been published on the internet; continue to be accessible for anyone located in Florida; and have been accessed by members of the Puerto Rican community (approximately 1.1 million in Florida) living within any of the fifty states.

19.     During the slanderous and libelous Broadcasts, Defendants acted wantonly and in tandem foregoing the most basic notions of fair and accurate reporting in favor of exploitative

sensationalism in the quest for higher ratings and profitable stories at the cost of Plaintiffs' reputation and livelihoods. Defendants acted (i) without proper fact-checking, (ii) without performing any meaningful investigation, (iii) without interviewing or contacting Plaintiffs, (iv) with absolutely no support for their statements, (v) knowing that the false and defamatory statements, implications, and meanings were contradicted by substantial credible information, which Defendants had prior to the Broadcasts, (vi) purposefully misstating documental information and (vii) with complete disregard for accuracy and the truth.

20.     Their target was solely the dissemination of scandalous rumors and fabrications handpicked for their predictable high-ratings' value and ability to generate profits.  Furthermore, Defendants used media framing and agenda setting tools to create false impressions of Plaintiffs by implication, while pursuing intentionally damaging and defamatory, yet profitable stories.  In other words, Plaintiffs names became staple items in Telemundo's news cycle simply for their profit value.

21.     Defendants weaponized Plaintiffs' names into profit-making machines. By means of abject bad faith defamation, they treated Sanchez as public-enemy-number-one in their Broadcasts, portraying him as the head and mastermind of a criminal enterprise or *mafia* coined by Defendants as "**The Lobbying Family**." Continuously in their Broadcast, Defendants referred to Plaintiffs as members of The Lobbying Family, while accusing them of corruption, undue influence on public officials, etc.  In doing so, Defendants intentionally wove a veil of criminal *mens rea* over Plaintiffs' business trade and practice of a legitimate, legal and protected activity under our Constitution.  They knowingly lied consistently, fabricated facts, willingly misstated documents and juxtaposed public matters to create a false impression of rampant immoral, illicit and unlawful activities by Plaintiffs.

22.     By reason of the nature of the services rendered by Plaintiffs for their clients, involving business consulting, lobbying and legal advisory in private and public affairs it is uniquely crucial that they be regarded with the highest trust and professional skill, integrity and honesty.  This was known to the Defendants at all times during the airing, publication and posting of the Broadcasts.  As alleged herein, through Defendants acts, Plaintiffs lost the high regard and trust they previously had and have thereby suffered enormous damage to their professional reputation and standard and to their income-earning ability in their chosen professions.

23.     Furthermore, Defendants knowingly and continuously published Broadcasts during 2019 and 2020 causing Plaintiffs to suffer grave embarrassment, ridicule and humiliation. As a direct result of Defendants' ill-will, Sanchez lost his job and clients, endured death threats against himself, Rodriguez and their minor children, and were forced to uproot from Puerto Rico permanently. The Plaintiffs continue to suffer economic, emotional and reputational damages as a result of Defendants continued attacks to discredit, disparage, and persecute Plaintiffs relentlessly, even when they have been residing in the State of Florida for over a year and half and have been leading a private life with their minor children.

24.     Plaintiffs bring this lawsuit to protect their integrity and hard-earned reputations, as well as to stand up for justice and send a message that a powerful media organization like Telemundo cannot expect to be immune to claims for publishing outright lies without consequences.  In doing so, Plaintiffs are taking a stand against unethical "journalism" and the proliferation of fake news and their harmful effects.

## FACTS AND GENERAL ALLEGATIONS

25.     Sánchez is a resident and citizen of the State of Florida who resides in Miami-Dade County, Florida. Sánchez, a former resident and citizen of Puerto Rico, previously worked as an

attorney, business consultant and lobbyist in Puerto Rico. On 2012, Sánchez joined WP Group a government affairs consulting firm. Sánchez also provided off counsel legal services to Wolf Popper, PSC a prestigious law firm in Puerto Rico, with offices in New York and Texas. He is the former Campaign Manager and Chairman of the transition team of then-Governor of Puerto Rico, Ricardo Rosselló ("Rosselló"). From January 2017 until on or about July 19, 2017, when he resigned, Sánchez was an unpaid, non-voting ex-officio member of the Puerto Rico Financial Oversight and Management Board ("FOMB")[1] on which he served solely as the Governor's Representative.  As a non-voting FOMB member, Sánchez had no responsibility or control over the FOMB's deliberations and/or decisions, nor had access to any privileged, confidential and/or non-public information.  Sánchez has never held a position in the state government of Puerto Rico. Sánchez has never been indicted, tried, pleaded or found guilty of any criminal, civil or ethical matter and has remain so even after two years of interrupted attacks, defamations and fabricated stories made by Defendants.

26.     Rodriguez is a resident and citizen of the State of Florida, who resides in Miami-Dade County, Florida. In 2003, Rodriguez obtained a B.A. in Government and History from Cornell University and then graduated from the School of Law of the University of Puerto Rico in 2007. She is a practicing attorney and a member in good standing of the state bar in Puerto Rico and is admitted to practice in the US District Court for the District of Puerto Rico.  Sanchez and Rodriguez are husband and wife and have two minor children. Rodriguez is not a "public figure" for any purposes within this complaint's context or otherwise. Rodriguez has never been indicted, tried, pleaded or found guilty of any criminal, unlawful or unethical activity and has remain so

---

[1] For the duties performed by and the responsibilities of the FOMB, *see* the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Pub. Law 114-187, and regulations promulgated thereunder.

NAVARRO
66 W. Flagler Street, 6th Floor, Miami, Florida 33130

even after over two years of uninterrupted, attacks, defamation and fabrication of stories by Defendants.

27.     On information and belief, Defendant TELEMUNDO INTERNATIONAL STUDIOS LLC is a Florida Limited Liability Company and is a division of NBC Universal Inc. and sister channel of TELEMUNDO INTERNACIONAL LLC, a/k/a/ Telemundo of Puerto Rico ("Telemundo"). Telemundo is an American Spanish-language terrestrial television network and division of NBC Universal, Inc., a corporation organized under the laws of the State of Delaware and headquartered in the city of Doral, Miami-Dade County, Florida. On information and belief, Telemundo broadcasts programs and original content aimed at Latino audiences within the state of Florida, other jurisdictions of the United States and the rest of the world.  Its programming includes Spanish language soap operas, sports, reality television and investigative journalism programs, among others.

28.     On information and belief, defendant Josue Raymond Fonseca, a/k/a Jay Fonseca ("Fonseca") touts himself on his Internet website, jayfonseca.com, as a "lawyer, journalist, commentator and influencer," and claims to be "one of the most influential people in public opinion in Puerto Rico," and "the most influential personality when it comes to creating public opinion about news and politics in Puerto Rico and with certain demographics in the United States." [2]Those demographics include people in Florida, Miami-Dade County, New York, Chicago and other states.  Fonseca also acknowledges on his website that he is "the publisher of the breaking news site www.jayfonseca.com."[3] He is the host of some of the most important shows in media networks in Puerto Rico such as Telemundo and Univision Radio. Fonseca produces investigative journalism programming on and for those outlets.  He also publishes a weekly column

---

[2] Jay Fonseca Website, December 21, 2020 available at:  https://jayfonseca.com/category/estados-unidos/ (December 21, 2020.
[3] Id.

in the island-wide Puerto Rican newspaper "Primera Hora". Fonseca also describes himself on his website as "a presenter and political commentator in the most important media networks in Puerto Rico where he currently supports journalistic investigation programs and political and government analysis."[4] As further alleged below, Fonseca streamed, Internet-posted and broadcasted "news" and commentary stories which contain libelous statements about Plaintiffs in print and slanderous statements in video segments broadcasted on Telemundo television programs including *Día a Día,* Telenoticias and *Jay y sus Rayos X*, *Telenoticias,* (jointly, the "Shows"), which in turn are reverberated by multiple persons employed by or otherwise affiliated with Telemundo through social media posts relying on the Telemundo brand.

29.     Usually, Fonseca's stories evolve and are broadcasted or posted within a 24-hour "news" cycle. He starts his dissertation early in the morning through his social media accounts, which include Facebook, Instagram, Twitter and his personal website, all of which are continuously promoted by Telemundo in live broadcast and its digital platforms. He continues his dissertations in two segments broadcasted by Telemundo and produced by Antonio Mojena, on the show Día a Día.  Día a Día is a variety and entertainment show tailored for family audience, broadcasted Monday to Friday from 1:00pm to 3:00pm. Fonseca's third segment is broadcasted on Telemundo's news show named "*Telenoticias*", broadcasted daily from 4:00pm to 6:00pm. Telenoticias, is a newscast in which Fonseca appears as a pansophic analyst or news expert, affording him the privilege of addressing whatever matter he wishes with an unrestrained ability to distort the truth, construct reality through a selective process and framing, bypassing any decorum of journalistic standards, and flat out maliciously fabricating news to garner ratings and following. Lastly, Fonseca is the star of the show *Jay y sus Rayos X*, which is broadcasted every

---

[4] Id.

Tuesday at 10pm on Telemundo. *Jay y sus Rayos X* is advertised as an investigative journalism program, where correspondents are labeled as journalists, but due to the "investigative" nuance, Fonseca has created the illusion in the audience's minds that the contents of the show are even more rigorous than those of a traditional newscast.

30.     Fonseca's uninterrupted access to virtually all audience groups to influence public opinion or belief is irregular and unheard of in the news ecosystem. No other Puerto Rican talent has such an absolute and almost monopolistic presence due to the constant participation in such diverse programs in terms of audience profiles and platforms. Fonseca also hogs two hours of radio time daily as part of a contract with Univision radio in Puerto Rico, which is streamed live and available throughout the United States. Fonseca uses every opportunity to instill in the minds of his audience the phrase "esta no es mi opinion, los datos son los datos" (translation: "this is not my opinion, the facts are the facts,") with the distinct intention of convincing and influencing the average media-consumer to believe that his statements are indeed truthful facts.

31.     Fonseca is an active news correspondent of Telemundo 51, Telemundo's channel station covering Miami Dade, Fort Lauderdale and West Palm Beach (herein after "T51"). Fonseca's investigative show, *Jay y sus Rayos X*, political analysis and social media outlets have been broadcasted and promoted on T51's channel and on its website, www.telemundo51.com. Moreover, due to Fonseca's notoriety and popularity among the rising Puerto Rican population residing in the state of Florida, he has received multiple sponsorships to promote products and services in the state. Such is the case of Fonseca's sponsor NUC University, which has campuses in the state of Florida and Puerto Rico.

32.     Fonseca's statements are made with the endorsement or acquiescence of Telemundo, which has allowed Fonseca's defamatory messages to have no bounds in its reach and

scope.  As proof, reference is made to the appearances of Mr. José Cancela, President of Telemundo Puerto Rico, (herein after "Cancela"), on public record to personally promote the show *Jay y sus Rayos X* and defend Fonseca. Cancela indicated that "through the show *Jay y sus Rayos X,* Telemundo intends to use the impact of social media platforms to carry out what we believe is the most important televised project in the history of television in Puerto Rico." [5]In furtherance thereof, Telemundo actively promotes all of Fonseca's social media platforms, such as Twitter, Instagram, personal blogs and Facebook pages. T51 has also promoted Fonseca's social media pages in his interventions as a news correspondent and when citing him in their online news stories. Due to Fonseca's dominance in Telemundo's news cycle, he is the best-known and most followed Puerto Rican journalist and/or news personality in social media in Puerto Rico. His Facebook page has over 1.2 million followers. This is significant considering Puerto Rico's current estimated population of 3.1 million and Florida's 1.1 million Puerto Rican population[6].

33.     Fonseca has stated that he aspires to be governor. In his own words, "without a doubt, being governor of Puerto Rico, we all aspire to be in the highest position, I would have loved it and I would love it at some point, but there is no platform. I have said so many things, some taken out of context and some have been screw-ups, very honest and very genuine things, and very necessary. So, it may be, not now, at least until 2020 I couldn't run for governor." [7] Fonseca's political aspirations made the front-page news in one of Puerto Rico's leading newspaper on October 7, 2015.[8]

---

[5] Primera Hora Newspaper, October 7, 2015 edition, available at https://www.primerahora.com/entretenimiento/cine-tv/notas/jay-fonseca-aspiraria-a-la-gobernacion.
[6] See article from the Center of Puerto Rican Studies of the City University of New York at https://centropr.hunter.cuny.edu/research/data-center/data-sheets/puerto-ricans-florida-2010-2017
[7]Id.
[8] Id.

34.     Fonseca has proven to have an ill-will intention and has admitted to his extreme bias against Plaintiffs on multiple occasions. On May 5, 2020, Fonseca posted a comment to his official social media accounts referencing Mabel Cabeza who was at the time being interviewed during a hearing process before the House of Representatives regarding a matter entirely unrelated to Plaintiffs. In the post, he included Plaintiffs' name because of their click-bait value.  He emphasized that Cabezas was a friend of Rodriguez and stated: "The pictures of her close relationship with Valerie Rodriguez, wife of Elias Sanchez…" [9] That same day, an Instagram user with the handle "deivitdavid" replied: "You used to eat with Elias…there are pictures of that".  In turn, Fonseca candidly replied in a most revealing manner: "that is right. Many times. And I told him enough [times] that if he started stealing, I would be the first to make sure that PR [Puerto Rico] did not forget his name." See **Exhibit A,** attached herein.  Then, as recent as November 25, 2020, after receiving the Spoliation letter from Plaintiffs, Fonseca posted on his official twitter account the following statement: "An ex-powerful [person] has already sent about 25 letters threatening to sue, he has 400 lawyers sending emails and requesting that I be fired and other incredible things… he keeps sending letters on key dates. Man, the threats by a corrupt person like you are entertainment to me." These are the true colors of someone with an axe to grind.  See **Exhibit B**, attached herein.

35.     In addition, the use of labels and phrases such as "ex-powerful" in the prior paragraph, "lobbying family" and "godfather" to describe Plaintiffs, which are described in greater detail herein, explain the calculated strategy by Defendants to capitalized on soap-opera narrative and stories, with Plaintiffs consistently depicted as the antagonists for click-bait purposes.  As if not enough, Fonseca uses the calculated strategy of attacking Plaintiffs and competitors based on

---

[9] Found at: https://www.facebook.com/JayFonsecaPR/photos/a.163264163691056/3557254177625354.

12

NAVARRO

66 W. Flagler Street, 6th Floor, Miami, Florida 33130

the interests of his sponsors and friends for obvious economic benefit and advertising revenue.  In particular, Fonseca has displayed a fixation with inventing a narrative of plots and rivalry.  Such is the case with his old-time good friend Itza Garcia ("Garcia"), who was the Deputy Chief of Staff for former Governor Ricardo Rosselló, before being forced out of her position under allegations of election rigging.  Fonseca has publicly described Garcia as the "success story of a very humble young woman whose stories are worthy of admiration" and someone so close that only "needs to grab the phone to reach him".  Fonseca has painted a picture of Garcia as the only upright individual in Government that was brave enough to put a stop to Plaintiffs' alleged interventions. For example, on August 8, 2019 on a column on the daily Primera Hora, Fonseca wrote: "Wanda Vázquez pressured [ex-prosecutor Yanira Liceaga] dramatically on multiple occasions to bring the case against Itza García, the former government's deputy chief of staff, who had a toxic relationship with Elías Sánchez and Valerie Rodríguez (very close to the now governor, who gave Valerie 216,000 dollars in contracts)". [10] See **Exhibit C**, attached herein. Again, on August 14, 2019, in another column in Primera Hora, Fonseca wrote: "…taking Itza out gave Elías and Valerie free rein in their agency lobbying". Furthermore, on or about August 13, 2019 during a live broadcast, while addressing then-Governor Wanda Vazquez Garced, Fonseca made the following slanderous statement: "I also want to know what was the alleged threat that you suffered at the hands of Itza García, who was by chance the person who put obstacles to the contracts of Elías Sánchez and Valerie Rodríguez". [11] See **Exhibit C**.

36.     Fonseca failed to remember that during the investigation of a Whatsapp chat scandal, which forced both the Governor's Chief of Staff and Garcia to leave their positions, the assigned special independent counsel confirmed that Garcia had written the following statements

---

[10] Found at: https://www.primerahora.com/opinion/jay-fonseca/columnas/wanda-vazquez- la-gobernadora-en-propiedad/.
[11] Found at: https://www.primerahora.com/opinion/jay-fonseca/columnas/gobernadora-que- no-quiere-leer-la-pagina/.

NAVARRO
66 W. Flagler Street, 6th Floor, Miami, Florida 33130

on the chat that she had created and administered and was the object of the investigation: "I do everything I can, but never anything that you have not earned with your effort and commitment. I regret that in some cases you have someone in better positions than you that do not deserve it and that they did not do even ¼ of what you did. I regret that some are not valued and recognized as they deserve. I hope little by little I can solve it." Unsurprisingly, Fonseca is always trying to victimize his good friend Garcia and fabricate a narrative of how she was a national hero with the courage to oppose Plaintiffs, but consistently omits the fact that she was singled out for allegedly threatening the Secretary of Justice, attempting to influence a judge during the 2016 election process and, admittedly, influence government officials to benefit members of her team that had worked together on the Ex-Governor's policy platform.  All of the above can only lead to the obvious conclusion that Fonseca had ulterior motives in his constant attacks against Plaintiffs and his subjective awareness was that of an extremely biased reporter.

37.     On information and belief Telemundo Network Group LLC, a company located in 2470 West 8th Avenue Hialeah, Florida, is responsible for maintaining both Telemundo Puerto Rico and T51's websites. Fonseca's interviews, multiple interventions both in Telemundo Puerto Rico and T51, and segments of his program, Jay y sus Rayos X, are constantly being rebroadcasted in both Telemundo Puerto Rico and T51's websites, catering to Puerto Rican residing in the island and in the State of Florida. Telemundo Network Group, LLC garners following and reach from the rebroadcasting of Fonseca's media segments. As such, Telemundo Network Group LLC not only serves as an additional platform for Fonseca's defamatory statements, but benefits from his slanderous, reckless, and malicious storylines.

38.     Jagual Media, LLC ("Jagual") is a Puerto Rico limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico, with its headquarters in San

Juan, Puerto Rico.  On information and belief, Jagual is a limited liability company owned and operated by Fonseca.  Jagual has republished Fonseca's defamatory statements as alleged herein by means of livestream, YouTube, Facebook and other social media platforms in Florida (including in Miami-Dade County), Puerto Rico, New York and by and through all of the Telemundo-associated and partner companies, reaching 94% of U.S. Hispanic TV households, including by and through WKAQ, a radio station in Puerto Rico servicing the Puerto Rico, Miami-Dade, Florida and New York Hispanic markets.

39.     On information and belief, TM Television, Inc., aka TM Enterprises Inc. ("TM"), is a corporation organized and existing under the laws of the Commonwealth of Puerto Rico and headquartered in San Juan, Puerto Rico and is wholly owned or controlled by television producer Antonio Mojena Zapico ("Mojena") in partnership or in association with Fonseca and/or with Jagual.  Together, they jointly produce the Fonseca newscast that is broadcast and/or streamed through Telemundo and other outlets to U.S. Hispanic viewers in what codefendant Telemundo acknowledges is 95% of the U.S. Hispanic market, including in Miami-Dade County, Florida, Puerto Rico, Orlando and New York. TM, under Mojena's full control, is an internationally recognized production company, producer of shows geared to the Latino community in the United States, including, but not limited to, being Executive Producer of the Billboard Latin Music Awards since 1999. The Billboard Latin Music Awards is an annual award show catered to Latin and Spanish language music, being held since 1994. Of its twenty-seven (27) editions, 89% or twenty-four (24) of them have been wholly produced in the state of Florida. Of those twenty-four award shows held in the State of Florida, nineteen (19) of them have been under the executive production of Mojena. Also, on information and belief, Mojena owns a residential property in the

State of Florida.[12] As such, TM, wholly owned by Mojena, has availed itself of the benefits of the State of Florida in this Court's venue by serving as an executive producer in the State of Florida, transmission in open newscasts, streaming, and all forms of social media during its operations, including of the defamatory statements alleged herein.

40.     During the times alleged hereinbelow, Defendants maliciously and with the specific intent to injure published false and defamatory statements about Plaintiffs alleged herein that were known by them to be false and/or with reckless disregard of the statements' truth or falsity at the time of publication, with the intent to cause injury to Plaintiffs, their professional reputations and their family welfare and well-being. Alternatively, and at a minimum, these statements were published without the Defendants' taking reasonable care to determine the truth or falsity of the statements before publishing them. As alleged herein, the statements resulted in threats of violence against Plaintiffs and their family members and ultimately forced them to seek a safe harbor for their own personal security and emotional well-being and have severely harmed their personal and professional reputations.

I.     **JANUARY 4, 2019 BROADCAST**

41.     On or about January 4, 2019, Defendants caused and published a video from a segment within the *Telenoticias* newscast bearing the headline *"**La familia cabildeo**"* (translation: "**The lobbying family**"), containing defamatory and slanderous statements of and concerning the Plaintiffs.

42.     The publication was made on the following internet website address, as well as on other platforms:   https://www.telemundopr.com/noticias/puerto-rico/la-familia-cabildeo_tlmd-puerto-rico/758/.

---

[12] Found at:  http://floridaparcels.com/property/23/0132310480550 .

16

NAVARRO

66 W. Flagler Street, 6th Floor, Miami, Florida 33130

43.     The January 4, 2019 Broadcast laid the groundwork for Telemundo and Fonseca's pattern and practice of vilifying and demonizing Plaintiffs and their immediate family members, causing damage to their personal and professional reputations and harming their business and financial interests.

44.     The January 4, 2019 Broadcast falsely and maliciously charged Rodriguez with (i) visiting a government agency and pressuring its Director to favor her client and (ii) causing the dismissal of the Puerto Rico Film Commissioner. The January 4, 2019 Broadcast contained the following false and defamatory statements of and concerning Plaintiffs:

a.      "Elias Sanchez, the wife of Elías Sánchez, Valerie Rodríguez, I call them the lobbying family because they are like an enlarged combo, like a multi-pack, where no matter what, they get involved.  In the Department of Health, there's the ex-wife of Charlie Rodriguez, the mother of [Rodriguez], the mother-in-law of Elías Sánchez. There is also the father-in-law of Elías Sánchez, that is Charlie Rodríguez, and the rest. They get involved in everything."

b.      "Well, it turns out that the Director of the Film Corporation was saying: 'Look, I have a study that says that the most I can give you is a 40% discount, subsidy for you to make the film in Puerto Rico."

c.      "Well, the lobbying family went there, Valerie Rodríguez, and started demanding, [using haughty hand gestures] oh no, you had to give a hundred, you have to give mine everything, 90% discount because he is mine, my virile male."

d.      "Well, a decision had to be made between the director of the Film Corporation and the lobbying family; and who do you think lost? The one doing the right thing or the lobbying family? [with a sarcastic smile] Javier Rua, fired."

A Spanish language copy of the transcript of the January 4, 2019 Broadcast with a side-by-side translation is attached as **Exhibit D** incorporated herein and made a part of this Complaint.

45.     By use of the particular words set forth in paragraph 44, Defendants conveyed among others, the following false and defamatory statements, implication and meaning of and concerning Plaintiffs:

e.      Plaintiffs and their family members acted in a concerted manner to unduly influence government affairs and decisions.

f.      The Film Commissioner had authority to limit the amount of incentives received by a film project based on a "study".

g.      Rodriguez visited the Film Corporation, confronted the Film Commissioner and demanded that her client be favored and provided a 100% or 90% in incentives; and that a sexual relationship existed between Rodriguez and her client.

h.      Plaintiffs influenced higher government officials and caused the dismissal of the then-Film Commissioner, Mr. Rúa, from his position.

46.      The false and defamatory meanings and implications of concerning Plaintiffs alleged in paragraph 44, were also conveyed by the combination of individual statements contained in the January 4, 2019 Broadcast, including the juxtaposition of words and statements to each other, which in the aggregate, produced the false and defamatory inferences conveyed through said meanings and implications.

47.      Contrary to the aforesaid false and defamatory statements, implications and meanings:

i.      Plaintiffs and their family members are distinguished and respectable members of society.  Mr. Charlie Rodriguez, an attorney in good standing with the Puerto Rico bar, has been a dedicated public servant since the 1980's and was President of the Puerto Rico Senate from 1997 through 2000. He is currently the President of the Democratic Party in Puerto Rico, after winning the Party's election by a landslide for a second term.  Mrs. Kathy Erazo, Rodriguez's mother, was also a dedicated public servant working for many years within Puerto Rico's Legislative Branch in different positions, including Chief of Staff for the President of the Senate, Mr. Thomas Rivera Schatz, from 2009 through 2012.  Each of the Plaintiffs and Rodriguez's parents have developed their professional careers independently and each have their own practice, with their individual clients.

j.      The limits on film tax credits are set forth by statute in Puerto Rico's Act 27-2011, known as the "The Economic Incentives for the Puerto Rico Film Industry Act."  They are not subject to negotiation or outside influences, but instead require a comprehensive audit process by an approved Certified Public Accountant with expertise in the Film Industry, before any tax credits can be issued.

k.      Rodriguez has never visited the Office of the Film Commissioner, nor has she had any confrontations with Mr. Rua. Rodriguez has been happily married to her husband, Sanchez, for seven (7) years and has never had an affair with anyone. As an attorney, becoming involved sexually or emotionally with a client would be a grave violation to the Code of Ethics governing attorneys' conduct and would be cause for disbarment by the Puerto Rico Supreme Court.

l.      It was public information that Mr. Rua's departure from the Film Corporation was due to his resignation after accepting a better job offer. As a matter of fact, and proof of Defendants constitutional malice, said information was published by Telemundo itself in an article posted on its own website on December 7, 2018 at 4:01pm, titled in English as "Another Government Resignation", which can be found at: https://www.telemundopr.com/noticias/puerto-rico/renuncia-pedro-rua-jovet/116194/.

48.     Each and every statement, implication and meaning of and concerning the Plaintiffs alleged above in paragraphs 44 and 45 are false.

49.     Defendants knew and intended that the particular statements set forth in paragraph 44 and published on the January 4, 2019 Broadcast would convey each and every false and defamatory implication and meaning set forth in paragraph 45 of and concerning the Plaintiffs and such false and defamatory meanings of and concerning the Plaintiffs were conveyed by the particular statements set forth in paragraph 44 and by the inferences drawn from the January 4, 2019 Broadcast statements in the aggregate.

50.     In the publication of the aforesaid false and defamatory statements, implications and meanings Defendants knew and should have known, among other things (i) that Fonseca is extremely biased against Plaintiffs; (ii) that no one had brought any administrative, civil or criminal claims at the time the alleged incidents allegedly occurred; (iii) that Fonseca as a licensed attorney would be held to a higher standard in his analysis and understanding of legal statutes; (iv) that they had absolutely no support for their defamatory statements; (v) that they had not checked or properly checked the facts underlying the January 4, 2019 and intentionally avoided contacting

Plaintiffs or Rodriguez's client to corroborate the allegations; and (vi) that the aforesaid false and defamatory statements, implications and meanings were contradicted by substantial credible information, which Defendants had prior to the January 4, 2019 Broadcast.

51.     Defendants' January 4, 2019 Broadcast was made with actual malice in that Defendants knew that the aforesaid statements and meanings were false and/or published or caused them to be published in reckless disregard for their truth or falsity.

52.     The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity.

53.     The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

54.     The airing and publishing of the Broadcast as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

55.     The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning the Plaintiffs.

56.     The defamatory statements with their implications and meanings alleged in paragraphs 44 and 45 were broadcasted by Defendants with bad motives and abject bad faith.

57.     By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field

have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues, friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs.  Plaintiffs have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

58.    By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (i) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and emotional well-being, (ii) damages sustained by the loss of Sanchez's job and clients, (iii) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (iv) the amount spent by Plaintiffs as legal fees and expenses in connection with any matters caused by the defamations alleged herein, and (v) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants.

59.    Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

## II.    FIRST JULY 16, 2019 BROADCAST AND APRIL 16, 2019

60.    On or about July 16, 2019, Defendants caused and published a video, from a segment within *the Jay y sus Rayos X* show that aired on July 16, 2019, bearing the headline "Investigación destapa supuesto esquema en Salud" (translation: "Investigation uncovers alleged scheme in [Puerto Rico's Department of] Health") containing defamatory and slanderous

statements of and concerning the Plaintiffs (the "July 16, 2019 Broadcast"). The July 16, 2019 Broadcast contained substantial footage from the *Jay y sus Rayos X* show that had aired on April 16, 2019 (the "April 16, 2019 Broadcast"). Both the July 16, 2019 Broadcast ant eh April 16, 2019 Broadcast falsely and maliciously charge Plaintiff with: (i) exerting undue influence over the affairs of the Department of Health, including (a) procurement of contracts and (b) hiring of staff; (ii) being accused by a whistleblower of involvement in the illegal procurement of the technology contract; and (iii) having a link to Mr. Alberto Velazquez Piñol, a federal indictee for corruption charges related to Puerto Rico Health Insurance Administration ("ASES").

61.    The publication of the July 16, 2019 Broadcast was made on the following internet website address, as well as on other platforms: https://www.telemundopr.com/programas/jay-y-sus-rayos-x/investigaci_n-destapa-supuesto-esquema-en-salud_tlmd-puerto-rico/46105/. A copy of the April 16, 2019 Broadcast can be located at: https://www.youtube.com/watch?v=6RWCdhIHEas.

62.    Both the July 16, 2019 Broadcast and the April 16, 2019 Broadcast falsely and maliciously charged Plaintiffs with exerting undue influence over the affairs of the Department of Health. The July 16, 2019 Broadcast contained the following false and defamatory statements of and concerning Plaintiffs:

m.    "Last year, Japhet Rivera, who was serving as the Department's associate secretary for planning and federal affairs, resigned and alleged in an affidavit that he was retaliated against for reporting illegal acts."

n.    "When Mr. Japhet Rivera resigned, one of the things that he mentioned was the contract that OGP wanted to award and granted so that 11.5 million dollars of state funds would be used to bring a digital platform to the Department of Health when it already had one from the federal government."

o.    "Under condition of anonymity, several employees have denounced the strong influence of the marriage of Elías Sánchez and Valerie Rodríguez within the

agency, they assure, they have been in charge of placing their loved ones in key positions."

p.       "From the first day of this Administration, the presence of Mr. Elías Sánchez has been felt."

q.       "Elías Sánchez and Valerie Rodríguez, eh, have lobbied for various contracts within the department?" [In the form of a leading question posed to the Secretary of Health by Reporter Collazo. Secretary responded: "That is not true, not ever."]

r.       "Valeria Collazo Cañizares, who, incidentally, a large part of the investigations that have come out in this program, when they come out, I know that you have done a commendable job, but there are some people that are not willing to talk and only give us the documents. This document is key."

s.       "This affidavit is from November 2018, that is, last year. And for me it has two key points. What happens? This person was the assistant secretary for federal affairs in the Department of Education(sic) and his name is Japhet Rivera. He denounces with his name, I think it is in this item here [points to a document being displayed on a screen behind them] that in the summer of last year the Governor's office sent Mr. Velazquez Piñol…to meet with him and pressure him to award a contract"

t.       "Excuse me Valeria, 'the Governor's office sent Mr. Alberto Velazquez;' why is it in English? Because this is a whistleblower retaliation complaint. What it means is a person who is reporting corruption and it is done [with the] federal authorities and [with] an affidavit.

u.       Fonseca: "And who else is mentioned in the sworn statement?" Collazo: "It mentions Elias Sanchez in several instances, right, and his marriage to Valerie Rodriguez, but particularly, and this is very important, because this contract was signed, it mentions, let's see if the date is around here, I think it's on this sheet, well anyway, they wanted to award a technology contract for eleven million a year and this person, what he was explaining was, but if the federal government has a program to handle that in exactly the same way, and it costs us a million for two years.

v.       "Here's the date, [reading from the screen] 'the letter was dated October twenty-fifth which was an oversight on my part.' In other words, a letter where he says, but look why are we going to spend eleven million, if the federal government gives us this for free, the same thing as that application that we are going to pay eleven million, the federal government gives it free."

w.       "Eleven million for one year, in other words, and the federal government one million, two years. And that contract was with Microsoft, it was awarded, and the lobbyist for that company is Elias Sanchez."

A Spanish language copy of the transcript of the July 16, 2019 Broadcast with a side-by-side translation is attached as **Exhibit E** incorporated herein and made a part of this Complaint.

63.     By use of the particular words set forth in paragraph 62, Defendants conveyed among others, the following false and defamatory statements, implications and meanings of and concerning Plaintiffs:

a.     Mr. Rivera endured retaliation and had to resign, so he reported the illegal acts that were taking place in the Department in an affidavit.

b.     One of the illegal acts was related to a contract by OGP for 11.5 million dollars for a digital platform for the Department of Health, while Mr. Rivera had already obtained one from the federal government.

c.     Plaintiffs had the power to influence the decision-making process in the Department of Health and to act as a staffing agency placing family and friends in high-level positions.

d.     Sanchez was constantly involved with and had an active participation in the Department of Health internal affairs.

e.     Plaintiffs used their influence to lobby in favor of certain contracts.

f.     Not everyone feels safe speaking out in connection with the investigations by the show, but they do provide key documents that help the investigations. The affidavit is one of those key documents.

g.     Another illegal act occurred when Mr. Velazquez Piñol was sent by the Governor's office to pressure Mr. Rivera into awarding a contract.

h.     The contents of the whistleblower retaliation complaint are reliable because the document is in English, it includes reports of corruption, it has to be sworn by the filer and it is processed by the federal authorities.

i.     The reliable federal document mentions Plaintiffs in multiple occasions, and it addresses the $11.5 million contract issue.

j.     Another contemporaneous document, a letter dated October 25 by Mr. Rivera includes detailed information about the corruption behind the award of an $11.5 million contract, particularly in light of a similar producing having been made available by federal government for free.

k.      Here is the big reveal, Sanchez has been identified as a lobbyist for the company who was awarded the $11.5 million contract. Therefore, he must be directly linked to the acts of corruption being alleged by the whistleblower.

64.      The April 16, 2019 Broadcast contained the following false and defamatory statements of and concerning Plaintiffs:

a.      Items c, d, and e from the July 16, 2019 Broadcast.

b.      "Mabel Cabeza has a close relationship with Valerie Rodríguez and our sources claim that this is how she got the position of Chief of Staff or head of personnel."

c.      Collazo: "Jay, we got this letter today. Let's read this part. Elias Sanchez sent us this letter, attorney Elias Sanchez, reacting to an interview that had not aired." Fonseca: "So then, forgive me, Elias Sanchez reacted to an interview that had not aired." Collazo: Correct and it mentions, right, in detail what happens in the interview, the questions I asked the Secretary. Fonseca: "In other words, the Secretary says that he has no relationship with Elias, but Elias had seen an interview that was done with the Secretary. Peter Quiñones, just in case, the press consultant, was recording at the same time we did the interview, so presumably, the press director, well, I don't know, maybe he had something to do with that." Collazo: "But well, the attorney wanted to let us know this: I inform you and clarify that neither I, nor Mrs. Rodriguez have any relationship or have had, directly or indirectly, with any entity that has to do with Tele-medicine or with the subject matter of the interview nor do we have any direct or indirect inherence in the hiring of the Department." Fonseca: "Okay. So they have no inherence." Collazo: "Well, they were reacting to a story that hadn't aired, and an interview that hadn't aired." Fonseca: "That is, Elias Sanchez reacted in a letter to information that only the Secretary of Health, who was the one who gave us the interview, could have told him. [With an overtly sarcastic tone] Or, oh well, unless we have someone here at Telemundo who passed the interview on to him right? It could be that fellow editors passed the interview on to Elias. Or the Secretary of Health called Elias and told him this is going to come out."

A Spanish language copy of the transcript of the April 16, 2019 Broadcast with a side-by-side translation is attached as **Exhibit F** incorporated herein and made a part of this Complaint.

65.      The false and defamatory meanings and implications of and concerning Plaintiffs alleged in paragraphs 62 and 63, were also conveyed by the combination of individual statements contained in the July 16, 2019 Broadcast, including the juxtaposition of words and statements to each other and the omission of certain facts, which in the aggregate, produced the false and defamatory inferences conveyed through said meanings and implications.

66.     Contrary to the aforesaid false and defamatory statements, implications and meanings contained in the July 16, 2019 Broadcast:

l.      Defendants relied entirely on Mr. Japhet C. Rivera whistle-blower complaint for their false and defamatory statements. Interestingly, a simple search on the internet for the name of Japhet C. Rivera produces multiple news stories concerning his dismissal in 2015 as director from the Veteran Affairs Illiana Health Care System in Danville, Illinois, including an article from the Puerto Rico Metro newspaper published on or about December 20, 2018 (found at https://www.metro.pr/pr/noticias/2018/12/20/denuncian-patron-represalias-salud.html). The most damaging information to Mr. Rivera's credibility is found at https://dailycaller.com/2016/01/18/va-secretly-paid-exec-86000-to-quit/ under the headline "VA Secretly Paid Exec Who Threatened Whistleblower $86,000 To Quit". The facts, quoting from an interview to Mr. Rivera himself, and from public documents obtained through a Freedom of Information Act request, show a clear pattern of severe misconduct by Mr. Rivera of a sexual nature, neglect of duty, threats to employees under his supervision, abuse of the due-process protections afforded to federal employees, and retaliatory conduct through the use of whistle-blowing tactics. Defendants relied entirely on an affidavit from a source that was publicly known for his use of retaliatory conduct through whistle-blowing tactics making Mr. Rivera more than just an imperfect source.  It is obvious from the recording that the anonymous source appearing with masked image and voice could not corroborate any of the allegations related to Plaintiffs as he also relied on the content of Mr. Rivera's affidavit for his statements.   Defendants had obvious reasons to doubt Mr. Rivera's veracity and the accuracy of affidavit's content, and either knew that publicly available contemporaneous reports raised serious questions about his credibility or were obligated to undertake a basic investigation of Mr. Rivera, which would have quickly and easily yielded this information.

m.      There were no discussions for a contract between the Department of Health and Microsoft for a grants management solution (digital platform).  In fact, a simple search in the public registry of government contracts reveals that the actual contract for a grants management solution was entered into by Microsoft and the Office of Management and Budget back in June 2018 for establishing a grants management solution for the Government's Center for Federal Opportunities and multiple government agencies, including the Department of Health, at no cost to the agencies.

n.      Plaintiffs had no involvement whatsoever in the hiring affairs of the Department of Health. Rodriguez is a childhood friend of the then Chief of Staff for the Secretary of Health, Ms. Mabel Cabeza, but Rodriguez had no involvement whatsoever in the Department's hiring of Mrs. Cabeza.  Ms. Cabeza admitted under oath during an unrelated investigation by the House of Representatives that she was introduced to the Health Secretary by Mr. Alfredo Escalera.

o.     Sanchez had absolutely no involvement whatsoever in the Department of Health's internal affairs. This was confirmed by the Secretary during his interview included in the broadcast; by Sanchez's letter addressed to Mr. Cancela and also by the Succeeding Secretary of Health, Dra. Quiñones de Longo, in an interview with Fonseca on March 28, 2020.

p.     The Secretary of Health told reporter Collazo unequivocally that Plaintiffs had never lobbied for any contract in the Department.  Rodriguez had two clients that were related to the Department of Health, but she has never lobbied for a contract for any of them. One of the clients was already under contract with the Department, and the other was an Association representing a collective of businesses within a health-related industry and Rodriguez's work was limited to regulatory matters.

q.     Mr. Rivera's affidavit was made public on December 20, 2018 by various news outlets, including El Vocero.  On December 24, 2018, El Vocero published an article where reporter Melissa Correa interviewed Mr. Rivera.  This contradicts Fonseca's misleading statements implying that the individual who shared the key document with his team did not want to be interviewed but was only willing to provide the document.

r.     Defendants intentionally juxtaposed Velazquez Piñol's name, actions and claims under the affidavit regarding a contract, but intentionally avoided referencing that the related contract was for project management services under the Zika program.  Defendants' sole purpose was to link Plaintiffs' names and the grant management solutions contract with the actions of the federal indictee, Mr. Velazquez Piñol. Defendants did so knowingly as it was clear from the affidavit content that the issues were not related.

s.     Reporter Melissa Correa from El Vocero, had investigated the matter, interviewed Mr. Rivera, published the affidavit, and confirmed to Sanchez that she had discarded publishing an article linking him to the affidavit statements for lack of credibility and failure to corroborate any of the claims. (El Vocero is a major newspaper in Puerto Rico).

t.     **The complaint makes absolutely no mention of Plaintiffs whatsoever.** In other words, Defendants fabricated the fact that Plaintiffs' names were all over the affidavit as stated during the broadcast.  In and of itself, this statement alone proves that Defendants published a defamatory story with clear and convincing evidence that they fabricated the slanderous statement with calculated falsity.

u.     The October 25 date in the complaint refers to the date of Mr. Rivera's resignation letter and not a letter about the digital platform.  Furthermore, the affidavit never states that the software proposed by Mr. Rivera was being provided for free by the federal government. The document states that the software had a cost of approx. $1 million for two years, that would be paid using federal funds, as opposed to state funds.  Defendants knowingly distorted the affidavit allegations to

instill in their viewers a story of corruption and waste of funds for services that are available at no cost.

v.       Defendants intentionally constructed a narrative about whistleblowers, corruption, individuals accused by the federal government for corruption, undue influence, retaliation against using fabrication, mischaracterization, and omissions of relevant facts, in order to ensure that viewers connected Plaintiffs to the allegations of criminal activity.

67.      Contrary to the aforesaid false and defamatory statements contained in the April

16, 2019 Broadcast described in paragraph 62:

a.       Please refer to items c, d and e in paragraph 63.

b.       Please refer to item c in paragraph 63.

c.       On April 10, 2016, Plaintiffs were warned by Mr. Peter Quiñones that Defendants were preparing to make false claims about a tele-medicine contract alleging that Plaintiffs were lobbying such contract with the Department of Health. Mr. Quiñones sent Plaintiffs video proof of the false claims.  In the video, Collazo can be seen asking the Secretary of Health the following question: "What about the Tele-medicine contract that Valerie Rodriguez brought to the Department?" Then, on April 16, 2019, Collazo posted on her twitter account a message promoting the *Jay y sus Rayos X* show that would air that same night. The post read as follows: "Who is in charge of the Department of Health? We investigate the internal war for the agency's political control and the award of contracts. Also, the alleged strong influence of lobbyists and the hiring and decision-making process.  More details tonight in #jayrayosx". See **Exhibit G**, attached herein.  By April 16, 2019 no one from Telemundo, *Jay y sus Rayos X* or any of the other Defendants had reached out to Plaintiffs to corroborate the allegations or to obtain their reaction.  With knowledge and experience with Defendant's modus operandi, Plaintiffs decided to take a stand and send a communication to Telemundo.  Thus, at 5:10 p.m. on that same day, Sanchez sent an email with a communication addressed to Mr. Ruben Roman and copying Mr. Jose Cancela, President of Telemundo Puerto Rico. The communication expressed unequivocally that Plaintiffs had no involvement whatsoever, direct or indirect, in any of the Department of Health's affairs, hiring, decision-making, contract awards or any other matters.  As a direct result of the communication, Defendants changed course and dropped the Tele-medicine claim from airing on their show.  See **Exhibit H**, attached herein.

68.      Each and every statement, implication and meaning of and concerning the Plaintiffs

alleged above in paragraphs 62, 63 and 64 are false.

69.     Defendants knew and intended that the particular statements set forth in paragraph 62 and published on the July 16, 2019 Broadcast would convey each and every false and defamatory implication and meaning set forth in paragraph 63 of and concerning the Plaintiffs and such false and defamatory meanings of and concerning the Plaintiffs were conveyed by the particular statements set forth in paragraph 62, and by the inferences drawn from the July 16, 2019 Broadcast statements in the aggregate.

70.     In the publication of the aforesaid false and defamatory statements, implications and meanings, Defendants acted with the required degree of actual malice to overcome any protections under the First Amendment and/or an Anti-Strategic Lawsuit Against Public Participation statute, given that (i) Mr. Japhet Rivera was an unreliable source due to his long history of using whistle-blower tactics to retaliate against coworkers and supervisors; (ii) there was no actual corroboration of the statements in the affidavit; that no one had brought any administrative, civil or criminal claims at the time the alleged incidents allegedly occurred; (iii) Fonseca, as a licensed attorney, is subject to a higher ethical standard in his analysis and understanding of legal matters; (iv) they had absolutely no support for their defamatory statements; (v) they had not checked or properly checked the facts underlying the July 16, 2019 and intentionally avoided contacting Plaintiffs to corroborate the allegations; (vi) that the aforesaid false and defamatory statements, implications and meanings were contradicted by substantial credible information, which Defendants had prior to the July 16, 2019 Broadcast; (vii) the whistleblower complaint was not hot news as it had been published seven (7) months prior to Defendants' Broadcast; (viii) Defendants ignored the truthful statements made by the Secretary, while relying on unreliable and anonymous sources that refused to go on the record with their claims; and (ix) the fact that Defendants shamelessly lied on the air about the contents of the

affidavit regarding: (a) the naming of Plaintiffs therein; (b) the actual cost of the alleged digital platform proposed by Mr. Rivera; and (c) a letter from October 25, 2018 about the Microsoft contract by Mr. Rivera

71.     The gross and irresponsible departure by Defendants from the most basic journalism standards is tantamount to actual malice.  It is obvious from the April 16, 2019 Broadcast that Fonseca and Collazo were fuming because they were forced to drop the unfounded, false and defamatory allegations about Plaintiffs' involvement with a tele-medicine contract in the Department of Health. They were so ridiculously upset that they dedicated a segment of the show to display Plaintiffs' communication and to insinuate that by reacting to a defamatory story before the story aired was factual proof of their connection to the Secretary of Health. Nothing farther from the truth, and in doing so, their statements are also defamatory and slanderous by implication. As explained, Plaintiffs were initially warned by the Department of Health's press director who witnessed first-hand Collazo's defamatory inquiries. Then, it was Collazo's own tweet that triggered Plaintiffs' communication to Telemundo.

72.     The overtly sarcastic tone with which Fonseca points to his fellow editors as potential moles in an attempt to imply a relationship between Plaintiffs and the Secretary in support of their defamatory story is categorically disturbing.  In the end, Defendants' desire was to get away with intentionally avoiding giving Plaintiffs an opportunity to react, which in turn exemplifies their conscious disregard for truth-finding. These are the calculated strategies of extremely biased Defendants. Most importantly, their withdrawal of the tele-medicine claims operates as an admission that Defendants knew the claims to be false or acted with a high degree of subjective awareness the story was probably false.

73.     Furthermore, Mrs. Melissa Correa was the journalist that initially published the affidavit and interviewed Mr. Rivera for El Vocero in December 2018.  Prior to Ms. Correa's articles, she reached out to Sanchez to inform him of a source (presumed to be Mr. Rivera) insisting on allegations about Plaintiffs' connection to a tele-medicine contract in the Department of Health, and their strong influence over the Department of Health's hiring, contract awards and decision-making affairs. Sanchez firmly rejected the allegations and urged Mrs. Correa to find a reliable source that would corroborate the unfounded allegations. That same afternoon, Mrs. Correa reached out to Sanchez again to confirm that she would not be publishing the story because she could not corroborate the claims and she had requested from the source an affidavit detailing the claims, but the source refused.   These claims are awfully similar to the ones made by Collazo and Fonseca on their July 16, 2019 Broadcast when they flat out lied about the content of Mr. Rivera's affidavit. The rejection of the story by another journalist and the lies about the content of the whistleblower affidavit are sufficient to prove Defendant's actual malice.

74.     Defendants' April 16, 2019 and July 16, 2019 Broadcasts were made with actual malice in that Defendants knew that the aforesaid statements and meanings were false and/or published or caused them to be published in reckless disregard for their truth or falsity.

75.     The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity.

76.     The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

77.     The airing and publishing of the Broadcasts as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

78.     The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning the Plaintiffs.

79.     The defamatory statements with their implications and meanings alleged in paragraphs 62, 63, and 64 were broadcasted by Defendants with bad motives and abject bad faith.

80.     By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues, friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs.  Plaintiffs have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

81.     By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (A) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and emotional well-being, (B) damages sustained by the loss of Sanchez's job and clients, (C) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (D) the amount spent by Plaintiffs as legal fees and expenses in connection with any

matters caused by the defamations alleged herein, and (E) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants.

82.      Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

## III.   SECOND JULY 16, 2019 BROADCAST

83.      On or about July 16, 2019, Telemundo caused and published a broadcast of the *Dando Candela* show containing defamatory and slanderous statements of and concerning Sanchez.

84.      The broadcast was aired on channel 2 in Puerto Rico between 5:55pm and 7pm. Although we do not have a recording the of the broadcast, we have multiple social media posts confirming that the statements were uttered on the Second July 16, 2019 Broadcast, which are attached as **Exhibit I** incorporated herein and made a part of this Complaint. We also have testimonial of witnesses that viewed the show live and began calling Plaintiffs in panic because they believed Sanchez was going to be arrested the next day as broadcasted by Telemundo.

85.      To the best of our knowledge and belief, the Second July 16, 2019 Broadcast consisted of a segment towards the end of the show when Reporter Saudi Rivera interrupted the live programming to reveal the "hot news" that Sanchez arrest in the city of Miami was imminent on July 17, 2019 and made reference to a sealed criminal docket.

86.      The story of Sanchez's arrest originated from contemporaneous social media posts on Facebook and Twitter from a Puerto Rican journalist named Sandra Rodriguez Cotto who had posted the following at 6:22 p.m. on Twitter and 6:25 p.m. on Facebook: "Case number 19-20429 in Miami is very interesting…I continue verifying what is that sealed case about and the alleged

arrest in Miami, Florida"; including a cropped image of a docket report with the following text: "19-20429 **Sealed v. Sealed** Defendant *SEALED* *Case filed*: 07/16/2019 *Added*: 07/16/2019". Most importantly, Sanchez's name was not included in any of Mrs. Cotto's posts. Therefore, the slanderous statement was yet another fabrication by Defendants. See **Exhibit J**, attached herein.

87.     The statement of and concerning Sanchez was not only completely false, but maliciously fabricated, subjecting him to humiliation, hatred, distrust, contempt, aversion ridicule and disgrace in the minds of a substantial number of people in Plaintiffs community in Miami, Florida, Puerto Rico, and other Puerto Rican communities in the United States.

88.     The defamatory statement involved the materially false implications that Sanchez was the target of an FBI investigation and an arrest warrant had been issued against him in Miami, Florida, where Plaintiffs had relocated with their minor children.

89.     The false and defamatory meanings and implications of and concerning Sanchez had the intention of harming Plaintiffs' reputation and deterring others from associating or dealing with them.

90.     The criminal docket case identified in the social media posts is from the US District Court for the Southern District of Florida for identity theft and other charges against one Mr. Ken Jeanbaptiste.

91.     The statements made by Defendants was false and no applicable privilege or authorization protecting the statement can attach to it.

92.     In broadcasting the false statement, Defendants, at all times, either knew the statement was false, had serious doubts as to the truth or broadcasted it with reckless disregard for the truth.

93.     The fact that other journalists, including Andrew Scuria and Joanisabel González, reached out to Plaintiffs in order to corroborate the false rumors being spread in social media, demonstrates that as usual Defendants intentionally avoided reaching out to Plaintiffs to corroborate their false and defamatory statements. In this case, Defendant's departure from accepted standards of journalistic practices coupled with Defendants' profit-making motives are evidence of a reckless disregard as to truth or falsity of the arrest allegations. It cannot be said the evidence concerning motive or care never bears any relation to the actual malice inquiry. Harte-Hanks Communications v. Connaughton, 491 U.S., at 667-668 (1989).

94.     Defendants' defamatory statements and implications constitute defamation per se. Damages for such statements may be presumed.

## IV.     TRIPLE S OR JULY 30, 2019 BROADCASTS

95.     Starting on or about July 30, 2019, Defendants, as already customary, in an attempt to capitalize on the use of Plaintiffs' names for ratings, concocted a series of fabricated, defamatory and highly inflammatory stories involving Triple S, one of the Government's health plan providers, which were designed to attract viewers to Defendants television network, websites, and Fonseca's social media accounts, and gain economic benefit through the viewership and corresponding advertising revenue.  The stories falsely and maliciously charged Sanchez with (i) illegally intervening in the procurement process of the Government's health plan providers, (ii) being associated with a federal indictee, and (iii) unethical practices by helping a party that had adverse interests to those of his client.

96.     On or about July 30, 2019, Fonseca made a defamatory statement on a Facebook post on his official page (located at: https://www.facebook.com/JayFonsecaPR/photos/a.163264163691056/2915355298481915).  An

image of the original statement in Spanish is attached as **Exhibit K** incorporated herein and made a part of this Complaint. The Facebook post contained the following false and defamatory statements of and concerning Sanchez:

a.     "RELATIONSHIP BETWEEN ELÍAS SÁNCHEZ AND TRIPLE S EXPLODES - 700 MILLION A YEAR - Rep. Jesús Manuel (@jmortizpr @jmanuelortiz) inquired about this and they had to respond regarding the relationship between Elias and Triple S. Triple S hired Elias through the firm. After apparently having been left out of Vital [Government's health plan], they entered and obtained a contract. We are talking about 700 million dollars in government payments to Triple S that they obtained after Elias' intervention. The incredible thing is that the WP law firm represented Menonita Healthcare at the same time, who are obviously affected by the entry of the competitor who generates the most money in Vital and who was left out until the intervention of Elias Sanchez."

That same day, during a Facebook live session, officially sponsored by Direct TV, Fonseca made defamatory statements concerning Sanchez (located at: https://www.facebook.com/JayFonsecaPR/videos/2418828148177513). A Spanish language copy of the transcript of the July 30, 2019 Facebook live broadcast with a side-by-side translation is attached as **Exhibit L** and incorporated herein and made a part of this Complaint. The broadcast contained the following false and defamatory statements of and concerning Sanchez:

b.     "Mmm how complicated this has become. I want to show you something, we are going to show you something better, so before continuing, really because whatever happens, right, you don't want people to say that one made it all up, or anything like that. So, we are talking again about Representative Jesús Manuel Ortiz […] You have to see this, frankly, because it's disturbing. See this […] Well, the representative Jesus Manuel Ortiz asked a question and here it is […] I am going to explain to you now why this is important. [Reading from a tweet by Rep. Jesus Manuel Ortiz] After several weeks Triple S answers questions posed by the Representative and look at the name that shows up in here. [Reading from an image attached to the tweet showing a document with official responses from Triple S] Do you have lobbyists. Yes, we have lobbyists, advisors, and legal advisers who assist us with government affairs and public policy as part of the normal course of our business. Were Mr. Alberto Velazquez Piñol and Mr. Elias Sanchez present in meetings with the insurer or if they were part of the procurement process. Mr. Alberto Velazquez Piñol, the one who was arrested, was present on behalf of ASES in meetings with Triple S related to the Vital program and was part of the procurement process also on behalf of ASES. Although Triple S consulted various issues with Attorney Sanchez as part of their engagement of the Wolf Popper LLP law firm, well, which was in force from June 1, 2017 to September 26, 2018, Mr. Sanchez did not participate in meetings between Triple S and ASES."

c.      "[With an eyes-wide-open facial expression] Ok. Damn. [Laughter] I will explain why this is so important. When Jesus Manuel asked that question, we in the press were all, well, I had also asked that question of whether Elias Sanchez had worked for Triple S […] and we had all asked the question because the rumors were that Triple S had been left out of the Vital Plan [Puerto Rico's government health plan]. We are talking about that they had been left out of the 700 million dollars that Vital represents for them or the Health Reform or the My Health system, as it was called before."

d.      "So, what happens? It appears that they hired Elias Sanchez and that's when they managed to obtain the contract. The [legal engagement] contract came from before they were left out [of the procurement process] [with an intrigued tone and facial expression], so, what did Elias Sanchez and Alberto Velázquez Piñol do to get them to enter? Well, I do not know. I don't know. But again, we are talking about $ 700 million."

e.      "This is breaking news! […] The key question here is: what was Elias Sanchez's role to get Triple S to enter the Vital Plan and how was this done? The interesting thing at the law firm level, well, is that Wolf Popper is the law firm representing Menonita Healthcare and at the same time Elias Sanchez then worked for Triple S, through, uhh, the firm.  I know that, well, the firm has a litigation division and a consulting division, but wow, ehh, this is ugly, this is, very ugly, very ugly. So anyways, we will be following up on this. **I, well, we had received information, and we knew that this had happened, but seeing it in writing, finally the company had to reply to the legislature under penalty of contempt, and they had to answer that question.**"

On a follow-up post on July 30, 2019, Fonseca made the following statements on his official Facebook page (located at: https://www.facebook.com/JayFonsecaPR/photos/a.16326416369105 6/29157614 31774635 ). An image of the original statement in Spanish is attached as **Exhibit M** incorporated herein and made a part of this Complaint. The Facebook post contained the following false and defamatory statements of and concerning Sanchez:

f.      "TRIPLE S GIVES INFO TO THE FEDS REPORT ON THEIR RELATIONSHIP WITH ELÍAS - Wolf Popper clarifies info - Triple S had to disclose to the SEC its relationship with Elias Sanchez who is allegedly being investigated by a Grand Jury. Remember that PR is currently seeking for 12-billion-dollars in funding for ASES or the VITAL government healthcare card collapses. That is, the biggest government contractor, with 700 million dollars a year, had to disclose this information to the SEC, while we plead to Congress for the necessary funding for Medicaid or funds will be depleted by October."

On that same day July 30, 2019, Telemundo published a story under the headline "Triple-S  confirms link with Elias Sanchez and orders an investigation" with an embedded video showing a segment from the *Telenoticias* morning newscast of an

interview by Reporter Ivonne Solla to Representative Jesus Manuel Ortiz. During the interview, Representative Ortiz confirms that he had presented a Resolution bill in the House of Representatives to initiate an investigation of the procurement process for Plan Vital. A copy of the original story in Spanish is attached as **Exhibit N** incorporated herein and made a part of this Complaint.  The story (located at: https://www.telemundopr.com/noticias/puerto-rico/triple-s-confirma-vinculo-con-elias-sanchez-y-ordena-investigacion/101134/) contained the following false statement:

g.      "As it has emerged, the company had been left out of the government's health plan and after Sanchez's intervention, they obtained a contract for approximately $700 million".

97.     By use of the particular words set forth in paragraph 96, Defendants conveyed among others, the following false and defamatory statements, implication and meaning of and concerning Sanchez:

a.      Triple S engaged Sanchez as a lobbyist because they had been left out of the Plan Vital procurement process. Sanchez intervened in the process illegally and as a result, Triple S became a provider under the Plan Vital. Sanchez committed ethical violations of the Lawyer's Professional Code of Ethics by helping Triple S who was competing in the process against another client of his Firm (Menonita).

b.      Both Sanchez's and Mr. Alberto Velázquez Piñol, who was arrested by federal authorities for corruption charges, were involved in the procurement process.

c.      Representative Jesus Manuel Ortiz forced Triple S to confess that they had used Sanchez to obtain the contract with Plan Vital illegally.

d.      Sanchez and Velazquez worked in tandem in a scheme to intervene illegally and help Triple S obtain a contract with Plan Vital because they both received a substantial benefit.

e.      Sanchez illegal intervention was not news to Fonseca because he already knew what had transpired.

f.      Triple S had to file a report with a federal regulator because they hired an individual that was being investigated by a Grand Jury.

g.      It is a fact that Triple S was left out of the Plan Vital contracts, but Sanchez intervened and that is the reason why they are a provider for the government.

98.     The false and defamatory meanings and implications of a concerning Sanchez alleged in paragraph 97, were also conveyed by the combination of individual statements contained in the July 30 stories, including the juxtaposition of words and statements to each other, which in the aggregate, produced the false and defamatory inferences conveyed through said meanings and implications.

99.     Contrary to the aforesaid false and defamatory statements, implications and meanings:

a.      Sanchez did not provide any lobbying services to Triple S in the Vital procurement process whatsoever. In fact, Sanchez explicitly denied any involvement in the Vital Healthcare process on statements made and published by Telemundo on July 17, 2019 (See **Exhibit O** attached herein). Triple S had a legal services agreement with Wolf Popper PSC (the Law Firm). Sanchez was not employed by the Law Firm but provided services as Of Counsel. The Law Firm issued a statement on July 30, 2019, which was transcribed by Fonseca on his follow-up post which stated unequivocally that "Triple S, on July 31, 2017, retained the services of WOLF POPPER, PSC (not LLP) to provide legal counseling on specific issues. Such issues did not include topics related to the Mi Salud/Vital healthcare. Any information alleging involvement on the above referenced matter is false." See **Exhibit M**. Triple S lobbying was done by other lobbyists and well-known firms in Puerto Rico. In fact, Defendants knew the identity of the actual lobbyist for Triple S on the ASES related issues, which were unrelated to Sanchez and his employer. Furthermore, Sanchez did not incur in any conflict of interest or unethical conduct by providing legal counsel to multiple companies within the same industry.

b.      Fonseca intentionally omitted to mention that Mr. Alberto Velazquez Piñol's arrest and federal charges were unrelated to Triple S or the procurement process for Plan Vital. The charges were related to his relationship with the accounting firm BDO, and various government contracts for BDO.

c.      Fonseca intentionally mischaracterizes Triple S' response to the Representative's request for information **which clearly states that Sanchez did not participate in any negotiations between ASES and Triple S for the Plan Vital**. Furthermore, Fonseca failed to emphasize that the engagement of Sanchez by Triple S for legal services preceded the RFP process by almost nine (9) months. Defendants defamatory implications are defeated by the fact that Triple S engaged Sanchez many months before the Request for Proposal was even announced in February 2018 and almost a year before the proposals under the RFP were due for submission.

d.      Fonseca, once again, intentionally mischaracterizes Triple S' response, which confirmed that Mr. Velazquez Piñol did indeed participate in the negotiation meetings on behalf of the regulator ASES, while confirming that Sanchez did not participate in any negotiations related to Plan Vital.

e.      Fonseca failed to mention that one of the sponsors with whom he has had the longest business relationship as a media personality happens to be MCS Health Management Options, Inc. ("MCS"). Interestingly, MCS was one of the parties that showed interest in the Plan Vital procurement process.  He also failed to disclose that Triple S and MCS have had a long-standing feud since 2011 when Triple S took over the service regions that were being serviced by MCS under the Government's health plan.  As news articles from 2011 reveal, "The Secretary of Health was confident that "they have learned from the setbacks they had in the course of the past months" with MCS, a situation that almost led the Mi Salud program to collapse. Although today the government blames the insurer and vice versa for the crisis, the contract with MCS that was supposed to end in 2013, was canceled in July due to a deadlock in the negotiation of rates, and due to the insurer's inability to provide services and pay providers efficiently. In addition to the request for a rate increase, MCS had for months faced problems with ASES due to large debts with doctors, hospitals, laboratories and even ambulances, and because it was never able to sign a contract with the number of providers required by ASES.[13]

f.      The disclosure to the SEC by Triple S on July 30, 2019 has absolutely nothing to do with any investigation by federal authorities.  Triple S filed an 8-K (current) report under item 7.01 of the SEC form.  Item 7.01 is related to Regulation FD (Fair Disclosure), which addresses the selective disclosure of information by publicly traded companies and other issuers. Regulation FD provides that when an issuer discloses material nonpublic information to certain individuals or entities—generally, securities market professionals, such as stock analysts, or holders of the issuer's securities who may well trade on the basis of the information—the issuer must also make public disclosure of that information. In this way, Regulation FD aims to promote full and fair disclosure.

g.      There is absolutely no proof, corroboration, acknowledgment or inference by Triple S or any other player in the RFP process pointing to Sanchez as having an intervention on behalf of Triple S or any other insurer for that matter, other than Defendants' own insidious machinations.

100.    Defendants took advantage of the political circumstances in which a member of the opposing party used an investigation not related to the RFP process for Plan Vital, but to its implementation and issues of non-payment and delayed payments to health providers by the

---

[13] Article located at: https://www.noticel.com/ahora/20111003/cuanto-costara-el-regreso-de-triple-s-a-mi-salud/.

40

NAVARRO

66 W. Flagler Street, 6th Floor, Miami, Florida 33130

insurers participating in the Government's health plan, in order to advance his recognition factor. During the interview with Telemundo's reporter Solla, Rep. Jesus Manuel Ortiz acknowledged that he had introduced a resolution bill for an investigation process into the RFP procurement process (R. de la C. 1012) that had not moved forward.  The bill referred to by Rep. Ortiz states the following: "On the date of June 18, 2018, in the digital newspaper "Noticel", Mr. Oscar Serrano and Mr. Eric de León Soto, published an article related to the process of selecting providers for the New Model of the Health Plan of the Government of Puerto Rico where it is stated that it and we quote: 'It is overdue and now it would start completely again due to an alleged 'error' detected after several companies had submitted their proposals and after one of them did not…**Although in said newspaper article the allegation is denied by the Health Insurance Administration, said allegation raises serious questions that need to be corroborated or denied**, as it is a closed process to the participants of the proposal process (RFP); in order to avoid possible legal challenges that would ultimately affect the services to the participants of the Government Health Plan...The House of Representatives of the Government of Puerto Rico understands that these allegations must be **investigated to determine if they are real or not**. If they are not true, the allegations that have been made will be denied and the process for requesting proposals would avoid a possible challenge to the process by any health organization participating in the process." See **Exhibit P**, attached herein.

101.     Furthermore, during his segment in the *Dia a Dia* broadcast on August 20, 2019, Fonseca interviewed Rep. Ortiz.  A Spanish language copy of the transcript of this broadcast with a side-by-side translation is attached as **Exhibit Q** and incorporated herein and made a part of this Complaint[14]. The following exchange took place between Fonseca and Rep. Jesus Manuel Ortiz:

---

[14] Plaintiffs have a full video of said segment which is included as **Exhibit Q** attached herein. A link of said segment was not found on Telemundo's website.

Reporter Fonseca:

"His [Jesús Manuel Ortiz] line of questioning focused on the role of Elias Sanchez and Velazquez Piñol in the procurement and lobbying actions to ensure that ASES granted government contracts to certain insurance companies. He asked the questions"

Reporter Fonseca:

"**We were under the impression that Elias Sanchez was not a lobbyist nor a consultant.**"

"We knew that Velázquez Piñol had some sort of role in the healthcare system, in ASES and in the [healthcare] card. **But the truth of the matter is that we did not know what the role of Elias Sanchez was.** You [Jesús Manuel Ortiz] asked the question, did you know that Elias Sanchez had some role in this or did you just asked based on rumors?

Representative Manuel Ortíz:

"Look, there were always rumors. In fact, Jay, all my line of questioning was based on information made available to the public. Some time ago, on or about summer 2018, there   had   been   some comments, including some information published by the press, claiming irregularities in the Vital bidding process. Obviously, as a legislator, I receive information and there were claims that Elias Sanchez worked with or counseled one of these companies [current providers under Plan Vital]. I made the question so that the public record would show if this was correct or not".

Reporter Fonseca:

"Wait, you received the information about this a year ago, in 2018?"

Representative Jesús Manuel Ortiz

"Well, I received that information on that date, since last summer there had been claims that there were problems in the bidding process. Later, I do not remember exactly when, I did receive information that this man, Velázquez Piñol, actively participated."

102.    The flip-flopping by Fonseca on what he knew and did not know at a point in time

is only indicative that he actually knew the defamatory statements and implications were false, or

at a minimum, he had a high degree of subjective awareness that the statements were probably

false.  The use of Fonseca of the calculated strategy to appear as a neutral actor is a façade meant

to distract from the gist of the matter.  Due to Fonseca's close relationship with Rep. Jesus M. Ortiz and his business relationship with MCS, discovery will reveal that Fonseca had a primary role in instigating the allegations against Sanchez through the Representative who may or may not be aware of Fonseca's ulterior motives.

103.    Each and every statement, implication and meaning of and concerning the Plaintiffs alleged above in paragraphs 96 and 97 are false.

104.    Defendants knew and intended that the particular statements set forth in paragraph 96 and published on the multiple stories on July 30, 2019 would convey each and every false and defamatory implication and meaning set forth in paragraph 97 of and concerning the Plaintiffs and such false and defamatory meanings of and concerning the Plaintiffs were conveyed by the particular statements set forth in paragraph 96, and by the inferences drawn from the July 30, 2019 statements in the aggregate.

105.    In the publication of the aforesaid false and defamatory statements, implications and meanings, Defendants acted with the required degree of actual malice to overcome any protections under the First Amendment and/or an Anti-Strategic Lawsuit Against Public Participation statute, given that (i) Fonseca is extremely biased against Sanchez and Triple S due to his business relationship with MCS, which is a direct competitor of Triple S, that was replaced by Triple S after its removal in 2011 from the government's health plan, and failed to obtain a contract under the RFP process with Plan Vital; (ii) none of the proponents in the RFP process filed any administrative, civil or criminal claim at the time of the awards of the Plan Vital contracts; (iii) Fonseca admitted on this Facebook live broadcast that the engagement of Sanchez by Triple S preceded any issue on the procurement process and that he had no knowledge of Sanchez actions; (iv) they had absolutely no support for their defamatory statements; (v) they had not checked or

43

NAVARRO
66 W. Flagler Street, 6th Floor, Miami, Florida 33130

properly checked the facts underlying the July 30, 2019 stories and intentionally avoided contacting Sanchez to corroborate the allegations; and (vi) the aforesaid false and defamatory statements, implications and meanings were contradicted by substantial credible information, which Defendants had prior to the July 30, 2019 Broadcasts, including information on Triple S actual lobbyists for Plan Vital.

106.   Defendants' defamatory statements were made with actual malice in that Defendants knew that the aforesaid statements and meanings were false and/or published or caused them to be published in reckless disregard for their truth or falsity.

107.   The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity, blinded by their interest in profit-making and advancing the interests of their own clients.

108.   The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

109.   The airing and publishing of the Broadcast as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

110.   The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning the Plaintiffs.

111.   The defamatory statements with their implications and meanings alleged in paragraphs 97 and 97 were published by Defendants with bad motives and abject bad faith.

112.   By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and

within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues, friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs.  Plaintiffs have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

113.    By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (i) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and emotional well-being, (ii) damages sustained by the loss of Sanchez's job and clients, (iii) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (iv) the amount spent by Plaintiffs as legal fees and expenses in connection with any matters caused by the defamations alleged herein, and (v) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants.

114.    Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

V.    **JUNE 25, 2019 AND JULY 12, 2019 BROADCASTS**

115.    On or about June 25, 2019, Defendants caused and published a broadcast, in a special edition of the *Jay y sus Rayos X* show, containing defamatory and slanderous statements of and concerning the Plaintiffs.

116.    A    copy    of    the    broadcast    can    be    found    at: https://www.youtube.com/watch?v=k4xB6E5zrbc. A Spanish language copy of the transcript of this broadcast with a side-by-side translation is attached as **Exhibit R** and incorporated herein and made a part of this Complaint.

117.    The June 25, 2019 Broadcast falsely and maliciously charged Sanchez with using confidential and privileged information, obtained during his tenure as Chairman of the Transition Committee for the Elected Governor and as the Governor's representative before the Financial Oversight and Management Board, to benefit his clients. During the broadcast, Fonseca used as visual aid an image projected onto a large screen displaying three (3) paralleled flowcharts under the general headline of Federal Authorities / FBI. Flowchart 1 (appearing vertically to the left of the screen) depicted a corruption scheme within Puerto Rico's Department of Treasury, involving the Secretary of Treasury (Raul Maldonado) who had been fired by the Governor just a day before and his son (Raulie Maldonado) who was subcontracted by multiple entities holding government contracts with Treasury and other agencies and who had also been terminated from all government contracts. Flowchart 2 (appearing vertically in the middle of the screen) depicted a corruption scheme under Puerto Rico's Health Insurance Administration ("ASES"), the Department of Health, and the Department of Education, involving Ms. Julia Keleher (former Secretary of Education), Ms. Angela Ávila (former ASES Director), Mr. Rafael Rodríguez (former Secretary of Health), and Mr. Alberto Velázquez Piñol (all, but for the Secretary of Health, were indicted by

the FBI on July 10, 2019 for corruption charges). Flowchart 3 (appearing vertically to the right of the screen) depicted an alleged corruption scheme resembling the other two, focused solely on Sanchez and described three following three stages: (i) his appointment to the incoming government transition committee for the elected governor; (ii) his appointment as Governor's representative to the Financial Oversight and Management Board (FOMB); and (iii) his resignation from the FOMB.

118.    The June 25, 2019 Broadcast defamatory statements were preceded by Fonseca's explanation of the FBI's investigation angles through the use of the three flowcharts projected on the screen. For Flowchart 1, Fonseca described a scheme in which the Secretary of Treasury appointed the members of an Advisory Committee that had access to privileged and confidential information. Then, those members used the information to obtain contracts with Treasury that were signed by the Secretary himself, and other agencies, and in turn, they subcontracted and benefitted the Secretary's son. For Flowchart 2, Fonseca described a scheme related to the Government's Medicaid program, with participation by the above-named individuals, where the Governor appointed an Advisory Committee including Mr. Velázquez Piñol, who obtained privileged and confidential information as a member of the committee, and then, in turn, arranged for contracts with an auditing company and received commission payments under those contracts.

119.    The June 25, 2019 Broadcast contained the following false and defamatory statements of and concerning Plaintiffs:

a.      "Why is this important? Remember, there is an advisory committee here [pointing to the "Advisory Committee" phrase in Flowchart 2] and there is an advisory committee here [pointing to the "Advisory Committee" phrase in Flowchart 1]. Why is this important? Because the same is being alleged regarding Elias Sanchez, the same. Elías Sanchez is appointed by the Governor to the transition team. In other words, the Governor wins and appoints him as director of the transition committee. That does not happen usually. Typically, the one who is

the Government's Chief of Staff is the one appointed to manage the transition [pointing to the "2016 Transition Team" phrase in Flowchart 3]. Why? Because the one who manages the transition is the person who is going to manage the entire Government and is going to have access to all the confidential information of how many desks are going to be bought in Education; how many computers will be bought in the Department of Family; of how necessary is it to make changes in the software of the department where there are millions and millions of dollars. All that information is obtained here [drawing a red circle around the "2016 Transition Team" phrase in Flowchart 3]".

b.       "It is very important that we understand this. What happens? That the Governor appointed Elias Sanchez, instead of William Villafañe who was going to be the Chief of Staff or Itza García who had been the one who drafted the Government program, who typically    dominate    these    issues [pointing to the "2016 Transition Team" phrase in Flowchart 3]. And Elías Sánchez obtains a lot of confidential information here [pointing to the "2016 Transition Team" phrase within Flowchart 3]. Then, he appoints him [underlining in red the phrase "Representative Fiscal Control Board" in Flowchart 3] to the Fiscal Control Board and when he appoints him as his representative before the Fiscal Control Board, he also gets a lot of confidential and privileged information. What things would the Board authorize, what contracts would the Board authorize, what contracts would the Board not authorize, what contract - what kind of software was the Board going to authorize, what kind of software was not going to be authorized by the Board."

c.       "And why did he resign? He went to the private sector and started calling agency secretaries to tell them: look what do you think of the contract of so-and-so. Look, let's give a contract to such-and-such."

d.       "That is, I create an advisory committee [pointing to the phrase "Advisory Committee" in Flowchart 2), I give you confidential and privileged information. That person [making air quotes gesture] does not charge for being my advisor, they do not charge [ending air quote gesture], but then they find out where things are going [drawing a red arrow pointing from the "Advisory Comittee" phrase to the "Contracts" word right below in Flowchart 1], what the Government's plans are, what things the Board is going to authorize and begin to release contracts that benefit [drawing a downward red arrow from "Contracts" pointing below to "Raulie Maldonado" in Flowchart 1] in this case the son, in this case himself [drawing a downward red arrow from "Contracts" pointing below to "Velazquez Piñol" in Flowchart 2] and in this case [pointing to Flowchart 3], to Elias Sánchez's clients. That, in short, is what the feds are investigating [drawing a red circle around the word "FBI" on the top right of the screen]: a pattern of sale of influences from people who obtained confidential and privileged information, thanks to the fact that they were appointed to these committees."

120.    On or about July 12, 2019, Defendants published similar defamatory accusations as stated on the June 25, 2019 Broadcast in a video segment found at https://www.telemundopr.com/fotosyvideos/el-gobernador-ha-dicho-una-sarta-de mentiras_tlmd-puerto-rico/104867/ , titled "The Governor has said a bunch of lies" within the Telenoticias newscast, which contains defamatory and slanderous statements about Sánchez.

121.    In the July 12, 2019 *Telenoticias* Broadcast Fonseca's states on two occasions his usual catch phrase "the facts are the facts" and "this is not my opinion" while alleging once again criminal and corrupt behavior by Sánchez.  Fonseca asked a series of questions directed to then-Governor Rosselló filled with defamatory false statements described below:

a.      "[…] When asked who is FDO, the Governor does not say who is FDO, knowing that he is Elías Sánchez. Why do you protect so much Elías Sánchez?, whom the Governor ... and I have a question for the Governor. When agency heads called you, Governor, if you want me to respect you, when they called you Governor, agency heads to warn you, that Elías was continually calling them pushing contracts, did you arrest Elías Sánchez? When did your cabinet chiefs oppose contracts because they understood that they were unnecessary and expensive. What's more, I am going to say specific contracts, Amplifund and Microsoft contracts lobbied by Elías Sánchez, personally. And you were told in writing that Elías Sánchez was lobbying those contracts. Did you stop it or did you allow it?"

b.      "Mr. Governor, when employees and bosses and members of your cabinet repeatedly warned you of questionable acts by Elías Sánchez, did you stop him?".

"That is not my opinion, Mr. Governor, the data is the data, and you can fight all you want with it."

c.      "Look, we are going to put it in the following way, your question is super important, we are going to put it in the following way. The governor says that he has proposals and mechanisms to stop corruption, Mr. Governor, it was you, it was you governor who appointed Elías Sánchez as your delegate to the board and president of the government transition committee, that is, **you gave him the mechanisms to to find out about all the contracts, all the purchases, all the computers, all the software that was going to be bought, all from Elías Sánchez.** You gave it to him, not me, you. **And after that knowing that at six months he would become a lobbyist and call the heads of the agency to push contracts in his interests.**

A Spanish language full copy of the transcript of this broadcast with a side-by-side translation is attached as **Exhibit S** and incorporated herein and made a part of this Complaint. Each of the statements stated on paragraphs 117, 118, 119, 121 are false and defamatory on its face. Defendants knew when making the statements and implications therein that the statements were false or had no reasonable grounds to believe they were true.

122.     By use of the particular words set forth in paragraphs 117, 118, 119, 121; and the making of markings on a screen on the June 25, 2019 Broadcast, Defendants conveyed among others, the following false and defamatory statements, implications and meanings of and concerning Plaintiffs:

a.     That Sanchez was appointed as director of the Transition team; that such appointment was irregular; and the purpose was to give him access to the type of information that would allow him to benefit his clients.

b.     That Sanchez appointment to the FOMB was also irregular and intended to give him access to information that would allow him to benefit his clients.

c.     That Sanchez obtained information with the intention of influencing agency heads to benefit his clients with government contracts.

d.     That Sanchez was guilty of the same actions and tools used by individuals that had been publicly accused of corruption behavior.

123.     The false and defamatory meanings and implications of and concerning Plaintiffs alleged in paragraphs 119, 121 and 122 were also conveyed by the combination of individual statements contained in the June 25, 2019 Broadcast, (which were later reinforced on his July 12, 2019 Broadcast), including the juxtaposition of words and statements to each other and the omission of certain facts, which in the aggregate, produced the false and defamatory inferences conveyed through said meanings and implications.

124.    Contrary to the aforesaid false and defamatory statements, implications and meanings:

a.    Sanchez was not appointed director of the Transition team, but instead, Chairman of the Transition team and the transition Committee included eleven members in total.  The actual executive director of the Transition team was in fact, Mr. William Villafañe, who was later designated as the Governor's Chief of Staff. In three out of the last four elections, the executive director of the transition team has been the individual designated as the Governor's Chief of Staff.  Pursuant to Public Act No. 197-2002, known as the "Government Transition Process Act", it is the Executive Director who has the most important role during the transition period. The director has following responsibilities: (A) receiving the Transition reports from all of the agencies; (B) organizing the storage of the transition reports and making them available for the members of the media; and (C) making the transition documents available to the general public through the Internet. Moreover, in connection with the same broadcast Fonseca maliciously and with the intent to cause injury to Sanchez omitted pertinent information which, had it been included in the broadcast, would have mitigated against the inferences of criminality that the broadcast unavoidably implied in the public mind through Fonseca's statements and illustrations. Such information includes: (1) the reality that by law, all transition hearings such as those referenced in the broadcast are open to the public and broadcasted to the public, and that all information exchanged between members of such groups are uploaded to a website repository for public access; and (2) that Sanchez did not take part in all of the public hearings and discussions during the transition process.

b.    Furthermore, Article 15 of Public Act No. 197-2002 specifically defines "Confidential Information and Documents" as information and/or document whose disclosure is barred by other laws or affecting the rights of third parties and ongoing investigations.  Therefore, plans for potential contracts by the agencies do not fall within the category of confidential information. In fact, none of the examples of what Fonseca claimed in the broadcast to be confidential and privileged information fall within that statutory definition, and so the referenced information to which the broadcast referred was all public information. Interestingly, Fonseca failed to mention that just like Mr. Villafañe, his good friend Ms. Itza Garcia was a member of the transition team with access to the same information; that at the time, both Mr. William Villafañe and Ms. Itza García had left their government positions under a public scandal; that Mr. Villafañe had opened his own practice as a lobbyist and attorney for private clients; and that Ms. Garcia was also working in the private sector.

c.    The ex-officio non-voting member of the FOMB as the Governor's representative, does not have a role in the internal dealings, meetings and discussions of members of the FOMB. The ex-officio member only takes part in the public hearings and has access only to the same information that is made

publicly available by the Board.   As a matter of fact, the FOMB established a contract review policy requiring agencies to submit for approval only those contracts already procured, but prior to execution, that exceed $10 million dollars. Furthermore, the FOMB's contract review is performed by the General Counsel's office, and the information is not submitted to the members of the Board. Furthermore, the contract review policy was adopted by the FOMB on November 6, 2017, almost four (4) months after Sanchez had resigned from the FOMB.

d.      There is not one agency head that has accused Sanchez of attempting to influence or pressured them into making decisions or to order them to grant contracts to any entity whatsoever.

e.      Public Act 197-2002 contains a special civil action that can be filed against any member of the transition team that uses confidential information accessed as part of the transition process to benefit himself, a client or a family member. No such action has ever been filed against Sanchez.

125.     Each and every statement, implication and meaning of and concerning the Plaintiffs alleged above in paragraphs 119, 121 and 122 are false.

126.     Defendants knew and intended that the particular statements set forth  and published on the June 25, 2019 and July 12, 2019 Broadcasts would convey each and every false and defamatory implication and meaning set forth in paragraph 122 of and concerning the Plaintiffs and such false and defamatory meanings of and concerning the Plaintiffs were conveyed by the particular statements set forth in paragraphs 119 and 121, and by the inferences drawn from the June 25, 2019 and July 12, 2019 Broadcasts statements in the aggregate.

127.     In the publication of the aforesaid false and defamatory statements, implications and meanings, Defendants acted with the required degree of actual malice to overcome any protections under the First Amendment and/or an Anti-Strategic Lawsuit Against Public Participation statute, given that (A) Fonseca is extremely biased against Plaintiffs due to his very close relationship to Ms. Itza García; (B) no individual has filed any administrative, civil or criminal claim at the time alleging misuse of government information for Sanchez's own benefit, a client or a family member; (C) they had absolutely no support for their defamatory statements;

(E) they had not checked or properly checked the facts underlying the June 25, 2019 or July 12, 2019 stories and intentionally avoided contacting Sanchez to corroborate the allegations; and (F) Fonseca fabricated and mischaracterized facts to support its defamatory statements, implications and meanings in the June 25, 2019 and July 12 , 2019 Broadcasts.

128.    Defendants' Broadcasts referenced herein was made with actual malice in that Defendants knew that the aforesaid statements and meanings were false and/or published or caused them to be published in reckless disregard for their truth or falsity.  To the best of our information and belief, Fonseca met with officials that confirmed to him that Sanchez was not the target of any criminal investigations. We expect that the extent of those conversations and the identity of the public officials will be revealed through discovery.

129.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity.

130.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

131.    The airing and publishing of the Broadcast as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

132.    The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning the Plaintiffs.

133.    The defamatory statements with their implications and meanings alleged in paragraphs119, 121 and 122 were broadcasted by Defendants with bad motives and abject bad faith.

NAVARRO
66 W. Flagler Street, 6th Floor, Miami, Florida 33130

134.     By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues, friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs.  Plaintiffs have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

135.     By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (A) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and emotional well-being, (B) damages sustained by the loss of Sanchez's job and clients, (C) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (D) the amount spent by Plaintiffs as legal fees and expenses in connection with any matters caused by the defamations alleged herein, and (E) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants.

136.     Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

## VI.    JULY 17, 2019 BROADCASTS

137.    On or about July 17, 2019, Defendants caused and published a broadcast of the *Telenoticias* newscast with special coverage of the public manifestations in Puerto Rico against ex-Governor Ricardo Rossello containing defamatory and slanderous statements of and concerning Sanchez (the "July 17, 2019 Broadcast").

138.    The July 17, 2019 Broadcast was aired live and a video segment was embedded in the republication of a story by the Center for Investigative Journalism ("CPI") in Defendant's website under the headline "Details about scheme orchestrated from Fortaleza" ("Fortaleza" or Fortress in English referring to the Governor's mansion and headquarters in Puerto Rico) located at:    https://www.telemundopr.com/noticias/puerto-rico/detallan-esquema-orquestado-desde-fortaleza/101461/) containing outrageous allegations and several libelous per se statements (the "July 17, 2019 Story").

139.    In addition, on July 17, 2019, Fonseca broadcasted a Facebook live video from Telemundo's                news                studio                located                at: https://www.facebook.com/JayFonsecaPR/videos/447608732750988. The first half of the video consisted of part of the live broadcast from *Telenoticias* and the second half included images of Fonseca walking around the studio making defamatory and slanderous statements based also on the CPI story (the "July 17, 2019 Facebook Live").

140.    Under standard common law principles, a person who publishes a defamatory statement by another bears the same liability for the statements as if he or she had initially created it.  However, when the re-publisher is a website, Section 230 of the Communications Decency Act ("CDA") provides immunity from tort liability to the website ("interactive computer service") so long as the information is provided by a third party ("information content provider").  Similarly,

under Florida law, if you republish a news item from a "reputable news service," you may be covered by the privilege known as the "wire service defense".

141.    The immunity for tort liability under Section 230 of the CDA is not extended to websites that can be considered an information content provider (defined as any person or entity that is responsible, in whole or in part, for the creation or development of the content). Likewise, the wire service defense is only applicable if the defendant meets the following four elements: (i) republished a news item from a reputable news agency; (ii) did not know the information was false and (iii) the news item on its face does not indicate any reason to doubt its veracity; and (iv) you do not substantially alter the news item when republishing it.

142.    The July 17, 2019 Story falsely and maliciously charge Sanchez with participating in a criminal enterprise to loot the Government of Puerto Rico by generating millions of dollars for self-gain through placing accomplices in key positions to control the flow of information from the agencies and awarding lucrative contracts.  The libelous per se and defamatory statements of and concerning Sanchez contained therein are:

> a.    "The looting, carried out through a main scheme and several secondary ones that share the same modus operandi and similar protagonists, was orchestrated from Fortaleza by the closest friends of Governor Rossello Nevares and with his knowledge, the investigation revealed. The modus operandi involved planting internal staff and external contractors in key advisory and communications positions in the agencies to control the entry and exit of information. Also sharing privileged data on government contracts to benefit private clients in exchange for commissions and payments. At the top of the scheme is the former president of the Transition Committee, lobbyist, former campaign manager and close friend of Rossello, Elias Sanchez".

> b.    "The main scheme is composed by these three figures - Sánchez, Bermudez and Miranda -, who on paper operate as "private citizens" and "contractors", but who in reality constitute the government upper echelons, with more power than any of the constitutional cabinet secretaries of Governor Rossello, according to multiple sources. In turn, it connects, sometimes directly and sometimes tangentially, with particular schemes, such as those uncovered with the arrests made by the Federal

Prosecutor in July at the Department of Education, the Health Insurance Administration (ASES) and the BDO accounting firm."

c.      "Sánchez, Bermudez and Miranda have generated millions through their businesses and have made decisions on a lot of what has happened in the Government in terms of hiring, firing and public projection since Rossello Nevares took office in January 2017, sources agree."

d.      "In the case of Sanchez, there are also undue and illegal interventions with cabinet secretaries. At least four agency heads went directly to the Governor or his advisers in Fortaleza to denounce these interventions by Sanchez at least since 2017 but the Governor never ordered an investigation or took action on it."

e.      "Although he does not have direct contracts with the Government, Sanchez, who has the closest link with the Governor, controls most of the larger contracts, placing his clients in a large part of the agencies and charging commissions of up to 25% of the amount of the contracts and fixed retainers that have reached $50,000 per month, indicated four sources that have witnessed the dynamics."

f.      "As they reported in separate conversations, the lobbyist [Sanchez] had constant access to Fortaleza and to privileged information on the large contracts that would take place in the agencies, he "connected" them to his clients and presented himself, frequently without invitation, at the doors of said agencies to present proposals tailored for the services they would be seeking."

g.      "One of these cases occurred in the midst of Hurricane Maria, when the company Adjusters International was hired for recovery work under the Tu Hogar Renace program of the Department of Housing. Sanchez's client, AECOM, lost that bid, and in December 2017 Sanchez appeared at the secretary's office, Fernando Gil Enseñat, to make demands to the official about his decision, two sources revealed to the CPI."

h.      "In mid-2018, Sanchez personally took his client GILA Corporation to the Department of the Treasury to push for contract regarding delinquent debt collection and managed to meet at least four times with two of the main officials and with one contractor: the current Secretary of the Treasury, and then advisor, Francisco Parés, the former secretary of the Treasury and then contractor, Juan Carlos Puig and the then secretary of the Treasury and chief financial officer, Raúl Maldonado, according to two sources with direct knowledge of the event."

i.      "Fuentes Marimón - who is outside of Puerto Rico - has not specified whether her complaints included Sánchez's interventions in the Treasury and was not available for an interview."

j.      "On the other hand, multiple sources spoke to the CPI about Sánchez's improper interventions in favor of his client, Microsoft. The technology company has secured more than $100 million in contracts during this administration. Two

sources pointed, for example, to the $ 11 million contract signed last summer to license AmpliFund, a Microsoft-owned grant management application. Despite the fact that the Government already had a similar and effective tool, and that it would cost a fraction to extend said license, the Rosselló Nevares administration decided to acquire the AmpliFund license."

k.      "According to two sources, an improper intervention by Sánchez also occurred in the Department of Correction when the Carolina Catering Services company obtained a $300 million contract to manage the stations, laundries and food in the prisons. The contract was awarded to this company despite bidding with a higher cost than another competitor, Trinity. Two sources told the CPI that Sanchez was the person responsible for intervening in the auction and getting Carolina Catering to obtain the contract."

l.      "A source indicated that after Hurricane María, Sánchez, through Christian Sobrino, brought the company CSA to the table, so that, through the Agency for Emergency and Disaster Management (AEMEAD), would obtain the contract for inspection of schools after the emergency. The $800,000 contract was awarded in late September 2017 and canceled shortly thereafter amid criticism, including from then-Secretary of Education Julia Keleher. Last week Keleher was also indicted by the feds in a scheme - so far unrelated - where BDO, Scherrer and Velázquez were also protagonists."

A Spanish language copy of the statements of the July 17, 2019 Story with a side-by-side translation is attached as **Exhibit U** incorporated herein and made a part of this Complaint.

143.    The July 17, 2019 Broadcast built upon, commented and expanded on the July 17, 2019 Story describing the statements therein as confirmed facts. The July 17, 2019 Broadcast contains the following slanderous and defamatory statements:

a.      "What the Center for  Investigative Journalism did is a devastating article because although one had doubts, because we are going to give him the benefit of the doubt that part of the information has clarifications, it is the relationship between Elías Sánchez and the Governor lying in bed together and his closest working group, about someone that has already been proven what we all knew here, that Elias Sanchez went to fight with agency heads when they did not give the contracts to his clients."

b.      "And I'm going to say more, Carlos Contreras has to explain also if he was called by Elias Sanchez regarding a contract that he wanted to procure through RFP [Request for Proposals] and Elías Sánchez was opposed to the RFP."

c.      "Again, the lying-in bed between the Governor and Elias Sanchez is obvious in this chat, and not only Elias Sanchez, but another group of individuals

that were making money without restraint, and frankly, again, that is the main topic here. It is that, access was given to continuous perennial information up to the strategy of how to communicate that information, even privileged and confidential information to people who later went and charged someone: I got you a contract, give me 25%. In other words, I got you a 10 million dollars contract, give me two and a half million. In other words, we are talking about, people just in case, the contract, which one of those who he allegedly lobbied for that is being talked about there, is a contract for multimillion-dollar amounts. We are not talking about 700 thousand dollars being made like Velázquez Piñol in the indictment, we are talking about millions and millions of dollars".

d.    Diaz Olivo: "Since the times of the Iliad and the Odyssey, [Pabon Roca: Oh damn!] regarding the relationship between Patroclus and Achilles, a relationship of solidarity of such a nature as that revealed here has not been seen." Pabon Roca: "Are they well compenetrated?" Diaz Olivo: "Very compenetrated early on their beginnings and certainly, this was an ongoing activity, planned, ordered, and with full knowledge of the Governor. That is what is behind these revelations." Pabon Roca: "And who is Patroclus and who is Achilles?" Diaz Olivo: It will have to be determined here in this case. But history tells these things. And the interesting part of this situation is that this is why we saw that when the Governor was asked questions about this relationship, the Governor could not answer them, he evaded them or gagged more than usual".

e.    Fonseca: "But Carlos, look, I'm going to say, and forgive me for interrupting you, the Governor told the country when he was repentant and humbled with a contrite heart before the church, before the hall of mirrors where he was reflected before the people. Because that is the symbolism of the hall of mirrors […] and he told the people that Velazquez Piñol had no control of anything". Diaz Olivo: No, because it was Elias. He was correct".

f.    Reporter Solla: "I want to return to the subject of the Governor's Chief of Staff because I believe that there were important revelations and above all, this article talks about interactions and potential contracts and you were about to touch on that issue." Pabon Roca: "Yes, I was directed to precisely a contract that is in controversy. The company has denied a relationship with Elias Sanchez and so says the CPI article, but the journalists' sources, two I believe in this case, the sources say that it is Elias Sanchez who was behind and it has to do with food in [the Department of] Correction." Fonseca: It was three hundred million in food." Pabon Roca: "A small contract [sarcastically] of three hundred million dollars where it is imputed that it was taken away from one company and given to the other, which is Elias Sanchez's goddaughter. Again, I repeat, the company has denied it and the Center responsibly reflects it. But again, there is a problem and I wanted to have asked him why he hesitates, he first recognizes a contract, he says that he does not remember that he has to look up his calendar, and then he says that there were several companies that Elias Sanchez brought, and we know about this one at least as stated, right, that could have clarified if the company says the reason, the truth or not."

A Spanish language copy of the statements of the July 17, 2019 Broadcast with a side-by-side translation is attached as **Exhibit U** incorporated herein and made a part of this Complaint.

144.    By use of the particular words set forth in paragraph 143, Defendants conveyed among others, the following false and defamatory statements, implication and meaning of and concerning Sanchez:

a.    The doubtful allegations have turned into proven facts where Sanchez intervened with agency heads when his clients were not favored.

b.    Sanchez also intervened with the Secretary of Transportation to influence his decision because Sanchez opposed the use of a competitive procurement process in order to benefit his client.

c.    Sanchez charged commissions of 25% to his clients based on the total amount of the contracts, and thus, Sanchez obtained millions of dollars through his relationship with the Governor.

d.    Sanchez had an intimate relationship with the ex-Governor and the engaged in sexual activity with each other.

e.    Sanchez controlled the matters involving the Puerto Rico Health Insurance Administration for which Velazquez Piñol was arrested.

f.    Although it has been denied by sources on the record, it is still not clear if the catering company was Sanchez's client because the journalists in the article have two unnamed anonymous sources and a $300 million contract is the type of deal in which Sanchez would be involved.

145.    The July 17, 2019 Facebook Live contains the following slanderous and defamatory statements:

a.    "The CPI has published a list of agreements of Elías Sánchez that was in the chat, and again the important thing for me about this is, remember it is corruption and that the manifestations cannot be stopped. But it is very important, that if you see that link, which I put there just in case, I think the time has come for it to become quite clear here, that there appears to have been an agreement of people who helped in Ricardo Rossello's campaign, after leaving contracts at levels impossible to accept and that those people were in bed with the administration and the governor specifically that is very shameful."

b.    "In other words, we are talking about that, for example, Elias Sanchez according to the CPI charged up to 50 thousand dollars per month for lobbying for a contract with the government and could charge you up to 25% commission. In my life I had heard that commission, it is normal 3 to 10%, 25% I had never heard

60

NAVARRO

66 W. Flagler Street, 6th Floor, Miami, Florida 33130

a figure like that, and the CPI affirms that that is what was being paid. In other words, we are talking that if this information that is being shared with "District of New York" is true, which is the district where basically the most brutal corruption cases and mafia cases take place, they go to "District of New York". That's where they are investigated, because this grand jury that is there, appears to have information and evidence according to the CPI that are simply incredible."

c.      "We are talking about a criminal organization and I am not exaggerating, if you read that article that is what it says, I am not saying that this is true because I am not aware of that and they are not my sources. A large part of what is there we have said it on my TV program but not all of it and frankly some of it are things that are very complicated things. Specifically, we are talking about how Alberto Velázquez Piñol, who the governor says was not named something, since it seems that he had access to much more than what was said and especially the lobbyists lying in bed in that chat. In other words, Ramón Rosario, who is now lobbying as well, the governor gives Carlitos Bermúdez access to ridiculously high contracts for giving public relations, to Edwin Miranda who got into contracts with the government through various mechanisms and corporations, we are talking of Elias Sanchez making money but by ridiculous numbers; and then again in the chat you see the level of the brotherhood and the level of everything is fine and everything is cool.".

Spanish language copy of the statements of the July 17, 2019 Facebook Live with a side-by-side translation is attached as **Exhibit V** incorporated herein and made a part of this Complaint.

146.    Each and every one of the statements of and concerning Sanchez alleged above in paragraph 142 from the July 17, 2019 Story are completely false and defamatory per se.  In addition, each and every one of the statements of and concerning Sanchez alleged above in paragraphs 143 and 145 from the July 17, 2019 Broadcast and Facebook Live are completely false and defamatory per se.

147.    The false and defamatory meanings and implications of and concerning Plaintiffs alleged in paragraph 144, were also conveyed by the combination of individual statements contained in the July 17, 2019 Broadcast, including the juxtaposition of words and statements to each other and the omission of certain facts, which in the aggregate, produced the false and defamatory inferences conveyed through said meanings and implications.

148.     Contrary to the false and defamatory statements, implications and meanings of and concerning Sanchez described in paragraphs 143, 144 and 145:

a.     Not one single Secretary or head of a government agency has accused Sanchez of intimidating or forcing them to award contracts to any of Sanchez's clients.   Sanchez has been a well-known lobbyist whom Defendants have criminalized for engaging in actions protected by the First Amendment of the Constitution of the United States of America. The Constitution guarantees everyone, rich or poor, business owners or labor unions, the right to petition (lobby), along with the right to practice religion freely, to express their opinions in public and to rally for a cause.

b.     The Secretary of Transportation has never alleged or accused Sanchez of intervening or opposing a competitive procurement process within the Department of Transportation.

c.     Sanchez has never charged a percentage of a government service or goods contract.

d.     Sanchez is not a homophobic individual and would not be usually offended by such claims as he is happily married to Rodriguez. However, the fact that Defendants caused and allowed this type of mockery and innuendos on live television is offensive to individuals non-conforming to the stereotypes that were celebrated on the broadcast. Their clear intention was to degrade Sanchez by insinuating that he had obtained favors from the Governor in exchange for sexual activity. In their exchange, the cast: (i) emphasized the word "encamamiento" ("lying in bed," in English) numerous times and stated that Sanchez and the then Governor had been lying in bed together since the beginning of their friendship; (ii) compared their friendship to the Greek mythology figures of Achilles and Patroclus to mockingly imply a homo-erotic bond between them, while asking who was Achilles and who was Patroclus of the two in order to trigger stereotypical and stigmatic notions of gender roles; (iii) speculated on how they were "compenetrados" ("embedded" in English, with clear connotations of sexual penetration); and (iv) used the word "gagged" to describe the manner in which the Governor responded to questions about Sanchez and their relationship (again with obvious sexual connotations). Defendants uttered these homosexual innuendos publicly while laughing out loud and using a mocking tone. The slanderous per se statements were made with the sole intent of publicly degrading Sanchez, particularly in the context of the predominantly Latino culture of Telemundo's Spanish-speaking audience, in which homosexuality is widely regarded as a social taboo and stigma.  This entire portion of the newscast is unsettling due to the fact that a major network would use its news program to not only make defamatory statements of corruption against Sanchez but decided to mischaracterize and use references to homosexuality as a way of degrading, humiliating and making jokes at the expense of Sanchez and his family. Telemundo's tolerance for such stereotypical and discriminating expressions aimed at inflaming all kinds of

62

NAVARRO

66 W. Flagler Street, 6th Floor, Miami, Florida 33130

negative sentiments by linking corruption allegations with anti-gay prejudice is not only disrespectful but unbecoming of our times.

e.      The public record shows that Sanchez did not participate in any negotiations on behalf of any client regarding the Government's health plan. Sanchez did not lobby before ASES on behalf of any client in connection with the Vital program's procurement process, including Triple S. In fact, it was known to Fonseca who the actual lobbyist for Triple S on the ASES matters were. The extend of Fonseca's knowledge and the exact moment in which he became aware of Sanchez's none-involvement, given his long-standing business relationship with Triple S' direct competitor, will be reveal through discovery.

f.      Sanchez had emphatically denied any involvement with the alleged catering company.  As well as the owner of that company, who also denied any relationship with Sanchez.   Furthermore, the Secretary of the Correction and Rehabilitation Department of Puerto Rico stated that Sanchez had never intervened with anything related to such matter[15].

149.    Each and every statement, implication and meaning of and concerning the Sanchez alleged above in paragraphs 143, 144 and 145 are false.

150.    Defendants knew and intended that the particular statements set forth in paragraph 142 and published on the July 17, 2019 Broadcast would convey each and every false and defamatory implication and meaning set forth in paragraph 144 of and concerning Sanchez and such false and defamatory meanings of and concerning Sanchez were conveyed by the particular statements set forth in paragraphs 143 and 145, and by the inferences drawn from the July 17, 2019 Broadcast and Facebook Live statements in the aggregate.

151.    Defendants would not be able to claim the immunity under Section 230 of the CDA because item (j.) of paragraph 142 is obviously based on the stories published by Defendants in connection with the Department of Health and Mr. Japhet Rivera's allegations.  Thus, Defendants would be considered to be an information content provider for purposes of the July 17, 2019 Story.

---

[15] Found at: https://periodismoinvestigativo.com/2019/07/el-saqueo-a-los-fondos-publicos-detras-del-chat/

63

NAVARRO

66 W. Flagler Street, 6th Floor, Miami, Florida 33130

152.    Likewise, the wire service defense would not be available to Defendants because Fonseca admitted to having doubts about the allegations and the July 17, 2019 Story on its face indicates multiples reason to doubt its veracity.  For example, the Story describes a main scheme headed by Sanchez that had some type of connection with the scheme uncovered with the arrests made by the Federal Prosecutor in July at the Department of Education, the Health Insurance Administration (ASES) and the BDO accounting firm.  However, the journalists contradict themselves by stating that "Last week Keleher was also indicted by the feds **in a scheme - so far unrelated** - where BDO, Scherrer and Velázquez were also protagonists."

153.    In the publication of the aforesaid false and defamatory statements, implications and meanings, Defendants acted with the required degree of actual malice to overcome any protections under the First Amendment and/or an Anti-Strategic Lawsuit Against Public Participation statute, given that (A) the claims included in the CPI article are so outrageous that no self-respecting journalist would accept them without question; (B) there was no actual independent corroboration by Defendants of the statements in the July 17, 2019 Story, Broadcast and Facebook Live; (C) no individual had brought any administrative, civil or criminal claims against Sanchez at the time the alleged incidents allegedly occurred; (D) Fonseca, as a licensed attorney, is subject to a higher ethical standard in his analysis and understanding of legal matters; (E) they had absolutely no support for their defamatory statements; (E) they had not checked or properly checked the facts underlying the July 17, 2019 Statements and intentionally avoided contacting Sanchez to corroborate the allegations; (F) that the aforesaid false and defamatory statements, implications and meanings were contradicted by substantial credible information, which Defendants had prior to the July 17, 2019 Facebook Live; (G) Fonseca admitted during the broadcast to having "doubts" about the allegations which equates to a high degree of subjective

awareness that they were probably false; (H) Fonseca admitted to sources known to Plaintiffs that he had spoken to federal sources, who confirmed that there was no investigation of Sanchez by the FBI, but that Fonseca wanted to shine a light so bright on him that something would have to give; and (I) Defendants ignored the truthful statements made by the catering company owner and the Secretary of Corrections, while relying on anonymous sources that refused to go on the record with their claims and that were unknown to Defendants.

154.    Defendants' July 17, 2019 Story and Broadcast was made with actual malice in that Defendants knew that the aforesaid statements and meanings were false and/or published or caused them to be published in reckless disregard for their truth or falsity.

155.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity.

156.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

157.    The airing and publishing of the July 17, 2019 Story and Broadcast as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

158.    The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning Sanchez.

159.    The defamatory statements with their implications and meanings alleged in paragraphs 143, 144 and 145 were published by Defendants with bad motives and abject bad faith.

NAVARRO
66 W. Flagler Street, 6th Floor, Miami, Florida 33130

160.    By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues, friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs.  Plaintiffs have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

161.    By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (A) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and emotional well-being, (B) damages sustained by the loss of Sanchez's job and clients, (C) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (D) the amount spent by Plaintiffs as legal fees and expenses in connection with any matters caused by the defamations alleged herein, and (E) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants.

162.    Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

## VII.    JULY 18-24, 2019 BROADCASTS

163.    On or about July 18, 2019, Defendants caused and published a broadcast of the news capsule *De Frente con Jay* on the *Dia a Dia* show containing defamatory and slanderous statements of and concerning the Plaintiffs (the "July 18, 2019 Broadcast"). On or about July 24, 2019, Defendants caused and published a broadcast under the headline "Manuel Natal untangles the bonds between Elías and Rossello" containing defamatory and slanderous statements of and concerning the Plaintiffs (the "July 24, 2019 Broadcast").

164.    The July 18, 2019 Broadcast contains a video excerpt under the headline "They deleted the chats" and can be located at: https://www.telemundopr.com/programas/dia-a-dia-programas-2/de- frente-con-jay-borraron-los-chats_tlmd-puerto-rico/101440/. The July 24, 2019 Broadcast contains a video excerpt from the *Jay y sus Rayos X* show and can be located at: https://www.telemundopr.com/noticias/puerto-rico/manuel-natal-desmenuza-vinculos-entre-elias-y-rossello-telemundo-telenoticias/101284/.

165.    The July 18, 2019 Broadcast falsely and maliciously charged Sanchez with setting up a pay-for-play scheme with ex-Governor Rossello to pay him a salary during his campaign period in exchange for future benefits under his Government administration. The July 18, 2019 Broadcast contains the following false and slanderous statements of and concerning Sanchez:

a.      "When Elías Sánchez was appointed, the Governor appointed him to be on the Fiscal Control Board, he had to file some reports. And Elías was slow in filing those reports because the federal law PROMESA required reports to be filed of the monies he had earned in the past. And guess who was an employee of Elías Sánchez in one of his corporations and had to be disclosed within the first six months of Ricardo Rossello's government? Who was an employee of Elias Sánchez, since 2012 while he was looking to run for the [election] campaign and after that, he ran to be Governor of Puerto Rico. That is, who supported the Governor when he was being a candidate? Who gave the Governor a job, what did the Governor live on?"

b.      "People of Puerto Rico, Elías Sánchez was the one who employed, the employer of Ricardo Rossello Nevares. Let them deny it! Let them deny it! ... Elías

Sánchez paid the governor his salary, he paid the governor his salary and then Elías came and orchestrated a whole system to enrich himself. Doesn't that sound like a trade of provide for me while I run and when I win, you enrich yourself? Doesn't it seem that way? Did I mention any names? Yes, I said it because it is there, it is sworn before the Federal Government. So, for the record, this is not an opinion, this is facts. Well, because sometimes people don't like my opinions… But the facts, can you refute them? Can it be disputed that Elías Sánchez was the employer of Ricardo Rossello and that Ricardo Rossello later allowed Elías Sánchez to enrich himself without restraint? Can anyone refute that fact?"

A Spanish language copy of the transcript of the July 18, 2019 Broadcast with a side-by-side translation is attached as **Exhibit W** incorporated herein and made a part of this Complaint.

166.    On July 18, 2019, Fonseca posted the following false, defamatory and libelous statement into all of his official social media accounts (the "July 18, 2019 SM Post"): "ELIAS INVESTED HEAVILY IN RICKY BEFORE HE WAS GOVERNOR - And now Elías (his wife Valerie, his father-in-law Charlie and his mother-in-law Kathy Erazo) filled their hands and became a millionaire thanks to Ricky. These are the facts and we had revealed it a year ago, in fact, Rep. Manuel Natal made this graph. Elías was Ricky's employer and Elías had to put it in his official reports to the federal government. Isn't this a quid pro quo? Keep me on the campaign and I'll make you a millionaire if I win? Everything we have said now, the people see that we must be vigilant on a daily basis so that democracy is not mocked.

A copy of the July 18, 2019 Facebook post **Exhibit X** incorporated herein and made a part of this Complaint.

167.    The July 24, 2019 Broadcast falsely and maliciously charged Sanchez with setting up a pay-for-play scheme with ex-Governor Rossello to pay him a salary during his campaign period in exchange for future benefits under his Government administration.

168.    It is important to point out that and excerpt of this show was published as part of Miami's T51 article titled "Ricardo Rosselló resigns as Governor of Puerto Rico". The addressed

article written by *Jay y sus Rayos X* and Telemundo Puerto Rico can be found at:

https://www.telemundo51.com/noticias/noticias-destacados/jay-fonseca-confirman-ricardo

Rosselló-renunciara-manana/115068/. See **Exhibit Y** attached herein.

169.    On said date, (July 24, 2019) Defendant's show achieved a historical rating record

with 32.5 of the viewers share vs a 9.8 share of its closest competitor.[16] The rating achieved that

night was higher than the ratings obtained in the previous two weeks by *Telenoticias* and

*NotiCentro* (Telemundo's competitor on Wapa TV).[17]

170.    The July 24, 2019 Broadcast contains the following false and defamatory

statements of and concerning Sanchez:

a.    Fonseca: "We have Manuel Natal with us, an attorney and representative of
the Citizen Victory Movement party. We are going to talk to you Manuel because
some time ago you performed an investigation and you had published a video that
talked about the relationship of the basically lying in bed between Elías Sánchez
and the Governor."

b.    Natal: "Well, I think that in the face of the country's impasse, the Puerto
Rican people have already expressed themselves clearly and forcefully demanding
the departure of Ricardo Rossello. Ricky Rossello refuses to resign. The Legislative
Assembly refuses to dismiss him and I think that the key element is precisely Elias
Sanchez because the future of Elias Sanchez is closely linked to that of Ricardo
Rossello. To recount: Elias Sanchez was the best man at Ricardo Rossello's
wedding. Ricardo Rossello was the best man at Elias Sanchez's wedding…Elías
Sánchez was Ricardo Rossello's employer when Ricardo Rossello went all over the
country campaigning under the Boricua the Time is Now movement."

c.    Fonseca: "So Elias Sanchez had a corporation that hired, that is, he paid
Ricardo Rossello. For doing what? Because he was a lawyer."

d.    Natal: "In 2012 Veritas Consulting, which was the firm of Elias Sanchez,
paid Ricardo Rossello; he collected close to $ 25,000 from Veritas Consulting.
Interestingly, it should also be noted that Elias Sanchez was receiving payment
from a contract with the President of the Senate at that time, Thomas Rivera Schatz.

---

[16] Taken from the website:https://www.tvboricuausa.com/2019/07/ratings-jay-fonseca-logra-audiencia-historica-jay-y-sus-rayos-x-telemundo.html.
[17] Id.

So, on the one hand, Thomas Rivera Schatz gave money to Elias and Elias in turn, through his company, gave money to Ricardo Rossello."

e.      Fonseca: "Which wouldn't be the first time according to Companys, would it? Remember that the governor, according to the friend, mentor and as the eldest brother of the Governor, Yosem Companys who is a young Puerto Rican who studied at Yale and met Governor Pedro Rossello and Pedro Rossello treated him like a son and took him to his house. And he also says that Ricardo Rossello told him that he received money from legislators through corporations that passed money to him to contact Pedro Rossello."

f.      Natal: "And later as we know, Elias Sanchez became Ricardo Rossello's campaign director and later Ricardo Ricardo Rossello's representative before the Fiscal Control Board. Why is Elias Sanchez the key element? Because an investigation into Elias Sanchez is an investigation into Ricardo Rossello."

g.      Natal: "But Jay, the following worries me: I worry that this is not pursued to the final consequences. Because the governor's departure does not end this story. The links of Elias Sanchez must be investigated not only with Ricky Rossello but also with the House of Representatives that is about to begin an investigation. Because the information I have is that things as important as the presidency of the House of Representatives,      Elias Sánchez also intervened to move the votes in favor of Johnny Mendez. And in this particular case, each and every one of the investigations that we have done on the scandals in the Rossello administration, the presence of Elias Sanchez is the common denominator. Jay, I did a study that establishes that the known clients of Elías Sánchez in this four-year period have received nearly 1.3 billion in contracts with the Government. If Elias has a commission contract like the one that Velázquez Piñol had of 10%, that represents for Elias Sanchez about 130 million. Let's say he has 5%, that represents 65 million only in the clients we know. Clients like Triple S, clients like Saint James, EC Waste, Microsoft, clients with huge contracts with the Government of Puerto Rico and that is why it is important."

h.      Fonseca: "And others that we did not know of, for example, that of GILA, which was one of those that you went wait wait, but how if GILA was lobbied by Roberto Prats, I mean, as far as we knew. It turns out then that Elias Sanchez goes to a meeting with the Secretary of the Treasury and then denies it, but it turns out that it may be that he was not representing GILA but rather the parent company, because it turns out that the contract that issued you the fines from autoexpreso they took it away from one but they gave it to his brother. In other words, they gave it to the company that was owned by the same owner."

i.      Natal: "But another example of what you mentioned earlier, Elías Sánchez represents Puma, but Elias Sanchez does not only represent Puma. Elias Sanchez has a close relationship with Steve Kupka who is the lobbyist for the electric power authority, which in turn represents the firm that was hired by the electric power authority for the privatization process. So we see that the figure of Elias Sanchez is

the common denominator in this Government and obviously to the extent that what everyone expects to happen in the next few hours or days happens to Elias Sanchez, that directly means that the Governor was also being investigated."

j.      Fonseca: And not only Elías Sánchez but the enlarged combo because it was the lobbying family, the family pack."

A Spanish language copy of the transcript of the July 24, 2019 Broadcast with a side-by-side translation is attached as **Exhibit Z** incorporated herein and made a part of this Complaint.

171.    The gravely false, defamatory, and slanderous statements by Defendants on the July 18, 2019 SM Post described in paragraph 166  are the type of stories that you would expect to hear in movies or political satire shows, but instead they are being articulated by the "lawyer, journalist, commentator and influencer" that is "one of the most influential people in public opinion in Puerto Rico," and "the most influential personality when it comes to creating public opinion about news and politics in Puerto Rico and with certain demographics in the United States." Fonseca forcefully takes his statement outside of the opinion and rhetorical hyperbole realm to press upon his viewers that these are the hard true facts.  The statements are so preposterous, ridiculous and barbaric that it is difficult to wrap your mind around the fact that Fonseca is considered the paragon of journalism. Contrary to Fonseca's statements, Rossello was hired by Veritas firm during the year 2012 for a short-term engagement not exceeding a period of six (6) months with a $5,000 salary per month. In fact, Rossello's campaign commenced on September 20, 2015, more than thirty (30) months after the end of his engagement with Sanchez's company Veritas Consulting.  To imply that Sanchez and Rossello setup a quid-pro-quo arrangement where in exchange for $25,000, Sanchez and all of his immediate family members would become multimillionaires is material for a cheap paperback novel.  Unfortunately, as laughable as it may sound, the gist of the matter is that most of his viewers and followers robotically believe his stories and are convinced that

Plaintiffs are a criminal mafia that has looted the Government of Puerto Rico, and as a consequence have subjected Plaintiffs to humiliation, hatred, distrust, contempt, aversion ridicule and disgrace.

172.    By use of the particular words set forth in paragraph 165, Defendants conveyed among others, the following false and defamatory statements, implications and meanings of and concerning Plaintiffs:

a.      Sanchez failed to file on time the financial disclosures required by PROMESA. The financial disclosures revealed that Rossello had been an employee of Veritas Consulting. That Sanchez maintained Rossello financially during his political campaign for Governor.

b.      Sanchez enriched himself as payback for having supported Rossello financially.

173.    By use of the particular words set forth in paragraph 170, Defendants conveyed among others, the following false and defamatory statements, implications and meanings of and concerning Plaintiffs:

a.      Manuel Natal completed an independent investigation that confirmed Fonseca's allegations that Sanchez and the Governor were lying in bed together.

b.      Sanchez and the ex-Governor's past and future are intertwined. Sanchez and the ex-Governor had some type of compensation scheme when Rossello was campaigning around the island.

c.      It was illegal for Rossello to be an employee of Sanchez's firm because Rossello is not a lawyer.

d.      Sanchez, Rossello and the President of the Senate, Thomas Rivera Schatz had developed a scheme to pass public funds to Rossello.

e.      The scheme was confirmed by Rossello's older brother to whom Rossello had admitted the existing scheme.

f.      The way to force Rossello out of the Government is by going after Sanchez.

g.      Forcing Rossello out of Government is not the final stage. Sanchez must pay for the millions of dollars he has stolen from the Government.

h.      Sanchez is a lobbyist related to GILA Corporation who participated in meetings regarding the contract that had been cancelled with GILA.

i.      Sanchez has been part of a criminal enterprise and will be arrested soon.

j.       Sanchez and his family are a criminal enterprise that will be going to jail.

174.    The false and defamatory meanings and implications of and concerning Plaintiffs alleged in paragraphs 172 and 173, were also conveyed by the combination of individual statements contained on the July 18, 2019 SM Post, the July 18, 2019 Broadcast and the July 24, 2019 Broadcast, including the juxtaposition of words and statements to each other and the omission of certain facts, which in the aggregate, produced the false and defamatory inferences conveyed through said meanings and implications.

175.    Contrary to the aforesaid false and defamatory statements, implications and meanings conveyed in paragraphs 165 and 172:

a.      Sanchez filed all of his financial disclosures with the Financial Oversight and Management Board (FOMB) in a timely manner. All of the disclosure documents are publicly available and easily accessible on the FOMB's website and include the dates on which they were filed. Interestingly, none of the financial disclosure documents required or included information about payments to employees for the past six years. There was absolutely no information regarding the short-term employment engagement between Veritas and Ricardo Rossello on any of the FOMB's financial disclosures.

b.      The alleged enrichment by Plaintiffs is a fabrication by Fonseca's ill-will and a product of his imagination.

176.    Contrary to the aforesaid false and defamatory statements, implications and meanings conveyed in paragraph 170 and 173:

a.      We have already commented extensively on the unbecoming use of sexual innuendo to degrade Sanchez and linking allegations of corruption with anti-gay prejudice in Paragraph 143, item d.

b.      Rossello was indeed employed by Sanchez's company Veritas Consulting LLC in the year 2012 for a short four-to-five-month period to work on a specific project involving issues for a client in the private sector.

73

NAVARRO

66 W. Flagler Street, 6th Floor, Miami, Florida 33130

c.      In 2012, Veritas Consulting LLC did not conduct business as a law firm. A simple search of the Puerto Rico Registry of Corporations maintained by the Department of State would have revealed that the purpose of the company is not related to legal services, but instead to "engage in all those activities authorized by the General Law of Corporations of Puerto Rico, as amended".

d.      Once again, a simple search in the Registry of Government Contracts maintained by the Puerto Rico Comptroller's Office would have revealed that Sanchez indeed had a Government contract with the Office of Legislative Services of the Legislative Assembly of Puerto Rico, and not with the President of the Senate, to serve as an advisor from January 16, 2009 through June 30, 2011.  Therefore, there was no overlapping between Sanchez's contract with the Office of Legislative Services and the short-term employment by Veritas with Ricardo Rossello in the year 2012.

e.      Yosem Companys is not Ricardo Rossello's older brother. His accounts have never been corroborated by anyone within the Rossello family or elsewhere.  In fact, Ricardo Rossello said on Twitter that the allegations were "totally false. It is truly lamentable and disappointing that a person which I considered a friend would make such ill-intentioned and false comments".

177.    This is the type of ill-intended statements that have resulted in threats to Plaintiffs wellbeing and physical integrity.  See **Exhibit DD.**

178.    This is not only flat out outrageous and ridiculous, but it is defamatory per se.

179.    As expressed by Sanchez in his written reaction to the CPI libelous claims that was published by Telemundo, he has never had any relationship with GILA LLC, any of its subsidiaries or its parent company. It is correct that Sanchez participated in meetings with the Department of Treasury, but it was in representation of the company Treasury Services Group, LLC and in relation to a proposal related to collection services for bad or uncollectible accounts, not for issues related to autoexpreso. The proposal included MSB, a company that is indeed related to GILA LLC and whose representative is Roberto Pratts, and not Sanchez.  Sanchez has not participated in any meetings regarding the autoexpreso contract.

180.    After 18 months, no one in Plaintiffs family has been arrested or accused of any criminal activity.

181.    Each and every statement, implication and meaning of and concerning the Plaintiffs alleged above in paragraphs 165 through 173 are false.

182.    Fonseca knew and intended that the particular statements set forth in paragraph 166 and published on the July 18, 2019 SM Post would convey each and every false and defamatory implication and meaning that can be inferred therefrom, of and concerning the Plaintiffs and such false and defamatory meanings of and concerning the Plaintiffs were conveyed by the particular statements set forth in paragraph 166, and by the inferences drawn from the July 18, 2019 SM Post statements in the aggregate.

183.    Defendants knew and intended that the particular statements set forth in paragraph 165 and published on the July 18, 2019 Broadcast would convey each and every false and defamatory implication and meaning set forth in paragraph 172 of and concerning the Plaintiffs and such false and defamatory meanings of and concerning the Plaintiffs were conveyed by the particular statements set forth in paragraph 165, and by the inferences drawn from the July 18, 2019 Broadcast statements in the aggregate.

184.    Defendants knew and intended that the particular statements set forth in paragraph 170 and published on the July 24, 2019 Broadcast would convey each and every false and defamatory implication and meaning set forth in paragraph 173 of and concerning the Plaintiffs and such false and defamatory meanings of and concerning the Plaintiffs were conveyed by the particular statements set forth in paragraph 170, and by the inferences drawn from the July 24, 2019 Broadcast statements in the aggregate.

185.    In the publication of the aforesaid false and defamatory statements, implications and meanings, Defendants acted with the required degree of actual malice to overcome any protections under the First Amendment and/or an Anti-Strategic Lawsuit Against Public

Participation statute, given that (A) the claims by Fonseca and Mr. Manuel Natal are so outlandish that no self-respecting journalist would accept them without question, although the average viewer could believe them; (B) there was no actual independent corroboration by Defendants of any the statements in the July 18, 2019 and July 24, 2019 statements; (C) no individual had brought any administrative, civil or criminal claims against Sanchez at the time the alleged incidents allegedly occurred; (D) Fonseca, as a licensed attorney, is subject to a higher ethical standard in his analysis and understanding of legal matters; (E) they had absolutely no support for their defamatory statements; (E) they had not checked or properly checked the facts underlying the July 18, 2019 and July 24, 2019 statements and intentionally avoided contacting Sanchez to corroborate the allegations; (F) that the aforesaid false and defamatory statements, implications and meanings were contradicted by substantial credible information, which Defendants had prior to the broadcast of the statements; (G) Defendants ignored the truthful statements made by Sanchez in order to avoid a fair and balanced report; and (H) Fonseca's extreme bias and ill-will against Plaintiffs.

186.    Defendants' July 18, 2019 SM Post, July 18, 2019 Broadcast and July 24, 2019 Broadcast were made with actual malice in that Defendants knew that the aforesaid statements and meanings were false and/or published or caused them to be published in reckless disregard for their truth or falsity.

187.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity.

188.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

189.    The airing and publishing of the July 18, 2019 SM Post, the July 18, 2019 Broadcast and the July 24, 2019 Broadcast as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

190.    The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning Sanchez.

191.    The defamatory statements with their implications and meanings alleged in paragraphs 165 through 170 were published by Defendants with bad motives and abject bad faith.

192.    By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues, friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs.  Plaintiffs have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

193.    By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (A) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and

emotional well-being, (B) damages sustained by the loss of Sanchez's job and clients, (C) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (D) the amount spent by Plaintiffs as legal fees and expenses in connection with any matters caused by the defamations alleged herein, and (E) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants.

194.    Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

**VIII.      JUNE 11- 21, 2019 BROADCASTS**

195.    On or about June 11, 2019, Defendants caused and broadcasted a live segment within Telemundo's *Telenoticias* newscast bearing the headline "Elias Sanchez knows all the secrets of the State" containing defamatory and slanderous statements of and concerning the Plaintiffs (the "June 11, 2019 Broadcast"). Then, on or about June 21, 2019, Defendants caused and broadcasted another live segment within Telemundo's *Telenoticias* newscast bearing the headline "How beautiful is Elias Sanchez's life, brother!" also containing defamatory and slanderous statements of and concerning the Plaintiffs (the "June 21, 2019 Broadcast").

196.    The    June    11,    2019    Broadcast    was    also    published    at: https://www.telemundopr.com/videos/_elias-sanchez-sabe-todos-los-secretos-del-estado__tlmd-puerto-rico/106113/.    The    June    21,    2019    Broadcast    was    also    published    at: https://www.telemundopr.com/noticias/local/que-bella-es-la-vida-de-elias-sanchez_tlmd-puerto-rico/101716/.

197.    The June 11, 2019 Broadcast falsely and maliciously charged Sanchez with obtaining "secrets of the state" through his position in the transition committee and benefitting

from the access to the FOMB. The June 11, 2019 Broadcast contained the following false and slanderous statements of and concerning Sanchez:

      a.    "The Governor appointed Elias Sanchez as his campaign manager, then he appointed him as the head of his transition committee. In other words, the man who was going to be in charge of knowing all the secrets of the past government and this one. Next, he is appointed [as] his representative before the Fiscal Control Board. In other words, he was going to have all the confidential secrets and all the important matters between the Board and the government, he was going to know them."

      b.    "In other words, he was closest to him for being the head of his campaign, closest to the government's transition, to knowing the secrets of one government and the other, and then the junta and the government. In other words, the governor gave him all the secrets of the state, of the government and so on, and all the accesses."

      c.    "And then that official, a couple of months into his government, resigns and begins calling the agency heads and asking for contracts for his private clients. And telling them, hey, uh, look, that which you're doing, don't, do this other thing [instead]. And many government officials complained and were upset and said: look he is calling me and I do not want to. And those officials ended up dismissed and the rest remained, those who listened to Elías remained."

A Spanish language copy of the transcript of the June 11, 2019 Broadcast with a side-by-side translation is attached as **Exhibit AA** incorporated herein and made a part of this Complaint.

198.    The June 21, 2019 Broadcast falsely and maliciously charged Sanchez with being the object of an investigation by federal authorities and that Sanchez had a security detail even that were being paid overtime before he was a public official. The June 21, 2019 Broadcast contained the following false and slanderous statements of and concerning Sanchez:

a.    "Elias Sanchez is supposedly being investigated by the feds, right, for supposedly selling influences."

b.    "Nor should we see as strange that Elías Sánchez is being investigated because he allegedly used security detail before he was even a public official. Ah, he has never been a public official. How about that? Because Elías Sánchez was the director of Ricardo Rossello's campaign and later he was the representative of the

Governor or president of the Transition Committee and after that he was the Governor's spokesperson in the Fiscal Control Board, but he had security detail and the detail received overtime, but they did so voluntarily because nobody ever found out officially. I mean, they didn't ask for permission, there was no request or anything like that. Wow, how beautiful is the life of Elías Sánchez brother! Wow, that Miami house has to be … life smiles at him!"

A Spanish language copy of the transcript of the June 21, 2019 Broadcast with a side-by-side translation is attached as **Exhibit BB** incorporated herein and made a part of this Complaint.

199.    By use of the particular words set forth in paragraph 195, Defendants conveyed among others, the following false and defamatory statements, implications and meanings of and concerning Plaintiffs:

      a.    Sanchez was going to use or had used "state secrets" received during Rossello's government transition and as member of the Board for his advantage to commit illegal acts.

      b.    Rossello gave Sanchez alone access to all the secrets of the state so that he could use confidential information to his personal benefit and that of his clients. He also had unvetted access to the Fiscal Board's confidential information.

      c.    After resigning from his position with the Fiscal Board, Sanchez did exactly what Fonseca warned against by calling agency heads and influencing them to award contracts and if they refused, they would be fired by the Governor.

200.    By use of the particular words set forth in paragraph 196, Defendants conveyed among others, the following false and defamatory statements, implications and meanings of and concerning Plaintiffs:

a.    Although he uses the word "supposedly", Fonseca has continuously insisted that as a matter of fact, Sanchez is being investigated by federal authorities, including the FBI, for selling influences.

b.    Sanchez was also the target of a local investigation related to the security detail that he used during the campaign and that were getting paid overtime for doing so.  Sanchez has used the money obtained illegally to purchase a house in Miami, Florida.

201.    The false and defamatory meanings and implications of and concerning Plaintiffs alleged in paragraph 197, were also conveyed by the combination of individual statements contained in the June 11, 2019 Broadcast, including the juxtaposition of words and statements to each other and the omission of certain facts, which in the aggregate, produced the false and defamatory inferences conveyed through said meanings and implications.

202.    The false and defamatory meanings and implications of and concerning Plaintiffs alleged in paragraph 198, were also conveyed by the combination of individual statements contained in the June 21, 2019 Broadcast, including the juxtaposition of words and statements to each other and the omission of certain facts, which in the aggregate, produced the false and defamatory inferences conveyed through said meanings and implications.

203.    Contrary to the aforesaid false and defamatory statements, implications and meanings in paragraphs 195 through 198:

a.      As explained extensively in paragraph 124, the Chairman of the Transition Committee does not have access to any additional information than what the Executive Director and members of the Transition Committee hold.  Fonseca intentionally omitted the fact that Sanchez participated in only a small number of transition hearings and that any and all transition information shared by or with the members of the transition team was uploaded to a website repository for public access, or for access by all members of the transition team.

b.      As an attorney, Fonseca knew that the Government of Puerto Rico does not hold any "secrets of the State," as such secrets are constrained to military or diplomatic matters or both, solely within the purview of nation-states. The Commonwealth of Puerto Rico is an unincorporated territory of the United States lacking the type of jurisdiction that brings about the authority to hold secrets of the State. Furthermore, as a non-voting member of the FOMB, Sanchez only had access to public documents pertaining to fiscal matters of the government. In addition, Sanchez only participated in public hearings of the FOMB, as he was always excluded from Executive Hearings in which the voting members discussed strategy and sensitive matters. A quick review of the publicly available By-laws of the FOMB confirms that the ex officio member, as a non-voting member only participates in the public hearings and not on the executive sessions.

c.     In all accounts where an agency head confirmed participating in a meeting with Sanchez in his role as a lobbyist, all of them have confirmed that they did not feel influenced in any way.  Not one public officer has accused or pointed to Sanchez as the cause for their termination by the Governor.

204.     Contrary to the aforesaid false and defamatory statements, implications and meanings in paragraphs 195 through 198:

a.     There has been no confirmation whatsoever from a credible source alleging that Sanchez is the target of any investigation by the federal authorities.

b.      Sanchez has emphatically denied all allegations of any security detail being assigned by the Police Bureau of Puerto Rico. There were two police agents that volunteered during their time off to accompany Sanchez to campaign events.  The Office of Government Ethics ("OGE") conducted an investigation regarding the two agents, but not regarding Sanchez because he was not a public servant during the campaign. The Director of the OGE, Mr. Luis Perez Vargas, confirmed that their investigation concluded that: "The Puerto Rico Police Bureau does not have a prohibition for police officers to serve as bodyguards for politicians in their free time. The OEG lawyers interviewed 25 police officers from various positions in the airport quarters, not a single agent provided evidence that those investigated provided security detail services. There are no witnesses who locate the investigated agents in the company of Sánchez. Nor is there any physical or documentary evidence that establishes that they accompanied Sánchez during working hours".  Finally, the allegation that Plaintiffs own a house in Miami, Florida can be easily confirmed or denied as property ownership information is public in the State of Florida.  Plaintiffs do not hold ownership interests, directly or indirectly, of any property in Florida.

205.     Each and every statement, implication and meaning of and concerning the Plaintiffs alleged above in paragraphs 195 through 198 are false.

206.     Defendants knew and intended that the particular statements set forth in paragraph 195 and published on the June 11, 2019 Broadcast, would convey each and every false and defamatory implication and meaning set forth in paragraph 197 of and concerning the Plaintiffs and such false and defamatory meanings of and concerning the Plaintiffs were conveyed by the particular statements set forth in paragraph 195, and by the inferences drawn from the June 11, 2019 Broadcast statements in the aggregate.

82

NAVARRO

66 W. Flagler Street, 6th Floor, Miami, Florida 33130

207.    Defendants knew and intended that the particular statements set forth in paragraph 196 and published on the June 21, 2019 Broadcast, would convey each and every false and defamatory implication and meaning set forth in paragraph 198 of and concerning the Plaintiffs and such false and defamatory meanings of and concerning the Plaintiffs were conveyed by the particular statements set forth in paragraph 196, and by the inferences drawn from the June 21, 2019 Broadcast statements in the aggregate.

208.    In the publication of the aforesaid false and defamatory statements, implications and meanings, Defendants acted with the required degree of actual malice to overcome any protections under the First Amendment and/or an Anti-Strategic Lawsuit Against Public Participation statute, given that (i) Fonseca is extremely biased against Plaintiffs; (ii) no individual has filed any administrative, civil or criminal claim at the time alleging misuse of government information for Sanchez's own benefit, a client or a family member; (iii) they had absolutely no support for their defamatory statements; (iv) they had not checked or properly checked the facts underlying the June 11, 2019 and June 21, 2019 Broadcasts and intentionally avoided contacting Sanchez to corroborate the allegations; and (v) Fonseca fabricated and mischaracterized facts to support its defamatory statements, implications and meanings in the June 11, 2019 and June 21, 2019 Broadcasts.

209.    Defendants' June 11, 2019 Broadcast and June 21, 2019 Broadcast were made with actual malice in that Defendants knew that the aforesaid statements and meanings were false and/or published or caused them to be published in reckless disregard for their truth or falsity.

210.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity.

211.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

212.    The airing and publishing of the Broadcast as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

213.    The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning the Plaintiffs.

214.    The defamatory statements with their implications and meanings alleged in paragraphs 195 through 198 were broadcasted by Defendants with bad motives and abject bad faith.

215.    By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues, friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs.  Plaintiffs have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

216.     By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (i) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and emotional well-being, (ii) damages sustained by the loss of Sanchez's job and clients, (iii) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (iv) the amount spent by Plaintiffs as legal fees and expenses in connection with any matters caused by the defamations alleged herein, and (v) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants.

217.     Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

## IX.        JULY 21-22, 2019 BROADCASTS

218.     In the heat of the manifestations in the Summer 2019 that resulted in the resignation of Governor Ricardo Rossello, the political activism by media personalities was fixed at full throttle. Fonseca, empowered and promoted by Telemundo and Defendants, played a key role in instigating and inciting protesters to increase the pressure on political figures and unsurprisingly against Sanchez.

219.     On or about July 21, 2019, Fonseca published a Facebook post at: https://www.facebook.com/JayFonsecaPR/posts/2897977536886358 under the headline "For tomorrow's March", containing a pressing list of the reasons why the Governor of Puerto Rico should resign (the "July 21, 2019 Post"). Fonseca introduced the list as follows: "I've seen people that get asked why he [Rossello] should resign and they don't have good responses, I will give you some…"

220.    The July 21, 2019 Post contained the following false and libelous statements of and concerning Plaintiffs:

a.    "Elias Sanchez continues to lie in bed with the Governor, and the Governor just appointed people close to Elias and to Mr. José Marrero, ex Director of the Budget and Management Office."

b.    "Because Elías Sánchez had security detail charging overtime, without a right to have them, and that is a mystery, meanwhile in cases of domestic violence we have to wait over 50 minutes for the police to show up."

c.    "Because he named Iris Santos (Chiqui) to overview Puerto Rico's budget, a person who is pushing Elias Sanchez personal agenda and the agenda of the clients he lobbies for, and the Governor is aware."

A Spanish language copy of the transcript of the July 21, 2019 Post with a side-by-side translation is attached as **Exhibit CC** incorporated herein and made a part of this Complaint.

221.    By use of the particular words set forth in paragraph 220, Defendants conveyed among others, the following false and defamatory statements, implications and meanings of and concerning Plaintiffs:

a.    Sanchez continues to have control of the Government upper management levels.

b.    Incited sentiments of frustration and despair by insisting that Sanchez had access to his own personal security detail, while victims of crimes waited long periods to receive Police assistance.

c.    Described the new Director of the Office of Management and Budget as an acolyte of Sanchez strategically placed to ensure that his clients continued benefitting from government contracts.

222.    The false and defamatory meanings and implications of and concerning Plaintiffs alleged in paragraph 221, were also conveyed by the combination of individual statements contained in the July 21, 2019 Post, including the juxtaposition of words and statements to each other and the omission of certain facts, which in the aggregate, produced the false and defamatory inferences conveyed through said meanings and implications.

NAVARRO
66 W. Flagler Street, 6th Floor, Miami, Florida 33130

223.    With his defamatory statements, Fonseca made a display of his political activism fueled not by conviction but by economic benefit channeled mainly to cement his recognition as a national hero. Aside from all the bias and ulterior motives described throughout this Complaint, it would be logical to ask: Why was Fonseca so hell-bent on attacking and destroying Plaintiffs? What made it so personal for him? Well, there is a rational response to these questions, which may be found in Fonseca's own statements about his personal political aspirations and his marked social undermining behavior. Social undermining refers to intentional offenses aimed at destroying another's favorable reputation, their ability to accomplish their work, or their ability to build and maintain positive relationships.

224.    Fonseca's political aspirations made the front-page news in one of Puerto Rico's leading newspaper on October 7, 2015. In his own words, "without a doubt, being governor of Puerto Rico, we all aspire to be in the highest position, I would have loved it and I would love it at some point, but there is no platform. I have said so many things, some taken out of context and some have been screw-ups, very honest and very genuine things, and very necessary. So, it may be, not now, at least until 2020 I couldn't run for governor."

225.    Fonseca's social undermining calculated strategy rendered fruits as Plaintiffs were forced to abandon Puerto Rico, their home, family and friends and seek refuge in the State of Florida.  On the same date, in response to the inflammatory statements made by Defendants, Plaintiffs, while in Miami-Dade County, Florida, received hundreds of threats and aggressive messages directed at him, Rodriguez and even their small children, then aged three and four, via Facebook, WhatsApp, voicemail and text messages. These are just but a minor sample:

      a.    "Look Mr. Dirty Sanchez…call your buddy and tell him to resign…also we have a great selection of orange uniforms for you and your minions…you may come at any moment to get measured to find out your size in 150 Ave. Carlos E. Chardon, San Juan, PR 00918".

b.      "Hello! You are a disgrace to the people of Puerto Rico; you should be in jail. It's disgusting that you are Puerto Rican. People are tired and you will pay the consequences".

c.      "FUCKING[18] CORRUPT"

d.      "Corrupt you should be crapping your pant. We are disgusted by the boys club. Corruption is the only way that a piece of shit like you can become a millionaire".

e.      "YOU and people like YOU that behave like criminal tyrants from the seat of power awarded by the people deserve to live in shame for the rest of your life".

f.      "F**KING THIEF, DRESSING, HOW CUTE THE BOY LOOKS DRESSED WITH THOSE MILLIONS THAT YOU HAVE STOLE YOU BALL OF SHIT".

g.      "Go f**k yourselves you bunch of mother f**kers, you have to move from PR…Jajajajaja there are rumors that you will be arrested [laughing emojis, popcorn and wine emojis]"

h.      "May God want you to rot in jail a**hole. You will pay for everything".

i.      "Homosexual, corrupt, you had sex with Rossello"

j.      "Elias, c**ksucker! Go f**k yourself!"

k.      "Corrupt, get the f**k out of here!"

l.      "Get the f**k out of this country, corrupt"

m.      "We are following your every step"

n.      "C**ksucker, I can't wait to see you in jail"

o.      "Get the f**k out of here you cocksucker; they are putting a price on your head charlatan, f**king rat"

p.      "Good afternoon, I spit on your face and your dinner on behalf of the people. We are coming after you".

---

[18] Due to the numerous amounts of times profanity has been used throughout, Plaintiff has censored profanity herein out in order to make reading less offensive to the reader.

q.      "Elias Sanchez, we are waiting for your arrest soon. Corrupt, thief, robber. Face the people. Your mockery of the people will not be tolerated. Turn yourself in to the authorities or to the people's justice".

r.      "You are part of the problem. GET THE F**K OUT OF PUERTO RICO!"

s.      "Knock knock! Get your toothbrush ready! The feds are coming to get you!"

226.    Sanchez was also threatened with death by an apparently responsive graffiti on one of the main avenues of the metropolitan area of Puerto Rico. As to Sanchez, the statements by Fonseca are false and made with knowledge of their falsity or with reckless disregard of the truth. A Spanish language copy of the messages received is attached as **Exhibit DD** incorporated herein and made a part of this Complaint.

227.    Each and every statement, implication and meaning of and concerning the Plaintiffs alleged above in paragraphs 220 and 221 are false. They have been emphatically disputed throughout this Complaint.

228.    Fonseca knew and intended that the particular statements set forth in paragraph 220 and published on the July 21, 2019 Post would convey each and every false and defamatory implication and meaning set forth in paragraph 221 of and concerning the Plaintiffs and such false and defamatory meanings of and concerning the Plaintiffs were conveyed by the particular statements set forth in paragraph 220, and by the inferences drawn from the July 21, 2019 Post statements in the aggregate.

229.    In the publication of the aforesaid false and defamatory statements, implications and meanings, Fonseca acted with the required degree of actual malice to overcome any protections under the First Amendment and/or an Anti-Strategic Lawsuit Against Public Participation statute, given that (i) Fonseca is extremely biased against Sanchez and has displayed a clear pattern of social undermining strategies; (ii) no source had filed any administrative, civil or

89

NAVARRO

66 W. Flagler Street, 6th Floor, Miami, Florida 33130

criminal claim at the time the alleged incidents allegedly occurred; (iii) he had absolutely no support for their defamatory statements; (iv) he had not checked or properly checked the facts underlying the July 21, 2019 Post and intentionally avoided contacting Plaintiffs to corroborate the allegations; and (v) Fonseca fabricated and mischaracterized facts to support his defamatory statements, implications and meanings in the July 21, 2019 Post.

230.    Defendants' July 21, 2019 Post was made with actual malice in that Defendants knew that the aforesaid statements and meanings were false and/or published or caused them to be published in reckless disregard for their truth or falsity.

231.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity.

232.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

233.    The airing and publishing of the Broadcast as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

234.    The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning the Plaintiffs.

235.    The defamatory statements with their implications and meanings alleged in paragraphs 220 and 221 were broadcasted by Defendants with bad motives and abject bad faith.

236.    By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and

high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues, friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs. Plaintiffs have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

237.    By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (i) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and emotional well-being, (ii) damages sustained by the loss of Sanchez's job and clients, (iii) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (iv) the amount spent by Plaintiffs as legal fees and expenses in connection with any matters caused by the defamations alleged herein, and (v) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants.

238.    Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

## X.       JULY 31, 2019 BROADCASTS

239.    On or about July 31, 2019, Defendants published a video excerpt online at https://www.telemundopr.com/programas/jay-y-sus-rayos-x/fei-revela-delaraciones-juradas-

sobre-wanda-vazquez_tlmd-puerto-rico/101070/ under the headline "FEI revela declaraciones juradas sobre Wanda Vázquez" (translation: "Special Independent Counsel reveals the sworn statements about Wanda Vázquez").  The video contains an excerpt from the Jay y sus Rayos X show broadcasted on or about July 30, 2019. On said videos, Defendants made the following defamatory and malicious statements:

> " Itza García and William Villafañe were the people who opposed or hindered and continually asked for competitive processes instead of direct contracting for those matters lobbied by Elías Sánchez. That has been told to us by multiple sources. In fact, we spoke about it years ago that there were two sides when this administration began: the side of Elías Sánchez and the side of William Villafañe. Two sides that although had a good professional relationship, in practice, Elías Sánchez asked for contracts and they continually had to be asking for competitive processes. That was Itza García mainly and William Villafañe in second who were continuously in that management. When the WhatsApp chat came out, all this scandal came out, Itza García left her position, William Villafañe leaves, and the people of the plan for Puerto Rico, who was the group that Itza García was leading, gradually came out of their positions and people close to Elías Sánchez ended up in the most important spheres of the Government"

The statements contained in this video are listed, in both Spanish and English, in **Exhibit EE,** attached herein.

240.    The defamatory statements involved the materially false implication that Sánchez sought to bypass competitive procurement processes established by law and regulations to coerce government agencies to grant contracts that benefitted his clients.

241.    Fonseca's statements were false and made with malice or with reckless disregard of their truth because as an attorney, Fonseca actually or constructively knew that the procurement and authorization process in place for Puerto Rican government contracts is highly regulated, with proposed contracts reviewed and authorized by the Governor's Chief of Staff's office, with the office of the Chief of Staff of the Governor having no legal jurisdiction to direct, change, intervene or modify an agency's procurement process.

242.     The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity.

243.     The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

244.     The airing and publishing of the Broadcast as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

245.     The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning the Plaintiffs.

246.     The defamatory statements with their implications and meanings alleged in paragraphs 239 and 240 were broadcasted by Defendants with bad motives and abject bad faith.

247.     By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues, friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs.  Plaintiffs

NAVARRO
66 W. Flagler Street, 6th Floor, Miami, Florida 33130

have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

248.    By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (i) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and emotional well-being, (ii) damages sustained by the loss of Sanchez's job and clients, (iii) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (iv) the amount spent by Plaintiffs as legal fees and expenses in connection with any matters caused by the defamations alleged herein, and (v) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants.

249.    Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

XI.    **AUGUST 12, 2019 AND JULY 16, 2019 BROADCASTS**

250.    On or about August 12, 2019, as part of a segment of Telemundo's daily program *Dia a Dia* found at https://www.telemundopr.com/programas/dia-a-dia-programas-2/_julia-keleher-enviaba informacion-confidencial-a-elias-Sánchez__tlmd-puerto-rico/45822/,Fonseca continued his pattern of slanderous statements against Plaintiffs.

251.    Fonseca once again commingled former Secretary of Education Julia Keleher ("Keleher") who is now a federal indictee, with Sánchez in his continuous quest to falsely portray him as corrupt. Here Defendants used visual and verbal cues to falsely implicate Sanchez in connection with a federal corruption indictment against Keleher, by implying that Keleher sent emails and confidential information to Sanchez for nefarious reasons.

252.     Based on a news article stating that they were over 18,000 discovery items related to Keleher's indictment, Fonseca visually started asking his production team in Telemundo to show Sánchez's picture on the background and then proceeded to state the following false and defamatory statements of and concerning Sanchez:

a. "…tell me if it's true or false that Julia Keleher continuously sent emails and confidential information to Elías Sánchez, and that is part of the evidence that they have against Julia, the times she used to communicate things to Elías about the Department of Education."

b. "The important thing is, wasn't the current Governor [Wanda Vazquez] part of that crowd, the one that people love and applauds so much?"

c. "Why doesn't the Secretary of Justice, now Governor [Vazquez], have the 18,000 documents, could it be because of her close relationship with Elías? I'm just asking, I am a nice guy (starts laughing) I only say these things as a question. If there's going to be documents showing Julia Keleher sending information to Elías. You know how it was with Velazquez Pinol right?"

A Spanish language copy of the transcript of the August 12, 2019 Broadcast with a side-by-side translation is attached as **Exhibit FF** incorporated herein and made a part of this Complaint.

253.     To better understand Defendants' malicious statements and corrupt implications made on August 12, 2019 Broadcast, is important to describe Fonseca's malicious statements made on July 16, 2019 on the *Dia a Dia* show. On this show Fonseca narrated the events of Keleher's arrival in Puerto Rico after her initial arrest by the United States' federal government.  The broadcast contained the following false and defamatory statements of and concerning Sanchez:

a. "Julia Keleher was arrested for two corruption schemes; she was arrested by the FBI because she was passing information to contractors who ... and to lobbyists who benefited from said information."

b. "that is, Julia Keleher is accused, again, of two things. Number 1: to pass information to contractors and pardon contractors or lobbyists so that they would personally benefit from that eh from those documents."

c. "We know that the investigation continues and that there are other angles. But the feds in my opinion really want to arrest Julia Keleher not to sink her, but to cooperate. If you see the evidence and the indictment itself, if you read the

accusatory statement, you will see that there are many things that are left as loose ends, to see if she cooperates and talks about other people and specifically because messages were continuously passed to her by lobbyists who have not yet been arrested."

A Spanish language copy of the transcript of the July 16, 2019 Broadcast with a side-by-side translation is attached as **Exhibit GG** incorporated herein and made a part of this Complaint.

254.    By use of the particular words set forth in paragraphs 252 and 253, Defendants conveyed among others, the following false and defamatory statements, implications and meanings of and concerning Plaintiffs:

a.    that Keleher was indicted because she was passing information to lobbyist and contractors and that said investigation continues and there were other angles.

b.    that the FBI had indicted Keleher not to bring her down, but to obtain her cooperation so that she would provide evidence of other individuals' wrongdoings and shed light particularly on why she continuously shared messages with lobbyists yet to be arrested.

c.    that Sanchez was the lobbyist with whom Keleher was sharing confidential information.

d.    that information sent by Keleher to Sanchez was similar to the information passed by Keleher to federal indictee Alberto Velazquez Pinol.

f.    that Sanchez was yet to be arrested as part of the ongoing investigation by the federal government involving the Department of Education of Puerto Rico.

255.    The false and defamatory meanings and implications of and concerning Plaintiffs alleged in paragraph 254, were conveyed by the combination of individual statements contained on the July 16, 2019   *Dia a Dia* show and the August 12, 2019 Broadcast, including the juxtaposition of words and statements to each other and the omission of certain facts, which in the aggregate, produced the false and defamatory inferences conveyed through said meanings and implications.

256.    Contrary to the aforesaid false and defamatory statements, implications and meanings conveyed in paragraphs 252, 253 and 254:

a.    Sanchez's name has never been mentioned or implied in any federal indictment or state accusation.

b.    that on July 10, 2019 the U.S. District Attorney for the District of Puerto Rico gave a press conference that was transmitted through all media outlets, including Telemundo, to address the public regarding the indictments issued by a grand jury that involved corruption allegations in both the Department of Health and the Department of Education. On said press conference, District attorney Rosa Emilia expressly denied any implication that Sanchez was suspect or had an involvement in the investigation which led to the indictment of Keleher. The District attorney responding to pressing questions by journalists regarding Sanchez or any involvement by other lobbyists other than Velazquez Pinol, repeatedly stated that such implications were "not alleged in the accusation and we have to limit ourselves to what is included in the indictment." See **Exhibit HH** attached herein.

c.    That the District Attorney's statements were prior to the July 16, 2019 and August 12, 2019 Broadcasts and hence Fonseca's statements were made with clear malice or reckless disregard of their truth or falsity and have damages Sanchez's reputation and business.

d.    Contrary to Fonseca's claim that the FBI just wanted to make Keleher cooperate and name other individuals, Keleher was charged with additional corruption charges on January 15, 2020.

e. That no other lobbyist was ever indicted or mentioned in the subsequent new accusations made against Keleher.

f. After 18 months, Sanchez has not been arrested or accused of any criminal activity.

g. Each and every statement, implication and meaning of and concerning the Plaintiffs alleged above in paragraphs 252 through 254 are false.

257.    That the Defendants' July 16, 2019 and August 12, 2019 Broadcasts were made with actual malice in that Defendants knew that the aforesaid statements and meanings were false and/or published or caused them to be published in reckless disregard for their truth or falsity.

258.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity.

259.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

260.    The airing and publishing of the Broadcast as described herein was accomplished by means which radically departed from responsible journalistic standards and practices. That no other credible news organization falsely implicated Sanchez in connection with a federal corruption indictment against Keleher, by implying or stating (as Defendants did) that Keleher sent emails and confidential information to Sanchez for nefarious and illegal reasons.

261.    The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning the Plaintiffs.

262.    By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues, friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs.  Plaintiffs

NAVARRO
66 W. Flagler Street, 6th Floor, Miami, Florida 33130

have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

263.    By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (i) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and emotional well-being, (ii) damages sustained by the loss of Sanchez's job and clients, (iii) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (iv) the amount spent by Plaintiffs as legal fees and expenses in connection with any matters caused by the defamations alleged herein, and (v) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants.

264.    Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

XII.        **OCTOBER 8, 2019 BROADCAST**

265.    On or about October 8, 2019, Defendants again made defamatory and false statements on Jay y sus Rayos X. A copy of the entire show can be found at https://www.youtube.com/watch?v=6RA9NPCCp4s and also, at **Exhibit II**, attached herein. Here, investigative journalist Collazo who works for Defendants, while hosting the show, spoke about an investigation which implied that the zoning regulation maps of Puerto Rico had been modified to benefit "certain developers and individuals with highly political influence." See **Exhibit II** attached herein.

266.    Collazo then stated that Rodríguez, "the wife of Elías Sánchez," was one of the architects of the modification of the zoning regulation maps in Puerto Rico, while posting pictures

of Plaintiffs. See **Exhibit II**. Collazo made such statements even after the President of the Planning Board of the Government of Puerto Rico, Ms. María Gordillo ("Gordillo"), repeatedly and truthfully told Collazo in an interview that Rodríguez had no involvement in the zoning modifications and stated that the scope of Rodríguez's legal services was limited to "Code Enforcement" matters, which has nothing to do with the modification of zoning regulation maps.

267.    Further, during the broadcast Collazo deliberately and willfully reinforced her efforts to characterize Rodríguez's legal work as corrupt by misquoting and showing a blurry version of Plaintiff's professional service proposal to the Planning Board. Even though the Planning Board had explicitly denied any involvement by Rodríguez with the modifications of the zoning maps that were subjects of the broadcast, and Sánchez has never represented any clients for zoning purposes in the Puerto Rico Planning Board, Collazo continued to insistently talk about Rodríguez's legal services contract, while Defendants plastered on the screen the words: "A tailored made map for certain people?" See **Exhibit II**.

268.    These statements described herein were published in public media and were seen throughout the Telemundo network in the U.S. Hispanic market, including Miami-Dade County. On information and belief, the October 8, 2019 Broadcast received the highest ratings for its time slot.

269.    The Broadcast contained the following false and defamatory statements of and concerning Plaintiffs:

a.  Collazo: "What some suspect is that this map is tailored for certain developers and some individuals with high political influence."

b.  Pedro Cardona [guest of the Show]: "one can conclude ehh that, there have been some orders made."

c.  Collazo: "although they could not specify the scientific consulting they have done for these changes, among the contracts that the Puerto Rico Planning Board

has, we find one to Attorney Valerie Rodríguez Erazo, the wife of Elías Sánchez. The contract was awarded on July 30, six (6) days after Governor Rosselló announced his resignation, but while he was still in La Fortaleza. What services exactly is Attorney Rodríguez providing the Board?

d. María Gordillo [President of the Planning Board]: "Attorney Rodríguez, works with Code Enforcement …. basically, it's taking to court those people who do not meet the requirements or who don't have permits."

e. Collazo: The President of the Board denied that Rodríguez Erazo was working with something related to the map, however, this would fall under the scope of work stated in her Proposal and in the signed Agreement. Attorney Rodríguez is not working on anything related to the qualification map?

d. Gordillo ": no, in nothing." …

f. Collazo: "it's says here (pointing to the contract), all through the document, about evaluating the current regulations that the Board has and even proposing, amendments, new regulation and new areas of opportunity."

g. Gordillo: "they can, this is the lawyers that we have hired, because in addition to Valerie, there are others, uh, they can propose or suggest to the Board some type of amendments to the Regulations. Nonetheless, the Board is the one that makes the decision whether or not to authorize the amendment to the Regulation."

h. Collazo: "I have with me Representative Denis Marquez and Planner Pedro Cardona. Hello, good night, thanks for joining us. First of all, maybe a reaction to that information. I think you just found out about that contract."

i. Pedro Cardona: "yes, well, this whole story, it really blows your mind. When you look at what is happening in the Planning Board, and the fact that we may be seeing that part of the agency's regulations are privatized, and that there is an external consultant that proposes modifications to the regulations, disguised as doing related to law enforcement, it's troubling."

A Spanish language copy of the transcript of the October 8, 2019 Broadcast with a side-by-side translation is attached as **Exhibit II** incorporated herein and made a part of this Complaint.

270.     By use of the particular words set forth in paragraphs 266, 267 and 269, Defendants conveyed among others, the following false and defamatory statements, implications and meanings of and concerning Plaintiffs:

101

NAVARRO

66 W. Flagler Street, 6th Floor, Miami, Florida 33130

a.      that the new zoning maps of Puerto Rico were tailored for certain developers and some individuals with high political influence.

b.      that it was Rodriguez, the wife of Sanchez, who tailored the zoning maps to illegally or in a corrupt manner benefit their clients.

c.      that Rodriguez contract was awarded six days after Rossello's resignation as a parting gift.

d.      that although the President of the Planning Board explicitly denied any involvement by Rodriguez with the zoning maps regulation, this fell under Rodriguez's Proposal and hence, Rodriguez was the one who modified the zooning maps.

e. that Rodriguez legal work is corrupt, and her contracts were the product of purportedly corrupt practices.

f.      that the Planning Boards' regulation process had been privatized and that Rodriguez, an external consultant, disguised as doing law enforcement related services, was the one modifying it.

g.      Rodriguez as an attorney for the Planning Board was lobbying for private interests in the Planning Board, hence she engaged in activities that were in clear violation of the Canons of Professional Ethics for attorneys in Puerto Rico.

271.    Contrary to the aforesaid false and defamatory statements, implications and meanings conveyed in paragraphs 266, 267, 269 and 270:

a.      Rodriguez has provided legal services to the Planning Board of Puerto Rico since 2011.

b.      Rodriguez legal contract is limited to Code Enforcement matters which have nothing to do with zoning maps regulations.

c.      that as Gordillo stated to Collazo, other attorneys contracted by the Planning Board provide the exact similar services as Rodriguez.

d.      As a matter of fact, a simple revision of the public contracts for legal services awarded by the Planning Board would have undoubtedly demonstrated that the other attorneys received higher compensation, sometime totaling up to four times of the amount of Rodriguez received for similar services.

e.      Sanchez has never lobbied in the Puerto Rico Planning Board or provided legal services with anything related to zoning maps in Puerto Rico.

f.      Rodriguez has never lobbied or worked for a client or private interest in anything that involves the Puerto Rico Planning Board, such would be a violation of the Canons of Professional Ethics for attorneys in Puerto Rico.

g.      Plaintiffs have never been arrested or accused of any criminal, civil or ethical (professional) activity.

272.    Each and every statement, implication and meaning of and concerning Plaintiffs alleged above in paragraphs 269 and 270 are false.

273.    The fact that even after the President of the Planning Board stated to Collazo that other attorneys offer the exact same services as Rodriguez, but Defendants refused to mention or look into those contracts, is further proof of Defendants actual malice. Collazo only emphasized on Rodriguez's contracts because she is married to Sanchez, mischaracterizing those contracts as the product of purportedly corrupt practices.

274.    In the publication of the aforesaid false and defamatory statements, implications and meanings, Defendants acted with the required degree of actual malice to overcome any protections under the First Amendment and/or an Anti-Strategic Lawsuit Against Public Participation statute, given that (i) Defendants broadcasted a Story once again accusing Plaintiffs of corrupt behavior even after she had first hand confirmation that Rodriguez did not work in anything related to the matters that were part of the Broadcast; (ii) no individual has filed any administrative, civil, criminal or ethical claim at the time alleging any type of wrongdoing by Plaintiffs for their  own benefit, a client or a private interest; (iii) they had absolutely no support for their defamatory statements, in fact the only people interviewed as part of that Broadcast explicitly denied any involvement from Rodriguez; (iv) they had not checked or properly checked the facts underlying the October 8, 2019 stories and, once again, intentionally avoided contacting Plaintiffs to corroborate the allegations; and (v) Defendants fabricated and mischaracterized facts to support its defamatory statements, implications and meanings in the October 8, 2019 Broadcast.

275.    Defendants' October 8, 2019 Broadcast was made with actual malice in that Defendants knew that the aforesaid statements and meanings were false and/or published or caused them to be published in reckless disregard for their truth or falsity.

276.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity.

277.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

278.    The airing and publishing of the Broadcast as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

279.    The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning the Plaintiffs.

280.    The defamatory statements with their implications and meanings alleged in paragraphs 269 and 270 were broadcasted by Defendants with bad motives and abject bad faith.

281.    By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues,

friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs. Plaintiffs have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

282.    By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (i) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and emotional well-being, (ii) damages sustained by the loss of Sanchez's job and clients, (iii) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (iv) the amount spent by Plaintiffs as legal fees and expenses in connection with any matters caused by the defamations alleged herein, and (Ev) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants. Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

## XIII.        JANUARY 22, 2020 BROADCAST

283.    On or about January 22, 2020, Defendants published a story at https://www.telemundopr.com/programas/jay-y-sus-rayos-x/especial-de-jay-y-sus-rayos-x-la-ultima-oportunidad/2144175/ which included defamatory and malicious statements on Jay y sus Rayos X. In this story, Fonseca interviewed recently fired Housing Secretary of Puerto Rico Fernando Gil, who at the time blamed his dismissal for political reasons. At the time, Gil was supporting the Governor's opposing candidate in the primaries. However, Governor Vazquez's administration affirmed that he was fired because of allegations of mismanagement of federal funds. Fonseca once again showed his perverse obsession with Plaintiffs by focusing his questions

only on whether Gil was fired because of Sanchez and Rodriguez's close relationship with Governor Vazquez. Fonseca reasserted his false narrative of corrupt behavior by Plaintiffs to cause injury to Sanchez's and Rodriguez's personal and professional reputations.  On said broadcast, Fonseca began Gil's interview with the following statement/question:

> "Some time ago the Centro Periodístico Investigativo "Investigative Journalist Center" said, that thanks to the fact that you warned about Elías Sánchez and the tentacles of Elías Sánchez in the government of Ricardo Rosselló, it became known that Elías Sánchez was informally going to push to benefit his clients. That Elías Sánchez lobbied, everyone knows of the close relationship between the Governor, Elías Sánchez, and his wife, who was an advisor to Wanda Vázquez. Do you believe that the reason the Governor fired you is in any form a revenge of Elías Sánchez or a revenge of the group of Elías Sánchez?"

284.    Even though Gil did not follow through with Fonseca's line of questioning stating that "I do not answer things that I do not know [regarding Sanchez and Rodríguez alleged relationship with Governor Wanda Vázquez], and I do not speculate in that regard", defendant continued his malicious line of questioning, following his ill-willed pattern of involving plaintiffs in various issues regarding government scandals to promote his defamatory portrayal of plaintiffs as corrupt individuals.

285.    Fonseca decided to ignore Gil's answer and proceeded to continue his line of questioning, trying vigorously to bring up plaintiffs' names once again as being responsible for Gil's termination.  As such, Fonseca followed with this question:

> "eh ok, but I mean, but you were the key person at one point, so that the skin began to come out afterwards, it turned out that the Secretary of Department of Transportation and Public Works, the Secretary of the Treasury and others, also admitted that Elías Sánchez continuously informally and formally asked for his clients, who nobody even knew they were. his clients, as happened in the Health Department with others too".

286.    Gil once again did not contribute to Fonseca's line of questioning, stating that in his case, Sánchez talked to him about a judicial challenge of a bidding process and that he had

dismissed Sanchez's claims, but Fonseca, for a third time, interrupted Gil, asking the following question:

a.      "Do you know if there is a close relationship between Elías Sánchez and the Governor? Valerie Rodríguez and the Governor? I mean the wife of Elías Sánchez and "about her appointment as Secretary of Justice, do you know if he had any role in it or if they met at his house or something like that?"

b.      And for a third time Gil debunked his line of questioning stating the following: ""I do not know, maybe, perhaps he gave that advice to the Governor at that time and thus the Governor appointed her, and it was at the same time that he appointed me, December 6, 2016".

An English translation of the interview is included in **Exhibit JJ** attached herein.

287.    Thus, Fonseca's line of questioning was malicious, defamatory, and showed a reckless disregard for the truth since:

a.      Both Fernando Gil and Governor Wanda Vázquez had given specific reasons for Gil's dismissal, none of which included any type of intervention by Plaintiffs.

b.      At the time of the interview, Plaintiffs had been living in the State of Florida for more than six (6) months and had no-involvement in Puerto Rico's government affairs.

c.      The above-outlined interview aired months after Defendants received a cease-and-desist letter which clearly outlined the pattern of malicious and slanderous statements made by Fonseca against Plaintiffs.

d.      Defendants, as with other instances in this claim, never made any attempt to contact Plaintiffs so that they could debunk Fonseca's statements and present their side of the Story.

288.    In the publication of the aforesaid false and defamatory statements, implications and  meanings Defendants knew and should have known, among other things (i) that Fonseca is extremely biased against Plaintiffs; (ii) that no one had brought any administrative, civil or criminal claims at the time the alleged incidents allegedly occurred; (iii) that Fonseca as a licensed attorney would be held to a higher standard in his analysis and understanding of legal statutes; (iv)

that they had absolutely no support for their defamatory statements; (v) that they had not checked or properly checked the facts underlying the January 22, 2020 interview with Fernando Gil and intentionally avoided contacting Plaintiffs to corroborate the allegations; and (vi) that the aforesaid false and defamatory statements, implications and meanings were contradicted by substantial credible information, which Defendants had prior to the January 2, 2020 Broadcast.

289.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity.

290.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

291.    The airing and publishing of the Broadcast as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

292.    The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning the Plaintiffs.

293.    The defamatory statements with their implications and meanings alleged in paragraphs 283, 284, 285, 286, and 288 were broadcasted by Defendants with bad motives and abject bad faith.

294.    By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field

have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues, friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs. Plaintiffs have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

295.    By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (i) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and emotional well-being, (ii) damages sustained by the loss of Sanchez's job and clients, (iii) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (iv) the amount spent by Plaintiffs as legal fees and expenses in connection with any matters caused by the defamations alleged herein, and (v) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants.

296.    Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

## XIV.        MARCH 20, 2020 BROADCAST

297.    On or about March 28, 2020, Fonseca published a Facebook live segment with Dr. Concepción Quiñones, former new Acting Secretary of the Health Department in Puerto Rico. A copy of the interview can be found at: https://www.facebook.com/JayFonsecaPR/videos/540509489993022. At the time, the press had

been reporting that the government had made an illegal procurement of rapid tests for COVID 19 in the amount of 38 million dollars to a dubious corporation.  Fonseca was granted an exclusive interview with acting Health Secretary Concepción Quiñones de Longo. During the interview, Fonseca once again forcefully inserted Sanchez's name in his quest to tie Plaintiffs, who at the time had been living outside of Puerto Rico for almost a year, to a new government corruption scandal.

298.    Once again, Fonseca's line of questioning began with the following question:

a.      "Doctor, I have several questions to ask you. To begin with, did you find out if Elías Sánchez or Valerie Rodríguez were going to represent clients to the Health Department? [if they came to the Health Department] "to present clients, accompany clients to the Health Department"

b.      To that, Dr. Quiñones de Longo clearly answered: "Never before me'

299.    Still, Fonseca continued in his quest to falsely implicate Plaintiffs, asking Dr. Quiñones the following:

a.      "Do you know if they have a framework of influence with [former Health Secretary] Dr. Rodríguez?"

b.      Once again, Dr. Quiñones answered the following: "I don't know, I couldn't honestly say".

300.    Fonseca, clearly not satisfied with Dr. Quiñones second answer, kept badgering her, asking the following:

a.      "I see. There are people who believe that Mabel Cabeza was the manager of the interests of certain people in the Health Department, did you hear, for example, some of that, for example that she represented the interests of Elías or Valerie Rodríguez at some point?"

b.      And for a third time, Dr. Quiñones was clear in her answer, stating that: "I have heard those comments, but I have no evidence that they can validate, that I say, I show you a paper where she is recommending something that represents Elías or something like that."

An English translation of the interview can be found in **Exhibit KK,** attached herein.

110
NAVARRO
66 W. Flagler Street, 6th Floor, Miami, Florida 33130

301.    Fonseca's interview was covered by every news media in Puerto Rico including Telemundo. The interview was rehashed entirely by Telemundo's news anchor, Zugey Lamela, who did a detail transcription of the interview on her social media platform. Hence, expanding the reach of the corrupt implications made against Plaintiffs by Fonseca. As with all the instances in this claim, neither Sánchez nor Rodríguez were contacted by defendants, denying them the opportunity to refute the claims and present their side of their story, showing defendants' complete disregard for the truth and the malicious intent of continuing to portray plaintiffs as corrupt to garner more ratings and following.

302.    Fonseca's defamatory statements were clearly damaging as other news outlets and entertainment personalities in Puerto Rico, decided to shine in and covered Fonseca's defamatory exclusive interview with Quiñones. Jorge Pabón, a tv, radio and social media personality with over one million followers, publicly known as "el Molusco" (the Mollusk) reacted to Fonseca's interview in a tweet stating  "Fonseca interviewed former Secretary of Health, and she pinpointed the alleged corrupt practices that of the famous Elías Sanchez, his wife and Mabel Cabeza", serving to repeat, promote, and disseminate Fonseca's defamatory, malicious and clearly false statements, with a reach of more than a quarter of Puerto Rico's population. See Exhibit GG, attached herein. Relevant to this claim is the fact that el Molusco's programming is rebroadcasted through a series of mobile applications, which are available to residents of the State of Florida. Also, Fonseca and el Molusco use each other's reach, popularity, and notoriety to promote their programming and business ventures. Under statements of praise and alleged close friendship, Fonseca and el Molusco benefit from each other popularity and following, through "free" advertisement and continuous mentions. Thus, this serves to prove the extent of the amount of damages caused by Fonseca's ploy to involve Plaintiffs in every alleged government corruption story.

## XV.        **NOVEMBER 25, 2020 POST**

303.    On or about November 25, 2020 Fonseca posted a defamatory statement on his

Twitter account, in which he falsely stated the following:

> "An ex-powerful [person] has already sent about 25 letters threatening to sue, he
> has 400 lawyers sending emails and requesting they fire me, [blah blah]…he keeps
> sending letters on key dates. Mano, [Man] the threats of a corrupt person like you
> entertain me."

A copy of said post in Spanish and its English translation can be found at **Exhibit B.**

304.    Even though Fonseca did not mention any names, his pattern of falsely implying

that Sanchez is a corrupt individual is so pervasive that the immediate response by people to his

tweet was to name Sanchez as the corrupt individual being refer to by Fonseca in his post.  Within

minutes, Fonseca deleted the tweet.

305.    This post not only proves Fonseca's malicious and ill will intent towards Sanchez,

but also that the pattern and prevalence of his defamatory statements was such that even without

explicitly mentioning him, the public assumed that Fonseca is talking about Sánchez every time

he mentions the phrase corrupt person. Furthermore, by deleting said post, Fonseca violated the

Spoliation letter he had previously received from Plaintiffs' Attorneys on November 25, 2020.

Fonseca's tweet was published and deleted after Plaintiffs sent several letters requesting a

retraction, an apology and a cease and desist. However, Fonseca has doubled down on his baseless

and reckless false claims of corrupt behavior and wrongdoing by Plaintiffs.

306.    The statements were part of Fonseca's pattern to portray Sánchez as a corrupt

lobbyist. The falsity of such statements is proven by the fact that there is no evidence of any type

of unduly interference by Plaintiffs on the Puerto Rico's Government procurement processes.

Furthermore, Plaintiffs never sought Itza García's help on any procurement processes that may

affect their clients and Garcia never had the authority to approve or deny government contracts.

Hence, Fonseca's depiction of Sanchez as corrupt lobbyist is not based on facts, but rather on his ill-will against Plaintiff.

307.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity and were published or caused to be published by Defendants acting in a negligent manner.  The airing and publishing of the Broadcasts as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

308.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a grossly irresponsible manner in failing to determine their truth or falsity.

309.    The aforesaid defamatory statements, implications and meanings were published or caused to be published by Defendants acting in a negligent manner.

310.    The airing and publishing of the Broadcast as described herein was accomplished by means which radically departed from responsible journalistic standards and practices.

311.     The aforesaid false and defamatory statements with their implications and meanings intended by Defendants and understood by the viewing public to be of and concerning the Plaintiffs.

312.    The defamatory statements with their implications and meanings alleged in paragraphs 303 and 304 were broadcasted by Defendants with bad motives and abject bad faith.

313.    By reason of Defendants' acts as alleged herein, the Plaintiffs have been grievously injured in their good name, character, reputation and professional standing in the community and within the legal profession.  Plaintiffs' reputation as being honorable, and as having integrity and

113
NAVARRO
66 W. Flagler Street, 6th Floor, Miami, Florida 33130

high moral professional standards has been deeply damaged; their good names and character acquired over many years of providing dedicated and skilled professional services in the legal field have been gravely wounded; their professional relationships built over the years have been seriously impaired and undermined; their relationships with colleagues in the legal field have been seriously damaged; and these Plaintiffs have been held up to ridicule and contempt by colleagues, friends, neighbors, and acquaintances as well as the public at large who viewed or acquired any knowledge of the aforesaid false and defamatory statements of and concerning Plaintiffs. Plaintiffs have also sustained pain and suffering and mental anguish by reason of the aforesaid acts of Defendants.

314.    By reason of the acts of Defendants as alleged herein, Plaintiffs have sustained additional damages including (i) the amounts spent by Plaintiffs in uprooting and moving to the State of Florida seeking a safe harbor for their own and their children's personal security and emotional well-being, (ii) damages sustained by the loss of Sanchez's job and clients, (iii) the amounts spent by Plaintiffs in travel costs to comply with their obligations to their clients as their attorneys, (iv) the amount spent by Plaintiffs as legal fees and expenses in connection with any matters caused by the defamations alleged herein, and (v) the amount spent by Plaintiffs in seeking to restore their reputation, all resulting from the aforesaid acts of Defendants.

315.    Plaintiffs reasonably believe that sufficient allegations are set forth herein to support punitive damage claim, and that discovery will reveal additional facts and proof that will support such a claim.

## COUNT I – DEFAMATION
### (By Sánchez Against All Defendants)

316.    Plaintiffs reallege and incorporated the allegations in paragraphs 25 through 315 as if set forth fully herein.

317.    Defendants jointly and severally published in Florida the statements alleged above; that being the Hispanic Miami-Dade County, Florida market and others, known the same to be true with malice the falsity of these statements caused injury to the plaintiff.

318.    Plaintiff avers that in the majority of circumstances -as alleged supra- the statements of facts and specific instances of publication defendants knew and should have known that the statements were false and have refused to redact or clarify any of the aforementioned specific instances of false reporting.

319.    Plaintiff further avers that these statements as described above were made with malice intended to cause injury to defendants' reputation business and property.

WHEREFORE Plaintiffs respectfully pray for an award of: (i) compensatory damages for the damage to Plaintiffs' reputations in a sum certain according to proof and not less than Five Million Dollars ($5,000,000.00);   (ii) consequential damages in the amount of damage to Plaintiffs' respective business and property in a sum certain according to proof and not less than Thirty Million Dollars ($30,000,000.00); (iii) punitive damages in a sum certain an amount sufficient to punish defendants and deter them from engaging in similar conduct;  (iv) costs of suit, including but not limited to reasonable attorney, incurred in connection with this litigation; and (v) any and all other relief that this Court deems just exhibited proper.

## COUNT II - SLANDER PER SE
### (Against All Defendants)

320.    Plaintiffs reallege and incorporated the allegations in paragraphs 25 through 315 as if set forth fully herein. This is a count under Florida defamation per se involving business and false light in the public eye.

321.    Defendants jointly and severally published in Florida a false statement; about the Plaintiffs; to a third party; that being the Hispanic Miami-Dade County, Florida market and others,

known the same to be true with malice the falsity of these statements caused injury to the Plaintiffs. These statements were made in public where heard by third parties involving Plaintiffs person and their business professions. The statements were known to be false and were stated with the intent to cause injury to business reputation and property.

322.    Defendants have alleged as true Plaintiff's criminal activities and indictment by the federal agencies. Inputting criminal conduct to Plaintiffs. These implication in the absence of said indictment in Miami Florida, or elsewhere amount to slander per se.

WHEREFORE Plaintiffs respectfully pray for an award of: (i) compensatory damages for the damage to Plaintiffs' reputations in a sum certain according to proof and not less than Five Million Dollars ($5,000,000.00);  (ii) consequential damages in the amount of damage to Plaintiffs' respective business and property in a sum certain according to proof and not less than Thirty Million Dollars ($30,000,000.00); (iii) punitive damages in a sum certain an amount sufficient to punish defendants and deter them from engaging in similar conduct;  (iv) costs of suit, including but not limited to reasonable attorney, incurred in connection with this litigation; and (v) any and all other relief that this Court deems just exhibited proper.

## COUNT III - LIBEL

323.    Plaintiffs reallege and incorporated the allegations in paragraphs 25 through 315 as if set forth fully herein.

324.    This is a count under Florida libel for the publication involving media production that was written, captured and published as true known to be false with malice to create injury upon Plaintiffs, that in fact as a direct and proximate cause of the Defendants malignant publications Plaintiffs were injured in their reputation, business and property.

WHEREFORE Plaintiffs respectfully pray for an award of: (i) compensatory damages for the damage to Plaintiffs' reputations in a sum certain according to proof and not less than Five Million Dollars ($5,000,000.00);   (ii) consequential damages in the amount of damage to Plaintiffs' respective business and property in a sum certain according to proof and not less than Thirty Million Dollars ($30,000,000.00); (iii) punitive damages in a sum certain an amount sufficient to punish defendants and deter them from engaging in similar conduct;  (iv) costs of suit, including but not limited to reasonable attorney, incurred in connection with this litigation; and (v) any and all other relief that this Court deems just exhibited proper.

## <u>COUNT IV - LIBEL PER SE</u>

325.    Plaintiffs reallege and incorporated the allegations in paragraphs 25 through 315 as if set forth fully herein.

326.    This is a count under Florida libel for the publication involving media production that was written captured and published a true known to be false with malice to create injury upon Plaintiffs, that in fact as a direct and proximate cause of the Defendants malignant publications Plaintiffs were injured in their reputation, business and property.

327.    Defendants have alleged as true Plaintiff's criminal activities and indictment by the federal agencies. Inputting criminal conduct to Plaintiffs. These implication in the absence of said indictment in Miami, Florida, or elsewhere amount to slander per se.

WHEREFORE Plaintiffs respectfully pray for an award of: (i) compensatory damages for the damage to Plaintiffs' reputations in a sum certain according to proof and not less than Five Million Dollars ($5,000,000.00);   (ii) consequential damages in the amount of damage to Plaintiffs' respective business and property in a sum certain according to proof and not less than Thirty Million Dollars ($30,000,000.00); (iii) punitive damages in a sum certain an amount

sufficient to punish defendants and deter them from engaging in similar conduct;  (iv) costs of suit, including but not limited to reasonable attorney, incurred in connection with this litigation; and (v) any and all other relief that this Court deems just exhibited proper.

## COUNTY V -TRADE LIBEL

328.    Plaintiffs reallege and incorporated the allegations in paragraphs 25 through 315 as if set forth fully herein.

329.    Defendants jointly and individually did cause the publication of a false statement of fact that is an intentional disparagement of the quality of the services or products of the plaintiff's business and that result in pecuniary damages to the plaintiff.

330.    Defendants jointly and individually "published" an untrue statement of fact.  The "Published" broadcast through Defendants media and social media communicated same or allowed the communication of the statement to third parties of false statements regarding "Sanchez" business and trade practices that they knew were false and did in fact published these statements with malice intending to cause injury to Plaintiff in business and professional reputation as an attorney and lobbyist.

331.    These communications did in fact resulted in pecuniary damage to plaintiff. Plaintiff has loss business and plaintiff's business have been significantly damaged in reputation to the extent that loss of future business may be proven by the aforementioned facts and evidence submitted at trial.

332.    As a direct and probable cause of Defendants trade libel plaintiff Sanchez was injured and suffered damages to his professional reputation.

WHEREFORE Plaintiffs respectfully pray for an award of: (i) compensatory damages for the damage to Plaintiffs' reputations in a sum certain according to proof and not less than Five

Million Dollars ($5,000,000.00);   (ii) consequential damages in the amount of damage to Plaintiffs' respective business and property in a sum certain according to proof and not less than Thirty Million Dollars ($30,000,000.00); (iii) punitive damages in a sum certain an amount sufficient to punish defendants and deter them from engaging in similar conduct;  (iv) costs of suit, including but not limited to reasonable attorney, incurred in connection with this litigation; and (v) any and all other relief that this Court deems just exhibited proper.

## COUNT VI-MULTIPLE COUNTS AND ALLEGATIONS

333.    Plaintiffs reallege and incorporated the allegations in paragraphs 25 through 315 as if set forth fully herein, and further state that the statements of facts in this claim are grouped by related topics, but each allegation constitute a separate claim under each of the above-described counts.

WHEREFORE Plaintiffs respectfully pray for an award of: (i) compensatory damages for the damage to Plaintiffs' reputions in a sum certain according to proof and not less than Five Million Dollars ($5,000,000.00);   (ii) consequential damages in the amount of damage to Plaintiffs' respective business and property in a sum certain according to proof and not less than Thirty Million Dollars ($30,000,000.00); (iii) punitive damages in a sum certain an amount sufficient to punish defendants and deter them from engaging in similar conduct;  (iv) costs of suit, including but not limited to reasonable attorney, incurred in connection with this litigation; and (v) any and all other relief that this Court deems just exhibited proper.

## COUNT VII – AIDING AND ABETTING
### (Against Does 1-10)

334.    Plaintiffs reallege and incorporated the allegations in paragraphs 25 through 315 as if set forth fully herein.

119

NAVARRO

66 W. Flagler Street, 6th Floor, Miami, Florida 33130

335.     Plaintiffs are informed and believe, and thereon allege, that Defendants elicited the assistance of others published in Florida false statements about the Plaintiffs to a third parties. The identities of these persons in unknown to Plaintiffs and thus, they are sued as DOES 1-10. Plaintiff will amend this Complaint to name them once their identity has been revealed.

336.     Each DOES 1-10 provided substantial assistance to the Defendants or otherwise encouraged the Defendants to publish false statement about the Plaintiffs.

337.     Each DOES 1-10's conduct was a substantial factor in causing harm to Plaintiffs.

338.     As a direct and proximate cause of the DOES Defendants aiding and abetting of the Defendants acts, Plaintiffs have been damaged.

WHEREFORE Plaintiffs respectfully pray for an award of: (i) compensatory damages for the damage to Plaintiffs' reputations in a sum certain according to proof and not less than Five Million Dollars ($5,000,000.00);   (ii) consequential damages in the amount of damage to Plaintiffs' respective business and property in a sum certain according to proof and not less than Thirty Million Dollars ($30,000,000.00); (iii) punitive damages in a sum certain an amount sufficient to punish defendants and deter them from engaging in similar conduct;  (iv) costs of suit, including but not limited to reasonable attorney, incurred in connection with this litigation; and (v) any and all other relief that this Court deems just exhibited proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 1.430(b) of the Florida Rules of Civil Procedure, Plaintiffs demand a trial by jury of all counts and claims alleged in this Complaint for which a jury trial is permitted pursuant to the Seventh Amendment of the U.S. Constitution, Article 1, Section 22 of the Florida Constitution, and/or all laws promulgated under either of them.

## DESIGNATION OF EMAIL ADDRESS

In accordance with Fla. R. Jud. Admin. 2.516(b)(1)(A), the undersigned attorney for the

Plaintiff hereby designate lou@nmbesq.com, mromo@nmbesq.com, and civil@nmbesq.com as

their primary service email address.

Dated: December 31, 2020

Respectfully submitted,

| | |
|---|---|
| **NAVARRO** | **Eric Ruben Huertas Morales, Esq.** |
| *Attorneys at Law* | *Co-Counsel for Plaintiffs* |
| *Counsel for Plaintiffs* | 66 W. Flagler Street, Suite 601 |
| 66 W. Flagler Street, 6th Floor | Miami, Florida 33130 |
| Miami, Florida 33130 | Tel: (305) 447-8707 |
| Tel: (305) 447-8707 | Fax: (305) 447-3787 |
| Fax: (305) 447-3787 | Email: erhuertas@eragroupllc.com |
| Email: civil@nmbesq.com | |
| lou@nmbesq.com | |
| mromo@nmbesq.com | |
| | |
| By: *Luis F. Navarro* | By: */s/ Eric Ruben Huertas Morales* |
|    Luis F. Navarro, Esq. |    Eric Ruben Huertas Morales |
|    Florida Bar No.: 629359 |    Florida Bar No.: 103722 |
|    Lorenzo J. Palomares, Esq. | |
|    Florida Bar No.: 100785 | |

**EXHIBIT A**

On or about May 5, 2020 story located at https://www.instagram.com/p/B_0k5NMA5uE/ in an Instagram post, Jay Fonseca posted: "That's true, [we ate together] several times. Many times I told him that if he started stealing I would be the first to make sure that PR did not forget his name.



**EXHIBIT B**

On or about November 25, 2020 Fonseca posted a defamatory statement on his Twitter account, in which he stated the following: "An ex-powerful [person] has already sent about 25 letters threatening to sue, he has 400 lawyers sending emails and requesting they fire me, [blah blah]… he keeps sending letters on key dates. Mano, [Man] the threats of a corrupt person like you entertain me." Following is a screen capture of said post:



**EXHIBIT C**

In the fourth paragraph column published online on or about August 7, 2019 and in the Primera Hora newspaper on  or about August 8, 2019, Jay Fonseca stated : "Wanda Vázquez pressured [prosecutor Yanira Liceaga, dramatically on multiple occasions to bring the case against Itza García, the former government's deputy chief of staff, who had a toxic relationship with Elías Sánchez and Valerie Rodríguez (very close to the now governor, who gave Valerie 216,000 dollars in contracts)".  Available online at: https://www.primerahora.com/opinion/jay-fonseca/columnas/wanda-vazquez-la-gobernadora-en-propiedad/



## ESTO TIENE SALVACIÓN

**JAY FONSECA**
PERIODISTA / jayfonsecapr@gmail.com

# Wanda Vázquez: la gobernadora en propiedad

La autoridad más fuerte que se le puede dar a un abogado es la capacidad de llevar casos y quitarle la libertad a una persona. No es poca cosa eso. Piénselo bien. Un ser humano nace libre y se supone que tenga una vida en libertad para decidir lo que quiera hacer con su vida. Sin embargo, la sociedad le da la autoridad a alguien para que lo meta preso, incluso de por vida.

Esa persona, el fiscal, debe ser alguien que tenga bien presente ese hecho. Es un privilegio enorme que la sociedad le ha dado. Tener la posibilidad de con tus argumentos quitarle la libertad a una persona y llevarla a privarle de lo más preciado que puede tener uno: la familia. Por tanto, el estándar de alguien que asume esa posición debe ser bien elevado. Wanda Vázquez, conforme a la evidencia que hemos visto públicamente, no lo ha merecido.

Según declaraciones juradas de personas que estaban bajo su mando, la gobernadora ha utilizado el poder de forma abusiva y partidista. No me refiero a cuando presuntamente ofreció contratos a la esposa de Héctor Ferrer para que su expareja hablara contra el entonces candidato de San Juan, ni me refiero a cuando decidió presionar a ir contra el alcalde PPD de Patillas por haber dejado dañar unos suministros de FEMA, mientras no hizo nada con los furgones que por montones se perdieron en Ceiba y bajo Unidos por Puerto Rico se mal usaron... Me refiero a sus actos como jefa de Justicia.

Según la ahora exfiscal, licenciada Yanira Liceaga, Wanda Vázquez le presionó dramáticamente en múltiples ocasiones para llevar el caso contra Itza García, otrora secretaria asociada de la gobernación, quien tenía una relación tóxica con Elías Sánchez y Valerie Rodríguez (muy cercanos a la ahora gobernadora, quien dio a Valerie 216 mil billetes en contratos).

Piense bien sobre este escenario: una fiscal va bajo juramento y le dice al Fiscal Especial Independiente que la jefa de fiscalía le presionó con ajotarle la fiscalía federal si ella no acusaba a Itza García. Precisamente, la jefa de fiscalía federal llamó al programa de Rubén Sánchez en WKAQ y dijo al aire que confiaba 150% en Wanda Vázquez en el mismo medio en que el Fiscal Especial estuviera acusando a Vázquez de estar usando su silla para su beneficio personal, llevando casos y presionando para lograr que se metiera gente presa para su conveniencia.

Imagínese lo valiente que usted tiene que ser para ir al FEI y decirle de las presiones que sufrió y dejar bajo juramento esto plasmado mientras a la vez reconoces que esta persona es capaz de crearle un rancho a cualquiera, como ella misma había acusado antes al FEI. Hay que ser bien valiente para hacer eso. Pero no fue ella nada más. Salió otra información de que su esposo citó en plena sala del tribunal a un posible testigo y le pidió ayudar a su esposa. O sea, un juez le pide a un testigo que se comunique con el abogado de su esposa que es la secretaria de Justicia y aquí no pasó nada camarada. Todas las presiones naturales que esta gente "no se da cuenta que ejercen".

Otro fiscal dijo que Wanda Vázquez, que oficialmente se había inhibido del caso donde su hija y yerno (empleado de ella btw) estaban vinculados, daba instrucciones, direcciones, preguntaba sobre el caso y hasta solicitaba estar en reuniones donde ella estaba "inhibida". Vimos que para un caso envió a cuatro fiscales para un caso bobo contra Leo Aldridge y todo por este haberle llevado el caso de una jovencita a quien querían llevar hasta la cárcel y apelaron hasta casi el tribunal celestial por haber empujado a una compañera en la escuela.

Ni hablar de que sus hijas ambas trabajan en puestos interesantemente bien pagos en el gobierno y que bajo juramento está dicho que cuando el esposo de una dijo que era demasiado el castigo en el famoso caso de Tyronne (su primo), la hija usó contra Tyronne las palabras proféticas que ahora debemos dedicarle a Ricardo Rosselló... "cállate la boca, que por culpa de ese cabrón estamos aquí".

In the tenth paragraph column published online on or about August 14, 2019 and in the Primera Hora newspaper on or about August 15, 2019, Jay Fonseca stated: "…taking Itza out gave Elías and Valerie free rein in their agency lobbying". Available online at: https://www.primerahora.com/opinion/jay-fonseca/columnas/gobernadora-que- no-quiere-leer-la-pagina/



## ESTO TIENE SALVACIÓN

### JAY FONSECA
PERIODISTA / jayfonsecapr@gmail.com

# Gobernadora que no quiere leer la página

La gobernadora Wanda Vázquez es correctamente la gobernadora constitucional de Puerto Rico. El proceso todos lo sabemos. Pedro Pierluisi juramentó sin ser confirmado por la Legislatura.

El Senado, machote en el bla bla, pero cobarde en la ejecución, no votó y con eso colgó el nombramiento como dispone la Constitución. Tampoco llevaron a votación al pueblo en un referéndum donde ellos se comprometerían a acoger se a la votación del pueblo, es decir, si bien nada obligaba a los legisladores a acoger la votación del pueblo y nada los obligaba a llevar un proceso electoral, bien pudo haberse resuelto todo lo que ocurrió en la revuelta del verano con una votación donde los cuerpos políticos se comprometerían a aceptar el resultado. Eso no ocurrió.

Sin embargo, en Puerto Rico se ha querido pasar la página sin leerla. Se ha hablado de paz, de sosiego, pareciera que los del chat siguen manipulando y KOI junto a Bermúdez se burlan mientras cogen de pendejos hasta a los nuestros.

Los populares también están contentos. No gobierna Pierluisi ni Jenniffer, así que sus posibles contendientes en 2020 no tienen el poder de La Fortaleza. Por eso, usted nota la calma de la oposición y su contienda porque gobierna alguien que para ellos no es un reto electoral.

Al parecer, la página no se quiere leer, se quiere tachar, se quiere borrar cómo si no hubiera ocurrido, como si los pasados dos años y medio no hubieran pasado. La secretaria, ahora gobernadora, no ha aclarado puntos medulares sobre lo que nos llevó al pueblo a ir a las calles.

No sabemos cuál ha sido la relación de la ahora gobernadora con Elías Sánchez y por qué se estrechez con la esposa de F do. Valerie Rodríguez; cuáles eventos de cabildeo han hecho ambos ante ella, en especial Valerie Rodríguez; qué cosas le han solicitado a ella desde que estaba en Justicia.

Pasar la página leerle sería condonar que sigan gobernando los del chat por proxy, sería permitir que los que escriban en el chat que cogían de pendejo hasta los nuestros, sigan gobernando, solo que a través de otras figuras que no sean ellos directamente, sino el personaje a quien ellos, a través de dejar o sacar a Luis Gerardo Rivera Marín y no confirmar a Pedro Pierluisi, terminó gobernando.

Se nos pide que pasemos la página, que le demos una oportunidad y yo personalmente no tengo problema en que se haga, pero quiero que el País, antes de pasar la página, la lea. Hay declaraciones horribles de fiscales que dicen que, si le llevaban la contraria a lo que quería la secretaria de Justicia, se les amenazaba con que se le sometería a un proceso por las autoridades federales. Como saben, la segunda en mando en Justicia es una fiscal federal en destaque y la jefa de fiscalía federal es íntima amiga de Wanda Vázquez. Incluso dijo ante el proceso criminal que enfrentó Wanda Vázquez que confiaba en ella 150%.

Quiere el País pasar la página y establecer a alguien en un proceso de supuesta paz que es capaz de amenazar a fiscales a quienes se les amenintra si ejercen su criterio propio y su libertad fiscal, que es de hecho una normativa en Puerto Rico. ¿Debe el País pasar la página cuando fiscales bajo juramento advierten de que la secretaria cuando decía que se inhibía de los procesos criminales donde ella podía tener algún beneficio personal o familiar, lo que ocurría era que ella daba instrucciones y participaba, y aunque oficialmente estaba inhibida, intervenía en el proceso de forma irregular, cuestionable y antiética?

No solo esto, la secretaria aseguró que fue amenazada por Itza García, secretaria asociada de la Gobernación. Si ustedes leen las declaraciones juradas en contra de la secretaria, resulta que la propia gente de Justicia dice que eso era falso. Pero con sacar a Itza se le dio rienda suelta a Elías y Valerie en su cabildeo de agencias.

En fin, pudiéramos hablar de que ella misma admitió que en Puerto Rico se le hace un rancho a cualquiera o de que ella abusó al FEI, en vez de permitir la participación del proceso y culminar en los tribunales, y entonces hacer las expresiones contra los integrantes del FEI.

Pudiéramos hablar de lo que hizo su esposo, juez en el caso donde benefició a su esposa indecorosamente; podríamos hablar de cómo al sacar a Itza García benefició a Elías Sánchez y Valerie Rodríguez; pudiéramos hablar de cómo las contrataciones de su hija y familiares han ocurrido en el Gobierno y podemos hablar de mucho más, pero el País supuestamente pide pasar la página, yo creo que antes de pasarla, hay que leerla.

On or about, August 16, 2019  Jay Fonseca published in Facebook: "The breaks to Elías Sánchez continue and his relationship with Wanda Vázquez is not answered - Read my column about some of the questions that Wanda Vázquez has not answered in her administration of justice and that they want us to turn the page without reading it. Avaible at https://www.facebook.com/JayFonsecaPR/posts/2948310848519693/



EXHIBIT D

The January 4, 2019 story located at at https://www.telemundopr.com/noticias/puerto-rico/la-familia-cabildeo_tlmd-puerto-rico/758/ consisting of a video of a segment within the *Telenoticias* newscast bearing the headline "*La familia cabildeo*" (translation: "The lobbying family") contains the following defamatory statements:



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 0:13 – 0:29 | Reporter Fonseca:<br><br>"Elías Sánchez, la esposa de Elías Sánchez, Valerie Rodríguez, a ellos yo les llamo la familia cabildeo porque son como un combo agrandado, como un multi-pack, donde no importa qué, ellos se meten en: el Departamento de Salud. Está la que era esposa de Charlie Rodríguez, la mama de, la suegra de Elías. También esta el suegro de Elías que es Charlie Rodríguez, y demás. Se meten en todo" | Reporter Fonseca:<br><br>"Elias Sanchez, the wife of Elías Sánchez, Valerie Rodríguez, I call them the lobbying family because they are like an enlarged combo, like a multi-pack, where no matter what, they get involved: in the Department of Health. There's the ex-wife of Charlie Rodriguez, the mother of, the mother-in-law of Elías Sánchez. There is also the father-in-law of Elías Sánchez, that is Charlie Rodríguez, and the rest. They get involved in everything." |

| 2 | 0:30 – 0:57 | Reporter Fonseca:<br><br>"Lo mas reciente es el asunto este de la Corporación de Cine, donde hay un estudio que dice que si el Gobierno va a hacer una película en Puerto Rico, si viene Fast and the Furious, Pirates of the Caribbean y demás, si van a hacer una película en Puerto Rico, pues es bueno darles un incentivo para que vengan. Pues Puerto Rico da unos incentivos y subsidios de hasta 50 millones de dólares, verdad, en total que reparte la compañía de cine. Pues resulta que el Director de la Corporación de Cine estaba diciendo: 'Mira, tengo un estudio que dice que lo mas que puedo darte es 40% de descuento, de subsidio para que hagas la película en Puerto Rico.'" | Reporter Fonseca:<br><br>"The most recent is the issue of the Film Corporation, where there is a study that says that if the Government is going to make a movie in Puerto Rico, if Fast and the Furious, Pirates of the Caribbean and others come, if they are going to make a movie in Puerto Rico, it is good to give them an incentive to come. Well, Puerto Rico gives incentives and subsidies of up to 50 million dollars in total, right, distributed by the film company. Well, it turns out that the Director of the Film Corporation was saying: "Look, I have a study that says that the most I can give you is a 40% discount, subsidy for you to make the film in Puerto Rico."" |
|---|---|---|---|
| 2 | 0:58 – 1:26 | Reporter Fonseca:<br><br>"Pues la familia cabildeo fue allí, Valerie Rodríguez, y empezó a chavar, [usando gesticulación de altenería] que no, que tenías que darle cien, al mío tienes que darle todo, 90% ahí de descuento porque ese es el mío, mi macho. ¿Saben que pasó verdad? Pues había que escoger entre el director de la Corporación de Cine y la familia cabildeo; y ¿quién usted cree que perdió? ¿El que estaba haciendo lo correcto o la familia cabildeo? [con sonrisa sarcástica] Botao Javier Rúa." | Reporter Fonseca:<br><br>"Well, the lobbying family went there, Valerie Rodríguez, and started demanding, [using haughty hand gestures] oh no, you had to give a hundred, you have to give mine everything, 90% discount because he is mine, my virile male. You know what happened right? Well, a decision had to be made between the director of the Film Corporation and the lobbying family; and who do you think lost? The one doing the right thing or the lobbying family? [with a sarcastic smile] Javier Rua, fired." |

**EXHIBIT E**

The July 16, 2019 story located at https://www.telemundopr.com/programas/jay-y-sus-rayos-x/investigaci_n-destapa-supuesto-esquema-en-salud_tlmd-puerto-rico/46105/ consisting of a video excerpt from a segment within the *Jay y sus Rayos X* broadcast from July 16, 2019 bearing the headline "*Investigación destapa supuesto esquema en Salud*" (translation: "Investigation uncovers alleged scheme in [Puerto Rico's Department of] Health"), contains the following defamatory statements.

As a prelude to statement 4, the Reporters, while projecting the whistle-blower complaint onto a screen behind them, describe their source of information, Mr. Japhet C. Rivera, and explain he that the content of the complaint revolves around an alleged pattern of retaliation due to his denial to accede to pressure by Mr. Velázquez Piñol's to sign a contract.



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 1:39 – 2:24 | Collazo:<br><br>El año pasado, Japhet Rivera, quien se desempeñaba como secretario asociado de planificación y asuntos federales del Departamento, presentó su renuncia y alegó en una declaración jurada que fue objeto de represalias por denunciar actos ilegales.<br><br>Masked voice:<br><br>"Cuando el Sr. Japhet Rivera renunció, una de las cosas que el mencionó fue el | Collazo:<br><br>Last year, Japhet Rivera, who was serving as the Department's associate secretary for planning and federal affairs, resigned and alleged in an affidavit that he was retaliated against for reporting illegal acts.<br><br>Masked voice:<br><br>"When Mr. Japhet Rivera resigned, one of the things that he mentioned was the contract that OGP wanted to award and |

| | | | |
|---|---|---|---|
| | | contrato que OGP quería otorgar y otorgó para que se usaran 11.5 millones de dólares de fondos estatales para traer una plataforma digital al Departamento de Salud cuando ya se había traído una del gobierno federal." | granted so that 11.5 million dollars of state funds would be used to bring a digital platform to the Department of Health when it already had one from the federal government."` |
| 2 | 2:25 – 2:38 | Reporter Collazo: "Bajo condición de anonimato, empleados del Departamento han denunciado la fuerte influencia del matrimonio de Elías Sánchez y Valerie Rodríguez dentro de la agencia. Aseguran, se han encargado de colocar a sus allegados en posiciones claves." | Reporter Collazo: "Under condition of anonimity, several employees have denounced the strong influence of the marriage of Elías Sánchez and Valerie Rodríguez within the agency, they assure, they have been in charge of placing their loved ones in key positions." |
| 3 | 2:39 – 2:46 | Masked voice: "Desde el primer día de esta administración, la presencia del señor Elías Sánchez se ha hecho sentir." | Masked voice: "From the first day of this Administration, the presence of Mr. Elías Sánchez has been felt." |
| 3 | 2:47 – 2:54 | Reporter Collazo asking a leading question to the Secretary of the Deparment of Health: "Elías Sánchez y Valerie Rodríguez, eh, han cabildeado por varios contratos dentro del departamento." Secretary: "Eso no es verdad, en ningún momento." | Reporter Collazo asking a leading question to the Secretary of the Deparment of Health: "Elías Sánchez and Valerie Rodríguez, eh, have lobbied for various contracts within the department." Secretary: "That is not true, not in any moment." |
| 4 | 2:56 – 3:14 | Fonseca: "En ningún momento. Valeria Collazo Cañizares, que, dicho sea de paso, gran parte de las investigaciones que en este programa han salido, cuando salen, yo se que tu has hecho un trabajo encomiable, pero hay unas de esas que las personas no están dispuestas a hablar y solo nos entregan los documentos. Este documento es clave." | Fonseca: "Not in any moment. Valeria Collazo Cañizares, who, incidentally, a large part of the investigations that in this program have come out, when they come out, I know that you have done a commendable job, but there are some of those people that are not willing to talk and only give us the documents. This document is key. " |

| 5 | 3:15 – 4:45 | Reporter Collazo: "Esta declaración jurada es de noviembre del 2018, o sea del año pasado. Y para mi tiene dos puntos claves. ¿Que pasa? Esta persona era el secretario auxiliar de asuntos federales en el Departamento de Educación(sic) y su nombre es Japhet Rivera. Él denuncia con su nombre, creo que esta en este punto de aquí [points to a document being displayed on a screen behind them] que en verano del año pasado la oficina del Gobernador envió al Sr. Velazquez Piñol. | Reporter Collazo: "This affidavit is from November 2018, that is, last year. And for me it has two key points. What happens? This person was the assistant secretary for federal affairs in the Department of Education(sic) and his name is Japhet Rivera. He denounces with his name, I think it is in this item here [points to a document being displayed on a screen behind them] that in the summer of last year the Governor's office sent Mr. Velazquez Piñol." |
|---|---|---|---|
| | | Fonseca: Aquí esta, Alberto Velazquez [points and passes his finger over the name where it is displayed on the screen] | Fonseca: "Here it is, Alberto Velazquez [points and passes his finger over the name where it is displayed on the screen]" |
| | | Collazo: Para reunirse con el para presionarlo para que se otorgara un contrato. | Collazo: To meet with him to pressure him to award a contract. |
| | | Fonseca Discúlpame Valeria, "the Governor's office sent Mr. Alberto Velazquez, ¿por qué esta en inglés? Porque esto es un whistleblower retaliation complaint. Lo que quiere decir es una persona que esta denunciando la corrupción y se hace en las autoridades federales y [con] una declaración jurada. | Fonseca "Excuse me Valeria, 'the Governor's office sent Mr. Alberto Velazquez,' why is it in English? Because this is a whistleblower retaliation complaint. What it means is a person who is reporting corruption and it is done [with the] federal authorities and [with] an affidavit. |
| | | Collazo: Y esta el nombre ahí de Velázquez Piñol, que ahora fue acusado, y la persona lo que dice es que de la oficina del Gobernador enviaron a Velazquez Piñol para reunirse con este secretario auxiliar para presionarlo para que otorgara un contrato. Esta persona se negó. | Collazo: And there is the name of Velázquez Piñol, who has now been accused, and what the person says is that the Governor's office sent Velázquez Piñol to meet with this assistant secretary to pressure him to award a contract. This person refused. |
| | | Fonseca: ¿Y que pasó cuando se negó? At the momento I started to see a significant change in the way Dr. Rodriguez (el Secretario de Salud Rafael Rodriguez que | Fonseca: And what happened when he refused? At the moment I started to see a significant change in the way Dr. Rodriguez (the Secretary of Health Rafael Rodriguez who |

| | | | |
|---|---|---|---|
| | | acaban de ver) treated me. De ahí en adelante, cuando yo me negué a ese contrato, empezaron a maltratarme por parte del Secretario.<br><br>Collazo:<br>De hecho, el Secretario le…la persona lo que alega en su declaración jurada es que el Secretario le dijo "ese contrato se va a otorgar", lo que pasa es que después vinieron, verdad, los huracanes y… | you just saw) treated me. From then on, when I refused that contract, they began to mistreat me on behalf of the Secretary.<br><br>Collazo:<br>In fact, the Secretary ... what the person alleges in his affidavit is that the Secretary told him "that contract is going to be awarded", what happened was that afterwards, the hurricanes and ... |
| 6 | 4:46 – 5:45 | Fonseca:<br>"¿Y a quien mas menciona en la declaración jurada?"<br><br>Collazo:<br>"Menciona en varias instancias a Elías Sanchez, verdad, y a su matrimonio con Valerie Rodríguez, pero particularmente, y esto es bien importante, porque este contrato si se dio, menciona, vamos que, déjame ver si esta la fecha por aquí, creo que esta en esta hoja, bueno en fin, se quería otorgar un contrato de tecnología por once millones anuales y esta persona lo que estaba explicando era, pero si el gobierno federal tiene un programa para manejar eso exactamente igual, y nos cuesta un millón por dos años."<br><br>Fonseca:<br>"Aquí esta la fecha, [reading from the screen] 'the letter was dated October twenty-fifth which was an oversight on my part'. O sea, que una carta donde él dice: pero mira, ¿por qué vamos a gastar once millones, si el gobierno federal nos da esto gratis? Lo mismo que hace esa aplicación que vamos a pagar once millones, el gobierno federal la da gratis."<br><br>Collazo:<br>"Once millones por un año, o sea, y el gobierno federal un millón, dos años. Y ese | Fonseca:<br>"And who else is mentioned in the affidavitt?"<br><br>Collazo:<br>"It mentions Elias Sanchez in several instances, right, and his marriage to Valerie Rodriguez, but particularly, and this is very important, because this contract was signed, it mentions, let's see if the date is around here, I think it's on this sheet, well anyway, they wanted to award a technology contract for eleven million a year and this person, what he was explaining was, but if the federal government has a program to handle that in exactly the same way, and it costs us a million for two years."<br><br>Fonseca:<br>"Here's the date, [reading from the screen] 'the letter was dated October twenty-fifth which was an oversight on my part.' In other words, a letter where he says, but look why we are going to spend eleven million, if the federal government gives us this for free, the same thing as that application that we are going to pay eleven million, the federal government gives it for free."<br><br>Collazo:<br>"Eleven million for one year, in other words, and the federal government one |

| | | contrato era con Microsoft, se otorgó, y el cabildero de esa compañía es Elías Sánchez." | million, two years. And that contract was with Microsoft, it was awarded, and the lobbyist for that company is Elias Sanchez." |
| | | Fonseca:<br>Ok. Gobernador… | Fonseca:<br>Ok. Governor… |
| | | Collazo:<br>La persona tuvo que renunciar, por cierto. | Collazo:<br>The person had to resign by the way. |
| | | Fonseca:<br>Eso es lo que pasa cuando, pues, 11 millones versus un millón de dólares… | Fonseca:<br>This is what happens when, well, 11 million versus one million dollars… |

**EXHIBIT F**

The Story broadcasted on or about April 16, 2019 in the *Jay y sus Rayos X* show (a copy of the broadcast can be found at: https://www.youtube.com/watch?v=6RWCdhIHEas ), which the following defamatory statements:

| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 8:16 – 8:38 | Collazo:<br>"Bajo condición de anonimato, empleados del Departamento [de Salud] han denunciado la fuerte influencia del matrimonio de Elías Sánchez y Valerie Rodríguez dentro de la agencia. Aseguran se han encargado de colocar a sus allegados en posiciones claves."<br><br>Voz Protegida:<br>"Desde el primer día de esta Administración la presencia del Señor Elías Sánchez se ha hecho sentir."<br><br>Collazo: "¿Elías Sánchez y Valerie Rodríguez han cabildeado por varios contratos dentro del Departamento?<br><br>Statement not included as part of the public broadcast:<br>Collazo:<br>"¿Y el contrato de Tele-medicina que llevó Valerie Rodríguez al Departamento?" | Collazo:<br>"Under condition of anonymity, Department [of Health] employees have denounced the strong influence of the marriage of Elías Sánchez and Valerie Rodriguez within the agency; claiming that they have been in charge of placing their close friends in key positions. "<br><br>Masked Voice:<br>"From day one of this Administration the presence of Mr. Elias Sanchez has been felt."<br><br>Collazo: "Elias Sanchez and Valerie Rodriguez have lobbied for multiple contracts within the Department?"<br><br>Statement not included as part of the public broadcast:<br>Collazo:<br>"And the Tele-medicine contract that Valerie Rodriguez brought to the Department?" |
| 2 | 9:17 – 9:26 | Collazo:<br>"Mabel Cabeza tiene una relación estrecha con Valerie Rodríguez y nuestras fuentes aseguran que fue así como consiguió el puesto de Chief of Staff o jefa de personal." | Collazo:<br>"Mabel Cabeza has a close relationship with Valerie Rodriguez and our sources claim that this is how she got the position of Chief of Staff or head of personnel." |
| 3 | 10:49 – 12:10 | Collazo:<br>Jay, hoy recibimos esta carta. Vamos a leer esta parte. Elías Sánchez nos envió esta carta, el Licenciado Elías Sánchez, reaccionando a una entrevista que no había salido al aire.<br><br>Fonseca:<br>O sea, que, perdóname, Elías Sánchez reaccionó a una entrevista que no había salido al aire. | Collazo:<br>Jay, we got this letter today. Let's read this part. Elias Sanchez sent us this letter, attorney Elias Sanchez, reacting to an interview that had not aired.<br><br>Fonseca:<br>So then, forgive me, Elias Sanchez reacted to an interview that had not aired. |

Collazo:
Correcto y menciona, verdad, en detalle lo que pasa en la entrevista, las preguntas que le hice al secretario.

Fonseca:
O sea, que el Secretario dice que el no tiene relación con Elías, pero Elías había visto una entrevista que se le hizo al Secretario. Peter Quiñones, por si acaso, el asesor de prensa, estaba grabando a la vez que hicimos la entrevista así que presumiblemente, el director de prensa, pues, no se, quizás tuvo que ver en eso.

Collazo:
Pero bueno, el licenciado quería dejar saber esto: le informo y aclaro que ni este servidor, ni la Sra. Rodríguez tenemos relación alguna o hemos tenido, directa ni indirecta, con alguna entidad que tenga que ver con la Tele-medicina ni con el tema objeto de la entrevista ni tenemos inherencia alguna de manera directa ni indirecta en las contrataciones en la que entra el Departamento.

Fonseca:
Ok. Así que no tienen inherencia alguna.

Collazo:
Bueno estaban reaccionando a una historia que no había salido, y a una entrevista que no había salido al aire.

Fonseca:
O sea que Elías Sánchez reaccionó en una carta a información que solo el Secretario de Salud, que fue el que nos dio la entrevista podía haberle dicho. [With an obvious sarcastic tone] ¿O, ah bueno, a menos que tengamos a alguien aquí en Telemundo que le pasó la entrevista a él verdad? Podría ser que los compañeros de edición le pasaron la entrevista a Elías. O el Secretario de Salud llamó a Elías y le dijo va a salir

Collazo:
Correct and it mentions, right, in detail what happens in the interview, the questions I asked the Secretary.

Fonseca:
In other words, the Secretary says that he has no relationship with Elias, but Elias had seen an interview that was done with the Secretary. Peter Quiñones, just in case, the press consultant, was recording at the same time we did the interview, so presumably, the press director, well, I don't know, maybe he had something to do with that.

Collazo:
But well, the attorney wanted to let us know this: I inform you and clarify that neither I, nor Mrs. Rodriguez have any relationship or have had, directly or indirectly, with any entity that has to do with Tele-medicine or with the subject matter of the interview nor do we have any direct or indirect inherence in the hiring of the Department.

Fonseca:
Okay. So they have no inherence.

Collazo:
Well, they were reacting to a story that hadn't aired, and an interview that hadn't aired.

Fonseca:
That is, Elias Sanchez reacted in a letter to information that only the Secretary of Health, who was the one who gave us the interview, could have told him. [With an overtly sarcastic tone] Or, oh well, unless we have someone here at Telemundo who passed the interview on to him right? It could be that fellow editors passed the interview on to Elias. Or the Secretary of

| | | esto. | Health called Elias and told him this is going to come out. |
|---|---|---|---|

**EXHIBIT G**

On or about April 16, 2019 story located at https://twitter.com/ValeriaCollazoC/status/1118160900597473285 in an Twitter post, Valeria Collazo posted: "Who is in charge of the Department of Health? We investigate the internal war for the agency's political control and the award of contracts. Also, the alleged strong influence of lobbyists and the hiring and decision making process.  More details tonight in #jayrayosx".



**EXHIBIT H**

On or about April 16, 2019 Sanchez sent an email to Cancela and Mr. Ruben Roman, the producer of *Jay y sus Rayos X* Telemundo show, alerting Telemundo of the false and defamatory statements Fonseca was going to say on his 10pm show. A copy of the emails and the letter sent are as follow:

| Statement | Translation |
|---|---|
| From: Elias Sanchez <eliassanchez2012@gmail.com><br>Date: April 16, 2019 at 5:10:29 PM EDT<br>To: rubenroman733@gmail.com<br>Cc: Jose.Cancela@nbcuni.com<br>Subject: Carta Telemundo.pdf<br><br>Ruben,<br><br>Adjunto una comunicación formal de mi parte referente al programa Jay y sus Rayos X de esta noche.<br><br>Cualquier duda o pregunta se puede comunicar con este servidor.<br><br>Cordialmente,<br><br>Lcdo. Elías F. Sánchez Sifonte | From: Elias Sanchez <eliassanchez2012@gmail.com><br>Date: April 16, 2019 at 5:10:29 PM EDT<br>To: rubenroman733@gmail.com<br>Cc: Jose.Cancela@nbcuni.com<br>Subject: Letter Telemundo.pdf<br><br>Ruben,<br><br>I am enclosing a formal communication from me regarding *Jay y sus Rayos X* show tonight.<br><br>Any doubt or question can be communicated with this server.<br><br>Cordially,<br><br>Atty. Elías F. Sánchez Sifonte |
| On Apr 16, 2019, at 5:35 PM, rubenroman733@gmail.com wrote:<br><br>Hola Elías!<br><br>Gusto en saludarte!<br><br>Déjame saber si Valeria te puede llamar. Yo no estoy en PR.<br><br>Gracias!!!<br>RRR<br><br>Sent from my iPhone | On Apr 16, 2019, at 5:35 PM, rubenroman733@gmail.com wrote:<br><br>Hi Elias!<br><br>Nice to greet you!<br><br>Let me know if Valeria can call you. I am not in PR.<br><br>Thank you!!!<br>RRR<br><br>Sent from my iPhone |
| On Apr 16, 2019, at 5:50 PM, Elias Sanchez <eliassanchez2012@gmail.com> wrote:<br><br>Saludos Rubén, el propósito de la carta fue poner a la gerencia en alerta sobre información falsa y difamatoria sobre mi persona y mi esposa que probablemente podría ser divulgada hoy, no hacerme disponible para entrevista sobre hechos que son totalmente falsos para crear una noticia donde no la hay.  Información falsa, sin evidencia alguna de personas anónimas o "fuentes" no pueden ser la base para crear noticias. | On Apr 16, 2019, at 5:50 PM, Elias Sanchez <eliassanchez2012@gmail.com> wrote:<br><br>Greetings Rubén, the purpose of the letter was to alert management of the false and defamatory information about myself and my wife that could probably be disclosed today, not to make me available for an interview on facts that are totally false to create a news that doesn't exist. False information, without any evidence from anonymous persons or "sources" cannot be the basis for creating news. |

| | |
|---|---|
| También tengo que mencionar que la referida periodista ha demostrado un ánimo prevenido en varios otros temas con este servidor, por lo que su bias natural es lo que puede estar motivando la acción.<br><br>\<image1.png><br><br><br><br>Cordialmente,<br><br>Elías<br><br>Sent from my iPhone | I also have to mention that the aforementioned journalist has shown a cautious spirit on several other issues with this server, so her natural bias is what may be motivating the action.<br><br>\<image1.png><br><br><br><br>Cordially,<br><br>Elías<br><br>Sent from my iPhone |
| **From:** rubenroman733@gmail.com<br>**Date:** April 16, 2019 at 6:31:14 PM AST<br>**To:** Elias Sanchez \<eliassanchez2012@gmail.com><br>**Cc:** Jose.Cancela@nbcuni.com<br>**Subject: Re: Carta Telemundo.pdf**<br><br>Entiendo tu punto, aunque no comparta algunas cosas que dices. Pero nada, respetuosamente estipulo las diferencias.<br><br>Con relación a otro asunto relacionado con JRX no dudes en comunicarte conmigo.<br><br>Un abrazo!<br><br>Gracias!!<br><br>RRR<br><br>Sent from my iPhone | **From:** rubenroman733@gmail.com<br>**Date:** April 16, 2019 at 6:31:14 PM AST<br>**To:** Elias Sanchez \<eliassanchez2012@gmail.com><br>**Cc:** Jose.Cancela@nbcuni.com<br>**Subject: Re: Carta Telemundo.pdf**<br><br>I understand your point, even if I don't share some of the things you say. But nothing, I respectfully stipulate the differences.<br><br>Regarding any other matter related to JRX, do not hesitate to contact me.<br><br>A hug!<br><br>RRR<br><br>Sent from my iPhone |

| Statement | Translation |
|---|---|
| 16 de abril de 2019 | Apr 16, 2019 |
| Ref.: Programa de 16 de abril de 2019 de *Jay y sus Rayos X* | Re: Program of April 16, 2019 of *Jay y su Rayos X* |
| Le escribo en representación mía y de la Sra. Valerie Rodríguez (en adelante, la "Sra. Rodríguez"). En o alrededor del 10 de abril de 2019, la periodista e investigadora Valeria Collazo, del programa *Jay y sus Rayos X*, entrevistó al Secretario de Salud, Dr. Rafael Rodríguez Mercado (en adelante, el "Secretario"). Por información y creencia, durante la entrevista la Sra. Collazo le preguntó en múltiples ocasiones al Secretario si este servidor y/o la Sra. Rodríguez, tenían algo que ver con el contrato de Tele-Medicina del Departamento de Salud o con procesos de otorgación de contratos en general en el Departamento. El Secretario le contestó que no, e inclusive le informó a la Sra. Collazo que la Tele-Medicina la donó Direct Relief, una organización sin fines de lucro y que no teníamos relevancia alguna en contrataciones del Departamento. | I am writing to you on behalf of myself and Mrs. Valerie Rodríguez (hereinafter, "Mrs. Rodríguez"). On or around April 10, 2019, journalist and researcher Valeria Collazo, from the *Jay y sus Rayos X* program, interviewed the Secretary of Health, Dr. Rafael Rodríguez Mercado (hereinafter, the "Secretary"). For information and belief, during the interview, Mrs. Collazo asked the Secretary on multiple occasions if this server and / or Mrs. Rodríguez had something to do with the Tele-Medicine contract of the Department of Health or with the granting processes of contracts in general in the Department. The Secretary answered no, and even informed Ms. Collazo that the Tele-Medicine was donated by Direct Relief, a non-profit organization and that we had no relevance whatsoever in contracting with the Department. |
| Recientemente, salió un anuncio en el canal de televisión Telemundo Puerto Rico, promoviendo la edición de hoy, 16 de abril de 2019, del programa *Jay y sus Rayos X*. En el referido anuncio aparece una silueta en carácter de anonimato hablando del tema de Tele-Medicina. Por tal razón, y en anticipo a lo que pueda decir una fuente anónima que no ha sido corroborada por fuente creíble adicional, y debido a que ningún periodista o representante del programa *Jay y sus Rayos X* nos ha contactado para solicitar nuestra reacción, le informo y aclaro que ni este servidor, ni la Sra. Rodríguez, tenemos relación alguna o hemos tenido, directa ni indirecta, con alguna entidad que tenga que ver con la Tele-Medicina ni con el tema objeto de la entrevista ni tenemos inherencia alguna de manera directa ni indirecta en las contrataciones en las que entra el Departamento. Le advertimos que de surgir una publicación esta noche, por virtud de entrevista o por expresión anónima, que mencione o insinúe que existe una relación entre nosotros y Tele-Medicina o con involucramiento nuestro en "otorgación de contratos", la misma estaría siendo publicada con malicia y a sabiendas que dicha información es falsa, en particular, cuando la misma ha sido negada por el Secretario y de manera directa por nosotros en esta misiva. De ocurrir lo anterior, le informamos que nos reservamos todos los derechos de presentar nuestros reclamos en los foros correspondientes. | Recently, an advertisement appeared on the television channel Telemundo Puerto Rico, promoting today's edition, April 16, 2019, of the program *Jay y sus Rayos X*. In the aforementioned advertisement, a silhouette appears for anonymity talking about the issue of Tele - Medicine. For this reason, and in anticipation of what an anonymous source may say that has not been corroborated by an additional credible source, and because no journalist or representative of the *Jay y sus Rayos X* program has contacted us to request our reaction, I inform you and I clarify that neither this server, nor Rodriguez, have any relationship or have had, direct or indirect, with any entity that has to do with Tele-Medicine or with the subject matter of the interview, nor do we have any inherence in any way direct or indirect in the contracts in which the Department enters. We warn you that if a publication arises tonight, by virtue of an interview or by anonymous expression, that mentions or implies that there is a relationship between us and Tele-Medicina or with our involvement in "granting contracts", it would be published with malice and knowing that said information is false, in particular, when it has been denied by the Secretary and directly by us in this letter. If the above occurs, we inform you that we reserve all rights to present our claims in the corresponding forums. |

Sinceramente,
Elías Sánchez Sifonte

c. José Cancela Presidente
Telemundo Puerto Rico
Jose.Cancela@nbcuni.com

Sinceramente,
Elías Sánchez Sifonte

c. José Cancela Presidente
Telemundo Puerto Rico
Jose.Cancela@nbcuni.com

**EXHIBIT I**

On July 16, 2019 reporter Saudy Rivera Soto on the Telemundo show Dando Candela stated that FBI was going to arrest Elías Sanchez. The following screenshots are social media post based on Mrs. Soto statement:





**EXHIBIT J**

On or about July 16, 2019 in a Twitter post Sandra Rodríguez Cotto posted: "Case number 19-20429 in Miami is very interesting…I continue verifying what is that sealed case about and the alleged arrest in Miami, Florida"; including a cropped image of a docket report with the following text: "19-20429 Sealed v. Sealed Defendant *SEALED* Case filed: 07/16/2019 Added: 07/16/2019".



**EXHIBIT K**

On or about July 30, 2019, Jay Fonseca posted on his Facebook page a story about the professional relationship between the insurance company Triple S and Mr. Sánchez. This story can be found at https://www.facebook.com/JayFonsecaPR/photos/a.163264163691056/2915355298481915 On said story, Mr. Fonseca stated as fact not an opinion that:

"Representative Jesus Manuel Ortiz asked Triple SSS about its relationship with Mr. Sanchez. Triple S hired Elías through the firm. After apparently having been left out of Vital [Program], they [Triple S] came back and was hired. We are talking about 700 million bills in government payments to Triple S that they achieved after Elías's intervention. The incredible thing is that the WP law firm represented Menonita Healthcare at the same time, who were obviously affected by the entry of its competitor, who generated the most money in Vital and was out until the intervention of Elías Sánchez".

He also attached as a picture on this post a "screenshot" of the Request of Information made by the Health Committee of the Puerto Rico House of Representatives, specifically State Representative Jesus Manuel Ortiz to Triple S regarding a legislative investigation of the Vital Healthcare Program. He drew a circle around question number 8-b. Said question reads:

"b. Please state if Mr. Alberto Velazquez-Piñol and Mr. Elias Sanchez were present at meetings with the insurer or if they were part of the hiring process.

Answer: Mr. Alberto Velazquez-Piñol was present on behalf of ASES in meetings with Triple-S related to the Vital program and was part of the hiring process, also on behalf of ASES. Although Triple S consulted several issues with Attorney Sánchez as part of the contractual relationship with Wolf Popper LLP law firm, which was in effect from June 1, 2017 to September 26, 2018, Mr. Sánchez did not participate in meetings between Triple-S and ASES."





**EXHIBIT L**

On or about July 30, 2019 Josue Fonseca made a live video on Facebook which can be found at https://www.facebook.com/JayFonsecaPR/videos/2418828148177513, bearing the headline *Explota relación Triple S y Elías Sánchez* (which translates to "Triple S and Elías Sanchez's relationship explodes"), which contain the following defamatory statements:



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 0:04-0:27 | Reporter Fonseca:<br><br>"mmm que complicadito se ha puesto esto yo quiero enseñarles algo, vamos a enseñarle algo mejor, para que antes de seguir verdad porque cualquier cosa que pase, verdad, no quiere que uno fue el que se lo inventó. Estamos hablando que el Representante Jesús Manuel Ortiz….vean esto… (y procede a enseñar la noticia publicada en El Nuevo Día de 30 de julio de 2019, con el título "Triple-S Compartirá información sobre Vital"). | Reporter Fonseca:<br><br>"This has become extremely complicated. We are going to show you something better, so before continuing, right, because, whatever happens one does not want them to say that one made up [the stories]. We are talking about State Representative Jesús Manuel Ortiz… .see this… (and proceeds to show the news published in El Nuevo Día on July 30, 2019, with the title "Triple-S will share information about Vital"). |

| 2 | 2:57 – 3:13 | Reporter Fonseca: | Reporter Fonseca: |
|---|---|---|---|
| | | "Contrataron [ Triple S] a Elías Sánchez y además ahí lograron entrar. El contrato venía de antes de haberse quedado afuera. ¿Qué hizo Elías Sánchez y Alberto Velázquez-Piñol para que entrara, pues no sé? Estamos hablando de nuevo, de 700 millones de dólares…" | "They [Triple S] hired Elías Sánchez and that's how they came back. The hiring was made before being left out. What did Elías Sánchez and Alberto Velazquez-Piñol do to get them back in the game, I don't know…Again, we are talking about 700 million dollars ..." |
| 3 | 3:26-4-30 | Reporter Fonseca | Reporter Fonseca |
| | | "Esto es un notición!! [enfatizando enérgicamente] La pregunta clave aquí es ¿cuál fue la gestión de Elías Sánchez para lograr que Triple S entrara al Plan Vital y cómo se hizo este asunto? Lo interesante a nivel de bufete de abogado, verdad, es que Wolf Popper es el bufete de abogados de Menonita Healthcare y a la misma vez Elías Sánchez entonces trabajaba con Triple S, a través de él, ehh, el bufete. Yo sé que, verdad, el bufete tiene una división de litigio y otra división de consultoría, pero ¡wow!, ehh, esto esta feo, esto, bien feo, bien feo, [ siendo bien enfático], este así que nada, estaremos dándole seguimiento a esto. Yo, verdad, habíamos escuchado y sabíamos que esto había pasado, pero verlo por escrito final, finalmente la empresa tenía que contestarle a la legislatura so pena de desacato, y tuvieron que contestar ese particular. Así que hay que darle crédito al Representante Jesús Manuel Ortiz y también al Presidente de la Comisión que permitió la pregunta, Juan Oscar Morales del PNP. Y por si acaso, Jesús Manuel es popular pero Juan Oscar es PNP". | "This is breaking news!! [emphasizing energetically] The key question here is what was Elías Sánchez's role to get Triple S to enter the Vital Plan and how was this done? The interesting thing at the law firm level, right, is that Wolf Popper is the law firm of Menonita Healthcare and at the same time Elías Sánchez then worked for Triple S, through him, uhh, the firm. I know that, right, the firm has a litigation division and a consulting division, but wow, ehh, this is ugly, this is, very ugly, very ugly, [being very emphatic], this one so nothing, we will be following up on this. I, right, we had received information, and we knew that this had happened, but seeing it in writing, finally the company had to answer the legislature under penalty of contempt, and they had to answer that issue. So, we must give credit to State Representative Jesús Manuel Ortiz and to State Representative Juan Oscar Morales, President of the Commission who allowed the question, Juan Oscar Morales of the NPP. And just in case, Jesús Manuel is PDP, but Juan Oscar is NPP ". |

**EXHIBIT M**

On or about July 30, 2019 Josue Fonseca posted a defamatory and malicious post his Facebook which can be found at     https://www.facebook.com/JayFonsecaPR/photos/a.163264163691056/2915761431774635,     bearing the headline " TRIPLE S RINDE INFO A LOS FEDERALES INFORME DE RELACIÓN  CON ELÍAS which contain the following defamatory statements:



| Statement | Translation |
|---|---|
| TRIPLE S RINDE INFO A FEDERALES INFORME DE RELACIÓN CON ELÍAS-Wolf Popper aclara info- Triple S tuvo que divulgar en el SEC su relación con Elías Sánchez quien presuntamente está siendo investigado por un gran jurado federal. Recuerden que a todas estas PR está buscando que nos aprueben 12 billones para ASES o colapsa la tarjeta de salud vital. O sea, el contratista más grande de 700 millones al año acaba de tener que informar al SEC para esto, mientras suplicamos al Congreso para fondos vitales de Medicaid o en octubre se acaban los fondos. Mientras, Wolf Popper, PSC envió el siguiente comunicado: WOLF POPPER, PSC (no LLP) fue contratado el 31 de junio de 2017 por Triple S para proveer asesoría legal en asuntos específicos. Dichos asuntos no incluyeron temas relacionados a ni asesoría sobre el Plan Mi Salud/Vital. Cualquier información en contrario en falsa. | TRIPLE S GIVES INFO TO THE FEDS REPORT ON THEIR RELATIONSHIP WITH ELÍAS-Wolf Popper clarifies info-Triple S had to disclose to the SEC its relationship with Elías Sánchez who is allegedly being investigated by a Grand Jury. Remember that PR currently is seeking a 12-billion-dollar bailout for ASES or the vital healthcare card collapses. That is, the biggest government contractor, 700 million a year, had to disclose this information to the SEC, while we plead Congress for the necessary funding for Medicaid or funds will be depleted in October. Meanwhile, Wolf Popper, PSC issued the following statement: Triple S, on July 31, 2017, retained the services of WOLF POPPER, PSC (not LLP) to provide legal counseling on specific issues. Such issues did not include topics related to the Mi Salud/Vital healthcare. Any information alleging involvement on the above referenced matter is false. |
| Vilma       Peña<br>Managing Partner<br>Wolf Popper, PSC | Vilma       Peña<br>Managing Partner<br>Wolf Popper, PSC |

**EXHIBIT N**

On or about July 30, 2019, Telemundo posted an interview with reporter Ivonne Solla, from Telenoticias, and Representative Jesus Manuel Ortiz. The defamatory story can be found at https://www.telemundopr.com/noticias/puerto-rico/triple-s-confirma-vinculo-con-elias-sanchez-y-ordena-investigacion/101134/ . In the live interview Representative Jesus Manuel Ortiz, a House member of the Health Committee, never stated that Elías Sanchez intervened in any way or form to secure that Triple S obtained a 700-million-dollar contract with the government of Puerto Rico. In fact, Representative Ortiz stated that Triple S confirmed that Sanchez never participated in any meetings between Triple S and ASES. However, Telemundo with a reckless disregard for the truth published that "the company [Triple S] had been left out of the Government's Health Plan and after Sanchez's intervention they [Triple S] obtained the 700 million contract.











La aseguradora confirmó su relación con el cabildero Elías Sánchez.



La aseguradora Triple-S confirmó que contrató al cabildero Elías Sánchez por medio del bufete en el que trabajaba, Wolf Popper LLP.

"El Sr. Alberto Velázquez-Piñol estuvo presente en representación de ASES en reuniones con Triple-s relacionadas al programa Vital y fue parte del proceso de contratación, también en representación de ASES. Aunque Triple-S consultó varios temas con el Lcdo. Sánchez como parte de su contratación del bufete Wolf Popper LLP, que estuvo en vigor desde el 1 de junio de 2017 hasta el 26 de septiembre de 2018, el Ser. Sánchez no participó en reuniones entre Triple-S y ASES", sostuvo la aseguradora tras un requerimiento de información de la Cámara de Representantes.

Según ha trascendido, la empresa habría quedado fuera del plan de salud del gobierno y tras la intervención de Sánchez, habrían logrado el contrato de unos $700 millones.

**Lo más popular**

**PROGRAMACIÓN EN VIVO**
Programación en vivo

**DÍA A DÍA**
Mira aquí nuestra
programación en vivo

**CORONAVIRUS EN PUERTO I**

---



**CORONAVIRUS EN PUERTO RICO** · HACE 2 HORAS
**Hacienda prepara plan de distribución para entregar ayuda de $600**

"Triple-S contrató a Wolf Popper LLP, una firma legal donde trabajaba Elías Sánchez, desde el 1 de junio de 2017 hasta el 26 de septiembre de 2018. Wolf Popper proveyó asesoría legal, de política pública y asuntos gubernamentales a la compañía en varios asuntos, incluyendo sobre ASES", sostuvo la asegurada este martes, en un comunicado de prensa escrito en inglés.

Según informó, a la luz de los recientes informes de prensa sobre ASES, Triple-S contrató este mes abogados externos para investigar su participación en el proceso de licitación de Vital.



Hero Wars

**Pronóstico**
SAN JUAN, PR

**81°**

Parcialmente
nublado
0.01% Precip

For the same day, on July 30, 2019, Telemundo posted an interview with reporter Ivonne Solla, from Telenoticias, and Representative Jesús Manuel Ortiz. Avaible online at: https://www.telemundopr.com/noticias/local/jesus-manuel-ortiz-aborda-que-irregularidades-encuentra-en-respuesta-de-triple-s_tlmd-puerto-rico/101133/





# Triple-S confirma vínculo con Elías Sánchez y ordena investigación

Contrató al bufete donde trabajaba el cabildero.

Por TELEMUNDO PR • Publicado el 30 de julio del 2019 • Actualizado a las 3:17 pm del 30 de julio del 2019



La aseguradora conTrmó su relación con el
cabildero Elías Sánchez.

La aseguradora Triple-S confirmó que contrató
al cabildero Elías Sánchez por medio del bufete
en el que trabajaba, Wolf Popper LLP.

"El Sr. Alberto Velázquez-Piñol estuvo presente
en representación de ASES en reuniones con
Triple-s relacionadas al programa Vital y fue
parte del proceso de contratación, también en
representación de ASES. Aunque Triple-S
consultó varios temas con el Lcdo. Sánchez
como parte de su contratación del bufete Wolf
Popper LLP, que estuvo en vigor desde el 1 de
junio de 2017 hasta el 26 de septiembre de
2018, el Ser. Sánchez no participó en reuniones
entre Triple-S y ASES", sostuvo la aseguradora

tras un requerimiento de información de la
Cámara de Representantes.

Según ha trascendido, la empresa habría
quedado fuera del plan de salud del gobierno y
tras la intervención de Sánchez, habrían
logrado el contrato de unos $700 millones.

## Puerto Rico



**PFEI** • HACE 28 MIN

**Designan FEI para
investigar
responsables por
compras de pruebas de
COVID-19**

about a chance at
## 100% CLEAR SKIN

**LEARN MORE >**

**PURPOSE AND SAFETY SUMMARY**

Important Facts About Taltz® (tól-ts). It is a prescription
medicine also known as ixekizumab.

Taltz is an injectable medicine used to treat:

- People six years of age and older with moderate to severe plaque
  psoriasis who may benefit from taking injections or pills
  (systemic therapy) or treatment using ultraviolet or UV light
  (phototherapy).
- Adults with active psoriatic arthritis. Adults
  with active ankylosing spondylitis.
- Adults with active non-radiographic axial spondyloarthritis
  with objective signs of inflammation.

It is not known if Taltz is safe and effective in children for
conditions other than plaque psoriasis or in children under 6

## Lo más popular



**DÍA A DÍA**
Mira aquí nuestra
programación en vivo



**PROGRAMACIÓN EN VIVO**
Programación en vivo



**MÚSICA**
Muere Armando Manzanero, un
romántico de todos los
tiempos



**AYU DA POR CORONAVIRUS**
Ayuda por coronavirus: Trump
firma segundo paquete de
estímulo económico



**ASTRONOMÍA** • HACE 2 HORAS

**No te pierdas este martes la "Luna Fría"**

**SPONSORED**
Experta en lingüística explica cómo hablar inglés con solo 15 minutos de estudio al día

Babbel

"Triple-S contrató a Wolf Popper LLP, una firma legal donde trabajaba Elías Sánchez, desde el 1 de junio de 2017 hasta el 26 de septiembre de 2018. Wolf Popper proveyó asesoría legal, de política pública y asuntos gubernamentales a la compañía en varios asuntos, incluyendo sobre ASES", sostuvo la asegurada este martes, en un comunicado de prensa escrito en inglés.

Según informó, a la luz de los recientes informes de prensa sobre ASES, Triple-S contrató este mes abogados externos para investigar su participación en el proceso de licitación de Vital.

**Pronóstico de El Tiempo**

SAN JUAN, PR

# 80°

Parcialmente nublado
0.01% Precip

ESTANOCHE

## 71°

MAÑANA

# 83°

## CUATRO PREGUNTAS RÁPIDAS

**¿Alguno de los restaurantes favoritos en el área de tu vida ha cerrado permanentemente como resultado de la pandemia de coronavirus?**

○ Sí

○ No

○ Otra / Sin opinión

SIGUIENTE

**SPONSORED** • **BABBEL**

**Experta en lingüística explica cómo hablar inglé…**

SPONSORED • HERO...

**¡Conseguir este tesoro e…**

SPONSORED • BABBEL

**Estos son los 3 pilares clave…**

SPONSORED • CLUB PARA EMPRENDED…

**Familia expulsa de casa a la hja el día de su…**

SPONSORED • BABBEL

**Experta en lingüística explica como hablar inglé…**

SPONSORED • WIFI U...

**El dispositivo para mejorar…**

**SPONSORED • CONS...**

## ¿Se empañan sus gafas…

**SPONSORED • CARS&YACHTS**

## Rebel Wilson bajó de peso y luce despampanante

**SPONSORED • CONSEJOS Y TRUCOS**

## Si comes jengibre todos los días durante 1 mes, esto e…

**SPONSORED • PROP...**

## Las gafas de lectura con…

**CARMEN YULÍN CRUZ**

## Carmen Yulín se va de Puerto Rico tras aceptar oferta de trabajo

**MANNY MANUEL**

## En Centro Médico Manny Manuel tras accidentarse por segunda vez

**SPONSORED • CAR N…**

**Por eso la
gente no…**

**SPONSORED • MANUKA FEED**

**Mezcla estos 3
ingredientes para aliviar …**

**SPONSORED • FAST PHRASES**

**Inglés sin aprender
gramática. ¡El cerebro…**

**SPONSORED • DO IT …**

**Fotos tomadas
segundos…**

**EXPLOSION EN NASHVILLE**

**Autoridades confirman que sospechoso
murió en la explosión de Nashville**

**ASESINATOS EN PUERTO RICO**

**Hombre es asesinado a tiros en Juana Díaz**



! ⁙ #

**TELENOTICIAS**

**EL TIEMPO**

**ESTADOS UNIDOS**

**CELEBRIDADES**

**DANDO CANDELA**

**MÚSICA**

**JAY Y SUS RAYOS X**

**MUNDO**

**DEPORTES**

WKAQ Public Inspection File

Aplicaciones de la FCC

Empleos

Envía tus comentarios

Términos de Servicio

Política de Privacidad

No venda mi información
personal

Aviso de California

AdChoices

Copyright © 2020 NBCUniversal Media, LLC. Derechos Reservados.

**EXHIBIT O**

The July 17, 2019 story located at https://www.telemundopr.com/noticias/puerto-rico/elias-sanchez-desmiente-su-arresto/101469/ bearing the headline "Elías Sánchez alega que difaman en su contra" (translation "Elías Sánchez alleges that they slander against him") contains two (2) videos embedded in the Story with the following slanderous statements:

**In the video ""¡Qué bella es la vida de Elías Sánchez brother!":**

We incorporate by reference herein the defamatory statements already described in Exhibit D.



**In the video "Elias Sanchez sabe todos los secretos del Estado":**

We incorporate by reference herein the defamatory statements already described in Exhibit C.





**PURPOSE AND SAFETY SUMMARY**

Important Facts About Taltz® (tōl-ts). It is a prescription medicine also known as ixekizumab.

Taltz is an injectable medicine used to treat:

- People six years of age and older with moderate to severe


**DA VIDA 2020**    **TELENOTICI**    **79º**

**TENDENCIAS**    Da Vida 2020    Telemundo Music Nights    Papelón 2020    Censo 202    **65 ALERTAS DE EL TIEMPO**

# Elías Sánchez alega que difaman en su contra

Tras la publicación de investigación que señala el supuesto control que tiene en el gobierno.

Por TELEMUNDO PR • Publicado el 17 de julio del 2019 • Actualizado a las 10:51 pm del 17 de julio del 2019

*El exrepresentante del gobernador Ricardo Rosselló en la Junta de Supervisión Fiscal, Elías Sánchez Sifonte, reaccionó este miércoles a la investigación del Centro de Periodismo Investigativo (CPI) que lo señala como quien controla las contrataciones del gobierno.*

A continuación, reproducimos de forma íntegra sus declaraciones escritas:

"*En a tarde de hoy, el Centro de Periodismo* Investigativo divulgó un artículo que está



*plagado de información falsa y difamatoria.* Debido al craso nivel de mendacidad de la publicación me veo en la obligación de refutar alegaciones y conjeturas que conforman el artículo. Además de servir este medio para hacer algunas refutaciones que me resultan indispensables, dado el daño reputacional que pueden causar, también debe servir para solicitar un cese y desista definitive de la publicación de información falsa y difamatoria en cuanto a mi persona. El artículo publicado por el Centro de Periodismo Investigativo no solo carece de veracidad y es difamatorio en su faz sino que da cuenta de un grave menosprecio por la verdad.

## Puerto Rico



**HUMACAO** • HACE 36 MIN

### Velatorio de Tito Rojas será este martes en Humacao



**CARMEN YULÍN CRUZ** • HACE 1 HORA

### Municipio de San Juan no ha pagado retiro de pensionados

*De ninguna manera "controlo" proceso de* contratación alguna en el Gobierno de Puerto Rico. Tal declaración es falsa, absurda y difamatoria. Tampoco he contado con información confidencial de ningún tipo para



### PURPOSE AND SAFETY SUMMARY

Important Facts About Taltz® (tŏl-ts). It is a prescription medicine also known as ixekizumab.

Taltz is an injectable medicine used to treat:

- People six years of age and older with moderate to severe plaque psoriasis who may benefit from taking injections or pills (systemic therapy) or treatment using ultraviolet or UV light (phototherapy).
- Adults with active psoriatic arthritis.
- Adults with active ankylosing spondylitis.
- Adults with active non-radiographic axial spondyloarthritis with objective signs of inflammation.

It is not known if Taltz is safe and effective in children for conditions other than plaque psoriasis or in children under 6

## Lo más popular



**DÍA A DÍA**

Mira aquí nuestra programación en vivo



**PROGRAMACIÓN EN VIVO**

Programación en vivo



**PREGUNTA DEL DÍA**

Entra y vota en la pregunta del día



**MÚSICA**

Muere Armando Manzanero, un romántico de todos los tiempos

**SPONSORED**

Experta en lingüística explica cómo hablar inglés con solo 15 minutos de estudio al día


Babbel

## Pronóstico de El Tiempo

**SAN JUAN, PR**

*beneficio de clientes. Cómo abogado en la* práctica privada represento entidades que cumplen con todos los preceptos de la ley y compiten según los parámetros que correspondan. Nunca me he "presentado sin invitación" a dependencias a presentar ninguna propuesta ni "cazar" propuestas con clientes.

*En cuanto a la licitación de Tu Hogar Renace, no* participé de la misma ni intervine de ningún modo en ella. Así lo constatan las propias declaraciones del Secretario de la Vivienda, quien reconoce que sostuvimos una reunión después de adjudicado el proceso. Dicha reunión fue coordinada con él y no como se expone en el artículo. El único propósito de dicha reunión, en la que acudí como abogado, fue para notificar que habría una impugnación oficial del proceso, la cual ocurrió y la Junta Revisora de Subastas nos dió la razón. Todo lo representado en el artículo en cuanto a este tema es falso y difamatorio.

79º

**ESTANOCHE**

71º

Mayormente
CUATRO PREGUNTAS
RÁPIDAS

**MAÑANA**

82º

Cargando encuesta...



1:31

"¡QuébellaeslavidadeElías Sánchez, brother!"



00:00                    -00:00

*Nunca he representado a Gila Corporation, tal* declaración es también totalmente falsa.

*En lo que constituye un claro menosprecio por la* verdad, los periodistas en el artículo a través de sus "fuentes" exponen que realicé una intervención indebida por la empresa Carolina Catering Services. No tengo y nunca he tenido relación alguna con dicha entidad ni conocimiento alguno en cuanto a este tema. A pesar de la clara negativa del Secretario de Corrección y de la Empresa en referencia, los periodistas y el medio optan por menospreciar la verdad y difamar.

*El señor Alberto Velazquez no tiene vínculo* alguno con mi familia como insinúan en su artículo. Tampoco represente a ninguna entidad en la licitación de Vital, como falsamente insinuaron.

1:40

"Elias Sanchez sabe todos los secretos del Estado"

*En lo que constituye otro ejemplo de grave* menosprecio por la verdad, publican, a pesar de

*la negativa de la empresa, que tuve alguna* intervención en la contratación de CSA para la inspección de escuelas.

*En estas expresiones atiendo, a modo de* ejemplo, solo algunos de los señalamientos falsos del artículo sin pretender abordar y agotar cada una de las distorsiones que incluye una por una. Estoy solicitando, por este medio, la corrección inmediata de las expresionaes falsas y difamatorias divulgadas en la historia.

*Cómo abogado en la práctica privada siempre* he cumplido con la ley en todo mi proceder y ante una publicación tan patentemente falsa, difamatoria y con grave menosprecio por la verdad estaré tomando las acciones legales que corresponden con el fin de proteger mi reputación y evitar que se continúe divulgando información difamatoria sobre mi persona", alegó.

Rechaza arresto

*Sánchez Sifonte negó el martes haber sido arrestado, como comentaron usuarios en las redes sociales.*

"Me dice que los rumores de que fue arrestado hoy en Miami son completamente falsos. También dijo que no coopera con el

Departamento de Justicia ni el FBI", escribió el reportero Andrew Scurria, del Wall Street Journal.

Sánchez Sifonte, quien también fue el director de campaña del primer ejecutivo, es uno de los integrantes del polémico chat que mantiene a esta administración en jaque.

Su participación en las conversaciones con altos funcionarios de gobierno ha sido motivo de múltiples cuestionamientos.

Sin embargo, antes ya había trascendido la investigación contra Sánchez Sifonte.

El pasado 11 de junio, tras revelarse la investigación por un supuesto esquema de venta de influencias y de otorgamiento de contratos en agencias gubernamentales, Sánchez Sifonte dijo que cualquier alegación sobre actos de corrupción por su parte es "absolutamente falsa".

"Cualquier alegación en esa dirección es absolutamente falsa. No he cometido ni participado de ningún acto de corrupción", dijo el cabildero en ese momento en declaraciones escritas.

"Trabajo para Wolf Popper (WP), bufete que en

efecto tiene contratos con el Departamento de Educación (DE). La relación contractual de WP con el DE precede a mi relación con la firma", sostuvo.

"No tengo ninguna relación con la división que presta servicios al gobierno", alegó.

---

SPONSORED • BABBEL

**Experta en lingüística explica cómo hablar inglé…**

SPONSORED • HERO…

¡Conseguir      este tesoroe…

SPONSORED • **BABBEL**

Estos son los 3 pilares clave…

SPONSORED • **CLUB PARA EMPRENDED…**

Familia expulsa de casa a la h!a el día de su…

SPONSORED • **BABBEL**

Experta en lingüística explica como hablar inglé…

SPONSORED • **CONS...**

¿Se empañan sus gafas…



! ▾▾ #

**TELENOTICIAS**

**EL TIEMPO**

**ESTADOS UNIDOS**

**CELEBRIDADES**

**DANDO CANDELA**

**MÚSICA**

**JAY Y SUS RAYOS X**

**MUNDO**

**DEPORTES**

WKAQ Public Inspection File

Aplicaciones de la FCC

Empleos

Envía tus comentarios

Términos de Servicio

Política de Privacidad

No venda mi información
personal

Aviso de California

AdChoi

**EXHIBIT P**

On or about June 18, 2018, in the digital newspaper "Noticel", Mr. Oscar Serrano and Mr. Eric de León Soto, published an article related to the process of selecting providers for the New Model of the Health Plan of the Government of Puerto Rico where it is stated that it and we quote: 'It is overdue and now it would start completely again due to an alleged 'error' detected after several companies had submitted their proposals and after one of them did not…Although in said newspaper article the allegation is denied by the Health Insurance Administration, said allegation raises serious questions that need to be corroborated or denied, as it is a closed process to the participants of the proposal process (RFP); in order to avoid possible legal challenges that would ultimately affect the services to the participants of the Government Health Plan...The House of Representatives of the Government of Puerto Rico understands that these allegations must be investigated to determine if they are real or not. If they are not true, the allegations that have been made will be denied and the process for requesting proposals would avoid a possible challenge to the process by any health organization participating in the process."

GOBIERNO DE PUERTO RICO

18va. Asamblea
Legislativa

3ra. Sesión
Ordinaria

**CÁMARA DE REPRESENTANTES**

**R. de la C. 1012**

20 DE JUNIO DE 2018

Presentada por la representante *Méndez Silva*, /
y los representantes *Ortiz González* y *Hernández Montañez*

Referida a la Comisión de Asuntos Internos

**RESOLUCIÓN**

Para ordenar a la Comisión de Salud de la Cámara de Representantes del Gobierno de Puerto Rico, realizar una investigación sobre el proceso de solicitud de propuestas ("Request for Proposal" en inglés) del Nuevo Modelo del Plan de Salud del Gobierno de Puerto Rico; en específico, sobre las imputaciones de problemas en el proceso de solicitud de propuestas relacionadas con la entrega de documentos dentro del término requerido, sobretodo, las Certificaciones Actuariales; y la posibilidad de que la Administración de Seguros de Salud comience el proceso de solicitud de propuestas desde el principio por un "error" de la agencia; y establecer que los trabajos de investigación sobre este asunto se realizarán en conformidad con los Artículos 12.5 y 12.19 del Reglamento de la Cámara de Representantes vigente.

**EXPOSICIÓN DE MOTIVOS**

El Plan de Salud Gubernamental se encuentra en estos momentos en el medio de un proceso de solicitud de propuestas ("Request for Proposal" en inglés) para la implantación de un Nuevo Modelo del Plan de Salud del Gobierno de Puerto Rico. Este Nuevo Modelo está inherentemente relacionado con los requerimientos del Plan Fiscal revisado por la Junta de Supervisión Fiscal y el cual esta administración deberá estar en cumplimiento a partir del nuevo año fiscal que comienza el primero de julio de 2018. El proceso comenzó en el mes de febrero con la apertura del proceso de solicitud de propuestas ("Request for Proposal" en inglés), en donde los interesados, tenían hasta el mes de abril para la entrega de las propuestas. Una vez analizada, para el mes de mayo del 2018 se realizaría la notificación oficial de intención de otorgamiento de contrato y

2

entre el mes de junio a julio del año 2018 se concluiría el proceso de adjudicación de dichos contratos  ya que los mismos necesitan ser autorizados por el Center of Medicare and Medicaid Services (CMS por sus siglas en inglés).  Una vez autorizados por CMS, entre los meses de julio a septiembre se completarían las contrataciones entre la Administración de Seguros de Salud y las organizaciones de salud autorizadas para comenzar a operar a través del Nuevo Modelo del Plan de Salud a partir del primero de octubre de 2018.

Para la fecha del 18 de junio de 2018, en el rotativo digital "Noticel", mediante un reportaje del Sr. Oscar Serrano y el Sr. Eric de León Soto se publicó un reportaje relacionado con el proceso de selección de proveedores para el Nuevo Modelo del Plan de Salud del Gobierno de Puerto Rico en donde se expresa que el mismo y citamos:"*está atrasado y ahora comenzaría completamente de nuevo por un supuesto "error" detectado después de que varias compañías hubieran sometido sus propuestas y después de que una de ellas no lo hiciera*".

En dicho artículo periodístico se establece que una fuente del medio periodístico dentro de una de las aseguradoras planteó el problema y citamos *"de que todas las compañías interesadas en la administración del plan de salud público ya mostraron sus cartas, sus ofertas, sus cálculos y sus estrategias para con el Nuevo Modelo, menos una. Ahora, la Administración de Seguros de Salud (ASES) propone rehrir el proceso para que todas las compañías tengan que volver a someter propuestas con nuevos criterios tarifarios que son resultado de un supuesto error de ASES."*

Aunque en dicho artículo periodístico se desmiente la alegación por la Administración de Seguros de Salud, dicha alegación levanta serios cuestionamientos que necesitan ser corroborados o desmentidos, por ser un proceso cerrado a los participantes del proceso de propuestas (RFP); para evitar posibles impugnaciones judiciales que lo único que traería es que los servicios a los participantes del Plan de Salud del Gobierno se vean afectados.

Por tanto, esta Asamblea Legislativa entiende urgente el investigar el proceso de solicitud de propuestas ("Request for Proposal" en inglés) del Nuevo Modelo del Plan de Salud del Gobierno de Puerto Rico; en específico, sobre las imputaciones de problemas en el proceso de solicitud de propuestas relacionadas con la entrega de documentos dentro del término requerido, sobretodo, las Certificaciones Actuariales; y la posibilidad de que la Administración de Seguros de Salud comience el proceso de solicitud de propuestas desde el principio por un "error" de la agencia.  La Cámara de Representantes del Gobierno de Puerto Rico entiende que estas alegaciones deben ser investigadas para determinar si son reales o no.  De no ser ciertas, las imputaciones que se han realizado quedarán desmentidas y el proceso de solicitud de propuestas se evitaría una posible impugnación del proceso por parte de cualquier organización de salud participante del proceso.  No obstante a esto, de ser correctas dichas alegaciones, hay que tomar las acciones correctivas de forma inmediata y llegar hasta las últimas consecuencias porque

3

una impugnación del proceso de solicitud de propuestas ("Request for Proposal" en inglés) del Nuevo Modelo del Plan de Salud del Gobierno de Puerto Rico; el cual está inherentemente relacionado con los requerimientos del Plan Fiscal revisado por la Junta de Supervisión Fiscal, podría poner en riesgo los servicios a recibirse por los participantes del Plan de Salud Gubernamental, los cuales bajo ninguna circunstancia pueden verse afectados; ya que nuestro pueblo necesita tener un Plan de Salud que brinde buenos servicios con el fin de mejorar la salud y la calidad de vida de nuestra ciudadanía, que es la finalidad de cualquier gobierno de turno.  Con el fin de evitar posibles cuestionamientos relacionados con el proceso de confidencialidad de los procesos de solicitud de propuestas ("Request for Proposal" en inglés), dentro del poder constitucional de investigación y fiscalización inherente del Poder Legislativo que emana del Artículo III de nuestra Constitución, establecemos las salvaguardas necesarias para que los trabajos y documentos relacionados con la investigación de este asunto autorizado por esta Resolución se realicen de conformidad con los Artículos 12.5 y 12.19 del Reglamento de la Cámara de Representantes vigente.

*RESUÉLVESE POR LA CÁMARA DE REPRESENTANTES DE PUERTO RICO:*

1    Sección 1-Se ordena a la Comisión de Salud realizar una investigación sobre el

2    proceso de solicitud de propuestas ("Request for Proposal" en inglés) del Nuevo Modelo

3    del Plan de Salud Gobierno de Puerto Rico; en específico, sobre las imputaciones de

4    problemas en el proceso de solicitud de propuestas relacionadas con la entrega de

5    documentos dentro del término requerido, sobretodo, las Certificaciones Actuariales; y

6    la posibilidad de que la Administración de Seguros de Salud comience el proceso de

7    solicitud de propuestas desde el principio por un "error" de la agencia.

8    Sección 2-Con el fin de proteger el proceso de confidencialidad dentro del

9    proceso de solicitud de propuesta en curso del Nuevo Modelo del Plan de Salud del

10   Gobierno de Puerto Rico  y dentro del poder de fiscalización inherente del Poder

11   Legislativo que emana del Artículo III de nuestra Constitución, se establece que los

12   trabajos y documentos relacionados con la investigación de este asunto autorizado por

4

1   esta Resolución se realizarán de conformidad con los Artículos 12.5 y 12.19 del

2   Reglamento de la Cámara de Representantes vigente.

3        Sección 3.-La Comisión rendirá un Informe con sus hallazgos, conclusiones y

4   recomendaciones, no más tarde de los sesenta (60) días siguientes a la aprobación de esta

5   Resolución.

6        Sección 4.-Esta Resolución comenzará a regir inmediatamente después de su

7   aprobación.

**EXHIBIT Q**

On or about August 20, 2019 Fonseca interviewed Representative Jesus Manuel Ortiz on the show *Día a Día* on his news segment *De frente con* Jay. The defamatory statements and important information which demonstrates Fonseca and Telemundo's reckless disregard for the truth, are transcribed as follow:

| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 0:38- 0:56 | Reporter Fonseca:<br><br>"El [Jesús Manuel Ortiz] hizo las preguntas de cual había sido el rol de Elías Sánchez y Velázquez Piñol en las contrataciones y en el cabildeo para asegurar que ASES contratara a ciertas aseguradoras. Y él hizo las preguntas". | Reporter Fonseca:<br><br>"His [Jesús Manuel Ortiz] line of questioning focused on the role of Elías Sánchez and Velázquez Piñol in the procurement and lobbying proceedings in to secure that ASES granted government contract to certain insurance companies. He asked the questions" |
| 2 | 2:31-2:36 | Reporter Fonseca<br><br>"Hasta donde nosotros sabíamos, Elías Sánchez no era cabildero y ni era consultor." | Reporter Fonseca<br><br>"It was our belief that Elías Sánchez was not a lobbyist nor a consultant" |
| 3 | 3:13- 3:26 | Reporter Fonseca<br><br>"Todos sabíamos que Velázquez Piñol tenía algún rol en el sistema de Salud y en ASES y en la tarjeta que tu tienes. Pero la verdad es que no sabemos el rol de Elías Sánchez. Tú [Jesús Manuel Ortiz] hiciste la pregunta, tu [Jesús Manuel Ortiz] sabías que ha habido algún rol de Elías Sánchez en esto o no lo sabías y le preguntaste por que había rumores?" | Reporter Fonseca<br><br>"We knew that Velázquez Piñol had some sort of role in the healthcare system, in ASES and in the [healthcare] card that you have. But the truth of the matter is that we did not know what the role of Elías Sánchez was. You [Jesús Manuel Ortiz] made the question, did you [Jesús Manuel Ortiz] knew that Elías Sánchez had some role in this or did you just asked based on rumors? |
| 4 | 3:27-4:01 | State Representative Jesús Manuel Ortiz<br><br>"Mira, a mí me habían llegado el rumor. De hecho, todas las preguntas que yo hice Jay vienen fundamentadas por información que había salido públicamente. Hace un tiempo atrás, como en el verano del 2018 ya había | State Representantive Jesús Manuel Ortíz<br><br>"Look, there were always rumors. In fact, Jay, all my line of questioning was based on information made available to the public. Some time ago, on or about summer  2018, there had been  some comments, including  some information |

|   |   |   |   |
|---|---|---|---|
|   |   | comentarios, incluso información en la prensa de que en el proceso de licitación de Vital se habían dado irregularidades. Y obviamente yo como legislador, uno recibe información y a mi me habían planteado que el licenciado Elías Sánchez de alguna manera trabajaba o asesoraba a una de estas empresas. Y yo hice lo pregunta ahí para que en públicamente en record contestara si era correcto o no correcto". (Fonseca lo interrumpe) | that published by the press, claiming irregularities in the Vital bidding process. Obviously, as a legislator, I receive information and there were claims that Elías Sánchez worked with or counseled one of these companies. I made the question so that the public record would show if this was correct or not" |
| 5 | 4:02-4:04 | Reporter Fonseca<br><br>"O sea que perdóname, a ti te llegó esa información hace un año, en el 2018" | Reporter Fonseca<br><br>"Wait, you received the information about a year ago, in 2018" |
| 6 | 4:06-4:22 | State Representative Jesús Manuel Ortiz<br><br>"Bueno me llegó desde ese momento, verano del año pasado ya venía información que había habido problemas en el proceso de licitación. Tiempo después, no puedo recordar exactamente cuanto tiempo, pero sí ya me había llegado información que tanto este señor, Velázquez Piñol, participaba activamente". (Fonseca interrumpe) | State Representative Jesús Manuel Ortiz<br><br>"Well, I received that information on that date, since last summer there had been claims that there were problems in the bidding process. Later, I do not remember exactly when, I did receive information that this man, Velázquez Piñol, actively participated." (Fonseca interrupts) |
| 7 | 4:38-4:44 | Reporter Fonseca<br><br>"[…] El legislador del PNP, Juan Oscar Morales, o sea que cuando vio esa respuesta que ha dicho o que ha hecho porque esa investigación hay que continuarla" | Reporter Fonseca<br><br>"[…] What did PNP State Legislator, Juan Oscar Morales said or did, when he saw that response, because the investigation has to continue" |
| 8 | 4:44-:4:46 | State Representative Jesús Manuel Ortiz<br><br>"Esa investigación está abierta […]". | State Representative Jesús Manuel Ortiz<br><br>"Said investigation is ongoing […]" |

## EXHIBIT R

The Story broadcasted on or about June 25, 2019 in a special edition of *Jay y sus Rayos X* (a copy of the program can be found at: https://www.youtube.com/watch?v=k4xB6E5zrbc), contains the defamation *per se* and defamation by implication statements expressed by Reporter Fonseca while projecting an image into a large screen displaying three (3) flowcharts in parallel under the headline "Autoridades Federales / FBI" (translation: Federal Authorities / FBI"). **Flowchart 1** (appearing vertically to the left of the projection screen): depicting a corruption scheme uncovered within Puerto Rico's Department of Treasury, involving the Secretary of Treasury (Raul Maldonado) who had been fired by the Governor just the day before and his son (Raulie Maldonado) who was subcontracted by multiple entities with government contracts with Treasury and other agencies and who had also been terminated from all government contracts. **Flowchart 2** (appearing vertically in the middle of the projection screen): depicting a corruption scheme under Puerto Rico's Health Insurance Administration ("ASES"), the Department of Health, and the Department of Education, involving Ms. Julia Keleher (former Secretary of Education), Ms. Angela Ávila (former ASES Director), Mr. Rafael Rodríguez (former Secretary of Health), and Mr. Alberto Velázquez Piñol (former Consultant to ASES), whom all, except Mr. Rodriguez, were indicted by the FBI on July 10, 2019 for corruption. **Flowchart 3** (appearing vertically to the right of the projection screen): depicting the stages of what is supposed to describe a corruption scheme resembling the other two, but involving my client and his appointment to the incoming government transition committee for the elected governor, his appointment as Governor's representative to the Financial Oversight and Management Board, and his resignation from said appointment.

The defamatory statements are preceded by an explanation of the investigation angles by the FBI through the use of the flowcharts in the projection screen. For **Flowchart 1**, Reported Fonseca described a scheme in which the Secretary of Treasury appointed the members of an Advisory Committee that had access to privileged and confidential information. Then, those members used the information to obtain contracts with Treasury, signed by the Secretary himself, and other agencies, and in turn, subcontracted and benefitted Raulie Maldonado, the Secretary's son. For **Flowchart 2**, Reporter Fonseca described a corruption scheme related to the Government's Medicaid program, with participation by the individuals named above, in which the Governor appointed an Advisory Committee including Mr. Velázquez Piñol, who obtained privileged and confidential information as a member of said committee, and then, in turn, arranged for contracts with an auditing company and received commission payments under those contracts.

| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 10:30 – 12:01 | "¿Por qué esto es importante? Recuerden, hay un comité asesor aquí (points to the "Comité Asesor" (translation: "Advisory Comitee") phrase within Flowchart 2) y hay un comité asesor acá (points to the "Advisory Commitee" phrase within Flowchart 1). ¿Por qué esto es importante? Porque lo mismo es lo quese está alegando por parte de Elías Sánchez, lo mismo. Elías Sánchez lo nombra el Gobernador al equipo de transición. Es decir, el Gobernador gana y lo nombra a él director del comité transición. Típicamente eso no ocurre. Típicamente el que es secretario de la Gobernación es el que nombran a dirigir la transición (points to the "Equipo de Transicion 2016" phrase (translation: "2016 Transition Team" within Flowchart 3). ¿Por qué? Porque el que dirige la transición es la persona que va a dirigir todo el Gobierno y va a tener acceso a toda la información confidencial de cuantos pupitres va a comprarse en Educación; de cuantas computadoras van a comprar en el Departamento de Familia; de cuanto es necesario hacer cambios en el software del departamento donde hay millones y millones de pesos. [De] [t]odo eso, se obtiene información aquí (draws a red circle around the "2016 Transition Team" phrase within Flowchart 3). Esto es bien importante que lo entendamos. ¿Qué pasa? Que el Gobernador, en vezde nombrar a William Villafañe que iba a ser el Secretario de la Gobernación o a Itza García que había sido la que hizo el programa de Gobierno, que son quienes típicamente dominan estos temas (points to the "2016 Transition Team" phrase within Flowchart 3), nombró a Elías Sánchez. Y Elías Sánchez obtiene aquí un montón de información confidencial (pointes to the "2016 Transition Team" phrase within Flowchart 3). Después lo nombra (underlines in red the phrase | "Why is this important? Remember, there is an advisory committee here (points to the "Advisory Committee" phrase within Flowchart 2) and there is an advisory committee here (points to the "Advisory Committee" phrase within Flowchart 1). Why is this important? Because the same is being alleged regarding Elías Sánchez, the same. Elías Sánchez is appointed by the Governor to the transition team. In other words, the Governor wins and appoints him as director of the transition committee. That does not happen usually. Typically, the one who is the Government's Chief of Staff is the one appointed to manage the transition (points to the "2016 Transition Team" phrase within Flowchart 3). Why? Because the one who manages the transition is the person who is going to manage the entire Government and is going to have access to all the confidential information of how many desks are going to be bought in Education; how many computers will be bought in the Department of Family; of how necessary is it to make changes in the software of the department where there are millions and millions of dollars. [Regarding] [a]ll that, information is obtained here (draws a red circle around the "2016 Transition Team" phrase within Flowchart 3). It is very important that we understand this. What happens? That the Governor appointed Elias Sanchez, instead of William Villafañe who was going to be the Chief of Staff or Itza García who had been the one who drafted the Government program, who typically dominate these issues (points to the "2016 Transition Team" phrase within Flowchart 3). And Elías Sánchez obtains a lot of confidential information here (points to the "2016 Transition Team" phrase within Flowchart 3). Then, he appoints him (underlines in red the phrase "Representative Fiscal Control Board") within Flowchart 3) to the Fiscal Control |

| | | | |
|---|---|---|---|
| | | "Representante Junta Supervision Fiscal" (translation: "Representative Fiscal Control Board") within Flowchart 3) a la Junta de Control Fiscal y cuando lo nombra representante suyo ante la Junta de Control Fiscal, también obtiene un montón de información confidencial y privilegiada. Que cosas iba a autorizar la Junta, que contratos iba a autorizar la Junta, que contratos no iba a autorizar la Junta, que contrato - qué tipo de software iba a autorizar la Junta, que tipo de software no se iba a autorizar en la Junta." | Board and when he appoints him as his representative before the Fiscal Control Board, he also gets a lot of confidential and privileged information. What things would the Board authorize, what contracts would the Board authorize, what contracts would the Board not authorize, what contract - what kind of software was the Board going to authorize, what kind of software was not going to be authorized at the Board. |
| 2 | 12:09 – 12:21 | "¿Y para qué renunció? Se fue a la empresa privada y empezó a llamar secretarios de agencias a decirle: mira que tú crees del contratito de fulano de tal. Mira vamos a darle un contratito a mengano de tal." | "And why did he resign? He went to the private sector and started calling agency secretaries to tell them: look what do you think of the contract of so-and-so. Look, let's give a contract to such-and-such." |
| 3 | 12:21 – 13:04 | "Es decir, yo (sic), lo mismo: comité asesor (draws a red circle around the "Advisory Committee" phrase within Flowchart 2), comité asesor (draws a red circle around the "Advisory Committee" phrase within Flowchart 1) asesor del gobernador (draws a red arrow from the "Advisory Committee" phrase within Flowchart 2 pointing to the phrase "2016 Transition Team" within Flowchart 3) asesor del gobernador (draws a second red arrow from the "Advisory Committee" phrase within Flowchart 2 pointing to the word "Renuncia" (translation: "Resignation") within Flowchart 3). Es decir, yo creo un comité asesor (points to the phrase "Adivsory Committee" within Flowchart 2), le doy información confidencial y privilegiada. Esa persona (makes hand gesture mimicking quotes) no cobra por ser mi asesor, no cobran (ends making quote signs with hands), pero entonces se enteran de por dónde va la cosa (draws a red arrow pointing from the "Advisory Comittee" phrase to the | "That is, I (sic), the same: advisory committee (draws a red circle around the "Advisory Committee" phrase within Flowchart 2), advisory committee (draws a red circle around the "Advisory Committee" phrase within Flowchart 1), adviser to the governor (draws a red arrow from the "Advisory Committee" phrase within Flowchart 2 pointing to the phrase "2016 Transition Team" within Flowchart 3), adviser to the governor (draws a second red arrow from the "Advisory Committee" phrase within Flowchart 2 pointing to the word "Resignation" within Flowchart 3). That is, I create an advisory committee (points to the phrase "Advisory Committee" within Flowchart 2), I give you confidential and privileged information. That person (makes hand gesture mimicking quotes) does not charge for being my advisor, they do not charge (ends quotes hand gestures), but then they find out where things are going (draws a red arrow pointing from the "Advisory Comittee" phrase to the "Contracts" word |

| | | "Contratos" (translation: "Contracts") word right below within Flowchart 1), cuales son los planes del Gobierno, qué cosas va a autorizar la Junta y empiezan a soltar contratos que benefician a (draws a red arrow from "Contracts" pointing right below to "Raulie Maldonado" within Flowchart 1) en este caso el hijo, en este caso el mismo (draws red arrow under ASES sheme pointing below to Velázquez Piñol) y en este caso (points to Flowchart 3) pues a los clientes de Elías Sánchez. Eso en síntesis es lo que están investigando los federales (draws a red circle around the word "FBI" on the top right of the screen): un patrón de venta de influencias de personas que obtuvieron información confidencial y privilegiada, gracias a que se le (sic) nombró a estos comités." | right below within Flowchart 1), what the Government's plans are, what things the Board is going to authorize and begin to release contracts that benefit (draws a red arrow from "Contracts" pointing right below to "Raulie Maldonado" within Flowchart 1) in this case the son, in this case himself (draws a red arrow from "Contracts" pointing right below to "Velazquez Piñol" within Flowchart 2) and in this case (points to Flowchart 3), to Elias Sánchez's clients. That, in short, is what the feds are investigating (draws a red circle around the word "FBI" on the top right of the screen): a pattern of sale of influences from people who obtained confidential and privileged information, thanks to the fact that [they were] appointed to these committees." |

**EXHIBIT S**

On or about July 12, 2019, Defendants published a video segment found at https://www.telemundopr.com/fotosyvideos/el-gobernador-ha-dicho-una-sarta-de-mentiras_tlmd-puerto-rico/104867/ titled "The Governor has said a bunch of lies" within the *Telenoticias* newscast, which contains defamatory and slanderous statements about Sanchez.



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 0:00-0:30 | Reporter Lamela:<br><br>"[…]Podrá aceptar el pueblo el arrepentimiento y el perdón de un gobernador que no llamó a las mujeres que les faltó el respeto, cuando dijo que una persona a la que le dio confianza violentó la intimidad y filtró el chat pero no quiso identificarlo cuando no dice quien le paga a Velázquez Piñol, que ahora oigo que es consultor pero no dice quien lo nombró consultor y quien le paga y tampoco quiere identificar la iniciales de FDO en el chat, ¿verdaderamente refleja arrepentimiento e indignación el gobernador?" | Reporter Lamela:<br><br>"The people will be able to accept the repentance and forgiveness of a governor who did not call the women who disrespected them, when he said that a person to whom he trusted violated privacy and leaked the chat but did not want to identify him when he did not say who He pays Velázquez Piñol, who now I hear that he is a consultant but does not say who appointed him a consultant and who pays him. Nor does he want to identify the initials of FDO in the chat, does the governor really reflect regret and indignation?" |

| 2 | 1:40-2:43 | Reporter Fonseca | Reporter Fonseca |
|---|---|---|---|
| | | "[...] cuando se le pregunta, quien es FDO el Gobernador no dice quien es FDO, sabiendo que es Elías Sánchez. ¿Por qué tanto proteger a Elías Sánchez?, a quien el Gobernador…y yo le tengo una pregunta al Gobernador. ¿Cuándo jefes de agencias te llamaron a ti, Gobernador, a usted si quiere que lo respete, cuando le llamaron a usted Gobernador, jefes de agencia para advertirle a usted, que Elías estaba llamándolos continuamente empujando contratos, usted detuvo a Elías Sánchez? ¿Cuándo jefes de su gabinete se opusieron a contratos porque entendían que eran innecesarios y costosos, es más, voy a decir contratos en específicos, contratos de Amplifund y Microsoft cabildeados por Elías Sánchez, personalmente. Y se le dijo a usted por escrito, que Elías Sánchez estaba cabildeando esos contratos. ¿Usted lo detuvo o usted lo permitió?" | "[...] When asked who is FDO, the Governor does not say who is FDO, knowing that he is Elías Sánchez. Why do you protect so much Elías Sánchez?, whom the Governor ... and I have a question for the Governor. When agency heads called you, Governor, if you want me to respect you, when they called you Governor, agency heads to warn you, that Elías was continually calling them pushing contracts, did you arrest Elías Sánchez? When did your cabinet chiefs oppose contracts because they understood that they were unnecessary and expensive. What's more, I am going to say specific contracts, Amplifund and Microsoft contracts lobbied by Elías Sánchez, personally. And you were told in writing that Elías Sánchez was lobbying those contracts. Did you stop it or did you allow it?" |
| 3 | 4:00-4:15 | Reporter Fonseca: | Reporter Fonseca |
| | | "Señor Gobernador, cuando empleados y jefes y miembros de su gabinete le advertían repetidamente de actos cuestionables de Elías Sánchez, usted lo detuvo?" | "Mr. Governor, when employees and bosses and members of your cabinet repeatedly warned you of questionable acts by Elías Sánchez, did you stop him?". |
| 4 | 7:10-7:19 | Reporter Fonseca | Reporter Fonseca |
| | | "Esa no es mi opinión señor gobernador, los datos son los datos, y pueden pelear todo lo que quieran con ellos." | "That is not my opinion, Mr. Governor, the data is the data, and you can fight all you want with it." |
| 5 | 8:46-9:44 | Reporter Fonseca: | Reporter Fonseca |
| | | "Mira vamos a plantearlo de la siguiente manera, tu pregunta es súper importante, vamos a plantearlo de la siguiente manera. El gobernador dice que el tiene propuestas y mecanismos para atajar la corrupción, señor gobernador fuiste tú, fue usted sr. gobernador el que nombró a Elías Sánchez como delegado suyo a la Junta y | "Look, we are going to put it in the following way, your question is super important, we are going to put it in the following way. The governor says that he has proposals and mechanisms to stop corruption, Mr. Governor, it was you, it was you governor who appointed Elías Sánchez as your delegate to the board and |

| | | | |
|---|---|---|---|
| | | presidente del comité de transición de gobierno, o sea usted le dio los mecanismos para que se enterara de todos los contratos, de todas las compras, de todas las computadoras, de todo el software que se iba a comprar, todo a Elías Sánchez. Usted se lo dio, no yo, usted. Y después de eso, sabiendo que a los 6 meses el se volvería cabildero y llamaría a los jefes de agencia para empujar contratos de sus intereses. Señor gobernador, cuando en la prensa salió y con esto termino que Raúl Maldonado tenía serios "issues" de corrupción donde un grupo que se nombró de asesores lograba contratos después y empujaba contratos y le daban contratos al hijo de Raúl Maldonado, usted no lo botó. | president of the government transition committee, that is, you gave him the mechanisms to to find out about all the contracts, all the purchases, all the computers, all the software that was going to be bought, all from Elías Sánchez. You gave it to him, not me, you. And after that knowing that at 6 months he would become a lobbyist and call the heads of the agency to push contracts in his interests. Mr. Governor, when the press came out and with this I concluded that Raúl Maldonado had serious corruption issues where a group that was named as advisers later won contracts and pushed contracts and gave contracts to Raúl Maldonado's son, you did not throw him out. |
| 6 | 9:50-10:09 | Reporter Fonseca<br><br>[…] El problema no son los mecanismos Zugey, no es si el puede gobernar el problema es que el gobernador miente con una facilidad brutal. Y le repito puede venir mañana de 3 a 4 a Telemundo, todas las preguntas que usted quiera y todo lo que acabo de decir, desmienta algo mañana a las 3 de la tarde en Telemundo o en WKAQ si quiere, para que no sea en radio y no tenga que dar la cara". | Reporter Fonseca<br><br>"The problem is not the mechanisms Zugey, it is not if he can govern the problem is that the governor lies with brutal ease. And I repeat, you can come tomorrow from 3 to 4 to Telemundo, all the questions you want and everything I just said, deny something tomorrow at 3 in the afternoon on Telemundo or on WKAQ if you want, so that it is not on the radio and don't have to show your face ". |

## EXHIBIT T

The July 17, 2019 story located at https://www.telemundopr.com/noticias/puerto-rico/detallan-esquema-orquestado-desde-fortaleza/101461/ bearing the headline *"Detallan esquema orquestado desde Fortaleza"* (translation: Details about scheme orchestrated from Fortaleza) contains the following slanderous statements:

| | Statement | Translation |
|---|---|---|
| 1 | "El saqueo, realizado por medio de un esquema principal y varios secundarios que comparten el mismo modus operandi y protagonistas similares, fue orquestado desde La Fortaleza por los allegados más cercanos del gobernador Rosselló Nevares y con su conocimiento, encontró la investigación. El modus operandi implicó el plantar personal interno y contratistas externos en puestos clave de asesoría y comunicaciones en las agencias para controlar la entrada y salida de información. También el compartir datos privilegiados sobre contrataciones de gobierno para beneficiar a clientes privados a cambio de comisiones y pagos. Al tope del esquema se encuentra el ex presidente del Comité de Transición, cabildero, ex director de campaña y amigo íntimo de Rosselló, Elías Sánchez Sifonte, seguido muy de cerca por el publicista Edwin Miranda Reyes y el estratega de prensa y comunicaciones, Carlos Bermúdez Urbina." | "The looting, carried out through a main scheme and several secondary ones that share the same modus operandi and similar protagonists, was orchestrated from La Fortaleza by the closest friends of Governor Rosselló Nevares and with his knowledge, the investigation revealed. The modus operandi involved planting internal staff and external contractors in key advisory and communications positions in the agencies to control the entry and exit of information. Also sharing privileged data on government contracts to benefit private clients in exchange for commissions and payments. At the top of the scheme is the former president of the Transition Committee, lobbyist, former campaign manager and close friend of Rosselló, Elías Sánchez Sifonte, closely followed by the publicist Edwin Miranda Reyes and the press and communications strategist, Carlos Bermúdez Urbina." |
| 2 | "El esquema principal lo componen estas tres figuras – Sánchez, Bermúdez y Miranda –, que en papel operan como "ciudadanos privados" y "contratistas", pero que en realidad constituyen la cúpula del Gobierno, con más poder que cualquiera de los secretarios del gabinete constitucional del gobernador Rosselló, según múltiples fuentes. A su vez, conecta, a veces de manera directa y en otras de forma tangencial con esquemas particulares, como los destapados con los arrestos hechos por la Fiscalía federal en julio en el Departamento de Educación, la Administración de Seguros de Salud (ASES) y la firma de contabilidad BDO." | "The main scheme is composed by these three figures - Sánchez, Bermúdez and Miranda -, who on paper operate as "private citizens" and "contractors", but who in reality constitute the government upper echelons, with more power than any of the constitutional cabinet secretaries of Governor Rosselló, according to multiple sources. In turn, it connects, sometimes directly and sometimes tangentially, with particular schemes, such as those uncovered with the arrests made by the Federal Prosecutor in July at the Department of Education, the Health Insurance Administration (ASES) and the BDO accounting firm." |

| | | |
|---|---|---|
| 3 | "Sánchez, Bermúdez y Miranda han generado millones a través de sus negocios y han decidido buena parte de lo que ha pasado en el Gobierno en términos de contrataciones, despidos y proyección pública desde que Rosselló Nevares asumió el cargo en enero de 2017, coinciden las fuentes." | "Sánchez, Bermúdez and Miranda have generated millions through their businesses and have made decisions on a lot of what has happened in the Government in terms of hiring, firing and public projection since Rosselló Nevares took office in January 2017, sources agree." |
| 4 | "En el caso de Sánchez, también hay intervenciones indebidas e ilegales con secretarios de gabinete. Al menos cuatro jefes de agencia acudieron directamente al Gobernador o a sus asesores en La Fortaleza a denunciar estas intervenciones por parte de Sánchez al menos desde 2017 pero el Mandatario nunca ordenó una investigación o tomó acción al respecto. | "In the case of Sánchez, there are also undue and illegal interventions with cabinet secretaries. At least four agency heads went directly to the Governor or his advisers in La Fortaleza to denounce these interventions by Sánchez at least since 2017 but the Governor never ordered an investigation or took action on it." |
| 5 | "Aunque no tiene contratos directos con el Gobierno, Sánchez, quien tiene el vínculo más estrecho con el Gobernador, controla la mayoría de las contrataciones de mayor cuantía, colocando a sus clientes en buena parte de las agencias y cobrando comisiones de hasta 25% del monto de los contratos e igualas fijas que han llegado a los $50,000 mensuales, indicaron cuatro fuentes que han presenciado la dinámica." | "Although he does not have direct contracts with the Government, Sánchez, who has the closest link with the Governor, controls most of the larger contracts, placing his clients in a large part of the agencies and charging commissions of up to 25% of the amount of the contracts and fixed retainers that have reached $50,000 per month, indicated four sources that have witnessed the dynamics." |
| 6 | "Según relataron en conversaciones por separado, el cabildero tenía acceso constante a La Fortaleza y a información privilegiada sobre las contrataciones grandes que se darían en las agencias, las "casaba" con sus clientes y se presentaba, frecuentemente sin invitación, a las puertas de dichas dependencias a presentar propuestas a la medida para los servicios que estarían buscando." | "As they reported in separate conversations, the lobbyist had constant access to La Fortaleza and to privileged information on the large contracts that would take place in the agencies, he "connected" them to his clients and presented himself, frequently without invitation, at the doors of said agencies to present proposals tailored for the services they would be seeking." |

| 7 | "Uno de esos casos se dio en medio de la emergencia del huracán María, cuando se contrató para trabajos de recuperación del programa Tu Hogar Renace del Departamento de la Vivienda, a la empresa Adjusters International. El cliente de Sánchez, AECOM, perdió esa subasta, y en diciembre de 2017 Sánchez se presentó en la oficina del secretario, Fernando Gil Enseñat, para reclamarle al funcionario por su decisión, revelaron dos fuentes al CPI." | "One of these cases occurred in the midst of Hurricane Maria, when the company Adjusters International was hired for recovery work under the Tu Hogar Renace program of the Department of Housing. Sánchez's client, AECOM, lost that bid, and in December 2017 Sánchez appeared at the secretary's office, Fernando Gil Enseñat, to make demands to the official about his decision, two sources revealed to the CPI." |
|---|---|---|
| 8 | "A mediados de 2018, Sánchez llevó personalmente al Departamento de Hacienda a su cliente GILA Corporation para empujar un contrato de cobro de deudas morosas y logró reuniones al menos en cuatro ocasiones con dos de los principales funcionarios y con un contratista: el actual secretario de Hacienda y entonces asesor, Francisco Parés, el ex secretario de Hacienda y entonces asesor por contrato, Juan Carlos Puig y el entonces secretario de Hacienda y principal oficial financiero, Raúl Maldonado, según dos fuentes con conocimiento directo del evento." | "In mid-2018, Sánchez personally took his client GILA Corporation to the Department of the Treasury to push for contract regarding delinquent debt collection and managed to meet at least four times with two of the main officials and with one contractor: the current Secretary of the Treasury, and then advisor, Francisco Parés, the former secretary of the Treasury and then contractor, Juan Carlos Puig and the then secretary of the Treasury and chief financial officer, Raúl Maldonado, according to two sources with direct knowledge of the event." |
| 9 | "Fuentes Marimón – quien se encuentra fuera de Puerto Rico – no ha precisado si entre sus denuncias figuraban las intervenciones de Sánchez en Hacienda y no estuvo disponible para entrevista." | "Fuentes Marimón - who is outside of Puerto Rico - has not specified whether her complaints included Sánchez's interventions in the Treasury and was not available for an interview." |
| 10 | "De otra parte, múltiples fuentes hablaron al CPI sobre intervenciones indebidas de Sánchez a favor de su cliente, Microsoft. La compañía de tecnología ha logrado más de $100 millones en contratos durante esta administración. Dos fuentes apuntaron, por ejemplo, al contrato de $11 millones firmado el pasado verano para obtener las licencias de AmpliFund, una aplicación de "grant management" propiedad de Microsoft. A pesar de que el Gobierno ya contaba con una | "On the other hand, multiple sources spoke to the CPI about Sánchez's improper interventions in favor of his client, Microsoft. The technology company has secured more than $ 100 million in contracts during this administration. Two sources pointed, for example, to the $ 11 million contract signed last summer to license AmpliFund, a Microsoft-owned grant management application. Despite the fact that the Government already had a similar and effective tool, and that it would cost a fraction to extend said license, the Rosselló Nevares |

|   | | |
|---|---|---|
| | herramienta similar y efectiva, y que costaría una fracción extender dicha licencia, la administración Rosselló Nevares decidió adquirir la licencia de AmpliFund." | administration decided to acquire the AmpliFund license." |
| 11 | "Según dos fuentes, en el Departamento de Corrección también ocurrió una intervención indebida de Sánchez cuando la compañía Carolina Catering Services obtuvo un contrato de $300 millones para manejar las comisarías, lavanderías y comida en las cárceles. El contrato fue adjudicado a esta compañía a pesar de que pujó por un costo mayor al de otro competidor, Trinity. Dos fuentes dijeron al CPI que la persona responsable de intervenir en la subasta y lograr que Carolina Catering consiguiera el contrato fue Sánchez." | "According to two sources, an improper intervention by Sánchez also occurred in the Department of Correction when the Carolina Catering Services company obtained a $300 million contract to manage the stations, laundries and food in the prisons. The contract was awarded to this company despite bidding with a higher cost than another competitor, Trinity. Two sources told the CPI that Sánchez was the person responsible for intervening in the auction and getting Carolina Catering to obtain the contract." |
| 12 | "Una fuente indicó que luego del huracán María, Sánchez, a través de Christian Sobrino, trajo a la mesa a la empresa CSA, para que, a través de la Agencia para el Manejo de Emergencias y Desastre (AEMEAD), obtuviera el contrato de inspección de escuelas tras la emergencia. El contrato de $800,000 fue otorgado a finales de septiembre de 2017 y cancelado poco tiempo después en medio de críticas, incluyendo las de la entonces secretaria de Educación, Julia Keleher. La semana pasada Keleher también fue acusada por los federales en un esquema – hasta el momento no relacionado – en donde BDO, Scherrer y Velázquez también eran protagonistas." | "A source indicated that after Hurricane María, Sánchez, through Christian Sobrino, brought the company CSA to the table, so that, through the Agency for Emergency and Disaster Management (AEMEAD), would obtain the contract for inspection of schools after the emergency. The $800,000 contract was awarded in late September 2017 and canceled shortly thereafter amid criticism, including from then-Secretary of Education Julia Keleher. Last week Keleher was also indicted by the feds in a scheme - so far unrelated - where BDO, Scherrer and Velázquez were also protagonists." |


FOR PATIENTS WITH **MODERATE** TO **SEVERE PLAQUE PSORIASIS**


TELEMUNDO PUERTO RICO

DA VIDA 2020     TELENOTICI                    79⁰

TENDENCIAS   Da Vida 2020   Telemundo Music Nights   Papelón 2020   Censo 202      54 ALERTAS DE EL TIEMPO

# Detallan esquema orquestado desde Fortaleza

Por CENTRO DE PERIODISMO INVESTIGATIVO • Publicado el 17 de julio del 2019 • Actualizado a las 6:01 pm del 18 de julio del 2019



Aseguró que el cabildero llegó a su o>cina a cuestionar por qué no otorgó subasta a su cliente.

Detrás de las conversaciones del chat de Telegram entre el gobernador de Puerto Rico, Ricardo Rosselló Nevares, y algunos de sus



colaboradores más cercanos se esconde una red multimillonaria de corrupción.

En medio de la peor crisis fiscal de su historia moderna, la isla es objeto de un saqueo de fondos públicos perpetrado por medio de venta de influencias, contrataciones y obtención de beneficios en el Gobierno, según encontró una investigación del Centro de Periodismo Investigativo (CPI). La investigación incluyó entrevistas a más de una veintena de personas con conocimiento directo de los hechos, la revisión de documentos y bases de datos de contratos y registros corporativos. El análisis y los testimonios de las fuentes apuntan a que la práctica se esparció por muchas de las agencias públicas.

El saqueo, realizado por medio de un esquema principal y varios secundarios que comparten el mismo modus operandi y protagonistas

similares, fue orquestado desde La Fortaleza

**por los allegados más cercanos del gobernador Rosselló Nevares y con su conocimiento, encontró la investigación.** El modus operandi implicó el plantar personal interno y contratistas externos en puestos clave de asesoría y comunicaciones en las agencias para controlar la entrada y salida de información. También el compartir datos privilegiados sobre contrataciones de gobierno



FOR PATIENTS WITH
**MODERATE** TO **SEVERE**
**PLAQUE PSORIASIS**

## Lo más popular



**DÍA A DÍA**
Mira aquí nuestra programación en vivo



**PROGRAMACIÓN EN VIVO**
Programación en vivo



**AY UDA POR CORONAVIRUS**
Ayuda por coronavirus: Trump firma segundo paquete de estímulo económico



**MÚSICA**
Muere Armando Manzanero, un romántico de todos los tiempos

**SPONSORED**
Experta en lingüística explica cómo hablar inglés con solo 15 minutos de estudio al día
Babbel

### Pronóstico de El Tiempo
**SAN JUAN, PR**

para beneficiar a clientes privados a cambio de comisiones y pagos.

**Puerto Rico**



HUMACAO • HACE 13 MIN

**Velatorio de Tito Rojas será este martes en Humacao**



CARMEN YULÍN CRUZ • HACE 1 HORA

**Municipio de San Juan no ha pagado retiro de pensionados**

**Al tope del esquema se encuentra el ex presidente del Comité de Transición, cabildero, ex director de campaña y amigo íntimo de Rosselló, Elías Sánchez Sifonte, seguido muy de cerca por el publicista Edwin Miranda Reyes y el estratega de prensa y comunicaciones, Carlos Bermúdez Urbina.** Los tres figuran entre los 12 participantes de las 889 páginas del chat del Gobernador revelado por el CPI el sábado y en el que se evidencia el intercambio de información privilegiada con personas que no son funcionarios y el uso de recursos públicos para hacer trabajo partidista.

Sánchez conoció a Rosselló desde principios del milenio mientras ambos pertenecían a la Juventud del Partido Nuevo Progresista (PNP) y, según personas que han estado cercanas al

**79°**

**ESTANOCHE**

**71°**

Mayormente nublado
0.1% Precip

**MAÑANA**

**83°**

## CUATRO PREGUNTAS RÁPIDAS

Cargando encuesta...



dúo, a través de los años desarrollaron una relación muy cercana que incluyó vivir juntos durante un periodo en Torrimar junto con quien sería luego la esposa del Gobernador, Beatriz Areizaga. Rosselló fue el padrino de la boda de Sánchez, quien a su vez lo apoyó intensamente cuando comenzó el movimiento Boricua Ahora Es, previo a iniciar su campaña por la candidatura para gobernador.

**El esquema principal lo componen estas tres figuras – Sánchez, Bermúdez y Miranda –, que en papel operan como "ciudadanos privados" y "contratistas", pero que en realidad constituyen la cúpula del Gobierno, con más poder que cualquiera de los secretarios del gabinete constitucional del gobernador Rosselló,** según múltiples fuentes. A su vez, conecta, a veces de manera directa y en otras de forma tangencial con esquemas particulares, como los destapados con los arrestos hechos por la Fiscalía federal en julio en el Departamento de Educación, la Administración de Seguros de Salud (ASES) y la firma de contabilidad BDO.

Exhibit A, Page 198 of 332

Detallan esquema orquestado desde Fortaleza - Telemundo Puerto Rico
Case 1:21-cv-20543-MGC Document 1-2 Entered on FLSD Docket 02/09/2021 Page 199 of 332
10/28/20, 3:42 PM

**7:16**

## Otra bomba contra el

Dos fuentes cercanas a las investigaciones federales dijeron al CPI que son inminentes más arrestos vinculados a esquemas de corrupción en la administración Rosselló Nevares.

> Sánchez, Bermúdez y Miranda han generado millones a través de sus negocios y han decidido buena parte de lo que ha pasado en el Gobierno en términos de contrataciones, despidos y proyección pública desde que Rosselló Nevares asumió el cargo en enero de 2017, coinciden las fuentes. En el caso de Sánchez, también hay intervenciones indebidas e ilegales con secretarios de gabinete.

Al menos cuatro jefes de agencia acudieron directamente al Gobernador o a sus asesores en La Fortaleza a denunciar estas intervenciones por parte de Sánchez al menos desde 2017 pero el Mandatario nunca ordenó una investigación o tomó acción al respecto.

> Aunque no tiene contratos directos con el Gobierno, Sánchez, quien tiene el vínculo más estrecho con el Gobernador, controla la mayoría de las contrataciones de mayor cuantía, colocando a sus clientes en buena

Exhibit A, Page 199 of 332

parte de las agencias y **cobrando comisiones de hasta 25% del monto de los contratos e igualas fijas que han llegado a los $50,000 mensuales**, indicaron cuatro fuentes que han presenciado la dinámica. Según relataron en conversaciones por separado, el cabildero tenía acceso constante a La Fortaleza y a información privilegiada sobre las contrataciones grandes que se darían en las agencias, las "casaba" con sus clientes y se presentaba, frecuentemente sin invitación, a las puertas de dichas dependencias a presentar propuestas a la medida para los servicios que estarían buscando.

En algunas instancias, Sánchez encontró la resistencia de secretarios de agencia.

Uno de esos casos se dio en medio de la emergencia del huracán María, cuando se contrató para trabajos de recuperación del programa Tu Hogar Renace del Departamento de la Vivienda, a la empresa Adjusters International. El cliente de Sánchez, AECOM, perdió esa subasta, y en diciembre de 2017 Sánchez se presentó en la oficina del secretario, Fernando Gil Enseñat, para reclamarle al funcionario por su decisión, revelaron dos fuentes al CPI.

Gil Enseñat aceptó al CPI que esa reunión se

Exhibit A, Page 200 of 332

Detallan esquema orquestado desde Fortaleza – Telemundo Puerto Rico 9/28/20, 3:42 PM

dio con ese propósito y que consideró la intervención como una indebida. Dijo que le informó a Sánchez que mantendría la determinación que su agencia había tomado porque cumplía con los procesos de ley y además, les generaba un ahorro de $21 millones en comparación con la propuesta de su cliente. AECOM apeló la decisión ante la Junta Revisora de la agencia, lo cual detuvo el contrato, y litigó contra Vivienda hasta llegar el Tribunal Supremo, en donde desistió del caso.

"Sí se presentó en mi oficina y pidió hablar conmigo… Me expuso que yo, en referencia a la agencia, había cometido un error en escoger el licitador que había escogido para Mi Hogar Renace", reconoció Gil Enseñat.

Sostuvo que como funcionario que ha servido anteriormente en el Gobierno y como abogado sabe que se debe a la Constitución y a las leyes y por tanto no accede a este tipo de presiones.

"Sé que la última consecuencia la pago yo. En ese sentido, no me tembló la mano", dijo.

¿Considera este tipo de intervención de cabilderos apropiada?, se le preguntó.

"No, no es apropiado, y te lo digo", contestó.

"La realidad es que eso pasa; a mí no me gusta, y yo no estoy de acuerdo con ello", agregó al enfatizar que es responsabilidad de cada funcionario no acceder a las presiones.

**Gil Enseñat dijo que acudió al Gobernador personalmente a relatar el suceso para anticiparle la posible pugna legal que iniciaría ya que no iba a ceder al pedido de Sánchez** y a decirle que tenía todo documentado y que iría hasta las últimas consecuencias. Aseguró que Rosselló le dijo que siguiera adelante con su decisión.

El CPI solicitó a La Fortaleza una reacción para esta historia pero no la recibió al cierre de la edición.

A pesar de que AECOM no consiguió el contrato de Tu Hogar Renace, la compañía tiene $1.1 millones en contratos con el Gobierno. Gil Enseñat dijo que algunos de estos contratos eran previos al incidente y otros posteriores, y que fueron obtenidos en buena lid.

**A mediados de 2018, Sánchez llevó personalmente al Departamento de Hacienda a su cliente GILA Corporation** para empujar un contrato de cobro de deudas morosas y logró reuniones al menos en cuatro ocasiones con

Exhibit A, Page 202 of 332

Case 1:21-cv-20543-MGC   Document 1-2   Entered on FLSD Docket 02/09/2021   Page 203 of 332

dos de los principales funcionarios y con un contratista: el actual secretario de Hacienda y entonces asesor, Francisco Parés, el ex secretario de Hacienda y entonces asesor por contrato, Juan Carlos Puig y el entonces secretario de Hacienda y principal oficial financiero, Raúl Maldonado, según dos fuentes con conocimiento directo del evento.

Maldonado, quien por años participó también de la dinámica, según las fuentes, terminó acudiendo al Negociado Federal de Investigaciones (FBI) a proveer información sobre las ilegalidades en el Gobierno de Puerto Rico, poco después de que su breve sucesora en Hacienda, Teresita Fuentes Marimón, acudiera en enero de 2019, primero al FBI, y luego donde Rosselló, con denuncias relacionadas a los esquemas de Hacienda.

## Rosselló no tomó acción al respecto. La funcionaria renunció fulminantemente.

Fuentes Marimón – quien se encuentra fuera de Puerto Rico – no ha precisado si entre sus denuncias figuraban las intervenciones de Sánchez en Hacienda y no estuvo disponible para entrevista.

La funcionaria también fue ante Rosselló a denunciar presuntos esquemas de lucro ilegal operados por Maldonado y su hijo, Raúl

Exhibit A, Page 203 of 332

Maldonado Nieves, a través de al menos siete compañías: Virtus, Óptima, Centurion, 6th Element, On Point, Integrity y OPG, aseguraron tres fuentes. Las empresas tenían al menos 65 contratos por $12.6 millones y presuntamente cobraban por acceso a Maldonado (padre) para gestiones, acuerdos favorables y rebajas de deuda en Hacienda, entre otros servicios.

El CPI intentó obtener reacción de Maldonado a través de su abogada Mayra López Mulero, pero esta indicó que no harían expresiones.

## De otra parte, múltiples fuentes hablaron al CPI sobre intervenciones indebidas de Sánchez a favor de su cliente, Microsoft. La compañía de tecnología ha logrado más de

$100 millones en contratos durante esta administración. Dos fuentes apuntaron, por ejemplo, al contrato de $11 millones firmado el pasado verano para obtener las licencias de AmpliFund, una aplicación de "grant management" propiedad de Microsoft. A pesar de que el Gobierno ya contaba con una herramienta similar y efectiva, y que costaría una fracción extender dicha licencia, la administración Rosselló Nevares decidió adquirir la licencia de AmpliFund.

El CPI llamó a Herbert Lewy, presidente de Microsoft, para una reacción al respecto y el

ejecutivo reconoció la llamada a través de su relacionista público, Vivian Sánchez. Además se le enviaron preguntas escritas. Sin embargo, al cierre de esta edición no se había recibido una respuesta.

Según dos fuentes, en el Departamento de Corrección también ocurrió una intervención indebida de Sánchez cuando la compañía Carolina Catering Services obtuvo un contrato de $300 millones para manejar las comisarías, lavanderías y comida en las cárceles. El contrato fue adjudicado a esta compañía a pesar de que pujó por un costo mayor al de otro competidor, Trinity. Dos fuentes dijeron al CPI que la persona responsable de intervenir en la subasta y lograr que Carolina Catering consiguiera el contrato fue Sánchez.

El CPI cuestionó al secretario de Corrección y Rehabilitación, Erik Rolón, si Sánchez intervino de alguna manera en la subasta de estos servicios. "No para nada; es totalmente incorrecto", dijo el también subsecretario de la Gobernación, quien aseguró que no hubo ninguna irregularidad en el proceso.

El CPI contactó al presidente de Carolina Catering, José Algarín, quien negó relación alguna con Sánchez y "sus asociados, familiares o empresas relacionadas a él", y dijo

que no usan cabilderos externos. "Rotunda y absolutamente, no", contestó a través de su relacionista, María "Maypi" Casta. Carolina Catering forma parte del conglomerado MGI Caribe, la que a su vez está relacionada Empresas Santana.

En la Administración de Seguros de Salud (ASES), la joya de la corona por el enorme monto de las contrataciones del plan de salud del Gobierno para indigentes, Vital, una compañía aseguradora logró que se admitiera su participación en la subasta y resultó agraciada con el mayor contrato pese a que entregó su propuesta dos días tarde, por lo que no cualificaba. Esta información es parte de las acusaciones radicadas hace unos días por fraude, conspiración, robo de fondos públicos y lavado de dinero contra la jefa de esa agencia, Ángela Ávila, el presidente de BDO, Fernando Scherrer, y contra su empleado y cabildero en  la agencia, Alberto Velázquez Piñol. Este último fue un alto funcionario de Gobierno y consultor desde la gobernación de Luis Fortuño y tiene vínculos con la familia de Sánchez, a través de una relación cercana con su exsuegra Katherine Erazo García, y su exesposa y pareja Valerie Rodríguez Erazo. Según dos fuentes del CPI, la aseguradora en cuestión es Triple-S, que es también cliente de Sánchez y su socia, la exsecretaria de Corrección y vicepresidenta de

la Junta de Gobierno de la Universidad de Puerto Rico, Zoraida Buxó.

Triple-S no respondió la pregunta de si Sánchez o alguna de sus empresas o asociados cabildearon a su nombre, ni si ha recibido requerimientos de las autoridades federales.

"Triple-S ya emitió una declaración previa en la que establece que no comentará sobre investigaciones federales y tampoco alimentará rumores o especulaciones", fue la respuesta por escrito de la principal oficial de comunicaciones de la empresa, Ivelisse M. Fernández.

En el pasado Triple-S y Empresas Santana figuraron entre los participantes en el esquema de corrupción por el cual fue acusado el ex gobernador Aníbal Acevedo Vilá por cuantiosos donativos de campaña ilegales de sus ejecutivos.

"Si no contratas a los clientes de Elías, no hay espacio para tí en el Gobierno (de Ricardo Rosselló)", dijo una fuente al CPI.

Una fuente indicó que luego del huracán María, Sánchez, a través de Christian Sobrino, trajo a la mesa a la empresa CSA, para que, a través de la Agencia para el Manejo de Emergencias y

**Desastre (AEMEAD), obtuviera el contrato de inspección de escuelas tras la emergencia. El contrato de $800,000 fue otorgado a finales de septiembre de 2017 y cancelado poco tiempo después en medio de críticas, incluyendo las de la entonces secretaria de Educación, Julia Keleher. La semana pasada Keleher también fue acusada por los federales en un esquema – hasta el momento no relacionado – en donde BDO, Scherrer y Velázquez también eran protagonistas.**

El presidente de la compañía, Frederik Riefkohl, negó rotundamente que CSA tenga relación alguna, "directa o indirectamente", con Elías Sánchez o con "ninguno de sus asociados".

"Sánchez no ha sido consultor, contratista, asesor ni director de CSA", manifestó Riefkohl al CPI, y resaltó que CSA es una empresa puertorriqueña que lleva más de 60 años en operaciones y que ha contratado con el Gobierno a través de administraciones de ambos partidos.

"No necesitamos usar cabilderos ni a nadie como tarjeta de presentación con el Gobierno", añadió.

CSA Architects & Engineers ha logrado $26 millones en contratos en 10 agencias en esta

administración, según el registros de contratos del Contralor.

El CPI contactó a Sobrino para una reacción, pero no contestó al cierre de esta edición.

Durante una rueda de prensa el martes, el CPI le preguntó directamente a Rosselló por qué Sánchez tiene tanto poder y acceso directo a sus secretarios de gabinete y el Gobernador evadió la pregunta. En vez, ofreció una respuesta confusa en la que no rechaza que Sánchez tenga dichos accesos.

"Sí, bueno, aquí hay personas que tienen distintas relaciones. Eso es relaciones [que] los individuos establecen, pero por mi parte, yo me he encargado y mi trabajo es encargarme de que exista un proceso, independiente de relaciones, de amiguismo, de lo que sea, [y] el proceso sea lo que determine las acciones hacia adelante", contestó.

Anteriormente, en la misma conferencia, Rosselló dijo, también de manera escueta, que evalúa "todos los contratos" relacionados a Sánchez.

No todo eran contratos

Dos fuentes dijeron que Laborers' International

Union of North America (LIUNA), cliente de Sánchez, consiguió la orden ejecutiva del gobierno de Rosselló que aumentó a $15 el salario mínimo en la industria de la construcción.

Asimismo el CPI supo, por tres fuentes, que Sánchez y sus allegados gestionaban ante los secretarios de agencias importantes beneficios económicos para sus clientes, tales como exenciones y créditos contributivos, el pago de deudas atrasadas con el Gobierno y la rebaja o condonación de deudas contributivas, entre otros.

También han dado información que apunta a la intervención de otros cabilderos y abogados en dinámicas similares durante esta administración.

Sánchez no quiso responder a preguntas sobre los señalamientos contenidos en esta historia, aunque había hecho expresiones en junio negando haber participado en algún acto de corrupción.

Respondió una petición de entrevista del CPI en un mensaje de texto en el que indicó que "no existe ninguna orden de arresto en su contra".

"No tengo comentarios adicionales",  agregó

Tras la insistencia sobre la importancia de esta historia, en la que además se mencionan los negocios de su suegra, ex funcionaria de Gobierno y ex asesora de Pedro Rosselló y de Thomas Rivera Schatz, Katherine Erazo García, y su esposa, la empresaria, cabildera y comentarista radial, Valerie Ann Rodríguez- Erazo, Sánchez sostuvo por mensaje de texto: "En estos momentos me encuentro de vacaciones con mi familia y no estoy disponible para entrevista. Varias personas en mi familia no son figuras públicas, por lo que estaremos pendientes para la acción correspondiente".

Erazo García, también exesposa del expresidente del Senado y miembro de Ricardo Rosselló, Charlie Rodríguez, ha obtenido contratos ascendentes a $357,500 con el Departamento de Desarrollo Económico y Comercio, y el Negociado de Telecomunicaciones a través de su empresa BCS Consulting Group con la cual también representa clientes privados en gestiones ante el Gobierno, y solo en el 2018 reportó

**$625,000 en ingresos al Departamento de Estado, más que duplicando a 2017 cuando reportó $276,000.**

Una porción de los contratos revisados para

esta historia es por servicios bonafide. Se desconoce qué porción de estos fue a parar al pago de comisiones de cabilderos e intermediarios, y a servicios inexistentes o sobrefacturados.

También se desconoce a cuánto ascienden las rebajas y créditos contributivos otorgados. El Gobierno de Puerto Rico sostiene que la información relacionada a los beneficios contributivos que concede, incluyendo los de las leyes 20 y 22, es confidencial.

El manejo de medios

**Solamente en contratos directos, Edwin Miranda y sus compañías obtuvieron más de $50 millones con 22 agencias de Gobierno.** En el caso de Carlos Bermúdez, su compañía de relaciones públicas, Ojo Creativo, consiguió 16 contratos con siete agencias, para un total de $540,000.

**Tres fuentes indicaron que Bermúdez y Miranda presuntamente ejercían presiones a compañías y a otros individuos para que contrataran con ellos en el ámbito privado si querían hacer negocios con el Gobierno.** Estos contratos, por ser privados, no figuran en la Oficina del Contralor. Miranda y Bermúdez también fueron parte de la Junta de Directores

de Unidos por Puerto Rico. Actualmente no están incluídos en su página oficial.

Una de las empresas de Miranda, por ejemplo, fue contratada por Microsoft – uno de los mayores contratistas del Gobierno y cliente de Sánchez, según dos fuentes – y por Unidos por Puerto Rico, la organización sin fines de lucro creada por la Primera Dama, Beatriz Rosselló, para el manejo de donativos tras el huracán María. Unidos por Puerto Rico, cuya presidencia fue ocupada por el cuñado de Elías Sánchez, Jorge del Pino, llegó a recibir $41 millones en donativos y también está siendo investigada por las autoridades federales.

Aunque Miranda ha dicho que el trabajo político partidista suyo se hacía mediante otras compañías y no de KOI, el CPI supo que a principios de este año, el empresario presuntamente instruyó a un grupo de sus empleados en KOI que tendrían que hacer trabajo político entre sus labores con los clientes privados y de Gobierno.

El publicista, quien comenzó en el manejo político en la administración de Luis Fortuño, tiene un total de cuatro compañías inscritas y dos fuentes con acceso a los documentos aseguraron que existe facturación duplicada o falsa. El representante independiente Manuel

Natal refirió algunas de las irregularidades en la facturación de las empresas de Miranda a las jefas de Fiscalía federal, del Departamento de Justicia de Puerto Rico, de la Oficina de Ética Gubernamental, y la Oficina del Contralor desde el 17 de noviembre de 2017.

El CPI intentó contactar a Miranda para una reacción pero al cierre de esta edición no fue posible comunicarse con él.

Por su parte, además de la política, Bermúdez lleva una larga trayectoria haciendo relaciones públicas para figuras del mundo del entretenimiento y de la farándula, aunque la Asociación de Relacionistas Profesionales de Puerto Rico aclaró que no está licenciado en esta profesión. La ley de los relacionistas públicos prohíbe actuar como tal sin tener licencia, aunque no conlleva penalidad. Entre modelos y reinas de belleza, funge según el Departamento de Estado como presidente de San Juan Moda y fue director ejecutivo de Miss Mundo de Puerto Rico. La cartera de artistas de Bermúdez ha incluído figuras como la presentadora y modelo Cynthia Olavarría, los raperos Tempo y Ozuna, Maripily, El Molusco y el merenguero Joseph Fonseca.

En el caso de Ozuna, el artista ha participado como talento de varios eventos públicos junto

al Gobernador. En el chat se menciona, por ejemplo, el tema musical Llegó la Navidad de Ozuna y el cuatrista Christian Nieves, gestionado a través de la Compañía de Turismo.

El Molusco aclaró que Carlos Bermúdez no es su representante ni relacionista fijo, pero indicó que este sí le ha manejado las relaciones públicas en algunos proyectos particulares. "Bermu trabajó uno o dos proyectos para mi.
Carlos Bermúdez es amigo de los artistas; es mi amigo", afirmó.

Dijo que no ha percibido dinero por las intervenciones en eventos de gobierno en los que participó como talento luego del huracán, cuando se creó Unidos por Puerto Rico.

Aunque negó ser el representante de Ozuna, Bermúdez, quien dijo estar fuera de Puerto  Rico, reconoció en declaraciones escritas que la compañía del artista lo contrata y que ha  sido contratado "en momentos" por los otros artistas. Sin embargo, rechazó que sus clientes o él se hayan beneficiado de sus relaciones con el Gobernador y el gobierno. También negó haber ejercido presiones para contrataciones privadas por parte del sector público.

En el ámbito político, además de representar a

la comisionada residente en Washington, Jenniffer González, al exalcalde de San Juan, Jorge Santini y la alcaldesa de Ponce, María "Mayita" Meléndez, Bermúdez se presentaba como contacto de prensa de los políticos Melinda Romero y Leo Díaz Urbina, su primo. González dijo tras la publicación del chat que había cancelado su contrato, aunque Bermúdez quiso hacer ver que era él quien había renunciado la mismo.

En la administración de Ricardo Rosselló, Bermúdez ha controlado las relaciones con la prensa y los medios de comunicación, al punto de ser la persona que seleccionó a casi todos los directores de comunicaciones internos de las agencias, así como a un consultor de medios externo adicional en la mayoría de los casos. Según dos fuentes con conocimiento de primera mano, las comunicaciones de casi todos los jefes gubernamentales eran canalizadas hacia Bermúdez por medio de la directora de comunicaciones de La Fortaleza, Rossy Santiago.

"La realidad es que quien puso a todo el mundo en sus puestos (de prensa y comunicaciones) fue él (Bermúdez)", aseguró una de las fuentes.

Entre los comunicadores clave que presuntamente colocó Bermúdez figuran ex

periodistas y personas vinculadas al mundo de la farándula
Denisse Pérez, actual secretaria de prensa de Rosselló, Rossy
Santiago, la directora de comunicaciones de La Fortaleza,
Yolanda Rosaly y Farasch López en Educación, Eric Perlloni en
Salud, Alejandro Pabón en ASES, Maura Ríos, en el DDEC,
Waldo Díaz, en Corrección, Iván Caraballo en Autoridad de
Asesoría Financiera y Agencia Fiscal y María Batista en la
Secretaría de la Gobernación.

Bermúdez aceptó que participó del proceso de selección y
recomendó algunas de estas personas, pero negó haberlas
escogido.

"[A]lgunos de estos los recomendé y fue una determinación
final, grupal donde terminaron conformando en el equipo. Fui
parte del grupo de trabajo para identificar talentos", dijo.

**El CPI además corroboró con varias fuentes
la existencia de un chat entre los oficiales
de comunicaciones, en el que Bermúdez y
Santiago daban instrucciones de cuándo y
cómo atender las peticiones de la prensa.**
"Yo no daba órdenes sino que era parte del grupo
de trabajo estratégico, éramos un equipo como los
hay en todos los gobiernos. Siempre procurando la
respuesta a medios y que se atendieran las
peticiones de los medios", reaccionó Bermúdez,
aunque el CPI pudo ver

instancias en las que Bermúdez ordenaba que se le dieran largas
a las peticiones.

El chat fue un detonante

El tema de la corrupción en la administración de Rosselló
Nevares, del que se han revelado casos que parecen aislados,
comenzó a explotar con la salida abrupta de Raúl Maldonado, su
visita al FBI y las declaraciones públicas de su hijo, Raúl
Maldonado Nieves, quien tildó directamente al Gobernador de
"corrupto" e hizo referencia directa a la presunta intervención de
Rosselló para alterar la auditoría al manejo de suministros del
huracán María a la organización Unidos por Puerto Rico para
proteger a su esposa. A partir de esa fecha comenzaron a
filtrarse a la prensa pedazos de un chat del Gobernador con once
miembros de su círculo íntimo en el que propio Rosselló, sus
funcionarios, asesores – incluyendo a Bermúdez y a Miranda – y
Sánchez hacían comentarios misóginos, homofóbicos e
insultantes a sectores de la población.

El sábado 14 de julio, el CPI publicó 889 páginas íntegras del
chat y un reportaje en el que establecía cómo además de
insultos y burlas, incluyendo mofas sobre los cadáveres del
huracán María, Rosselló, sus funcionarios,

asesores y Sánchez, quien no tiene ninguna relación formal con el Gobierno de Puerto Rico, planificaban el uso de herramientas del Estado para perseguir otros funcionarios, para manipular medios de comunicación, e intercambiaban información privilegiada sobre las operaciones gubernamentales. Desde el mismo sábado, el pueblo se tiró a las redes sociales y a la calle en protestas que han continuado caldeándose en reclamo de la renuncia inmediata de Rosselló.

El sábado, después de que el CPI revelara el contenido íntegro del chat del gobernador con sus figuras más allegadas, Rosselló anunció que ya no usaría el consejo y servicios de la mayoría de los miembros del chat, algunos de los cuales no tenían relación oficial con el Gobierno, pero se aferró a su puesto. Desde entonces, ha sostenido que no va a renunciar.

Ese día, tanto Bermúdez como Miranda anunciaron que renunciaron a todos sus contratos con el Gobierno. En el caso de Sánchez, el Gobernador — de manera ambigua — manifestó que "prescindió" de sus contratos. Pero Sánchez no ha tenido ningún contrato registrado con el Gobierno. Rosselló tampoco ha sido claro en definir cuál exactamente ha sido el rol de Sánchez luego de dejar la posición de representante suyo ante la Junta

de Control Fiscal.

Dos de los miembros del chat, el principal oficial financiero y representante del Gobierno ante la Junta, Christian Sobrino y el secretario de Estado, Luis Rivera Marín, presentaron sus renuncias el sábado. La renuncia de Sobrino fue inmediata, mientras que la de Rivera Marín es efectiva a finales del mes de julio. Otros dos funcionarios públicos en el chat, el secretario de Gobernación, Ricardo Llerandi y el secretario de Asuntos Públicos, Anthony Maceira, permanecerán en sus puestos.

El presidente de la Cámara de Representantes, Méndez, ha tenido ante sí por casi un año un pedido de investigación de las operaciones de cabildeo para empresas que hace Sánchez y sus asociados sin estar debidamente registrados, y no ha hecho nada al respecto.

***Carla Minet, Laura Moscoso, Vanessa Colón, Damaris Suárez y Jeniffer Wiscovitch colaboraron con esta historia.***

SPONSORED • **BABBEL**

**Experta en lingüística explica cómo hablar inglé…**

SPONSORED • **HERO…**

**¡Conseguir este tesoro e…**

SPONSORED • **BABBEL**

**Estos son los 3 pilares clave…**

SPONSORED • **CLUB PARA EMPRENDED…**

**Familia expulsa de casa a la h!a el día de su…**

SPONSORED • **BABBEL**

**Experta en lingüística explica como hablar inglé…**

SPONSORED • CONS...

**¿Se empañan sus gafas…**


**TELEMUNDO**
PUERTO RICO

!    ••    #

**TELENOTICIAS**

**EL TIEMPO**

**ESTADOS UNIDOS**

**CELEBRIDADES**

**DANDO CANDELA**

**MÚSICA**

**JAY Y SUS RAYOS X**

**MUNDO**

**DEPORTES**

WKAQ Public Inspection File

Aplicaciones de la FCC

Empleos

Envía tus comentarios

Términos de Servicio

Política de Privacidad

No venda mi información

personal

Aviso de California

AdChoices

**EXHIBIT U**

The July 17, 2019 story located at https://www.telemundopr.com/noticias/puerto-rico/detallan-esquema-orquestado-desde-fortaleza/101461/ contains an embedded video from *Telenoticias* with the following slanderous comments:



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 0:05 – 0:31 | Fonseca:<br><br>"Lo que hizo el Centro de Periodismo Investigativo es un artículo devastador porque aunque uno tuviera dudas, porque vamos a darle el beneficio de la duda de que parte de la información tenga aclaraciones, es la relación de encamamiento entre Elías Sánchez y el Gobernador y su grupo de trabajo mas cercano, de alguien que aquí esta ya demostrado lo que sabíamos todos, que Elías Sánchez iba continuamente a pelear con jefes de agencia cuando no le daban a sus clientes los contratos. | Fonseca:<br><br>"What the CPI did is a devastating article because although one had doubts, because we are going to give him the benefit of the doubt that part of the information has clarifications, it is the relationship between Elías Sánchez and the Governor lying in bed together and his closest working group, about someone that has already been proven what we all knew here, that Elías Sánchez went to fight with agency heads when they did not give the contracts to his clients. " |

| 2 | 0:43 – 0:52 | Fonseca:<br>"Y voy a decir más, Carlos Contreras tiene que explicar también si el fue llamado por Elías Sánchez por un contrato que él quería hacer por RFP y Elías Sánchez se oponía al RFP." | Fonseca:<br>"And I'm going to say more, Carlos Contreras has to explain also if he was called by Elias Sanchez regarding a contract that he wanted to procure through RFP and Elías Sánchez was opposed the RFP." |
|---|---|---|---|
| 3 | 1:00 – 1:55 | Fonseca:<br>"De nuevo, el encamamiento del Gobernador con Elías Sánchez en este chat es obvio, y no solo Elías Sánchez, otro grupo de personas que estaban haciendo dinero con las dos manos, y francamente, de nuevo, ese es el tema principal aquí. Es que, es que se le dio [Pabon Roca: No son los chats?] acceso a información continua perenne hasta la estrategia de cómo comunicar esa información, hasta información privilegiada y confidencial a gente que después iba y le cobraba a alguien: te conseguí un contrato, dame 25%. O sea, te conseguí un contrato de 10 millones de pesos, dame dos millones y medio. O sea, estamos hablando de, gente por si acaso, el contrato, que uno de los que se cabildeo presuntamente por él de los que se habla ahí, es contrato de cantidades multimillonarias. No estamos hablando de que se hizo 700 mil pesos como Velázquez Piñol en el indictment , estamos hablando de millones y millones y millones de dólares." | Fonseca:<br>"Again, the lying in bed between the Governor and Elias Sanchez is obvious in this chat, and not only Elias Sanchez, but another group of individuals that were making money without restraint, and frankly, again, that is the main topic here. It is that, access was given to continuous perennial information up to the strategy of how to communicate that information, even privileged and confidential information to people who later went and charged someone: I got you a contract, give me 25%. In other words, I got you a 10 million dollars contract, give me two and a half million. In other words, we are talking about, people just in case, the contract, which one of those who he allegedly lobbied for that is being talked about there, is a contract for multimillion-dollar amounts. We are not talking about 700 thousand dollars being made like Velázquez Piñol in the indictment, we are talking about millions and millions and millions of dollars. " |
| 4 | 2:32 – 3:48 | Díaz Olivo:<br>"Desde los tiempos de la Iliada y la Odisea, [Pabon Roca: Eah diablo] con la relación de Patroclo y Aquiles no se [background laughter by Pabon Roca and Fonseca] había visto una relación de solidaridad de tal naturaleza como la que se revela aquí."<br><br>Pabón Roca:<br>"¿Están bien compenetrados?<br>Díaz Olivo:<br>"Muy compenetrados desde temprano en | Díaz Olivo:<br>"Since the times of the Iliad and the Odyssey, regarding the relationship between Patroclus and Achilles, a relationship of solidarity of such a nature as that revealed here has not been seen."<br><br>Pabón Roca:<br>"Are they well compenetrated? Embedded<br>Díaz Olivo:<br>"Very compenetrated early on their |

sus inicios y ciertamente, esto era una actividad en marcha, planificada, ordenada, y con pleno conocimiento del Gobernador. Eso es lo que esta detrás de lo que dicen estas revelaciones."

Pabón Roca:
"¿Y quién es Patroclo y quien es Aquiles?"

Diaz Olivo:
Habrá que determinarlo aquí en este caso. Pero la historia cuenta estas cosas. Y lo interesante de esta situación es que por eso nosotros veíamos que cuando se le hacían preguntas al gobernador sobre esta relación el Gobernador no las podía contestar, las evadía o gageaba mas de lo acostumbrado.

Fonseca:
Pero Carlos, mira, yo voy a decir, y perdona que te interrumpa, el Gobernador le dijo al país cuando estaba arrepentido y humillado con un corazón contrito ante la iglesia, ante el salón de los espejos donde el se reflejaba ante el pueblo […] y le dijo allí a la agente que Velazquez Piñol no tenia ningún control de nada.

Diaz Olivo:
No, porque era Elias.  Estaba correcto.

Solla:
Yo quiero retomar el tema del Secretario de la Gobernación porque yo creo que hubo revelaciones importantes y sobre todo, en este artículo se habla de interacciones y de potenciales contratos y tu estabas entrando en ese punto.

Pabon Roca:
Si, yo iba dirigido a precisamente un contrato que esta en controversia, la empresa ha negado relación con Elias Sanchez y asi mismo lo dice el articulo del CPI, pero las fuentes de los

beginnings and certainly, this was an ongoing activity, planned, ordered, and with full knowledge of the Governor. That is what is behind these revelations."

Pabón Roca:
"And who is Patroclus and who is Achilles?"

Diaz Olivo:
It will have to be determined here in this case. But history tells these things. And the interesting part of this situation is that this is why we saw that when the Governor was asked questions about this relationship, the Governor could not answer them, he evaded them or gagged more than usual.

Fonseca:
But Carlos, look, I'm going to say, and forgive me for interrupting you, the Governor told the country when he was repentant and humbled with a contrite heart before the church, before the hall of mirrors where he was reflected before the people. Because that is the symbolism of the hall of mirrors […] and he told the people that Velazquez Piñol had no control of anything.

Diaz Olivo:
No, because it was Elias. He was correct.

Solla:
I want to return to the subject of the Governor's Chief of Staff because I believe that there were important revelations and above all, this article talks about interactions and potential contracts and you were about to touch on that issue.

Pabon Roca:
Yes, I was directed to precisely a contract that is in controversy. The company has denied a relationship with Elias Sanchez and so says the CPI article, but the journalists' sources, two I believe in this case, the sources say that it is Elias Sanchez who was behind and it has to do with food in [the

| | | | |
|---|---|---|---|
| | | periodistas, dos creo en este caso, de las fuentes dicen que es Elias Sanchez el que estuvo detrás y tiene que ver con comida en Correccion.<br><br><br><br>Fonseca:<br>Eran trescientos millones en comida.<br><br>Pabon Roca:<br>Un pequeño contrato de trescientos millones de dólares donde se imputa que se le quita a una empresa y se le da a la otra que es ahijada de Elias sanchez. Vuelvo y repito la empresa lo ha negado y de manera responsable el centro asi lo refleja. Pero de nuevo, ahí hay un problema y yo quería haberle preguntado porque el titubea, reconoce primero un contrato, dice que no recuerda que tiene que buscar su calendario, y luego dice que fueron varias compañias las que llevo Elias Sanchez y sabemos de esta por lo menos según, verdad, dice y eso hubiera podido aclarar si la empresa dice la razón, la verdad o no. | Department of] Correction.<br><br><br>Fonseca:<br>It was three hundred million in food.<br><br><br>Pabon Roca:<br>A small contract [sarcastically] of three hundred million dollars where it is imputed that it was taken away from one company and given to the other, which is Elias Sanchez's goddaughter. Again, I repeat, the company has denied it and the Center responsibly reflects it. But again, there is a problem and I wanted to have asked him why he hesitates, he first recognizes a contract, he says that he does not remember that he has to look up his calendar, and then he says that there were several companies that Elias Sanchez brought, and we know about this one at least as stated, right, that could have clarified if the company says the reason, the truth or not. |

**EXHIBIT V**

The July 17, 2019 story located at https://www.facebook.com/JayFonsecaPR/videos/447608732750988 consisting of a Face Book live video inside the *Telenoticias* Studio, broadcasted on his personal facebook page, that contains the following defamatory statements:



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 1:53 – 4:25 | Reporter Fonseca:<br><br>"El CPI (Centro Periodístico Investigativo) ha publicado una lista de acuerdos de Elías Sánchez que estaba en el chat, y de nuevo lo importante para mi de esto es, recuerden es la corrupción y que el pueblo no se puede quitar. Pero es bien importante, que si ustedes ven ese link, que les puse ahí por si acaso, yo creo que llegó el momento de que aquí se quede bastante claro ya, que aparenta haber habido un acuerdo de gente que ayudó en la campaña de Ricardo Rosselló, después de jartarse de contratos a niveles imposibles de aceptar y que esa gente tenía un encamamiento con la administración y el gobernador específicamente que es bien | Reporter Fonseca:<br><br>The CPI (Investigative Journalistic Center) has published a list of agreements of Elías Sánchez that was in the chat, and again the important thing for me about this is, remember it is corruption and that the people cannot be removed. But it is very important, that if you see that link, which I put there just in case, I think the time has come for it to become quite clear here, that there appears to have been an agreement of people who helped in Ricardo's campaign Rosselló, after leaving contracts at levels impossible to accept and that those people had a bed with the administration and the governor specifically that is very shameful. |

vergonzoso.

O sea, estamos hablando de que por ejemplo, Elías Sánchez según el CPI cobraba hasta 50 mil billetes mensuales por cabildearte un contrato con el gobierno y te podía cobrar hasta 25% de comisión. Yo en mi vida había escuchado eso de comisión, es normal 3 a 10%, 25% yo jamás había escuchado una cifra como esa y el CPI afirma que eso es lo que se estaba pagando. O sea, estamos hablando que de ser cierta esta información que está siendo compartida con "District of New York" que es el distrito donde básicamente se opera los casos de corrupción mas brutales y los casos de la mafia, van a "District of New York", ahí es donde se investigan, pues este gran jurado que esta allí, aparenta estar teniendo evidencia de información según el CPI que simplemente son increíbles. Estamos hablando de una organización criminal y no estoy exagerando, si usted lee ese artículo eso es lo que dice, yo no estoy diciendo que eso es verdad porque eso a mi no me consta y no son mis fuentes, gran parte de lo que esta ahí, la hemos dicho en mi programa de TV pero no toda y francamente algunas de ellas son cosas son cosas bien complicadas. Específicamente estamos hablando de como Alberto Velázquez Piñol, que el gobernador dice que no fue nombrado algo, pues parece ser que tuvo acceso a muchísimo más de lo que se decía y sobre todo el encamiento de cabilderos en ese chat. O sea, Ramón Rosario que ahora está cabildeando también, el gobernador le da unos accesos a Carlitos Bermúdez de contratos ridículamente elevados por dar relaciones públicas, a Edwin Miranda que se jartó en contratos con el gobierno a través de diversos mecanismos y corporaciones, estamos

In other words, we are talking about that, for example, Elías Sánchez according to the CPI charged up to 50 thousand tickets per month for lobbying you for a contract with the government and could charge you up to 25% commission. In my life I had heard that commission, it is normal 3 to 10%, 25% I had never heard a figure like that, and the CPI affirms that that is what was being paid. In other words, we are talking that if this information that is being shared with "District of New York" is true, which is the district where basically the most brutal corruption cases and mafia cases take place, they go to "District of New York", That's where they are investigated, because this grand jury that is there, appears to be having information evidence according to the CPI that they are simply incredible. We are talking about a criminal organization and I am not exaggerating, if you read that article that is what it says, I am not saying that this is true because I am not aware of that and they are not my sources, a large part of what is there We have said it in my TV program but not all of them and frankly some of them are things that are very complicated things. Specifically, we are talking about how Alberto Velázquez Piñol, who the governor says was not named something, since it seems that he had access to much more than what was said and especially the lobbying of lobbyists in that chat. In other words, Ramón Rosario, who is now lobbying as well, the governor gives Carlitos Bermúdez access to ridiculously high contracts for giving public relations, to Edwin Miranda who got into contracts with the government through various mechanisms and corporations, we are talking of Elías Sánchez making money but by ridiculous numbers; and then again in the chat you see the level of the brotherhood and the level of everything

| | | | |
|---|---|---|---|
| | | hablando de Elías Sánchez haciendo dinero pero por números ridículos; y entonces de nuevo en el chat se ve el nivel de cofradía y el nivel de todo está bien y todo está chévere." | is fine and everything is cool.". |

**EXHIBIT W**

The July 18, 2019 story located at https://www.telemundopr.com/programas/dia-a-dia-programas-2/de- frente-con-jay-borraron-los-chats_tlmd-puerto-rico/101440/ from the *De Frente con Jay* news capsule within *Dia a Dia* contains the following slanderous comments:

|   | Time Stamp | Statement | Translation |
|---|-----------|-----------|-------------|
| 1 | 3:10 – 4:10 | Fonseca:<br><br>"Cuando nombraron a Elías Sánchez, el Gobernador lo nombró a estar en la Junta de Control Fiscal, él tenía que rendir unos informes. Y Elías se tardooooo, en entregar esos informes por que la ley federal PROMESA exigía que se entregaran unos informes de los chavitos que se había ganado en el pasado. Y adivinen quien era empleado de Elías Sánchez en una de sus corporaciones y tuvo que divulgarlo a los primeros seis meses del Gobierno de Ricardo Rosselló. ¿Quién era empleado de Elías Sánchez, desde el año 2012 mientras estaba buscando correr para la campaña y después de eso, corrió para ser Gobernador de Puerto Rico. Es decir, ¿quién mantuvo al Gobernador cuando él estaba siendo un candidato? ¿quien le dio trabajo al Gobernador, de qué vivía el Gobernador?" | Fonseca:<br><br>"When Elías Sánchez was appointed, the Governor appointed him to be on the Fiscal Control Board, he had to file some reports. And Elías was slooow in filing those reports because the federal law PROMESA required reports to be filed of the monies he had earned in the past. And guess who was an employee of Elías Sánchez in one of his corporations and had to disclose it within the first six months of Ricardo Rosselló's government. Who was an employee of Elías Sánchez, since 2012 while he was looking to run for the [election] campaign and after that, he ran to be Governor of Puerto Rico. That is, who supported the Governor when he was being a candidate? Who gave the Governor a job, what did the Governor live on? " |

| 2 | 4:11 – 5:47 | Fonseca: | Fonseca: |
|---|---|---|---|
| | | "Pueblo de Puerto Rico, Elías Sánchez era el que empleaba, el patrono de Ricardo Rosselló Nevares. ¡Que me desmientan! ¡Que me desmientan! ... Es que Elías Sánchez le pagaba al gobernador su salario, le pagaba al gobernador su salario y después vino Elías y orquestó todo un sistema para jartarse de billetes. ¿Eso no le suena a un intercambio de mantenme en lo que yo gano y cuando yo gano te jartas? ¿No les parece eso? ¿He dicho nombre yo? Sí lo dije porque esta ahí, está juramentado ante el Gobierno Federal. Así que, que conste que no es una opinión, son los datos. Pues, porque la gente después no le gustan mis opiniones…Pero los datos, ¿puedes refutarlos? ¿Puede refutarse que Elías Sánchez era el empleador de Ricardo Rosselló y que luego Ricardo Rosselló permitió que se enriqueciera con las dos manos Elías Sánchez? ¿Alguien puede refutar ese dato?" | "People of Puerto Rico, Elías Sánchez was the one who employed, the employer of Ricardo Rosselló Nevares. Let them deny it! Let them deny it! ... Elías Sánchez paid the governor his salary, he paid the governor his salary and then Elías came and orchestrated a whole system to enrich himself. Doesn't that sound like a trade of provide for me while I run and when I win, you enrich yourself? Doesn't it seem that way? Did I mention any names? Yes, I said it because it is there, it is sworn before the Federal Government. So, for the record, this is not an opinion, this is facts. Well, because sometimes people don't like my opinions… But the facts, can you refute them? Can it be disputed that Elías Sánchez was the employer of Ricardo Rosselló and that Ricardo Rosselló later allowed Elías Sánchez to enrich himself without restraint? Can anyone refute that fact? |

**EXHIBIT X**

On or about July 18, 2019 story located at: https://www.facebook.com/JayFonsecaPR/photos/a.163264163691056/2892655080751937 consisting of Facebook of Jay Fonseca, that contains the following statement: "ELIAS GOT TICKETS (money)  TO RICKY BEFORE HE WAS GOVERNOR - And now Elías (his wife Valerie, his father-in-law Charlie and his mother-in-law Kathy Erazo) is jacked up and becomes a millionaire thanks to Ricky. These are the data and we had taken it a year ago, in fact, Rep. Manuel Natal made this graph. Elías was Ricky's employer and Elías had to put it in his official reports to the federal government. Isn't this a quid pro quo? Keep me on the campaign and I'll make you a millionaire if I win? Everything we have said now, the people see that we must be vigilant every day so that democracy is not mocked. Puerto Rico is a paradise, we just need to cooperate, keep in mind that every day that I go to school I am competing with other countries that want to steal our jobs and that the companies that are here go there. We have to know that every time we go to work, to take exams at school and university, I am wearing the Puerto Rican shirt as if we were at the baseball world cup or the Olympics. Puerto Rico is a paradise, we just need to cooperate.



**EXHIBIT Y**

On or about July 25, 2019  story located at https://www.telemundo51.com/noticias/noticias-destacados/jay-fonseca-confirman-ricardo-rossello-renunciara-manana/115068/ publishing a video from the *Jay y sus Rayos X* broadcast of July 24, 2019 contains the following slanderous comments:



RicardoRossellórenunciaala gobernacióndePuertoRico

## Compartimos minuto a minuto de lo que surge en este tenso día.

PorJayysusRayosX/TELEMUNDOPR/EFE• Publicadoel23dejulio
del2019• Actualizadoalas1:01amdel25dejuliodel2019

Ricardo Rosselló anunció la noche de este miércoles que
renuncia a la gobernación de Puerto Rico, efectivo el
viernes 2 de agosto.

A continuación te brindamos un resumen de los sucesos:

**12:08 p.m.** | La secretaria de Justicia, Wanda Vázquez,
anuncia que asumirá la encomienda, de ser necesario.

Noticias Destacadas

**BOEING 737 MAX** • HACE 51 MIN



### Sale desde Miami el primer vuelo con pasajeros de un 737 MAX en EEUU desde los accidentes

MIAMI – HACE 1 HORA



### Suspenden programa de scooters motorizados en Miami



**COVID-19**

El Senado vota sobre el aumento de los cheques de estímulo a $2,000



**AYUDA POR CORONAVIRUS**

Ayuda por coronavirus: cuándo recibiré mi cheque de estímulo



**MIAMI-DADE**

Choque en la autopista Palmetto deja heridos y fuerte congestionamiento



**CORONAVIRUS EN EEUU**

La Cámara Baja aprueba el aumento de los cheques de estímulo, de $600 a $2,000



**AUSPICIADO**

Consejos para mantenerte activo

Promoción de Pasteur Medical Center

**11:52 p.m.** | Rosselló anuncia que renuncia a la gobernación efectivo el 2 de agosto.

**11:41 p.m.** | Inicia mensaje del Gobernador.

**10:20 p.m.** | Fuentes de Jay Fonseca aseguran que el presidente del Senado, Thomas Rivera Schatz, ya ordenó la redacción de las reglas del juicio político contra Rosselló.

**10:00 p.m.** | Filtran imagen de Rosselló grabando mensaje.

**8:46 p.m.** | El presidente del Partido Demócrata, Tom Pérez, pide a Rosselló que renuncie. Este recurrió a Twitter para hacer la petición.

"Es imposible gobernar sin confianza pública", tuiteó.

## Pronóstico de El Tiempo

MIAMI, FL

# 76°

**ESTA NOCHE**

# 70°

Parcialmente nublado
0% Precip

**MAÑANA**

# 79°

 **Tom Perez** 
@TomPerez



It's impossible to govern without public confidence. Through his inexcusable actions, Governor Rosselló lost the trust of his people and his ability to govern effectively. The people of PR have made their voices heard. It's time for Gov Rosselló to heed their calls and resign.

8:46 p. m. · 24 jul. 2019   

**8:36 p.m.** | Representante Quiquito Meléndez afirma que Rosselló violó acuerdo para renunciar a las 5:00 p.m.

**8:00 p.m.** | Johnny Méndez convoca a Sesión Extraordinaria este jueves, a las 2:00 p.m. para evaluar la creación de comisión especial para iniciar residenciamiento del gobernador.

**6:30 p.m.** | Más de dos horas después de convocar a periodistas y moverlos fuera de la sala de prensa, Anthony Maceria solo anuncia que Rosselló ofrecerá un mensaje en la noche, aunque no indicó la hora.

**4:30 p.m.** | A la espera de mensaje en La Fortaleza.

## CUATRO PREGUNTAS RÁPIDAS

Cargando encuesta...

**4:00 p.m.** | Johnny Méndez informa en conferencia de prensa que ya inició el proceso de residenciamiento. "El proceso comenzó.
Quien único lo puede detener es el señor Gobernador. A buen entendedor pocas palabras bastan", dijo Méndez en conferencia de prensa, tras confirmar que Rosselló daría pronto un mensaje al País.

**3:00 p.m.** | Reportan que Rosselló citó a su gabinete a una reunión a las 4:00 p.m. en Fortaleza.

**2:58 p.m.** | La comisionada residente Jenniffer González solicitó al presidente Donald Trump que asigne un coordinador federal para Puerto Rico, para el manejo de fondos federales.

**1:25 p.m.** | Walter Soto-León denuncia que intentan restringir presencia de los periodistas en Fortaleza. "Sgto. Alemán me da instrucciones de que tengo que permanecer en el salón de prensa y no moverme por los predios del lugar, como habitualmente hacemos".

**1:05 p.m.** | Exasesor en comunicaciones de Rosselló, Carlos Bermúdez,comparece al Departamento de Justicia. "Le pido disculpas a ustedes, los medios... por lo que escribí yo, por lo que no escribí yo y lo que no detuve...Vengo

con un corazón avergonzado".

**12:55 p.m.** | Asesor jurídico del gobernador Rosselló, Carlos Saavedra, confirma que acaba de sostener una reunión con él en la Fortaleza.

**12:30 p.m.** | El licenciado Enrique Colón entrega a la Cámara informe que recomienda residenciamiento del gobernador.

**12:17 p.m.** | Envían declaraciones de Anthony

 Ricardo Rosselló renuncia a la gobernación de P    !    ▪▪    ▼

Nevares no ha renunciado y continúa en Puerto Rico. Como dijo ayer, está en un proceso de reflexión y de escuchar al pueblo. Cualquiera que sea la decisión que tome, se comunicará oficialmente, como de costumbre. Debido al ambiente de expectativa, al momento, hay rumores incorrectos que se están divulgando, incluso en algunos medios de comunicación.
Reiteramos que cualquier comunicación oficial se compartirá con los medios".

**12:08 p.m.** | Declaraciones de Pedro Pierluisi:
"Puerto Rico vive momentos sin precedente, pero somos un pueblo bueno y vamos a salir adelante. Mi compromiso probado con Puerto Rico y mi gente se mantiene tan firme como el primer día. Mi corazón y mi mente están con cada puertorriqueño, pero en este momento las

normas a las que estoy sujeto en el bufete para el que trabajo no me permiten hacer expresiones o conceder entrevistas. De haber cambios en esta situación, así lo dejaré saber oportunamente". Pierluisi ha sido mencionado como posible secretario de Estado.

**11:30 a.m.** | Telenoticias confirma que informe de juristas encontró que se cometieron cinco delitos en el chat y que recomienda el residenciamiento del gobernador. La determinación es unánime. Carlos "Johnny" Méndez ya habría notificado al gobernador que inició el proceso del residenciamiento.

**10:00 a.m.** | Presidente de la Cámara de Representantes, Carlos "Johnny" Méndez dice que, al momento, no ha recibido informe de juristas que evalúan posibilidad de residenciamiento.

**9:30 a.m.** | Caucus del PNP se reunirá al mediodía el Capitolio.

**8:40 a.m.** | El secretario de Asuntos Públicos, Anthony Maceira, le asegura a Jay Fonseca que Ricardo Rosselló está en Puerto Rico y que sigue siendo el gobernador.

**8:24 a.m.** | Se confirma la renuncia la secretaria de la Oficina de Gerencia y Permisos (OGPE),

María Cintrón.

**7:00 a.m.** | Llerandi desmiente que el gobernador haya salido del País.

**6:40 a.m.** | El saliente secretario de la Gobernación, Ricardo Llerandi, dice en entrevista radial (WKAQ) que aunque Rosselló no le ha informado si tomó o no una decisión, "ayer era otro Ricardo Rosselló".

**6:35 a.m.** | El exsecretario de Justicia, Antonio Sagardía, alega que habló con el gobernador y que su renuncia se debe a investigación.

El martes

El presentador de Jay y Sus Rayos X, Jay Fonseca dijo en su programa que sus fuentes le informan que el gobernador Ricardo Rosselló hará pública su renuncia este miércoles.

1:06
## Fuentes aseguran que Rosselló renuncia este

Al momento de salir al aire, la información no había sido

informada.

Las fuentes aseguraron que participaban de reuniones convocadas a última hora, para coordinar los pasos a seguir ante el panorama.

Sin embargo, Jay hizo claro que él no ha confirmado la información.

Momentos antes, se confirmó en el mismo programa la salida del licenciado Elías Sánchez de la firma de asuntos públicos -con rama legal y de cabildeo- Wolf Popper LLC.

Se va Llerandi

La presión por la renuncia de Rosselló aumentó el martes con otra renuncia en su gabinete.

Ricardo Llerandi anunció su renuncia al cargo de secretario de la Gobernación de Puerto Rico en el marco de la crisis institucional por corrupción y por la difusión de un polémico chat.

Llerandi, en una carta dirigida a Rosselló, señala que renuncia también a los puestos de administrador de La Fortaleza -sede del Ejecutivo- y director de la Compañía de Comercio y Exportación, además de matizar que para hacer una transición más ordenada

serán efectivas el 31 de julio.

La dimisión de Llerandi supone un episodio más en la desbandada de altos funcionarios  del Ejecutivo de Rosselló, después de que se filtrara el contenido de un chat de 889 páginas en el que el gobernador y su círculo más cercano insultan y se mofan de la oposición, compañeros de partido, mujeres y miembros de la comunidad LGBT.

La lista de dimisiones tras el inicio de la crisis incluye al responsable de las Finanzas gubernamentales, Christian Sobrino; el asesor de comunicaciones, Carlos Bermúdez; el secretario de Estado, Luis Rivera Marín; el presidente del Banco de Desarrollo Económico, Gerardo Portela, y el ayudante especial de la primera dama, Raymond Cruz, entre otros.

En total, más de 50 altos cargos de la Administración han renunciado a sus cargos desde que Rosselló llegó al poder en enero de 2017.

"Estaré siempre agradecido por la confianza que me brindó para asumir estos cargos, así como las responsabilidades que en el camino me fueron encomendadas. Tuve la bendición de contar con un equipo extraordinario y los mejores años de mi vida profesional los tuve

liderando la iniciativa PR Emprende", subraya Llerandi en la carta.

"Los últimos días han sido sumamente difíciles para todos. En esta coyuntura histórica me corresponde anteponer sobre cualquier consideración el bienestar de mi familia. Las amenazas recibidas las puedo tolerar como individuo, pero nunca permitiré que afecten a mi hogar. Mi esposa e hijos son todo para mí. Ese es mi deber principal", subraya.

La dimisión de Llerandi se suma a las anunciadas el martes por parte de uno de sus ayudantes, Raymond Cruz, y la de George Laws que dejará la dirección interina de la Administración de Asuntos Federales de Puerto Rico (Prfaa), a partir del 15 de agosto.

La tensión política se apoderó paulatinamente de la Isla del Encanto, primero, con los arrestos de varios exfuncionarios de la Administración de Rosselló, y luego, tras la filtración de casi 900 páginas de un chat en las que el exmandatario y sus allegados insultaban, se burlaban y hasta comentaban sobre ejercer daño físico a opositores políticos y otras figuras de la vida pública.

- Filtran las 889 páginas del chat de Telegram

La indignación llegó a niveles nunca antes vistos en la isla caribeña, provocando manifestaciones históricas a las que se unieron cientos de miles de personas de todos los sectores, incluyendo a renombrados artistas

Mira aquí nuestra programación en vivo.

SPONSORED • BABBEL

**Experta en lingüística explica cómo hablar un…**

SPONSORED • PROP...

**Las gafas de lectura con…**

Ricardo Rosselló renuncia a la gobernación de Puerto Rico - Telemundo Miami (51)                12/29/20, 1:26 PM

SPONSORED • **BABBEL**

**Empresa alemana cre…**

SPONSORED • **WIFI ULTRA BOOST**

**El dispositivo para mejorar el WiFi que arrasa en…**

SPONSORED • **CLUB PARA EMPRENDED…**

**Padre empresario tira a su h!aadolescenteala calle.**

SPONSORED • **CONS…**

**¿Se empañan sus gafas…**

Ricardo Rosselló renuncia a la gobernación de Puerto Rico - Telemundo Miami (51)                                    12/29/20, 1:26 PM

 **51**

!        ••        #

---

| | | |
|---|---|---|
| **NOTICIAS LOCALES** | **INMIGRACIÓN** | WSCV Public Inspection File |
| **ESTADOS UNIDOS** | **ENTRETENIMIENTO** | WWDT Public Inspection File |
| **CUBA** | **ACCESO TOTAL** | Aplicaciones de la FCC |
| **VENEZUELA** | **SALUD** | Accesibilidad WSCV |
| **PUERTO RICO** | **MUNDO** | Política de Privacidad |
| **MÉXICO** | **BOLETÍN ELECTRÓNICO** | No venda mi información personal |

Empleos WSCV
Términos de Servicio
Reporte 397 del FCC
Publicidad con nosotros

Copyright © 2020 NBCUniversal Media, LLC. Derechos Reservados.

**EXHIBIT Z**

The July 24, 2019 story located at https://www.telemundopr.com/noticias/puerto-rico/manuel-natal-desmenuza-vinculos-entre-elias-y-rossello-telemundo-telenoticias/101284/ publishing a summary of the contents of the excerpt video from the *Jay y sus Rayos X* broadcast of July 24, 2019 contains the following slanderous and libelous comments:

| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 0:03 – 0:24 | Fonseca:<br>"Tenemos con nosotros a Manuel Natal, licenciado representante del partido Movimiento Victoria Ciudadana. Vamos a hablar contigo Manuel porque tú habías hecho hace un tiempo una investigaciones donde habías publicado un vídeo que hablaba de la relación de básicamente un encamamiento entre Elías Sánchez y el Gobernador." | Fonseca:<br>"We have Manuel Natal with us, an attorney and representative of the Citizen Victory Movement party. We are going to talk to you Manuel because some time ago you performed an investigation and you had published a video that talked about the relationship of the basically lying in bed between Elías Sánchez and the Governor." |
| 2 | 0:30 – 2:08 | Natal:<br>"Bueno yo creo que ante el tranque que vive el país, el pueblo puertorriqueño ya se expresó de forma clara y contundente exigiendo la salida de Ricardo Rosselló. Ricky Rosselló se niega a renunciar. La Asamblea Legislativa se niega a destituirlo y yo pienso que la ficha del destranque es precisamente Elías Sánchez porque el futuro de Elías Sánchez está estrechamente vinculado al de Ricardo Rosselló. El recuento: Elías Sánchez fue el padrino de las bodas de Ricardo Rosselló. Ricardo Rosselló fue el padrino de la boda de Elías Sánchez… Elías Sánchez fue el empleador de Ricardo Rosselló cuando Ricardo Rosselló se fue por todo el país haciendo campaña bajo el movimiento Boricua Ahora Es."<br><br>Fonseca:<br>"O sea que Elías Sánchez tenía una corporación que contrataba, o sea le pagaba a Ricardo Rosselló. ¿Por hacer qué? Porque él era abogado."<br><br>Natal:<br>"En el año 2012 Veritas Consulting que era la firma de Elías Sánchez le pagaba a | Natal:<br>"Well, I think that in the face of the country's impasse, the Puerto Rican people have already expressed themselves clearly and forcefully demanding the departure of Ricardo Rosselló. Ricky Rosselló refuses to resign. The Legislative Assembly refuses to dismiss him and I think that the key card is precisely Elías Sánchez because the future of Elías Sánchez is closely linked to that of Ricardo Rosselló. To recount: Elías Sánchez was the best man at Ricardo Rosselló's wedding. Ricardo Rosselló was the best man at Elías Sánchez's wedding… Elías Sánchez was Ricardo Rosselló's employer when Ricardo Rosselló went all over the country campaigning under the Boricua the Time is Now movement."<br><br>Fonseca:<br>"So Elías Sánchez had a corporation that hired, that is, he paid Ricardo Rosselló. For doing what? Because he was a lawyer."<br><br>Natal:<br>"In 2012 Veritas Consulting, which was the |

| | | | |
|---|---|---|---|
| | | Ricardo Rosselló; cobró cerca de $25,000 dólares de parte de Veritas Consulting. Interesantemente también señalar que Elías Sánchez en ese momento cobraba de un contrato del presidente del Senado en aquel entonces Thomas Rivera Schatz. Así que por un lado, Thomas Rivera Schatz le daba dinero a Elías y Elías a su vez, a través de su compañía, le daba dinero a Ricardo Rosselló." | firm of Elías Sánchez, paid Ricardo Rosselló; he collected close to $ 25,000 from Veritas Consulting. Interestingly, it should also be noted that Elías Sánchez was receiving payment from a contract with the President of the Senate at that time, Thomas Rivera Schatz. So, on the one hand, Thomas Rivera Schatz gave money to Elías and Elías in turn, through his company, gave money to Ricardo Rosselló." |
| | | Fonseca:<br>"Que no sería la primera vez según Companys, ¿no? Recuerda que el gobernador, según el amigo, mentor y como hermano mayor del gobernador Yosem Companys que es un joven puertorriqueño que estudiaba en Yale y conoció al gobernador Pedro Rosselló y, Pedro Rosselló lo trató como un hijo y lo llevó a su casa, y además dice que Ricardo Rosselló le dijo a él que él recibía dinero de legisladores a través de unas corporaciones que le pasaban dinero a él para contactar a Pedro Rosselló." | Fonseca:<br>"Which wouldn't be the first time according to Companys, would it? Remember that the governor, according to the friend, mentor and as the eldest brother of the Governor, Yosem Companys who is a young Puerto Rican who studied at Yale and met Governor Pedro Rosselló and Pedro Rosselló treated him like a son and took him to his house. And he also says that Ricardo Rosselló told him that he received money from legislators through corporations that passed money to him to contact Pedro Rosselló." |
| 3 | 2:09 – 2:24 | Natal:<br>"Y posteriormente sabemos que Elías Sánchez se convirtió en el director de campaña de Ricardo Rosselló y posteriormente en el representante de Ricardo Rosselló ante la Junta de Control Fiscal. ¿Por qué Elías Sánchez es la ficha del destranque? Porque una investigación a Elías Sánchez es una investigación a Ricardo Rosselló." | Natal:<br>"And later as we know, Elías Sánchez became Ricardo Rosselló's campaign director and later Ricardo Ricardo Rosselló's representative before the Fiscal Control Board. Why is Elías Sánchez the key card? Because an investigation into Elías Sánchez is an investigation into Ricardo Rosselló." |

| 4 | 2:55 – 4:36 | Natal: | Natal: |
|---|---|---|---|

Natal:

"Pero Jay a mi me preocupa lo siguiente: a mí me preocupa que esto no llegue hasta las últimas consecuencias. Porque la salida del gobernador no pone fin a esta historia. Hay que investigar los vínculos de Elías Sánchez no solamente con Ricky Rosselló sino también con esa Cámara de Representantes que está próxima a comenzar una investigación. Porque la información que yo tengo es que cosas tan importante como la presidencia de la Cámara de Representantes, Elías Sánchez también intervino para mover los votos a favor de la figura de Johnny Méndez. Y en este caso en particular, todas y cada una de las investigaciones que hemos hecho sobre los escándalos en la administración Rosselló, la figura de Elías Sánchez es el denominador común. Yo hice un estudio Jay que establece que los clientes de Elías Sánchez que conocemos en este cuatrienio han recibido cerca de $1,300 millones en contratos con el Gobierno. Si Elías tiene un contrato de comisión como el que tenía Velázquez Piñol de 10%, eso representa para Elías Sánchez cerca de $130 millones. Digamos que tiene uno de 5%, eso representa $65 millones solamente en los clientes que conocemos. Clientes como Triple S, clientes como Saint James, EC Waste, Microsoft, clientes con contratos grandísimos con el Gobierno de Puerto Rico y por eso es que es importante."

Natal:

"But Jay, the following worries me: I worry that this is not pursued to the last consequences. Because the governor's departure does not end this story. The links of Elias Sanchez must be investigated not only with Ricky Rosselló but also with the House of Representatives that is about to begin an investigation. Because the information I have is that things as important as the presidency of the House of Representatives, Elías Sánchez also intervened to move the votes in favor of Johnny Mendez. And in this particular case, each and every one of the investigations that we have done on the scandals in the Rosselló administration, the presence of Elías Sánchez is the common denominator. Jay, I did a study that establishes that the known clients of Elías Sánchez in this four-year period have received nearly 1.3 billion in contracts with the Government. If Elías has a commission contract like the one that Velázquez Piñol had of 10%, that represents for Elías Sánchez about 130 million. Let's say he has 5%, that represents 65 million only in the clients we know. Clients like Triple S, clients like Saint James, EC Waste, Microsoft, clients with huge contracts with the Government of Puerto Rico and that is why it is important."

Fonseca:

"Y otros que no sabíamos porque por ejemplo el de GILA que fue uno de los que honestamente uno se quedó cómo que perate perate pero si GILA era cabildeada por Roberto Prats, y digo, hasta donde sabíamos nosotros. Resulta entonces qué Elías Sánchez va a una reunión con el secretario de Hacienda y después lo niega pero resulta ser que puede ser que no

Fonseca:

"And others that we did not know of, for example, that of GILA, which was one of those that you went wait wait, but how if GILA was lobbied by Roberto Prats, I mean, as far as we knew. It turns out then that Elías Sánchez goes to a meeting with the Secretary of the Treasury and then denies it, but it turns out that it may be that he was not representing

| | | | |
|---|---|---|---|
| | | estuviera representando a GILA sino al Parent Company, porque resulta ser que le quitaron el contrato al que te daba las multas de autoexpreso se lo quitaron a él pero se lo dieron al hermano de él. O sea se lo dieron a la compañía que era del mismo dueño." | GILA but rather the parent company, because it turns out that the contract that issued you the fines from autoexpreso they took it away from one but they gave it to his brother. In other words, they gave it to the company that was owned by the same owner." |
| 5 | 4:37 – 5:20 | Natal:<br>"Pero otro ejemplo de eso que tú lo mencionaste horita, Elías Sánchez representa a Puma, pero Elias Sánchez no soalmente representa a Puma. Elías Sánchez tiene una relación estrecha con con Steve Kupka que es el cabildero de la autoridad de energía eléctrica que a su vez representa el bufete que fue contratado por la autoridad de energía eléctrica para el proceso de privatización. Así que vemos que la figura de Elías Sánchez es el denominador común en este Gobierno y obviamente en la medida en que a Elías Sánchez, ocurra lo que todo el mundo espera que va a ocurrir en las próximas horas o días, eso significa directamente que el gobernador también estaba siendo investigado."<br><br>Fonseca:<br>"Y no sólo Elías Sánchez sino el combo agrandado porque era la familia cabildeo, a familia el Family pack."<br><br>Natal:<br>"Claro que sabemos que incluye a Charlie Rodríguez y a Valerie Rodriguez Erazo y a otros." | Natal:<br>"But another example of what you mentioned earlier, Elías Sánchez represents Puma, but Elias Sánchez does not only represent Puma. Elías Sánchez has a close relationship with Steve Kupka who is the lobbyist for the electric power authority, which in turn represents the firm that was hired by the electric power authority for the privatization process. So we see that the figure of Elías Sánchez is the common denominator in this Government and obviously to the extent that what everyone expects to happen in the next few hours or days happens to Elias Sanchez, that directly means that the Governor was also being investigated."<br><br>Fonseca:<br>"And not only Elías Sánchez but the enlarged combo because it was the lobbying family, the family the family pack."<br><br>Natal:<br>"Of course we know it includes Charlie Rodríguez and Valerie Rodriguez Erazo and others." |



Up to 90% of people saw
**SIGNIFICANT IMPROVEMENT**
of their psoriasis plaques*

*Results at 12 weeks.

**PURPOSE AND SAFETY SUMMARY**

Important Facts About Taltz® (tōl-ts). It is a prescription medicine also known as ixekizumab.

Taltz is an injectable medicine used to treat:

- People six years of age and older with moderate to severe



**DA VIDA 2020**    **TELENOTICI**    **77º**

TENDENCIAS    Da Vida 2020    Telemundo Music Nights    Papelón 2020    Censo 202    70 ALERTAS DE EL TIEMPO

# Manuel Natal desmenuza vínculos entre Elías y Rosselló

"Una investigación a Elías Sánchez es una investigación a Ricardo Rosselló".

Por Jay y sus Rayos X • Publicado el 24 de julio del 2019

El representante Manuel Natal visitó el programa Jay y Sus Rayos X para desmenuzar los vínculos estrechos que unen al licenciado Elías Sánchez y el gobernador Ricardo Rosselló.

**That offers a chance at 100% CLEAR SKIN***

*4 out

En el programa, el licenciado -parte del Movimiento Acción Ciudadana- inició su disertación al establecer la relación personal que les une: que ambos fueron padrinos en sus respectivas bodas.

Sin embargo, fue en el 2012 que Sánchez se convirtió en empleador de Rosselló a través de la empresa Veritas Company, que tenía contratos con el Senado de Puerto Rico, indicó.

Puerto Rico



**NURIA SEBAZCO** • HACE 17 MIN

### Exclusiva: familia de pareja que murió en accidente pide prudencia para evitar más tragedias



**HÉCTOR VÁZQUEZ MUÑIZ** • HACE 29 MIN

### Enorme sacrificio de las duras de la pértiga

El vínculo continuó con el nombramiento de Sánchez como director de Campaña de Rosselló "y posteriormente en el representante de Ricardo Rosselló ante la Junta de Control Fiscal. ¿Por qué Elías Sánchez es la ficha del destranque? Porque una investigación a Elías Sánchez. es una investigación a Ricardo Rosselló, indicó Natal.

"A mí me preocupa que esto no llegue a las

**PURPOSE AND SAFETY SUMMARY**

Important Facts About Taltz® (tól-ts). It is a prescription medicine also known as ixekizumab.

Taltz is an injectable medicine used to treat:

- People six years of age and older with moderate to severe plaque psoriasis who may benefit from taking injections or pills (systemic therapy) or treatment using ultraviolet or UV light (phototherapy).
- Adults with active psoriatic arthritis. Adults
- with active ankylosing spondylitis.
- Adults with active non-radiographic axial spondyloarthritis with objective signs of inflammation.

It is not known if Taltz is safe and effective in children for conditions other than plaque psoriasis or in children under 6



### Mira aquí nuestra programación en vivo



**PROGRAMACIÓN EN VIVO**

### Programación en vivo



**ZUGEY LAMELA**

### Hacienda dice estar listo para distribuir los $600 en enero



**MÚSICA**

### Muere Armando Manzanero, un romántico de todos los tiempos

**SPONSORED**

### ¡Conseguir este tesoro es imposible! Demuestra que nos equivocamos

Hero Wars

## Pronóstico de El Tiempo

**SAN JUAN, PR**

últimas consecuencias, porque la salida del Gobernador no le pone fin a esta historia, Hay que investigar los vínculos de Elías Sánchez, no solo con Ricky Rosselló, sino también con esa Cámara de Representantes, que está próxima a iniciar una investigación, porque la información que yo tengo es que cosas tan importantes como la presidencia de la Cámara de Representantes, Elías Sánchez también intervino para mover los voto a favor de Johnny Méndez", concluyó el Representante.

**77°**

**ESTANOCHE**

**71°**

Mayormente nublado
0.72% Precip

**MAÑANA**

**83°**

Mira aquí nuestra programación en vivo.

## CUATRO PREGUNTAS

## RÁPIDAS

**¿Crees que habrá otra pandemia en tu vida?**

◯ Sí

◯ No

◯ Otra / Sin opinión

SIGUIENTE

SPONSORED • HERO WARS

**¡Conseguirestetesoroes imposible!Demuestraqu...**

PURPOSE and SAFETY SUMMARY

**Important Facts About Emgality**® (em-GAL-it-ē) injection. Also known as galcanezumab-gnlm.

Emgality is a prescription medicine used for the preventive

SPONSORED • BABBEL
Experta en lingüística…

SPONSORED • **BABBEL**

Empresa alemana cre…

SPONSORED • **WIFI ULTRA BOOST**

El dispositivo para mejorar el WiFi que arrasa en…

SPONSORED • **PROPERFOCUS**

Las gafas de lectura con enfoque ajustable que so…

SPONSORED • **BABBEL**

Experta en lingüística…

SPONSORED • **CONS…**

Si comes jengibre tod…

**SPONSORED** • **CLUB PARA EMPRENDED...**

Padre empresario tira a su h!a adolescentealacalle.

**SPONSORED** • **CONSEJOS Y TRUCOS**

¿Se empañan sus gafas cuandousauna máscara?…

**SPONSORED** • **CARS...**

No podemos creercomos…

**CARMEN YULÍN CRUZ**

Carmen Yulín se va de Puerto Rico tras aceptar oferta de trabajo

**MANNY MANUEL**

En Centro Médico Manny Manuel tras accidentarse por segunda vez

**SPONSORED** • **CONS...**

Limpiarás tu colchón…

**SPONSORED •** **BABBEL**

10 millones de personas  decidieron aprender un…

**SPONSORED •** **CONSEJOS Y TRUCOS**

¡Este es el salario mensua…

**SPONSORED •** **THET…**

NETFLIX sin restricciones…

**EXPLOSION EN NASHVILLE**

Autoridades  confirman  que  sospechoso  murió  en  la explosión de Nashville

**MARADONA**

Autopsia de Maradona: revelan lo que había  en su cuerpo al momento de su muerte



!     "     #

**TELENOTICIAS EL**

**TIEMPO**

**ESTADOS UNIDOS**

**CELEBRIDADES DANDO**

**CANDELA MÚSICA**

**JAY Y SUS RAYOS X**

**MUNDO**

**DEPORTES**

WKAQ Public Inspection File

Aplicaciones de la FCC

Empleos

Envía tus comentarios

Términos de Servicio

Política de Privacidad

No venda mi información

personal

Aviso de California

AdChoices

**EXHIBIT AA**

The June 11, 2019 story located at https://www.telemundopr.com/videos/_elias-sanchez-sabe-todos-los-secretos-del-estado_tlmd-puerto-rico/106113/, consisting of a video from a segment within the *Telenoticias* newscast bearing the headline *"Elias Sanchez sabe todos los secretos del Estado"* (translation: "Elias Sanchez knows all the secrets of the State") contains the following slanderous statements:



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 0:19 – 0:44 | Reporter Fonseca: "El Gobernador nombró a Elías Sánchez su jefe de campaña, después lo nombra su jefe de comité de transición. O sea, el hombre que se iba a encargar de saber todos los secretos del pasado gobierno y este. Después, lo nombra jefe - su representante ante la Junta de Control Fiscal. O sea, que iba a tener todos los secretos confidenciales y todos los asuntos importantes entre la junta y gobierno, él los iba a saber." | Reporter Fonseca: "The Governor appointed Elias Sanchez as his campaign manager, then he appointed him as the head of his transition committee. In other words, the man who was going to be in charge of knowing all the secrets of the past government and this one. Next, he is appointed chief - his representative before the Fiscal Control Board. In other words, he was going to have all the confidential secrets and all the important matters between the Board and the government, he was going to know them. " |

| 2 | 0:45 – 0:58 | Reporter Fonseca:<br><br>"Es decir, era el mas allegado a él por ser el jefe de su campaña, el mas allegado a la transición del gobierno, de saber los secretos de un gobierno y el otro, y después la junta y el gobierno. O sea, el gobernador le dio todos los secretos del estado del gobierno y demás, y todos los accesos." | Reporter Fonseca:<br><br>"In other words, he was closest to him for being the head of his campaign, closest to the government's transition, to knowing the secrets of one government and the other, and then the junta and the government. In other words, the governor gave him all the secrets of the state of the government and so on, and all the accesses." |
|---|---|---|---|
| 3 | 1:00 – 1:25 | Reporter Fonseca<br><br>"Y después, ese funcionario, a los par de meses de   su gobierno, renuncia y comienza a llamar a los jefes de agencia y a pedirle contratos para sus clientes privados. Y decirle, oye, eh, mira eso que tu estas haciendo no, hazte esto otro. Y muchos funcionarios del gobierno daban quejas y se molestaban y decían: mira es que me esta llamando y yo no quiero. Y esos funcionarios terminaban botaos y los demás se quedaban, los que le hacían caso a Elías se quedaban." | Reporter Fonseca<br><br>"And then that official, a couple of months into his government, resigns and begins calling the agency heads and asking for contracts for his private clients. And telling them, hey, uh, look, that which you're doing, don't, do this other thing [instead]. And many government officials complained and were upset and said: look he is calling me and I do not want to. And those officials ended up dismissed and the rest remained, those who listened to Elías remained. " |

**EXHIBIT BB**

The June 21, 2019 story located at https://www.telemundopr.com/noticias/local/que-bella-es-la- vida-de-elias-sanchez_tlmd-puerto-rico/101716/, consisting of a video from a segment within the *Telenoticias* newscast bearing the headline *"¡Qué bella es la vida de Elías Sánchez, brother!"* (translation: "How beautiful is Elias Sanchez's life brother!") contains the following slanderous statements:



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 0:01 – 0:04 | Reporter Fonseca:<br>"Elías Sánchez supuestamente esta siendo investigado por los federales, verdad, supuestamente por vender influencias." | Reporter Fonseca:<br>"Elias Sanchez is supposedly being investigated by the feds, right, for supposedly selling influences." |

| 2 | 0:45 – 1:31 | Reporter Fonseca: | Reporter Fonseca: |
|---|---|---|---|
| | | "Tampoco debemos ver como extraño que Elías Sánchez este siendo investigado porque presuntamente utilizaba escoltas antes incluso de ser un funcionario público. Ah es que el nunca ha sido funcionario público. ¿Qué cosas no? Porque Elías Sánchez era el director de la campaña de Ricardo Rosselló y después era el representante del Gobernador o presidente del Comité de Transición y después de eso fue el portavoz del Gobernador en la Junta de Control Fiscal, pero tenia escolta y las escoltas cobraban *overtime*, pero lo hacían voluntariamente porque nunca se enteró nadie oficialmente. O sea, no pidieron permiso ni hubo una solicitud ni nada por el estilo. ¡Wow, que bella es la vida de Elías Sánchez brother! ¡Wow, esa casa de Miami tiene que estar…la vida le sonríe!" | "Nor should we see as strange that Elías Sánchez is being investigated because he allegedly used security detail before he was even a public official. Ah, he has never been a public official. How about that? Because Elías Sánchez was the director of Ricardo Rosselló's campaign and later he was the representative of the Governor or president of the Transition Committee and after that he was the Governor's spokesperson in the Fiscal Control Board, but he had security detail and the detail received overtime, but they did so voluntarily because nobody ever found out officially. I mean, they didn't ask for permission, there was no request or anything like that. Wow, how beautiful is the life of Elías Sánchez brother! Wow, that Miami house has to be ... life smiles at him! " |

**EXHIBIT CC**

The          July          21,          2019          facebook          post          located          at
https://www.facebook.com/JayFonsecaPR/posts/2897977536886358  contains  the  following  slanderous
comments:







15. Porque en vez de proteger a la gente que alerta de la corrupción, como Teresita Fuentes cuando era jefa de Hacienda, lo que hacen es sacarlos, perseguirlos transferirlos y castigarlos.
16. Porque se permitió que se robara precisamente en donde más sufren los más vulnerables, en la salud y en la educación.
17. Porque los cabilderos siguen en medio de la AEE y aunque los empleados del PNP mismo te han advertido de los conflictos éticos y conflictos legales dejando por escrito que se ha estado dando info privilegiada y confidencial a estos sujetos, no hacen nada para detenerlos, aún con advertencias de gerenciales por escrito.
18. Porque en la AEE se le daban los contratos a COBRA aunque en mi programa demostramos que era la empresa que más caro salía de todas.
19. Porque se aguantaron las ayudas de María para adelantar razones políticas y se pidió traquetear con BDO, según dijo Rauli y hasta ahora Rauli no ha fallado en lo que ha dicho, para evitar que se afectara a la primera dama.
20. Porque todavía quieren seguir cogiendo al pueblo de pendejo alegando que tienen un estudio legal que lo exonera de delitos en el chat, pero no lo publican, no dicen si lo pagaron con fondos privados, etc.
21. Porque sin duda se cometió el delito del Código Penal artículo 263 de Negligencia en el Cumplimiento del deber, porque no puede ser gobernador quien incumple con el deber más básico de proteger a los más pobres, a los más vulnerables, sabiendo que su negligencia ahora nos atrasará la recuperación de María, los fondos de los pobres, le resta credibilidad a todas las instituciones, y sobre todo, atrasa la posible estadidad que tanto alega proteger y amar, pero con su presencia hecha por el piso toda la farsa que él mismo ha creado.
22. Porque si así actuaban y escribían en público, imagínate lo que hablaban en los chats que se borraban y lo que decían cuando nadie podía escuchar



Hay muchas otras, pero honestamente, ir al aire y escribir es la parte fácil, hablar con fuentes y reuniones es la parte complicada, tengo varias reuniones hoy y varias entrevistas para otros medios. También un almuerzo con mis familiares cercanos. Escribo más tarde.

FOR THE MARCH OF TOMORROW – I've seen some people asking why they should quit and don't have very good answers, I tell you some: 1. Because the guise continues with Elias Sanchez and the governor just named people linked to companies lobbied by Elias and very close to Jose Marrero, former budget director, whom we will soon talk about. 2. Because while Itza Garcia was told that he had to deliver his cell phone and could not leave Justice until he cloned it due to the Whatsapp scandal, these are allowed to follow their path as if nothing, they are given additional time. 3. For as they mock the dead, in Forensic Science a body like that of the son of Dimaris Traverse may take 8 months, but for KOI there are always 50 million. 4. Because the federal government is asking not to give more funds or give them more conditions which will mean spending additional millions on consultants, bureaucracy, and slowness on money for the most vulnerable who they claim to defend. 5. Because still most chat members haven't delivered their phones and it seems like here's a conspiracy to cover all this up in Justice. 6. Because Elias Sanchez managed to have an escort charge overtime without any right to escort, and that's a mystery, although you can call the police and it can take up to 50 minutes to arrive in domestic violence cases. 7. Because going to church to say that you are humiliating yourself, but you keep lying, you do not force your people to turn over your cell phone, you do not deliver yours, but you want the people to create your repentance by faith. 8. Because the governor still lies by not admitting that Alberto Velazquez Pi ñol, the arrested by the federals recently, was named directly by him to direct the issue of Health at COE. 9. Because you went to apologize to the fatty in the

🔒 facebook.com

Health at COE. 9. Because you went to apologize to the fatty in the picture, but you couldn't do it in secret, you had to take your photographer who charges over 100 thousand notes a year (good photographer, btw). 10. Because while they nailed us for 40 years, they shared confidential and privileged information with contractors and lobbyists who could benefit vulture funds. 11. Because they conspired to remove a person from his 19-year post for being the wife of an independent senator. 12. For while in 9-1-1 it may take up to 14 minutes to diligence an emergency, there are dead hours to write in chats and Carlitos Bermudez is paid half a million notes for such assholes as written. 13. For it is three weeks since Ra úl Maldonado was said to be quoted in jail and they still do not, precisely when he said that in Justice they were complicit in these scams. 14. Because by nominating Iris Santos (Chiqui) puts someone to direct the budget that keeps pushing Elias Sanchez's agenda and the companies that this lobbying and the governor knows it. 15. For instead of protecting people who alert from corruption, like Teresita Fuentes when she was head of the tax, what they do is bring them out, pursue them transfer and punish them. 16. For it was allowed to be robbed precisely where the most vulnerable suffer, in health and in education. 17. Because lobbyists are still in the middle of the AEE and although the employees of the PNP itself have warned you of ethical conflicts and legal conflicts leaving it in writing that these subjects have been given privileged and confidential information, they do nothing to stop them , still with managerial warnings in writing. 18. Because the AEE was given contracts to COBRA although in my program we proved that it was the most expensive company of all. 19. Because Mary's aid was endured to advance political reasons and asked to play with BDO, Rauli said and so far Rauli has not failed what she has said, to prevent the first lady from being affected. 20. Because they still want to keep catching the people of an

🔒 facebook.com

affected. 20. Because they still want to keep catching the people of an asshole claiming they have a legal study that exonerates them from crimes in the chat, but do not publish it, do not say if they paid for it with private funds etc. 21. For the offence of the Penal Code Article 263 of Negligence in the Performance of duty was committed, because it cannot be governor who violates the most basic duty to protect the poorest, the most vulnerable, knowing that your negligence will now delay us the recovery of Mary, the funds of the poor, remains credibility to all institutions, and above all, delay the possible statehood that claims to protect and love, but with its presence made on the floor all the charade that he himself has created. 22. For if so they acted and wrote in public, imagine what they spoke in the chats that were erased and what they said when no one could hear There are many others but honestly going on air and writing is the easy part talking to sources and meetings is the tricky part I have several meetings today and several interviews for other media. Also lunch with my close relatives. I write later.

Translated







|   | Statement | Translation |
|---|-----------|-------------|
| 1 | 1. Porque sigue el encamamiento con Elías Sánchez y el gobernador acaba de nombrar a gente vinculada a las empresas cabildeadas por Elías y muy cercanas a José Marrero, ex director de presupuesto, de quien pronto hablaremos bastante.<br><br>2. Porque Elías Sánchez lograba tener escolta cobrando overtime sin derecho alguno a escolta y eso es un misterio, aunque tú puedes llamar a la policía y puede tardar hasta 50 minutos en llegar en casos de violencia doméstica.<br><br>3. Porque al nombrar a Iris Santos (Chiqui) pone a alguien a dirigir el presupuesto que sigue empujando la agenda de Elías Sánchez y las empresas que este cabildea y el gobernador lo sabe. | 1. Elías Sánchez continues to lie in bed with the Governor, and the Governor just appointed people close to Elías and to Mr. José Marrero, ex Director of the Budget and Management Office.<br><br>2. Because Elías Sánchez had security detail charging overtime, without a right to have them, and that is a mystery, meanwhile in cases of domestic violence we have to wait over 50 minutes for the police to show up.<br><br>3. Because he named Iris Santos (Chiqui) to overview Puerto Rico's budget, a person who is pushing Elías Sánchez personal agenda and the agenda of the clients he lobbies for, a given the Governor knows. |

**EXHIBIT DD**

On or about July 2019, in response to Fonseca's post about Plaintiff, Sanchez received hundreds of death threats directed against him, Rodríguez and their small children. Examples of said threats are as follows:

**"Look Mr. Dirty Sanchez…call your buddy and tell him to resign…also we have a great selection of orange uniforms for you and your minions…you may come at any moment to get measured to find out your size in 150 Ave. Carlos E. Chardon, San Juan, PR 00918".**



**"Hello! You are a disgrace to the people of Puerto Rico; you should be in jail. It's disgusting that you are Puerto Rican. People are tired and you will pay the consequences".**



**"FUCKING CORRUPT"**



**"Corrupt you should be crapping your pant. We are disgusted by the boys club. Corruption is the only way that a piece of shit like you can become a millionaire".**



**"YOU and people like YOU that behave like criminal tyrants from the seat of power awarded by the people deserve to live in shame for the rest of your life".**



**"FUCKING THIEF, DRESSING, HOW CUTE THE BOY LOOKS DRESSED WITH THOSE MILLIONS THAT YOU HAVE STOLE YOU BALL OF SHIT".**



**"Go fuck yourselves you bunch of mother fuckers, you have to move from PR…Jajajajaja there are rumors that you will be arrested [laughing emojis, popcorn and wine emojis]"**



**"May God want you to rot in jail asshole. You will pay for everything".**



**"Homosexual, corrupt, you had sex with Rossello"**



**"Elias, cocksucker! Go fuck yourself!"**



**"Corrupt, get the fuck out of here!"**



**"Get the fuck out of this country, corrupt"**



**"We are following your every step"**



**"Cocksucker, I can't wait to see you in jail"**



**"Get the fuck out of here you cocksucker; they are putting a price on your head charlatan, fucking rat"**



**"Good afternoon, I spit on your face and your dinner on behalf of the people. We are coming after you".**



**"Elias Sanchez, we are waiting for your arrest soon. Corrupt, thief, robber. Face the people. Your mockery of the people will not be tolerated. Turn yourself in to the authorities or to the people's justice".**



**"You are part of the problem. GET THE FUCK OUT OF PUERTO RICO!"**



**"Knock knock! Get your toothbrush ready! The feds are coming to get you!"**



This Graffiti was found on one of the main avenues in the San Juan area. The Graffitti stated, in Spanish "$5 reward for Elias Sánchez's head."



**EXHIBIT EE**

The July 31, 2019 story located at https://www.telemundopr.com/programas/jay-y-sus-rayos-x/fei-revela-delaraciones-juradas-sobre-wanda-v_zquez_tlmd-puerto-rico/101070/ publishing a video from the *Jay y sus Rayos X* broadcast of July 20, 2019 contains the following slanderous comments:



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 1:34 – 3:20 | Fonseca:<br><br>"Por si acaso me estoy refiriendo al caso donde se alegó por parte del fiscal especial independiente de que Wanda Vázquez tenía unas agendas y usaba su posición como jefa de Justicia para presionar indebidamente a los fiscales y a las fiscales que estaban bajo su mando para radicar acusaciones contra personas que ella entendía. En específico dos casos donde ella estaba directamente vinculada: 1) en el robo de la casa donde su hija y su yerno estaban…y posteriormente el caso de Itza García. Itza García y William Villafañe eran las personas que se oponían o que le ponían trabas y pedían continuamente que hicieran competencias en vez de contrataciones directas a aquellas cosas cabildeadas por Elías Sánchez. Eso nos lo han dicho múltiples fuentes. De hecho, lo hablamos hace años que había dos bandos cuando empezó esta administración: el bando del Elías Sánchez y el bando de William Villafañe. Dos bandos que si bien tenían buena relación profesional. En la práctica, Elías Sánchez pedía unos contratos y continuamente había que estar pidiendo que se hicieran competencias. Eso eran Itza García principalmente y William Villafañe en segundo quienes continuamente estaban en esa gestión. Al salir el chat de whatsapp, salir todo este escándalo, sale Itza García de la posición sale William Villafañe y la gente del plan para Puerto Rico que era al grupo que dirigía Itza García fue saliendo poco a poco de sus posiciones y terminan personas más cercanas a Elías Sánchez en las esferas más importantes del Gobierno." | Fonseca:<br><br>"Just in case, I am referring to the case where it was alleged by the independent special prosecutor that Wanda Vázquez had agendas and used her position as head of Justice to unduly pressure the prosecutors who were under her command to file accusations against people she wanted. Specifically, two cases in which she was directly linked: 1) in the robbery of the house where her daughter and son-in-law were ... and later the case of Itza García. Itza García and William Villafañe were the people who opposed or hindered and continually asked for competitive processes instead of direct contracting for those matters lobbied by Elías Sánchez. That has been told to us by multiple sources. In fact, we spoke about it years ago that there were two sides when this administration began: the side of Elías Sánchez and the side of William Villafañe. Two sides that although had a good professional relationship, in practice, Elías Sánchez asked for contracts and they continually had to be asking for competitive processes. That was Itza García mainly and William Villafañe in second who were continuously in that management. When the WhatsApp chat came out, all this scandal came out, Itza García left her position, William Villafañe leaves, and the people of the plan for Puerto Rico, who was the group that Itza García was leading, gradually came out of their positions and people close to Elías Sánchez ended up in the most important spheres of the Government." |

**EXHIBIT FF**

The August 12, 2019 story located at https://www.telemundopr.com/programas/dia-a-dia-programas-2/_julia-keleher-enviaba-informacion-confidencial-a-elias-sanchez__tlmd-puerto-rico/45822/ consisting of a video of a segment within his segment *De frente con Jay*, (translated to: Upfront with Jay Fonseca"), on the *Día a Día* program contains the following defamatory statements:



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 1.50-3:11 | Reporter Fonseca:<br><br>"voy a explicarles algo, ustedes [refiriéndose a la producción de Telemundo] tenían horita puesto a Elías, ¿verdad? Ponme a Elías, ponme a Elías, ponme a Elías. Elías Sánchez, pónmelo, ponme a Elías pónmelo Elías Sánchez … no esa sigue siendo Keleher, qué me digan a mi si es cierto o falso que Julia Keleher le enviaba continuamente emails e información confidencial a Elías Sánchez y que parte de la información que hay en contra de Julia, es las veces que le comunicaba cositas a Elías del Departamento de Educación. Y lo importante, y ¿de ese corillo no era que es la Gobernadora | Reporter Fonseca:<br><br>"I'm going to explain something to you, you [talking to the production team] had Elías photo on, right? Put Elías on, put Elías on, put Elias on. Elías Sánchez, put him on,, put Elias, put him Elías Sanchez. No that's still Keleher, can they tell me if it's true or false that Julia Keleher continuously sent emails and confidential information to Elías Sánchez, and that that's part of the evidence that they have against Julia, the times she used to communicate things to Elías about the Department of Education. The important thing is, wasn't the current Governor part of that crowd, the one that people love and |

| | | | |
|---|---|---|---|
| | | actual que ahora todo el mundo aplaude y quiere mucho?[…]<br><br>Y una pregunta ¿ y porque esos 18 mil documentos no los tiene     Wanda Vázquez y los tiene los federales? By the way, no vengan que ahora los tiene Rosa Emilia porque eso no fue Rosa Emilia que lo investigó. Eso fue la fiscalía de Washington que traían a una fiscal aquí y usaron una de aquí también, A mi… | applauds so much?[…]<br><br>And one question, why Wanda Vázquez does not have those 18,000 documents and the federals do? By the way, do not come now and say Rosa Emilia [former US District attorney for the District of Puerto Rico] has them because Rosa Emilia did not investigate this. That was the Washington prosecutor's office that brought a prosecutor here and used one from here too, to me ... |
| 2 | 3:13- 3:45 | Reporter Fonseca<br><br>¿Por qué los 18 mil documentos no los tiene nuestra Secretaria de Justicia, Wanda Vázquez, ahora Gobernadora, será por su estrecha relación con Elías? Yo sólo estoy preguntando, vez, yo soy un tipo bien buena gente (se ríe), y yo hago estas cosas a forma de pregunta. Si va a ver documentos de Julia Keleher pasándole información a Elías. Tu sabes como era lo de Velázquez Pinol verdad… [comienza a presentar al Representante Jesús Manuel Ortiz quien lo acompañaba en el estudio]. | Reporter Fonseca<br><br>"Why doesn't the Secretary of Justice, now Governor, have the 18,000 documents, could it be because of her close relationship with Elías? I'm just asking, I am a nice guy (starts laughing) I only say these things as a question. If there's going to be documents showing Julia Keleher sending information to Elías. You know how it was with Velazquez Pinol right?   [introduces   Representative Jesus   Manuel   Ortiz   who   was accompanying Fonseca on the studio]. |

**EXHIBIT GG**

The July 16, 2019 story located at https://www.telemundopr.com/programas/dia-a-dia-programas-2/de-frente-con-jay-sobre-la-llegada-de-keleher_tlmd_puerto-rico/47875/ bearing the headline "*De Frente con Jay Sobre la Llegada de Keleher* (translation: Head-on with Jay on Keleher's Arrival) contains the following statements:



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 2:38-2:52 | Reporter Fonseca<br><br>"Julia Keleher fue arrestada por dos esquemas de corrupción, fue arrestada por el FBI debido a estar pasándole información a contratistas que..y a cabilderos que se beneficiaban de dicha información […]" | Reporter Fonseca<br><br>"Julia Keleher was arrested for two corruption schemes; she was arrested by the FBI because she was passing information to contractors who ... and to lobbyists who benefited from said information." |

| 2 | 3:16-3:29 | Reporter Fonseca<br><br>"[…] es decir, Julia Keleher se le acusa, de nuevo, de dos cosas. Número 1: de pasarle información a contratistas y perdón a contratistas o cabilderos para que ellos se beneficiaran personalmente de eso eh de esos documentos. […]" | Reporter Fonseca<br><br>"that is, Julia Keleher is accused, again, of two things. Number 1: to pass information to contractors and pardon contractors or lobbyists so that they would personally benefit from that eh from those documents" |
| 3 | 3:54-4:30 | Reporter Fonseca:<br><br>"Sabemos que sigue la investigación y que hay otros ángulos. Pero los federales en mi opinión quieren realmente no arrestar a Julia Keleher para hundirla, sino para que coopere. Si ustedes ven la evidencia y el propio indictment, si ustedes leen el pliego acusatorio, van a ver que hay muchas cosas que se dejan como cabos sueltos, para ver si ella coopera y habla de otras personas y en específico porque se le pasaba continuamente mensajes a cabilderos que no han sido arrestados todavía". | Reporter Fonseca:<br><br>"We know that the investigation continues and that there are other angles. But the feds in my opinion really want to arrest Julia Keleher not to sink her, but to cooperate. If you see the evidence and the indictment itself, if you read the accusatory statement, you will see that there are many things that are left as loose ends, to see if she cooperates and talks about other people and specifically because messages were continuously passed to her by lobbyists who have not yet been arrested. " |

**EXHIBIT HH**

On or about July 10, 2019 former U.S. District Attorney for the District of Puerto Rico, Attorney Rosa Emilia Rodríguez offered a press conference on the arrests made by the FBI of former Secretary of Education Mrs. Julia Beatrice Keleher and former Executive Director of Puerto Rico Health Insurance Administration Mrs. Angela Avila Marrero. A copy of the Press Conference is available at:https://m.facebook.com/noticelpr/videos/586860565396644/?refsrc=https://m.facebook.com/watch/&_rdr



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 30:04 | Reporter:<br>"Se puede establecer si otra persona obtuvo dinero a través de este fraude para su beneficio personal?"<br><br>Prosecutor Rodríguez:<br>"Eso no está alegado en la acusación y nos tenemos que limitar a lo que es la acusación." | Reporter:<br>"Can it be alleged that another person obtained money through this fraudulent scheme for their personal gain?"<br><br>Prosecutor Rodriguez:<br>"That is not alleged in the indictment and we have to limit ourselves to what the indictment states." |

| 2 | 32:28 | Reporter: "Usted habla de que… explicaba que había una cláusula donde se prohibía la subcontratación y el pago de cabilderos, esa cláusula ehh, como o a que cabildero si era Alberto Velázquez o si es un individuo x adicional?" | Reporter: "You say that… you explained that there was a clause where subcontracting and the payment of lobbyists were prohibited, that clause ehh, how or to what lobbyist did it referred to Alberto Velázquez or another individual" |
|---|---|---|---|
| | | Prosecutor Rodríguez: "La acusación nombra a Alberto Velázquez y la prohibición es a cualquier cabildero, sea Alberto Velázquez o cualquiera." | Prosecutor Rodríguez: "The indictment names Alberto Velázquez and the prohibition is against any lobbyist, be it Alberto Velázquez or anyone else." |
| | | Reporter: "Se pago a cabilderos externos que no fuese Alberto Velázquez?" | Reporter: "Did other external lobbyists, other than Alberto Velázauez, got paid?" |
| | | Prosecutor rodríguez: "Eso no esta alegado en la acusación, no podemos hablar de eso." | Prosecutor Rodríguez: "That is not stated in the indictment, we cannot talk about it." |
| 3 | 40:07 | Reporter: "Una última pregunta… nos podrían afirmar que el gobernador no esta siendo parte de la pesquisa?" | Reporter: "One last question ... could you tell us that the Governor is not being subject of the investigation?" |
| | | Prosecutor Rodríguez: "El gobernador no está mencionado en la acusación. puedo decir que no." | Prosecutor Rodríguez: "The Governor is not named in the indictment. I can say no." |
| 4 | 46:30 | Reporter: "En el punto 35 del Indictment… esta investigación puede tener ramificación con otra que se este llevando a cabo en New York sobre la figura de Elías Sánchez? Pueden tener vínculos?" | Reporter: "In paragraph 35 of the Indictment ... this investigation may have ramifications with another that is being carried out in New York on Elías Sánchez? Can they have links?" |
| | | Prosecutor Rodríguez: "Yo te puedo hablar de mi oficina, este es el caso que sometimos ante un gran jurado ayer, nosotros no tenemos… hemos trabajado en algunas ocasiones con Washington en casos de fraude y otros | Prosecutor Rodríguez: "I can tell you about my office, this is the case that we submitted to a grand jury yesterday, we do not have ... we have worked on some occasions with Washington on fraud cases and other |

| | | | |
|---|---|---|---|
| | | asuntos como derechos civiles, este caso no tiene nada que ver con New York." | matters such as civil rights, this case has nothing to do with New York." |
| | | Reporter:<br>"Pero ese inciso 35 no crea entonces ninguna relación?" | Reporter:<br>"But that paragraph 35 does bear any links then?" |
| | | Prosecutor Rodríguez:<br>"Bueno lo que pasa es que… yo estoy hablando de acusaciones, pudieron haber alegado, pero nosotros no estamos investigando… si el distrito de new york esta investigando algo nosotros no estamos atado a eso." | Prosecutor Rodríguez:<br>"Well what happens is that ... I am talking about accusations, they could have alleged, but we are not investigating ... if the district of New York is investigating something we are not tied to that." |
| 5 | 49:12 | Reporter:<br>"No me quedo claro sobre los comentarios que hizo sobre el gobernador Ricardo Rosselló… para estar claro usted dice que no esta mencionado en el indictment." | Reporter:<br>"I am not clear about the comments you made about Governor Ricardo Rosselló… to be clear, you say that he is not mentioned in the indictment." |
| | | Prosecutor Rodríguez:<br>"Esta acusación no menciona ni tiene nada que ver con el gobernador." | Prosecutor Rodríguez:<br>"This indictment does not mention nor has anything to do with the Governor." |
| 6 | 53:20 | Reporter:<br>"En el punto 35 ustedes establecen en el indictment que para en o antes de junio 17 del 2017 el individuo le envía un email a Julia Beatrice Keleher donde le da forward el resume del individuo que había sido su director de campaña en el 2016. Hacia la gobernación, eso nos da a inferir que se trata del gobernador, el gobernador envió un correo electrónico a Julia Keleher? necesito que aclaren eso." | Reporter:<br>"In paragraph 35 you established in the indictment that on or before June 17, 2017 that the individual sends an email to Julia Beatrice Keleher where she gives forward the resume of the individual who had been his campaign director in the 2016 Governor's race, which makes us infer that you are talking about the Governor, did the Governor sent an email to Julia Keleher? I need you to clarify that." |
| | | Prosecutor Rodríguez:<br>"Como surge de la acusación es un candidato a la gobernación en el 2016, como usted sabe en el 2016 hubo varios candidatos a la gobernación." | Prosecutor Rodríguez:<br>"As the indictment states, it is a candidate for Governor in 2016, as you know in 2016 there were several candidates for governor." |

| | | Reporter:<br>"Que no necesariamente es el gobernador Ricardo Rosselló?"<br><br>Prosecutor Rodríguez:<br>"No surge de la acusación que haya sido el gobernador Ricardo Rosselló." | Reporter:<br>"Not necessarily Governor Ricardo Rosselló?"<br><br>Prosecutor Rodríguez:<br>"It does not state in the from the indictment that it was Governor Ricardo Rosselló." |
|---|---|---|---|

**EXHIBIT II**

The October 8, 2019 story located at https://www.youtube.com/watch?v=6RA9NPCCp4s contains the following slanderous comments during a segment titled "¿Un mapa hecho a la medida de ciertas personas?" (translation: "A map tailor made for certain individuals?"):

| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 16:28- 24:55 | 20:59- 21:05: Valeria Collazo: Lo que sospechan algunos es que este mapa esta hecho a la medida de ciertos desarrolladores y de individuos con alta influencia política.<br><br>21:06- 21:12 Pedro Cardona: "uno puede concluir ehhh que, aquí ha habido unos encargos hechos"<br><br>21:13- 21:40 VC: aunque no nos pudieron especificar la consultoría científica que han hecho para estos cambios, entre los contratos que hay de la<br>Junta de Planificación, encontramos uno a la licenciada Valerie Rodríguez Erazo, esposa de Elías Sánchez. El contrato fue otorgado el pasado 30 de julio, 6 días después de que Rosselló anunciara su renuncia, pero mientras aún estaba en La Fortaleza. ¿Qué servicios exactamente está prestando a la Junta la licenciada Rodríguez?<br><br>21:41-21:43 María Gordillo: "La licenciada Rodríguez, ella trabaja con Code Enforcement.<br><br>21:43 VC: ¿cómo?<br><br>21:43 Gordillo: code enforcement.<br><br>21:45: VC: " ¿qué?" (dice algo más pero no se entiende)<br><br>21:50-21:58 MG: básicamente es | 20:59- 21:05: Valeria Collazo: What some suspect is that this map is tailored for certain developers and some individuals with high political influence.<br><br>21:06- 21:12 Pedro Cardona: one can conclude ehh that, there have been some orders made.<br><br>21:13- 21:40 VC: although they could not specify the scientific consulting they have done for these changes, among the contracts that the Puerto Rico Planning Board has, we find one to Attorney Valerie Rodríguez Erazo, the wife of Elías Sánchez. The contract was awarded on July 30, six (6) days after Governor Rosselló announced his resignation, but while he was still in La Fortaleza. What services exactly is Attorney Rodríguez providing the Board?<br><br>21:41-21:43 María Gordillo: Attorney Rodríguez, works with Code Enforcement.<br><br>21:43 VC: excuse me?<br><br>21:43 Gordillo: code enforcement.<br><br>21:45: VC: "what?" (she starts to ask something but is not audible)<br><br>21:50-21:58 MG: basically, it's taking to court those people who do not meet the |

llevando al tribunal aquellas personas que no cumplan con los eh requisitos o que tengan ausencia de permisos.

21:59 VC: que va a estar trabajando con los nuevos códigos y reglamentos que esta trabajando la Junta.

22:03-22:13 MG: y básicamente son los reglamentos que tienen que ver con Code Enforcement. Que son los que están con querellas y con auditorías.

22:13-22:28 VC: La Presidenta de la Junta negó que Rodríguez Erazo estuviera trabajando con algo relacionado al mapa, sin embargo, esto caería bajo las funciones desglosadas en su propuesta y en el acuerdo firmado. La licenciada Rodríguez, ¿no está trabajando en nada relacionado al mapa de calificación?

22:29 MG: no, en nada.

22:32- 22:43 VC: aquí habla todo el tiempo de eh de evaluar la reglamentación vigente que tiene la Junta y proponer, incluso, enmiendas o nuevas regulaciones y áreas de oportunidad.

22:44-23:09 MG: ellos pueden, este los abogados que tenemos contratados, porque además de Valerie, hay otros, ehh pueden proponer, o pueden este sugerir a la Junta algún tipo de enmienda a la Reglamentación que hay aplicable. Pero como quiera, la Junta es la que toma la decisión si se va a dar o no esa enmienda al reglamento.

23:10-23:16 VC: conmigo se encuentra el Representante Denis Márquez y el Planificador Pedro Cardona, Hola Buenas

requirements or who don't have permits.

21:59 VC: it says here that she will be working with the new codes and new regulations that the Board is working on.

22:03-22:13 MG: basically, they are the regulations that have to do with Code Enforcement. Does have to do with audits and complaints.

22:13-22:28 VC: The President of the Board denied that Rodríguez Erazo was working with something related to the map, however, this would fall under the scope of work stated in her Proposal and in the signed Agreement. Attorney Rodríguez is not working on anything related to the qualification map?

22:29 MG: no, in nothing.

22:32- 22:43 VC: it's says here (pointing to the contract), all through the document, about evaluating the current regulations that the Board has and even proposing, amendments, new regulation and new areas of opportunity.

22:44-23:09 MG: they can, this is the lawyers that we have hired, because in addition to Valerie, there are others, uh, they can propose or suggest to the Board some type of amendments to the Regulations. Nonetheless, the Board is the one that makes the decision whether or not to authorize the amendment to the Regulation.

23:10-23:16 VC: I have with me Representative Denis Marquez and Planner Pedro Cardona. Hello, good night, thanks for joining us. First of all, maybe a

| | | Noches, gracias por acompañarnos. Primero quizás una reacción a esa información, creo que eh se acaban de enterar de ese contrato. | reaction to that information. I think you just found out about that contract. |
| | | 23:23 Pedro Cardona: Si, bueno, eh toda esta historia, realmente te vuela la cabeza. Cuando uno mira lo que está pasando en la Junta de Planificación y el hecho de que podamos estar viendo que se privatice a parte de la reglamentación de la agencia, que haya un consultor externo que sea el que plantea modificaciones a la reglamentación, amparado en que esta haciendo algo de Law Enforcement, es preocupante. | 23:23 Pedro Cardona: yes, well, this whole story, it really blows your mind. When you look at what is happening in the Planning Board, and the fact that we may be seeing that part of the agency's regulations are privatized, and that there is an external consultant that proposes modifications to the regulations, disguised as doing related to law enforcement, it's troubling. |

**EXHIBIT JJ**

On or about January 22, 2020 Defendants published a story at https://www.youtube.com/watch?v=dZ1TnxnyH0c which included defamatory and malicious statements on *"Jay y sus Rayos X"*.

| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 0.44-1:24: | Reporter Fonseca:<br>"Hace un tiempo el Centro Periodístico Investigativo dijo, gracias a que usted alertó sobre Elías Sánchez y los tentáculos de Elías Sánchez en el gobierno de Ricardo Roselló, se empezó a saber que Elías Sánchez iba de manera informal a presionar para beneficiar a sus clientes. Que Elías Sánchez cabildeaba, todo el mundo sabe de la relación estrecha entre la Gobernadora, Elías Sánchez, y su señora esposa que fue asesora de Elías Sánchez. Usted cree, que la razón por la cual la Gobernadora lo despide a usted es una venganza de Elías Sánchez o una venganza del grupo de Elías Sánchez?" | Reporter Fonseca:<br>"Some time ago the Centro Periodístico Investigativo "Investigative Journalist Center" said, that thanks to the fact that you warned about Elías Sánchez and the tentacles of Elías Sánchez in the government of Ricardo Roselló, it became known that Elías Sánchez was informally going to push to benefit his clients. That Elías Sánchez lobbied, everyone knows of the close relationship between the Governor, Elías Sánchez, and his wife, who was an adviser to Elías Sánchez. Do you believe that the reason the Governor fired you is in any form a revenge of Elías Sánchez or a revenge of the group of Elías Sánchez?" |
| 2 | 1:25-1:52 | Fernando Gil:<br>"Eh Jay, yo quiero dejar esto bien claro. En el momento en que pasaron esas cosas, que dicho sea de paso, este servidor pasó la página, y hizo lo que entendía a su haber siendo servidor público, tenía que hacer. Eh y obviamente esa contestación solamente y lo repito te la puede dar una sola persona, que es la Gobernadora que es Wanda Vázquez Garced. Yo no contestó cosas que a mi no me constan, y que yo no especulo en ese sentido". | Fernando Gil:<br>"Eh Jay, I want to make this very clear. At the time those things happened, by the way, this guy turned the page, and did what he understood he had to do as a public official, he had to do. Eh and obviously that answer can only be, and I repeat it, can only be given by one person, who is the Governor who is Wanda Vázquez Garced. I do not answer things that I do not know, and I do not speculate in that regard". |

| 3 | 1:53- 2:15 | Reporter Fonseca | Reporter Fonseca |
|---|---|---|---|
| | | "eh ok, pero o sea pero usted fue la persona clave en un momento dado, para que empezara a salir la madeja de después resultó ser que el Secretario de DTOP, Secretario de Hacienda y otros, también admitieron que Elías Sánchez continuamente de forma informal y formal pedía para clientes de el, que ni si quiera se sabía que eran clientes de él, como pasó en salud con otros también" | "eh ok, but I mean, but you were the key person at one point, so that the skein began to come out afterwards, it turned out that the Secretary of Department of Transportation and Public Works, the Secretary of the Treasury and others, also admitted that Elías Sánchez continuously informally and formally asked for his clients, who nobody even knew they were. his clients, as happened in the Health Department with others too". |
| 4 | 2:16- 2:33 | Fernando Gil | Fernando Gil |
| | | " en mi situación y vuelvo y lo repito, eh se dio una situación en una posible o impugnación de subasta, se me pidió hablar conmigo, vuelvo y lo repito, hablamos cuando me trajo su punto. Dentro de lo presentado le digo, este no es el foro número uno, hay procesos para ello y te aconsejo que [..] (Jay lo interrumpe) | "In my situation and, once again, I repeat it, uh there was a situation in a possible or auction challenge, he asked to speak with me, again, I repeat it, we talked when he brought me his point. Within the things he presented, I tell him, this is not, number one the forum, there are processes for it, and I advise you to [..] (Jay interrupts it). |
| 5 | 2:33-2:37 | Reporter Fonseca | Reporter Fonseca |
| | | "usted sabe si hay una relación estrecha entre Elías Sánchez y la Gobernadora? Valerie Rodríguez y la Gobernadora?" | "Do you know if there is a close relationship between Elías Sánchez and the Governor? Valerie Rodríguez and the Governor?" |
| 6 | 2:45-2:53 | Reporter Fonseca | Reporter Fonseca |
| | | "o sea la esposa de Elías Sánchez y" | "I mean the wife of Elías Sánchez and" |
| 7 | 2:55-3:03 | Reporter Fonseca | Reporter Fonseca |
| | | "sobre el nombramiento de ella como Secretaria de Justicia, ¿usted sabe si él tuvo alguna gestión o si se reunieron en la casa de él o algo por el estilo?" | "about her appointment as Secretary of Justice, do you know if he had any role in it or if they met at his house or something like that?" |

| 8 | 3:03-3:17 | Fernando Gil | Fernando Gil |
|---|-----------|--------------|--------------|
| | | "Desconozco, sabe que el a lo mejor le dio ese pues consejo al Gobernador en ese momento y así el Gobernador la nombró, y fue el mismo tiempo que me nombró a mi, 6 de diciembre de 2016". | "I do not know, maybe, perhaps he gave that advice to the Governor at that time and thus the Governor appointed her, and it was at the same time that he appointed me, December 6, 2016". |

**EXHIBIT KK**

The March 28, 2020 story located at https://www.facebook.com/JayFonsecaPR/videos/540509489993022 consisting of a Face Book live with the former secretary of the Health Department of Puerto Rico, Dr. Concepción Quiñones de Longo, "Entrevista a la doctora Concepcion Quiñones de Longo", that contains the following defamatory statements:



| | Time Stamp | Statement | Translation |
|---|---|---|---|
| 1 | 19:05 – 20:26 | Reporter Fonseca: "Jay: Doctora, yo tengo varias preguntas que hacerle, para empezar, usted llegó a saber si Elías Sánchez o Valerie Rodríguez iban a presentar clientes al Dpto. de salud?<br><br>Doctora: si venían a presentar?<br><br>Reporter Fonseca: a presentar clientes, acompañar clientes al Dpto. de salud.<br><br>Doctora: Ante mi nunca. No sé si lo hicieron ante el Dr. Rafael Rodríguez, | Reporter Fonseca: "Doctor, I have several questions to ask you. To begin with, did you find out if Elías Sánchez or Valerie Rodríguez were going to represent clients to the Health Department?"<br><br>Doctor: "if they came to represent?"<br><br>Reporter Fonseca: "to present clients, accompany clients to the Health Department".<br><br>Doctor: "Never before me. I don't know if they did it before Dr. Rafael Rodríguez, not before me. I saw Charlie Rodríguez there |

| | | | |
|---|---|---|---|
| | | ante mi no. Yo vi en algunas ocasiones por allí a Charlie Rodríguez pero no fue hacerme presentaciones a mi.<br><br>Reporter Fonseca: sabe si ellos tienen algún marco de influencia con el Dr. Rodríguez?<br><br>Doctora: Yo no sé, no podría decir honestamente.<br><br>Reporter Fonseca: Veo. Hay personas que creen que Mabel Cabeza era la gestora de los intereses de ciertas personas en el Dpto. de salud, usted escuchó por ejemplo algo de eso, por ejemplo de que ella representara los intereses de Elías o Valerie Rodríguez en algún momento?<br><br>Doctora: Yo he escuchado esos comentarios, pero no tengo evidencia que puedan validar, que yo diga, te enseño un papel donde ella está recomendando algo que lo representa a Elías o algo así. Pero esa es la comidilla del Dpto. mañana, tarde y noche.<br><br>Reporter Fonseca: Entiendo. | on some occasions, but it was not to make presentations to me"<br><br>Reporter Fonseca: "Do you know if they have a framework of influence with Dr. Rodríguez?"<br><br>Doctor: "I don't know, I couldn't honestly say".<br><br>Reporter Fonseca: "I see. There are people who believe that Mabel Cabeza was the manager of the interests of certain people in the Health Department, did you hear, for example, some of that, for example that she represented the interests of Elías or Valerie Rodríguez at some point?"<br><br>Doctor: I have heard those comments, but I have no evidence that they can validate, that I say, I show you a paper where she is recommending something that represents Elías or something like that. But that's the talk of the department morning, noon and night.<br><br>Reporter Fonseca: I get it. |

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

     Plaintiffs,

                                    CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

     Defendants.

_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

Jagual Media, LLC
c/o Josue Fonseca Aponte, Registered Agent
105 Ave Arterial Hostos
Bayside Cove Apt 401
San Juan, Puerto Rico 00918

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com

Page 1 of 2

within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____

                                          CLERK OF THE CIRCUIT COURT

(SEAL)

                                          By: _____
                                               Deputy Clerk

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

     Plaintiffs,

                              CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

     Defendants.

_____

## **INDIVIDUAL SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

Josue Fonseca
Telemundo Puerto Rico
383 Ave. Roosevelt
Hato Rey, Puerto Rico 00918

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
Email: civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com

Page 1 of 3

within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____

                                        CLERK OF THE CIRCUIT
COURT

(SEAL)

                                        By: _____
                                           Deputy Clerk

**IMPORTANT**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this circuit court located at:73 W. Flagler Street, Miami, Florida 33130. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your written response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the party serving this Summons as stated above.

**IMPORTANTANTE**

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal 73 W. Flagler Street, Miami, Florida 33130. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despoj ado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede ilamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, at mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada arriba como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de 1'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal 73 W. Flagler Street, Miami, Florida 33130. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, Si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. II y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, it vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff s Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

     Plaintiffs,

                                    CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

     Defendants.

_____

## <u>CORPORATE SUMMONS</u>

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

NBCUniveral Media, LLC
c/o CT Corporation System, Registered Agent
1200 South Pine Island Road
Plantation, Florida 33324

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com
within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of

Page 1 of 2

Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____

CLERK OF THE CIRCUIT COURT

(SEAL)

By: _____
    Deputy Clerk

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

      Plaintiffs,

                                    CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

      Defendants.

_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

              Telemundo International, LLC
          c/o CT Corporation System, Registered Agent
              1200 South Pine Island Road
               Plantation, Florida 33324

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

              Luis F. Navarro, Esq.
                NAVARRO
              *Attorneys at Law*
      66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
    Email: civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com
within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of

Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____

                                        CLERK OF THE CIRCUIT
COURT

(SEAL)

                                        By: _____
                                             Deputy Clerk

Case 1:21-cv-20543-MGC Document 1-2 Entered on FLSD Docket 02/09/2021 Page 305 of 332

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

     Plaintiffs,

                                CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

     Defendants.

_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:
Telemundo International Studios, LLC
c/o CT Corporation System, Registered Agent
1200 South Pine Island Road
Plantation, Florida 33324

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:
Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
Email: civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com
within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of

Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____

                                              CLERK OF THE CIRCUIT

COURT

(SEAL)

                                            By: _____
                                              Deputy Clerk

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

     Plaintiffs,

                              CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

     Defendants.

_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

              Telemundo Network Group, LLC
          c/o CT Corporation System, Registered Agent
                1200 South Pine Island Road
                 Plantation, Florida 33324

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

                 Luis F. Navarro, Esq.
                   NAVARRO
                 *Attorneys at Law*
      66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
    Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com
within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of

Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED:  _____

                                        CLERK OF THE CIRCUIT

COURT

(SEAL)

                                        By: _____
                                            Deputy Clerk

Case 1:21-cv-20543-MGC   Document 1-2   Entered on FLSD Docket 02/09/2021   Page 309 of 332

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

     Plaintiffs,

                                     CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

     Defendants.

_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

TM Entertainment, Inc.
c/o TM Entertainment, Inc., Registered Agent
436 Sergio Cuevas
Bustamante
San Juan, Puerto Rico 00918

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com

Page 1 of 2

within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____

                                        CLERK OF THE CIRCUIT
COURT

(SEAL)

                                        By: _____
                                            Deputy Clerk

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

     Plaintiffs,

                                    CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

     Defendants.

_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

TM Television, Inc.
c/o TM Television, Inc., Registered Agent
436 Sergio Cuevas
Bustamante
San Juan, Puerto Rico 00918

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com

Page 1 of 2

within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____

                                        CLERK OF THE CIRCUIT

COURT

(SEAL)

                                        By: _____
                                            Deputy Clerk

Page 2 of 2

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

      Plaintiffs,

                                 CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

      Defendants.

_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

Jagual Media, LLC
c/o Josue Fonseca Aponte, Registered Agent
105 Ave Arterial Hostos
Bayside Cove Apt 401
San Juan, Puerto Rico 00918

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com

Page 1 of 2

within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____1/11/2021_____

CLERK OF THE CIRCUIT COURT

(SEAL)

By: _____308760_____

    Deputy Clerk

Page 2 of 2

Filing # 119301866 E-Filed 01/08/2021 01:00:15 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

     Plaintiffs,

                                      CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

     Defendants.

_____

## **INDIVIDUAL SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

Josue Fonseca
Telemundo Puerto Rico
383 Ave. Roosevelt
Hato Rey, Puerto Rico 00918

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor, Miami, Florida 33130
Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com

Page 1 of 3

within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED:  _____1/11/2021_____

CLERK OF THE CIRCUIT COURT

(SEAL)

By: _____

Deputy Clerk

**IMPORTANT**

A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this circuit court located at:73 W. Flagler Street, Miami, Florida 33130. A phone call will not protect you.  Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case.  If you do not file your written response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements.  You may want to call an attorney right away.  If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the party serving this Summons as stated above.

**IMPORTANTANTE**

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal 73 W. Flagler Street, Miami, Florida 33130. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despoj ado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede ilamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, at mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada arriba como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de 1'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal 73 W. Flagler Street, Miami, Florida 33130. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, Si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. II y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, it vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff s Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

Filing # 119301866 E-Filed 01/08/2021 02:21:33 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

     Plaintiffs,

                              CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

     Defendants.
_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

NBCUniveral Media, LLC
c/o CT Corporation System, Registered Agent
1200 South Pine Island Road
Plantation, Florida 33324

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com
within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of

Page 1 of 2

Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____ 1/11/2021 _____

CLERK OF THE CIRCUIT COURT

(SEAL)

By: _____
    Deputy Clerk

308760

Filing # 119301866 E-Filed 01/08/2021 02:21:33 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

     Plaintiffs,

                                  CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

     Defendants.

_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

Telemundo International, LLC
c/o CT Corporation System, Registered Agent
1200 South Pine Island Road
Plantation, Florida 33324

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com
within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of

Page 1 of 2

Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____1/11/2021_____

CLERK OF THE CIRCUIT

COURT

(SEAL)

By: _____

    Deputy Clerk

Case 1:21-cv-20543-MGC   Document 1-2   Entered on FLSD Docket 02/09/2021   Page 322 of 332

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

    Plaintiffs,

                                       CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

    Defendants.

_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:
Telemundo International Studios, LLC
c/o CT Corporation System, Registered Agent
1200 South Pine Island Road
Plantation, Florida 33324

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:
Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com
within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of

Page 1 of 2

Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____1/11/2021_____

CLERK OF THE CIRCUIT
COURT

(SEAL)

By: _____308760_____
    Deputy Clerk

Page 2 of 2

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

     Plaintiffs,

                        CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

     Defendants.

_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

                Telemundo Network Group, LLC
          c/o CT Corporation System, Registered Agent
                1200 South Pine Island Road
                  Plantation, Florida 33324

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

                  Luis F. Navarro, Esq.
                    NAVARRO
                 *Attorneys at Law*
      66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
    Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com
within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of

Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____ 1/11/2021 _____

CLERK OF THE CIRCUIT

COURT

(SEAL)

By: _____

Deputy Clerk

Filing # 119301866 E-Filed 01/08/2021 01:00:15 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

    Plaintiffs,

                         CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

    Defendants.

_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

TM Entertainment, Inc.
c/o TM Entertainment, Inc., Registered Agent
436 Sergio Cuevas
Bustamante
San Juan, Puerto Rico 00918

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor**,** Miami, Florida 33130
Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com

Page 1 of 2

within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____1/11/2021_____

CLERK OF THE CIRCUIT COURT

(SEAL)

By: _____308760_____

Deputy Clerk

Filing # 119301866 E-Filed 01/08/2021 01:00:15 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE, an
individual, and VALERIE RODRIGUEZ
ERAZO, an individual,

     Plaintiffs,

                                    CASE NO.: 2020-027995-CA-01

v

JOSUE FONSECA, a/k/a JAY
FONSECA, an individual; TELEMUNDO
INTERNATIONAL STUDIOS LLC, a Florida
limited liability company; TELEMUNDO
INTERNACIONAL LLC a/k/a TELEMUNDO DE
PUERTO RICO, LLC., a Florida limited liability
company; JAGUAL MEDIA, LLC, a Puerto Rico
limited liability company; NBCUNIVERSAL
MEDIA, LLC, a Delaware corporation; TELEMUNDO
NETWORK GROUP, LLC; a Delaware corporation;
TM TELEVISION, INC., a Puerto Rico corporation;
TM ENTERTAINMENT, INC., a Puerto Rico corporation;
and DOES 1 – 10, inclusive,

     Defendants.
_____

## **CORPORATE SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of The State:

You are commanded to serve this Summons and a copy of the attached Complaint in this lawsuit
on the following Defendant:

TM Television, Inc.
c/o TM Television, Inc., Registered Agent
436 Sergio Cuevas
Bustamante
San Juan, Puerto Rico 00918

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's
Attorney:

Luis F. Navarro, Esq.
NAVARRO
*Attorneys at Law*
66 W. Flagler Street, 6th Floor, Miami, Florida 33130
Email:  civil@nmbesq.com; lou@nmbesq.com; mromo@nmbesq.com

Page 1 of 2

within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED: _____1/11/2021_____

CLERK OF THE CIRCUIT COURT

(SEAL)

By: _____308760_____

Deputy Clerk

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ELIAS SANCHEZ SIFONTE and
VALERIE RODRIGUEZ ERAZO,

        Plaintiffs,

                                Case No. 2020-027995-CA-01

vs.

JOSUE FONSECA, *et al.*,

        Defendants.

_____/

## <u>NOTICE OF APPEARANCE OF COUNSEL</u>

Deanna K. Shullman, Rachel E. Fugate, and Giselle M. Girones of Shullman Fugate

PLLC hereby give notice of their appearance as counsel on behalf of Defendants Josue Fonseca,

Telemundo International Studios LLC, Telemundo Internacional LLC, Telemundo of Puerto

Rico LLC,[1] Jagual Media LLC, NBCUniversal Media, LLC, Telemundo Network Group LLC,

TM Television, Inc., and TM Entertainment, Inc. The certificate of service for all pleadings,

orders, and other papers in this action should include **Deanna K. Shullman, Rachel E. Fugate,**

**and Giselle M. Girones** at Shullman Fugate PLLC, 2101 Vista Parkway, Suite 4006, West Palm

Beach, FL 33411 and dshullman@shullmanfugate.com, rfugate@shullmanfugate.com, and

ggirones@shullmanfugate.com.

                      Respectfully Submitted,

                      SHULLMAN FUGATE PLLC

                      */s/ Deanna K. Shullman*

---

[1] Plaintiffs incorrectly refer to Defendant Telemundo of Puerto Rico LLC by the incorrect name "Telemundo de Puerto Rico, LLC" and also mistakenly refer to Telemundo of Puerto Rico LLC as an alternative name for "Telemundo Internacional, LLC." The correct entity name is Telemundo of Puerto Rico LLC. Telemundo of Puerto Rico LLC is not an alternate name for Telemundo Internacional LLC, which is an unrelated entity.

Deanna K. Shullman
Florida Bar No. 514462
Rachel E. Fugate
Florida Bar No. 144029
Giselle M. Girones
Florida Bar No. 124373
2101 Vista Parkway, Suite 4006
West Palm Beach, FL  33411
Tel: (561) 429-3619
dshullman@shullmanfugate.com
rfugate@shullmanfugate.com
ggirones@shullmanfugate.com

*Attorneys for Defendants Josue Fonseca,
Telemundo International Studios LLC, Telemundo
Internacional LLC, Telemundo of Puerto Rico
LLC, Jagual Media LLC, NBCUniversal Media,
LLC, Telemundo Network Group LLC, TM
Television, Inc., and TM Entertainment, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy for the foregoing has been served on

the following counsel of records via the Florida Court E-portal system on this 29th day of

January, 2021:


Luis F. Navarro
Lorenzo J. Palomares
Navarro Attorneys at Law,
66 W. Flagler Street, 6th Floor
Miami, Florida 33130
(305) 447-8707
civil@nmbesq.com
lou@nmbesq.com
mromo@nmbesq.com

Eric Ruben Huertas Morales
66 Flagler Street, Suite 601
Miami, FL 33030
(305) 447-8707
erhuertas@eragroupllc.com

*Attorneys for Plaintiffs*

*Deanna K. Shullman*_____
Attorney
