**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.: 1:21-cv-20543-MGC-Cooke

ELIAS SANCHEZ SIFONTE and
VALERIE RODRIGUEZ ERAZO,

           Plaintiffs,

vs.

JOSUE FONSECA, *et al.,*

           Defendants.

_____/

### DEFENDANTS JOSUE FONSECA AND JAGUAL MEDIA LLC'S MOTION TO DISMISS AND SUPPORTING MEMORANDUM OF LAW, AND JOINDER IN TM TELEVISION'S MOTION TO TRANSFER VENUE

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Josue Fonseca and Jagual Media LLC (collectively, "Defendants") move this Court to dismiss Plaintiffs Elias Sanchez Sifonte ("Sanchez") and Valerie Rodriguez Erazo's ("Rodriguez") (collectively, "Plaintiffs") Complaint [D.E. 1-2] in this action.[1] In addition, Defendants join and fully adopt TM Television's Motion to Transfer Venue to the District of Puerto Rico [D.E. 31]. In support of this motion, Defendants state:

---

[1] On February 26, Plaintiffs filed an amended complaint, along with a Motion to Remand, seeking to add three parties (two of whom are non-diverse) to this action. [D.E. 16, 17]. The amended complaint is not operative, however, because it seeks to interpose an amendment that would deprive this Court of jurisdiction over this case. *See Andreasen v. Progressive Express Ins. Co.*, 276 F. Supp. 3d 1317, 1321-24 (S.D. Fla. 2017); *see also Peralta Community College Dist. v. United Nat. Ins. Co.*, No. 04-03287, 2004 WL 2254621, at *1 (N.D. Cal. Oct. 5, 2004) ("[T]he operative complaint here is the original complaint filed [in state court]. If [p]laintiff wishes to file an amended complaint, it may request leave to do so by motion. The Court may then consider pursuant to 28 U.S.C. § 1447(e) any request to join a non-diverse party."). Thus, Rule 15(a) does not apply and until the Court determines whether proposed joinder of new, non-diverse defendants is permissible under Section 1447(e), the amended complaint is treated as a proposed amendment. *Id.*; *see also Absorbezz LLC v. Hierseman*, No. 19-61442-CIV, 2019 WL 11506034, at *3 (S.D. Fla. Sept. 12, 2019) (Cooke, J.) (filing an amended complaint under Rule 15(a) "does not allow a plaintiff to avoid scrutiny under section 1447(e)"); *Andreasen*, 276 F. Supp. 3d at 1323-24 (court must apply Section 1447(e) first).

## Introduction and Background

This lawsuit stems from a political scandal that began on July 8, 2019, dubbed "TelegramGate," which concerned the leak of 889 pages of a group chat between then-Governor of Puerto Rico, Ricardo Rossello, and his tight-knit cluster of friends.[2] Among the chat participants was Sanchez—Rossello's 2016 political campaign director, later his liaison to Puerto Rico's Financial Oversight and Management Board, and now a lobbyist. The leaked messages received widespread news coverage given their misogynistic, homophobic, and profane nature.[3] The messages also suggested the administration may have been inappropriately favoring its politically connected friends by sharing confidential state information with politically connected associates, such as Sanchez.

The leak led to massive public outcries, with more than a week of daily protests throughout the Commonwealth. The Puerto Rico Bar Association issued a report discussing potential crimes revealed in the chat, including possible instances of diversion of funds, conspiracy, disclosure of private information, and intent to terminate employment based on political beliefs.[4] On July 17, 2019, the Puerto Rico Department of Justice ordered that all chat participants be interviewed, and a few days later a judge issued a warrant for the participants' cell phones.[5] Rossello ultimately resigned in disgrace on August 2, 2019.

---

[2] On July 18, 2019, *Centro de Periodismo Investigativo* ("CPI") an award-winning investigative journalism company in Puerto Rico, published all 889 pages of the text messages. A few days prior, authorities had arrested Julia Keleher and Angela Avila Marrero, two high-ranking Puerto Rico government officials who served in Rossello's administration, for unlawfully steering $15.5 million in federal contracts to politically connected lobbyists.

[3] For example, the messages referred to New York City Council member Melissa Mark-Viverito as a "whore," made homophobic remarks about celebrity Ricky Martin, joked about the bodies that piled up after Hurricane Maria, and referred to San Juan Mayor Carmen Yulin Cruz, as "a daughter of a bitch," implying she should be shot. *See* [D.E. 24 at 3 and n.4].

[4] *See* Francis Robles and Patricia Mazzel, *Puerto Rico Authorities Seize Cellphones Connected to Online Chat That Triggered Uprising*, THE NEW YORK TIMES, Jul. 23, 2019 https://www.nytimes.com/2019/07/23/us/puerto-rico-cellphone-warrants.html.

[5] Sanchez refused to, and ultimately did not, turn over his cell phone. *See* Luis J. Valentin Ortiz and Damaris Suarez, *Puerto Rico Justice Dept. asks for Special Independent Prosecutor for Telegram chat members*, CENTRO DE PERIODISMO INVESTIGATIVO, Jan. 12, 2020,
(*footnote continued on next page*)

On February 13, 2020, the Oficina del Panel Fiscal Especial Independiente ("the panel") appointed special prosecutors to investigate whether Rossello and certain other chat participants, including Sanchez, committed crimes.[6] On November 10, 2020, the special prosecutors reported their findings to the panel. Although the panel declined to file criminal charges against the chat participants, it did refer Sanchez to the Puerto Rico Attorney General's Office for possible ethics violations resulting from his intervention in government matters.[7]

Naturally, the TelegramGate participants, including Sanchez, received widespread coverage from news organizations around the world. In their lawsuit, however, Plaintiffs ignore the vast majority of that coverage and instead target Fonseca, a journalist who provides opinion and commentary on political matters. Plaintiffs have sued only over coverage of the scandals in Fonseca's news programs titled *Jay y Sus Rayos X* and *Dia a Dia*, as well as his social media posts, and Telemundo of Puerto Rico LLC's *Telenoticias* and *Dando Candela* news programs.

Plaintiffs claim that 25 publications, published between January 4, 2019 and November 22, 2020, are defamatory. *See* [D.E. 1-2 ¶¶ 41-315].[8] In the same counts of the

---

https://periodismoinvestigativo.com/2020/01/puerto-rico-justice-dept-asks-for-special-independent-prosecutor-for-telegram-chat-members/

[6] *See* Oficina del Panel Fiscal Especial Independiente, *Varios participantes del "Chat" de Telegram en la mira del FEI*, Feb. 13, 2020 available at http://panelfei.com/wp-content/uploads/2020/02/Varios-participantes-del-Chat-de-Telegram-en-la-mira-del-FEI.pdf. *See* Declaration of Giselle M. Girones ("Girones Decl." or "Girones Declaration") submitted herewith at ¶ 22, Comp. Ex. A.

[7] *See* Oficina del Panel Fiscal Especial Independiente, *Fiscales Especiales Independientes No Presentarán Cargos Criminales En El Caso Del Chat*, Nov. 24, 2020 available at http://panelfei.com/wp-content/uploads/2020/11/Fiscales-Especiales-Independientes-no-presentar%C3%A1n-cargos-criminales-en-el-caso-del-Chat.pdf. *See* Girones Decl. ¶ 23, Comp. Ex. B.

[8] The exhibits attached to the Complaint purport to be uncertified transcripts and translations of the statements alleged to be defamatory. The statements appear in the exhibits in isolation, divorced from the rest of the publication in which they appear and without their full context. Accordingly, the entirety of the publications at issue, as well as certified translations thereof, are attached to the Girones Declaration, the Declaration of Josue Fonseca ("Fonseca Decl.") and the Declaration of Sonia I. Melendez De Leon ("Melendez De Leon Decl.") filed
*(footnote continued on next page)*

Complaint, Plaintiffs have sued all defendants for defamation (Count I), slander per se (Count II), libel (Count III), libel per se (Count IV), and trade libel (V).[9] Plaintiffs also allege "multiple counts and allegations" (Count VI) and "aiding and abetting" (Count VII).[10] All of Plaintiffs claims fail, however, and should be dismissed.

<u>Argument</u>

The purpose of Rule 12(b)(6) is to permit the Court to terminate actions, such as this one, that are fatally flawed from the start, to spare the litigants and the Court the burdens of unnecessary pretrial and trial activity. When evaluating a motion to dismiss a court "must accept the allegations of the complaint as true and must construe the facts alleged in the light most favorable to the plaintiff." *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994). That said, a court should not accept "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "'[N]aked assertions' devoid of 'further factual enhancement'" also cannot survive a motion to dismiss. *Ashcroft v. Iqbal*, 556

---

simultaneously herewith. Publication numbers referred to in this Motion correspond to the exhibit numbers to the Girones, Fonseca and Melendez De Leon declarations. The Motion will also refer to the exhibit letters used by Plaintiffs in attempting to allege the statements at issue in the Complaint. So, for example, Publication 1-D refers to the publication at Exhibit 1 of the Girones Declaration and Exhibit D of Plaintiffs' Complaint. Likewise, Publication 3-F refers to the publication at Exhibit 3 of the Melendez De Leon Declaration and Exhibit F of Plaintiffs' Complaint.

[9] These claims are subsets of defamation and must be consolidated into a single defamation claim. *See Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1247 n. 2 (S.D. Fla. 2014) ("defamation encompasses both libel and slander"); *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378 n. 11 (S.D. Fla. 2006) (consolidating defamation-related claims into a single defamation analysis and explaining that "[n]otwithstanding the particulars of the title, the elements of libel and slander—defamation—are the same"); *Chinnici v. WBI, Inc.*, No. 8:14-CV-1357, 2015 WL 1525785, at *1 (M.D. Fla. Apr. 2, 2015) (declining to differentiate between "various claims for defamation, defamation of character, libel, and slander"). Moreover, because the putatively distinct claims derive from the same allegedly defamatory publications, Florida's single cause of action rule also bars Plaintiffs from raising these duplicative claims. *Tobinick v. Novella*, 9:14-cv-80781, 2015 WL 328236, at *11 (S.D. Fla. Jan. 23, 2015) ("prohib[iting] defamation claim from being re-characterized in additional, separate counts for *e.g.*, libel, slander.").

[10] Count VI is not a recognized cause of action under Florida law. Instead, this count appears to be some type of blanket assertion that cross-applies all allegations to all counts, to which no response is required. Count VII sets forth a claim for "aiding and abetting" against the 10 unnamed parties <u>only</u>, and thus Defendants need not respond to that claim either.

U.S. 662, 678 (2009); *see also Papasan v. Alain*, 478 U.S. 265, 286 (1986) (courts are "not bound to accept as true a legal conclusion couched as a factual allegation"). Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citations omitted).

Both federal and Florida courts stress the prominent function courts play in defamation cases and favor the early dismissal of untenable claims. *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) ("application of the plausibility pleading standard makes particular sense when examining public figure defamation suits [because i]n these cases there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation"); *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983) (discussing the court's "prominent function" in defamation cases to "either dismiss[] the complaint for failure to state a cause of action or [ ] grant[] a directed verdict at the proof stage"). The "chilling effect" these cases have on First Amendment rights makes pretrial disposition especially important and appropriate. *Karp v. Miami Herald Publ'g Co.*, 359 So. 2d 580, 581 (Fla. 3d DCA 1978); *see also Stewart v. Sun-Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997). This is particularly relevant here, where the Plaintiffs' Complaint of media coverage concerning issues of public concern go to the heart of First Amendment protections.

To state a valid defamation claim, Plaintiffs must plead and prove: (1) a false and defamatory statement of and concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault on the part of the publisher; and (4) damages. *Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 845 (Fla. 4th DCA 2002) (citing *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 804 (Fla. 1st DCA 1997)). Plaintiffs' Complaint fails to state a claim for several independent reasons. First, Plaintiffs fail to separately delineate their claims between each other and among the Defendants, which alone requires dismissal. Second, Plaintiffs failed to provide adequate pre-suit notice as to nineteen statements, requiring dismissal of the claims premised on the improperly noticed statements. Third, many statements at issue are not "of and concerning" Plaintiffs, are not defamatory as a matter of law, or are hyperbolic, protected opinion or non-actionable questions. Finally, several publications in which some of

the challenged statements appear are also privileged and protected under Florida's wire service defense. Thus, Plaintiffs cannot state a viable claim against Defendants, and the Complaint must be dismissed.

## I.     The Complaint is procedurally deficient and must be dismissed.

Rule 8(a) requires a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Importantly, "each claim founded upon a separate transaction or occurrence . . . must be stated in a separate count" if doing so would promote clarity. Fed. R. Civ. P. 10(b). When a complaint "indiscriminately lumps all defendants together," it fails to comply with both Rule 8 and Rule 10(b) and must be dismissed. *See Fox v. Loews Corp.*, 309 F. Supp. 3d 1241, 1249 (S.D. Fla. 2018) (internal citations omitted) (dismissing complaint where it impermissibly and confusingly lumped the defendants together). Indeed, this Circuit has little tolerance for shotgun pleadings of this nature which "waste scarce judicial resources, inexorably broaden the scope of discovery, wreak havoc on appellate court dockets, and undermine the public's respect for courts." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294-95 (11th Cir. 2018); *see also Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1322-23 (11th Cir. 2015) (one type of shotgun pleading is where a complaint fails to "separate[] into a different count each cause of action or claim for relief."); *Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001) (finding complaint insufficient due to lack of distinction among defendants and factual allegations within counts).

Plaintiffs' Complaint is a typical shotgun pleading and should be dismissed on that ground alone. Both Plaintiffs have sued four separate media companies and one individual in six counts directed at all defendants without explaining which of the more than 100 statements at issue pertain to which Plaintiff and what statements each defendant purportedly published.[11] *See, e.g.*, [D.E. 1-2, Counts I-VI]. The Complaint blends defendants together, fails to delineate which statement was published by which individual or entity, and leaves Defendants and this Court to guess what allegations and claims Plaintiffs are asserting against which defendant, and on what factual basis.

---

[11] The Complaint originally named eight defendants, but on March 11, 2021, Plaintiffs voluntarily dismissed defendants Telemundo International Studios LLC, Telemundo Internacional LLC, and TM Entertainment, Inc. [D.E. 22].

For example, it is unclear whether Plaintiffs seek to hold Fonseca liable for statements not made or published by him, as, for example, Fonseca did not create or publish the statements in the July 16, 2019 *Dando Candela* program (Publication 4-I) or the July 30, 2019 TelemundoPR.com web article (Publication 8-N). Similarly, the Complaint repeatedly presents large chunks of prose that purportedly pertain to both Plaintiffs. *See, e.g.*, [D.E. 1-2 ¶ 68] (featuring more than three text-dense pages of alleged statements and summarily stating that "[e]ach and every statement, implication and meaning of and concerning Plaintiffs" are false); *id.* ¶ 181 ("Each and every statement, implication and meaning of and concerning Plaintiffs alleged above in Paragraphs 165 through 173 are false."). A cursory reading of these statements shows that, as discussed below, many do not pertain to Rodriguez. But because the defamation counts simply allege "Defendants" published false statements "about the Plaintiffs" without specifically identifying which statements Plaintiffs allege are actionable by each Plaintiff and against which defendant, it is unclear whether Rodriguez alleges all statements to be "of and concerning" her.[12]

This method of pleading is improper, lacks clarity and warrants dismissal. *Mirabal v. Bank of Am. Corp.*, No. 15-21838-CIV, 2015 WL 12817702, at *2 (S.D. Fla. Oct. 1, 2015) (granting a motion to dismiss "because [p]laintiff uses the terms '[d]efendant' and '[d]efendants' interchangeably without identifying which particular defendant his allegations relate to"); *Bently v. Bank of Am., N.A.*, 773 F. Supp. 2d 1367, 1373 (S.D. Fla. 2011) (dismissing claims because plaintiff "improperly lump[ed] defendants together in these claims despite that defendants are separate and distinct" and explaining that a plaintiff "must treat each defendant as a separate and distinct legal entity and delineate the conduct at issue as to each defendant."); *R.K./FL Mgmt. v. Chevaldina*, No. 11-17842-CA, 2014 WL 12585533, at *2 (Fla. 11th Cir. Ct. Mar. 17, 2014) (defamation complaint must specifically attribute each particular remark to a particular defendant). Defendants therefore request that this Court dismiss the Complaint for failure to clearly set forth Plaintiffs' claims and require Plaintiffs, if they are to replead, to separately set forth their claims against each Defendant.

---

[12] Although Count I features a parenthetical subtitle that purports to specify it is brought by Sanchez only, the paragraphs in Count I refer to "Plaintiffs," and "Plaintiff" interchangeably. [D.E. 1-2 ¶¶ 316-319].

## II.   <u>Plaintiffs failed to satisfy a condition precedent.</u>

Before a plaintiff can sue a media defendant, such as Fonseca or Jagual Media LLC, for defamation he or she must supply pre-suit notice in accordance with Section 770.01 of the Florida Statutes. *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1316 (S.D. Fla. 2020) (compliance with Section 770.01 is "a condition precedent to a defamation suit."); *accord Rendon v. Bloomberg, L.P.*, 403 F. Supp. 3d 1269, 1273 (S.D. Fla. 2019); *Ross v. Gore*, 48 So. 2d 412, 415 (Fla. 1950). Specifically, Section 770.01, Florida Statutes, provides:

> Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, <u>at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast</u> **and** <u>the statements therein which he or she alleges to be false and defamatory</u>.

§ 770.01, Fla. Stat. (emphasis added). Thus, the requisite pre-suit notice must not only identify the article or broadcast, but it must also specify the particular statements alleged to be false and defamatory therein. *Id.*

Courts have interpreted Section 770.01 to require plaintiffs provide "the best possible notice" when specifying the allegedly false and defamatory statements at issue. *Nelson v. Associated Press, Inc.*, 667 F. Supp. 1468, 1474-75 (S.D. Fla. 1987). As the phrase facially connotes, what constitutes "best possible notice" turns on the degree of specificity available to the plaintiff before filing suit. *Id.* (explaining that the relevant inquiry is what the "Plaintiff was capable of doing"). Where, as here, the material is readily available online, the best possible notice is specification of <u>each</u> allegedly defamatory statement within each publication. *See, e.g., Skupin v. Hemisphere Media Grp., Inc.*, No. 3D19-1555, 2020 WL 6153447, at *3 (Fla. 3d DCA Oct. 21, 2020) (finding plaintiff failed to satisfy Section 770.01 as to statements in fifth and sixth news reports where English and Spanish transcripts of the several broadcasts at issue were readily available). For example, in *Rendon*, the court found the best possible notice was "verbatim quotes" of the specific statements alleged to be defamatory because, based on the level of detail in the complaint, "[p]laintiff was capable of doing so'" prior to filing suit. 403 F. Supp. 3d at 1274. Thus, when a complaint includes an allegedly defamatory statement for which no notice was provided, such statements must be dismissed. *Id.* at 1275 (dismissing claims based on statements for which no pre-suit notice was provided); *see also Nelson*, 667 F. Supp. at 1483-84 (prohibiting defamation plaintiff from suing on a

statement not included in pre-suit notice); *Magnum Towing Inc. v. Sunbeam Television Corp.*, No. 92-04833, 27 Med. L. Rep. 1728 (Fla. 11th Cir. Ct. Nov. 7, 1997) (evaluating statements within a broadcast and explaining that "[s]tatements enumerated as 5 (c), (d), (e), (f), (g), and (h) above are not actionable on the additional ground that they were not included in Plaintiffs' letter to [the defendant] under Section 770.01, Florida Statutes.").

In this case, Plaintiffs sent correspondence to Defendants on three occasions prior to filing suit. *See* Declaration of Josue Fonseca ("Fonseca Decl.") ¶¶ 5-8.[13] None of these communications satisfied the pre-suit notice requirement with respect to nineteen statements. *Compare* Fonseca Decl. ¶¶ 5-7, Exs. A-C *with* [D.E. 1-2 ¶¶ 44(b), 62(m)-(n), (q), (s)-(t), 64(c), 96(b)-(c), 121(b)-(c), 143(d), (f), 166, 252(b)-(c) and 253(a)-(c)]. Indeed, as in *Rendon*, Plaintiffs' verbatim recitation of the statements in the Complaint serves as "evidence of the notice [Plaintiffs] w[ere] capable of providing."[14] *Rendon*, 403 F. Supp. 3d at 1274. Plaintiffs simply chose not to. As such, Plaintiffs have failed to state a claim with respect to the improperly noticed statements.

### III.    The Complaint fails to state a cause of action.

Plaintiffs' Complaint also suffers from a number of substantive defects that require dismissal. Most of the statements are not of and concerning Rodriguez and many are not of and concerning Sanchez. Many statements are also not defamatory. Some statements constitute opinion or hyperbole protected by the First Amendment. And some others are questions, which are not statements of fact and thus non-actionable. Finally, some publications are privileged and protected by the wire service defense.

---

[13] The Court may consider the pre-suit letters on a motion to dismiss because Plaintiffs specifically allege to have complied with "all conditions precedent" before suing (D.E. 1-2 ¶16), and the pre-suit notice is central to their defamation claims. *See Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (court may consider document not attached to complaint when "a plaintiff refers to [that] document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss."); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (same); *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1316 (S.D. Fla. 2020) (considering pre-suit letters on motion to dismiss).

[14] Plaintiffs' ability to also recite verbatim the other 83 allegedly false and defamatory statements in their notice further serves as evidence of the level of specificity they could provide.

### A. *Several statements are not "of and concerning" Plaintiffs.*

At the core of First Amendment freedom of expression is the fundamental proposition that there is no defamation when the statement complained of did not directly or by clear implication concern the plaintiff. *See, e.g.*, *McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793, 794 (Fla. 1st DCA 1986) (citing *New York Times Co .v. Sullivan*, 376 U.S. 254, 277 (1964) and *Rosenblatt v. Baer,* 383 U.S. 75 (1966) for the proposition that the "of and concerning" requirement is constitutionally mandated); *see also Baker v. McDonald's Corp.*, 686 F. Supp. 1474, 1484 (S.D. Fla. 1987) ("the plaintiff must show that the defendant made a false statement of fact of or concerning the plaintiff"), *aff'd*, 865 F.2d 1272 (11th Cir. 1988). Accordingly, to be actionable the statements complained of must be "specifically directed at the plaintiff." *Rosenblatt*, 383 U.S. at 81; *Miller v. Twentieth Century Fox Int'l Corp.*, 29 Med. L. Rep. 1087, 1091 (M.D. Fla. 2000) (challenged words must refer "solely or especially" to the plaintiff).

By lumping the claims of both Plaintiffs together, Plaintiffs seek to avoid the constitutional mandate that each of them limits his or her claims to those statements for which each is the direct object. Indeed, Plaintiffs collectively challenge 102 statements in the 25 publications. But the vast majority of those statements have nothing at all to do with Rodriguez. Specifically, 75 statements are simply not directed at and do not, by clear implication, concern Rodriguez. *See* Publications 2-E, 3-F, 4-I, 5-K, 6-L, 7-M, 8-N, 9-R, 10-S, 11-U, 12-V, 13-W, 15-Z, 16-AA, 17-BB, 18-CC, 19-EE, 20-FF, 21-GG, 23-JJ, and 25-B. By way of example, statements to the effect that Sanchez obtained confidential information from Rossello (Publications 9-R, 11-U, 12-V, and 16-AA) are not specifically directed at Rodriguez. Statements concerning Sanchez's work for Triple S (Publications 5-K, 6-L, 7-M, and 8-N), his procurement of government contracts (Publications 10-S and 23-JJ), or his ties to Rossello (Publications 13-W, 15-Z, and 18-CC) are likewise not "of and concerning" Rodriguez. Rodriguez cannot base her defamation claims against Defendants on statements made about her husband, and her claims concerning these statements should be dismissed with prejudice.

Similarly, some statements are not about or directed at Sanchez. For example, statements concerning Rodriguez's work with Code Enforcement (Publication 22-II) or Rodriguez's request for a discounted subsidy from the Director of the Puerto Rico Film Corporation (Publication 1-D) are not about and not directed at Sanchez. Thus, Sanchez

cannot base his defamation claims against Defendants on these statements, and they should be dismissed with prejudice.

Finally, some statements do not concern either Plaintiff. Statements about the resignation of the Department of Education's Assistant Secretary cannot reasonably be construed to refer to either Plaintiff. *See* [D.E. 1-2 ¶ 62(m)-(n), (r)-(t)]; *see also* Publications 2-E and 3-F. Similarly, statements concerning the criminal proceedings of former public official Julia Keleher also cannot reasonably be construed to be directed at or refer "solely or especially" to either Plaintiff. *See* [D.E. 1-2 ¶¶ 252-253]; *see also* Publication 20-FF and 21-GG. Accordingly, these statements should likewise be dismissed with prejudice.

### B. Several statements are not defamatory as a matter of law.

Even as to those statements that are "of and concerning" either of the Plaintiffs, many fail for the reason that they are not capable of defamatory meaning. Fundamental to this Court's role in determining whether dismissal is appropriate in a defamation case is its evaluation of whether the statements at issue are reasonably capable of conveying a defamatory meaning. *See Parekh v. CBS Corp., et al.*, 820 F. App'x 827, 833 (11th Cir. 2020) (affirming dismissal of defamation claims with prejudice where statements were not capable of defamatory meaning); *see also Rubin v. U.S. News & World Rep., Inc.*, 271 F.3d 1305, 1306 (11th Cir. 2001) ("where the court finds that a communication could not possibly have a defamatory or harmful effect, the court is justified in dismissing the complaint for failure to state a cause of action") (internal quotations omitted). A statement is defamatory if it "exposes a person to distrust, hatred, contempt, ridicule or obloquy or which causes such person to be avoided, or which has a tendency to injure such person in his office, occupation, business or employment." *Thomas*, 699 So. 2d at 803; *see also Parekh*, 820 F. App'x at 833. In other words, a defamatory statement is one that naturally and proximately injures a plaintiff's reputation in a material way. *Byrd*, 433 So. 2d at 595; *see also Thomas*, 699 So. 2d at 803 (a defamatory statement "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.").

It is well-settled in Florida that the court must evaluate an allegedly defamatory publication not by "extremes, but as the common mind would naturally understand it." *McCormick v. Miami Herald Publ'g Co.*, 139 So. 2d 197, 200 (Fla. 2d DCA 1962). In other words, "the statement should be considered in its natural sense without a forced or strained

construction." *Byrd*, 433 So. 2d at 595. *See also Smith v. Cuban Am. Nat. Found.*, 731 So. 2d 702, 704 (Fla. 3d DCA 1999). Context is key in the analysis. "There is no way to determine the "gist" or "sting" of the publication in the mind of the average [reader] without examining the statement in context." *Smith*, 731 So. 2d at 704. As a result, each publication alleged to be defamatory must be viewed in its totality; that is, the Court must consider all the words and pictures used and not just isolated words or phrases. *Id.* (citations omitted). As the *Byrd* Court explained:

> When words and pictures are presented together, each is an important element of what, in toto, constitutes the publication. Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines.

433 So. 2d at 595 (citations omitted).

In short, the court must consider the context in which the statements were published, the author's use of cautionary terms, and all the circumstances surrounding the publication, including the medium of expression and its audience. Where the court finds that a communication could not reasonably have a defamatory or harmful effect, it should dismiss the complaint for failure to state a cause of action. *McCormick*, 139 So. 2d at 200 (holding that dismissal was proper where article with allegedly false portions excised would have the same effect on the mind of a reasonable reader as the article in question); *Vanmoor v. Fox News Network*, 34 Med. L. Rep. 2022, 2024 (Fla. 17th Cir. Ct. May 26, 2006) (dismissing defamation complaint because words spoken were not defamatory).

Plaintiffs challenge several statements that, even if ultimately proven to be inaccurate, are simply incapable of defamatory meaning. The gist of the more than 100 statements at issue concern allegations of "influence peddling" related to Sanchez's lobbying business. For example, the statements generally concern Sanchez's alleged "strong influence" and describe Sanchez's "selling [of] influences" to procure government contracts for his clients. *See* Publication 1-D, 2-E, 3-F, 5-K, 6-L, 8-N, 10-S, 11-U, 12-V, 13-W, 14-X, 15-Z, 16-AA, 18-CC and 24-KK. But these types of statements do not naturally injure Sanchez's reputation and are not defamatory as a matter of law. Influence peddling is the very business of lobbyists. As such, Florida courts have held that accusations of "influence peddling" are not defamatory. *See Seropian v. Forman*, 652 So. 2d 490, 495-96 (Fla. 4th DCA 1995) (accusations of "influence

peddling" when used to describe the exchange of benefits for political favors is not defamatory).

For the same reasons, statements identifying Sanchez as a "lobbyist," (Publication 2-E, 5-K, 6-L, 8-N, 9-R, 10-S, 11-U, 12-V, 15-Z, 16-AA, 18-CC, 23-JJ, and 24-KK) and generally describing Plaintiffs as "the lobbying family," (Publication 1-D, 14-X, 15-Z, and 23-JJ), are not defamatory. There is nothing unlawful about lobbying. Indeed, it is an activity facilitating the First Amendment-based right to petition the government. Thus, even where one speaks disapprovingly of the practice, courts have held that an allegation of "lobbying" cannot be defamatory as a matter of law. *See, e.g.*, *Bigelow v. Brumley*, 37 N.E.2d 584, 592-94 (Ohio 1941) (rejecting defamation claim arising from allegation that plaintiff was a "lobbyist").

At bottom, Plaintiffs' true grievance is with his involvement in one of Puerto Rico's largest political scandals. It was Sanchez's own actions—not Defendants' reporting about them—that contributed to the uproar in Puerto Rico and spurred any purported hatred, contempt, distrust or ridicule Plaintiffs experienced there. Thus, statements about Plaintiffs' alleged influence peddling and lobbying efforts construed in their natural sense, as the common mind would understand them, without a forced or strained construction, are not defamatory. The Court should dismiss the Complaint as to these statements—and others like them—because they are not defamatory as a matter of law.

### C. Several Statements are Constitutionally Protected Rhetorical Hyperbole or Opinion

Additionally, several statements Plaintiffs complain of are statements of opinion or rhetorical hyperbole and cannot constitute actionable defamation. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990); *Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir. 2002); *Hallmark Builders, Inc. v. Gaylord Broad. Corp.*, 733 F.2d 1461, 1464 (11th Cir. 1984). This concept is grounded on a very simple premise:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries, but on the competition of other ideas.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974). Whether statements are protected opinion is a question of law for the court to decide. *See Della-Donna v. Yardley*, 512 So. 2d 294, 295 (Fla. 4th DCA 1987).

Where opinions are based on facts that are set forth in the publication or that are otherwise known or available to the reader as a member of the public, they are not actionable. *See Beck v. Lipkind*, 681 So. 2d 794, 795 (Fla. 3d DCA 1996) (citing *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981)). Opinions are actionable only if they rely on <u>undisclosed facts</u> that form the basis for the opinion. *See Turner v. Wells*, 879 F. 3d 1254, 1262 (11th Cir. 2018); *see also Miami Children's World, Inc. v. Sunbeam Television Corp.*, 669 So. 2d 336, 336-37 (Fla. 3d DCA 1996) (holding that reporter's characterizations constituted pure opinion, the basis of which was fully discussed within news broadcast, and thus did not constitute actionable defamation).

The First Amendment similarly protects rhetorical or hyperbolic statements because these statements cannot "reasonably [be] interpreted as stating actual facts." *Milkovich.*, 497 U.S. at 20; *Horsley*, 292 F.3d at 701. "This provides assurance that public debate will not suffer for lack of imaginative expression or the rhetorical hyperbole [that] has traditionally added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 20. Protection of hyperbole recognizes the reality that exaggeration has become an "integral part of social discourse," and thus even statements highly insulting to the plaintiff are not actionable. *Horsley*, 292 F.3d at 701-02 (finding statement that plaintiff was "an accomplice to murder" was rhetorical hyperbole); *Fortson v. Colangelo*, 434 F. Supp. 2d 1369 (S.D. Fla. 2006) (calling member of rival basketball team "thug," "thugged out," "a vacant lot," a "meaningless mass" and "gangstas or wankstas" is rhetorical hyperbole); *Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp. 917, 924 (M.D. Fla. 1996) (letter stating that author's book is a "fraud" is pure opinion); *Demby v. English*, 667 So. 2d 350, 354 (Fla. 1st DCA 1995) (letter accusing animal control director of being "inhumane" and "unreasonable" is pure opinion); *Pullum v. Johnson*, 647 So. 2d 254, 257 (Fla. 1st DCA 1994) (calling plaintiff a "drug pusher" amounted to rhetorical hyperbole, which negated impression that defendant was stating actual facts about the plaintiff).

In short, a publication's spin, grounded in the author's opinion of the facts or imaginative expression, is not actionable. *Turner*, 879 F.3d at 1264-66 (report finding that plaintiff engaged in "homophobic taunting" and exercised "poor judgment" was protected opinion based on the known, disclosed facts); *Donald J. Trump for President, Inc. v. The New York Times Co.*, No. 152099/2020, 2021 WL 938979, at *1 (N.Y. Sup. Ct. Mar. 9, 2021) (use

14

of terms "deal" and "quid pro quo" to describe "unseemly" actions between Trump campaign and Russia was nonactionable opinion.)

Here, Plaintiffs premise their claims on protected opinions and non-actionable insults. For example, words describing Sanchez's disclosed actions as "complicated," "ugly," "shameful," or "devastating" are not provably true or false and are instead protected imaginative expressions. *See* Publication 6-L, 11-U and 12-V. Similarly, loose, figurative language alleging Sanchez was "binging on" contracts is non-actionable. *See* Publication 12-V. Defendants enjoy editorial license to label Sanchez's actions as such.

Similarly, Plaintiffs could never prove whether they "get involved in everything" (Publication 1-D), or whether Sanchez had a "close" relationship with Rossello (Publication 11-U, 12-V, 15-Z, 18-CC, and 23-JJ).[15] Those characterizations hinge on facts disclosed in the respective publications, including the underlying disclosed public records, and are non-actionable opinions. Likewise, statements that discuss potential "conflicts of interest" over Sanchez's representation of Triple S and his firm's simultaneous representation of Triple-S' competitor, Menonita (Publication 5-K and 6-L), or that question the "quid pro quo" nature of Sanchez and Rossello's actions (Publication 14-X) are based on disclosed facts and thus protected. *Zorc v. Jordan*, 76 So. 2d 768 (Fla. 4th DCA 2000) (statements about mayor who "influence[d]" property values, and whose actions were "unethical" and "perhaps illegal" were protected opinions); *see also Donald J. Trump for President*, 2021 WL 938979, at *1 (statement describing "unseemly" "quid pro quo deal" between Russia and Trump campaign associates was protected opinion). These expressions of opinion/editorial discretion, and others like them, should be dismissed with prejudice.

### D. Questions cannot be the basis of defamation claim.

Plaintiffs also identify a series of questions which are not actionable because, by definition, they are not <u>statements</u> of fact and cannot reasonably be interpreted to set forth

---

[15] Plaintiffs allege these statements also purportedly imply Sanchez is homosexual and are thus defamatory. [D.E. 1-2 ¶¶ 143, 144(d), 148(d)]. Although Plaintiffs' strained interpretation is unsupported by the publications, which refer to Sanchez's "complicit relationship with" Rossello, in any event imputations of homosexuality are simply not defamatory as a matter of law because they do not subject one to reputational injury, shame or ridicule. *Boehm v. Am. Bankers Ins. Grp., Inc.*, 557 So. 2d 91, 94-95 n. 1 (Fla. 3d DCA 1990) (collecting cases noting imputation of homosexuality, in view of the evolution of social mores, is not defamatory).

any fact that would defame Plaintiffs. *See* Publication 2-E (D.E. 1-2 ¶ 62(q)), 22-II, 23-JJ, and 24-KK). To support a claim for defamation, as discussed above, a statement must be one of fact, that is, able to be proved true or false. *Milkovich*, 497 U.S. at 21. Questions are not generally capable of being proved true or false and do not set forth a statement of fact unless they can be "reasonably read as an assertion of a false fact." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993); *Tesla, Inc. v. Tripp*, No. 3:18-cv-00296, 2020 WL 5570983, at *14 (D. Nev. Sept. 17, 2020) (finding question could not reasonably be read as assertion of fact). "[I]nquiry itself, however embarrassing or unpleasant to its subject, is not accusation. The language used cannot be tortured to make that certain which is in fact uncertain." *Chapin*, 993 F.2d at 1094.

Because questions must assert a false statement of fact to be actionable, posing questions rarely gives rise to a successful defamation claim. For example, in *Chapin*, the court found that the question "who will benefit more from the project, GIs or [Plaintiff]?" although provoking public scrutiny of the plaintiff's activities, could not be read to imply an assertion that the plaintiff was directly pocketing sales proceeds or was otherwise dishonest. *Id.*

Likewise, in *Abbas v. Foreign Policy Group, LLC*, the court declined to find questions asking whether the "sons of the Palestinian president [were] growing rich off their father's system" and "ha[d] enriched themselves at the expense of regular Palestinians…" gave rise to a defamation claim. 783 F.3d 1328, 1338-39 (D.C. Cir. 2015). In doing so, the court explained such genuine efforts to obtain information could not be defamatory and finding otherwise would "render legitimate reporting impossible." *Id.* at 1339; *see also Lucille Farms Prods., Inc. v. Dow Jones*, No. 19923/83, 11 Med. L. Rep. 2240, 2242 (Sup. Ct. N.Y. Cnty. June 3, 1985) (questioning whether plaintiff's business was linked to organized crime "makes no affirmative statement—at best it is to be construed as an opinion, or at worst a speculation").

As in *Chapin* and *Abbas*, the questions Plaintiffs challenge cannot reasonably be interpreted to be an assertion of a false and defamatory fact. Rather, they are inquiries seeking to elicit facts from Puerto Rico's former Secretary of Health (Publication 2-E (D.E. 1-2 ¶ 62(q)), Planning Board President (Publication 22-II), Secretary of Housing (Publication 23-JJ) and the interim Secretary of Health (Publication 24-KK), about Plaintiffs' relationship with Rossello and their lobbying efforts. Because the questions do not assert any false and

defamatory fact, Defendants are entitled to dismissal of Plaintiffs' claims premised on these questions as a matter of law.[16]

### E. *The July 17, 2019 publications are privileged.*

Finally, as noted above, Florida law requires a plaintiff to plead that a publication was not privileged to sustain a defamation claim. *Mile Marker*, 811 So. 2d at 845. When a media defendant republishes news reports from established news sources, the long-established privilege for republication, known as the "wire service defense," insulates the defendant from liability. The defense, which was adopted by the Florida Supreme Court in 1933, broadly protects a republication or rebroadcast of a news report "from a generally recognized reliable source of daily news . . . " *Layne v. Tribune Co.*, 146 So. 234, 238 (Fla. 1933).

For example, in *Layne*, the *Tampa Morning Tribune* was sued for libel for its republication of reports from the Associated Press and Universal Service about a Congressman, his secretary, the delivery of a trunk of liquor and allegations of illegally possessing alcohol. The Florida Supreme Court recognized that news outlets often rely on other generally recognized reliable sources of news in preparing their coverage and could not provide relevant information to readers without a republication privilege:

> No newspaper could afford to warrant the absolute authenticity of every item of its news, nor assume in advance the burden of specially verifying every item of news reported to it by established news gathering agencies, and continue to discharge with efficiency and promptness the demands of modern necessity for prompt publication, if publication is to be had at all.

*Id.* at 239. The court thus held that such reasonable reliance cannot form the basis for liability in defamation and affirmed the dismissal of the plaintiff's libel action. *Id.* at 238-39.

A privileged republication does not need to be a verbatim recitation if it is consistent with the original news story. In *MacGregor v. Miami Herald Publishing Co.*, the Second District of Florida analyzed whether the wire service defense precluded an action against the *Miami Herald* for republishing a news dispatch from United Press, with slight alterations and a

---

[16] These questions are likewise subject to dismissal because the publications in which they appear, as a whole, are incapable of defamatory meaning. To be sure, Defendants' questions were designed to probe Plaintiffs' involvement and relationship with Rossello's administration. That is what investigative journalists do, and these publications contain express denials from public officials which belie any defamatory suggestion Plaintiffs purport arise from the questions. *See* Publication 2-E, 22-II, 23-JJ, and 24-KK.

different headline. 119 So. 2d 85, 85 (Fla. 2d DCA 1960). The court found that the headline could not support a cause of action for libel because it was consistent with the United Press story. *Id.* at 88 (affirming summary judgment on this basis).

And although described as the "wire service" privilege, this defense is not limited to republication of information from an actual wire service. In *Nelson v. Associated Press, Inc.*, the court held that the defense applied to an article in *Newsweek*, which condensed and summarized "an array of other newspapers and wire service reports," making no differentiation between the newspaper reports relied upon and the wire service reports relied upon. 667 F. Supp. at 1475-77.

Here, Defendants' reporting on July 17, 2019, consisting of a web article (Publication 11-U), broadcast (Publication 11-U), and Facebook Live post (Publication 12-V), falls squarely within the wire service defense.[17] Defendants relied on CPI for their reporting. Plaintiffs themselves recognize this fact. *See* [D.E. 1-2 ¶¶ 138-139] (admitting statements were republication of CPI article). CPI is a recognized reliable news source.[18] Indeed, CPI has published hundreds of stories on varying issues of public concern in Puerto Rico and received numerous awards from professional journalism associations in Puerto Rico and abroad, including earning the 2020 Louis M. Lyons Award for Conscience and Integrity in Journalism at Harvard University for its reporting on TelegramGate, and the 2020 Park Center for Independent Media Izzy Award for its reporting on the Puerto Rico government's lack of

---

[17] Defendants did not publish the text of the web article found at the beginning of Plaintiffs' Exhibit U. The article was published online by Telemundo of Puerto Rico. It contained two embedded videos, the second of which, titled "Another bomb against the Governor," was published by Defendants. *See* Publication 11-U. Nevertheless, because both the web article and the broadcast are privileged under Florida's wire service defense, Defendants address both here.

[18] This Court may take judicial notice of the fact that CPI is a recognized online investigative news publication in Puerto Rico. *See* Fed. R. Evid. 201(b) (a court may take judicial notice of "a fact that is not subject to reasonable dispute" and is either "generally known within the trial court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

disaster preparedness.[19]

The CPI article was based on information provided by various sources and public records, and Defendants relied on the accuracy of the information contained in it. *See* Girones Decl. ¶ 24, Comp. Ex. C.[20] Indeed, the July 17, 2019 web article is a verbatim recitation of the CPI article, including the statements Plaintiffs challenge here. *Compare Id. with* Publication 11-U. Although the web article appeared with a different headline, the headline was consistent with the contents of the CPI story. *See MacGregor*, 119 So. 2d at 85. Therefore, the wire service privilege applies to it.

Likewise, a comparison of the CPI article and Defendants' July 17, 2019 broadcast and Facebook Live Post confirms Defendants provided a brief, consistent summary of the CPI article and repeatedly attributed the information to CPI. *Compare* Girones Decl. ¶ 24, Comp. Ex. C with Publication 11-U and 12-V. For example, the CPI article reported "at least four heads of agencies went directly to the Governor or his advisers in La Fortaleza to denounce these interventions by Sanchez since 2017, but the Governor never ordered an investigation or took action in this regard . . . In some instances, Sanchez faced resistance from agency secretaries." *See* Girones Decl. ¶ 24, Comp. Ex. C, p. 11. And the July 17, 2019 broadcast, relying on the CPI article, similarly reported "that Elias Sanchez would continually

---

[19] *See* Nieman Foundation, *Puerto Rico's Centro de Periodismo Investigativo receives 2020 Louis M. Lyons Award*, Jan. 27, 2020, available at https://nieman.harvard.edu/events/centro-de-periodismo-investigativo-receives-2020-louis-m-lyons-award/; *and* Park Center for Independent Media, *Izzy Awards 2020*, available at https://www.parkindymedia.org/izzy-awards-2020/#:~:text=The%20Izzy%20Award%2C%20created%20by,was%20held%20virtually%2C%20over%20Zoom. *See also* Online Journalism Awards, *Centro de Periodismo Investigativo Puerto Rico*, available at https://awards.journalists.org/organizations/centro-de-periodismo-investigativo-puerto-rico/ (naming CPI a finalist for both the 2019 Online Journalism Awards Excellence in Collaboration and Partnerships award, and the 2019 University of Florida's Award for Investigative Data Journalism, for its reporting on Hurricane Maria co-published with Associated Press and Quartz).

[20] A copy of the CPI article is attached to the Girones Declaration as Composite Exhibit C. The Court may consider the CPI article on this motion to dismiss because Plaintiffs refer to it in their Complaint, and it is central to Plaintiffs' claims that Defendants knowingly published unprivileged, false and defamatory statements concerning them. [D.E. 1-2 ¶¶ 138-139] (stating that Defendants "republi[shed] a story by [CPI]" and made "statements based also on the CPI story").

fight with agency heads when they didn't give his clients the contracts." Publication 11-U at p. 29. Similarly, in summarizing the CPI's reporting that "Sanchez, who has the closest ties to the Governor, controls most of the larger contracts, placing his clients in most of the agencies and charging commissions of up to 25% of the contract amounts and fixed retainers of up to $50,000 per month, indicated four sources that have witnessed the dynamic," (Girones Decl. ¶ 24, Comp. Ex. C, p. 11), the July 17, 2019 Facebook Live Post indicated "Sanchez, according to the [CPI], charged up to fifty-thousand dollars a month for lobbying contracts with the government and could charge commissions of up to twenty-five percent." Publication 12-V at p. 5.

Florida courts refuse to impose liability based, as here, solely on the republication of another news source's content. Defendants' reporting mirrors that of the *Tampa Morning Tribune*, the *Miami Herald* and *Newsweek* in the *Layne*, *MacGregor* and *Nelson* cases. As in those cases, dismissal of the claims related to the July 17, 2019 publications is required under the wire service defense.

## Conclusion

Plaintiffs' Complaint must be dismissed. The Complaint fails to comply with basic pleading requirements by failing to differentiate between the Plaintiffs or among the various defendants. Plaintiffs failed to comply with Section 770.01, Florida Statutes, with respect to a number of the statements. The remaining statements are either not of and concerning Plaintiffs, not defamatory as a matter of law or non-actionable opinion, questions and hyperbolic statements. And several publications are also privileged under Florida's wire service defense. Thus, Defendants respectfully request this Court dismiss Plaintiffs' Complaint.

## Request for Hearing

Pursuant to Local Rule 7.1(b)(2), and as stated in Defendant TM Television, Inc's Motion [D.E. 31], Defendants request a single hearing addressing all of the Defendants' motions to dismiss and the motion to transfer this action to Puerto Rico. Given the number of parties to this dispute, the number of statements at issue, and the complexity of the issues raised by the motions, Defendants believe oral argument will assist the Court in adjudicating the motions. Defendants believe 1.5 hours would be a sufficient allotment of time for the combined hearing.

Dated: April 2, 2021

Respectfully Submitted,

SHULLMAN FUGATE PLLC

**Deanna K. Shullman**
Deanna K. Shullman (Florida Bar No. 514462)
dshullman@shullmanfugate.com
Rachel E. Fugate (Florida Bar No. 144029)
rfugate@shullmanfugate.com
Giselle M. Girones (Florida Bar No. 124373)
ggirones@shullmanfugate.com
2101 Vista Parkway, Suite 4006
West Palm Beach, FL 33411
Tel: (561) 429-3619

*Attorneys for Defendants Josue Fonseca and*
*Jagual Media LLC*